IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| WILLIAM Z. WHITE | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| THE CITY OF GREENSBORO, | ) |
| ERIC G. SIGMON, in his individual and | ) |
| official capacity, | ) |
| JOHNNY L. RAINES, JR., in his | ) |
| individual and official capacity, | ) |
| WILLIAM B. BARHAM, in his individual | ) |
| and official capacity, | ) |
| BRIAN S. WILLIAMSON, in his individual | ) |
| and official capacity, | ) |
| JASON A. LOWE, in his individual and | ) |
| official capacity, | ) |
| B.J. BARNES, Sheriff of Guilford | ) |
| County in his official capacity, | ) |
| TRAVELERS CASUALTY AND SURETY COMPANY | ) |
| OF AMERICA | ) |
| JAMES MATTHEW STALLS, in his | ) |
| individual and official capacity, | ) |
| ELIZABETH M. BUSKIRK, in his | ) |
| individual and official capacity, | ) |
| DAVID W. COOK, in his individual and | ) |
| official capacity, | ) |
| HOMER F. WILKINS, in his individual | ) |
| and official capacity, | ) |
| THE CITY OF REIDSVILLE, | ) |
| LYNWOOD F. HAMPSHIRE, in his | ) |
| individual and official capacity, | ) |
| SHANNON C. COATES, in his individual | ) |
| and official capacity, | ) |
| ROBERT A HASSELL, in his individual | ) |
| and official capacity, | ) |
| THE CITY OF BURLINGTON, | ) |
| JAMES E. HINSON, JR., in his | ) |
| individual and official capacity, | ) |
| JAMES M. SHWOCHOW, in his individual | ) |
| and official capacity, | ) |
| ERIC A. WATKINS, in his individual and | ) |
| official capacity, | ) |

1:18-cv-00969

CODY A. WESTMORELAND, in his )
individual and official capacity, )
DON WAYNE SCOTT, JR., in his )
individual and official capacity, and )
JIM WESTMORELAND, in his individual )
and official capacity, )
LINDSAY MICHELLE ALBERT, in his )
individual and official capacity, )
                                     )
            Defendants.              )
_____ )
                                     )

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, Chief District Judge.

This lawsuit arises out of the arrest of Plaintiff William Z. White, when he was a Greensboro Police Department ("GPD") officer, and his subsequent firing. White claims that members of the Guilford County Sheriff's Office ("GCSO"), led in part by his brother-in-law, unfairly targeted him by wrongly convincing other law enforcement agencies that he had participated in illegal activity. White alleges multiple constitutional violations, via 42 U.S.C. § 1983, an unlawful taking under the Fifth and Fourteenth Amendments, violation of federal COBRA, 29 U.S.C. § 1166, state law torts of malicious prosecution, trespass, tortious interference with contract, and conspiracy, and violation of the North Carolina Constitution against twenty-four named Defendants across four law enforcement agencies:

- Members of the GCSO -- Sheriff B.J. Barnes in his official capacity; James Stalls, Elizabeth Buskirk, David Cook, and Homer Wilkins, all in their individual and official

capacities, and Travelers Casualty & Surety Company of America as issuer of the Sheriff's surety bond[1] ("GCSO Defendants");

- City of Greensboro and employees James Schwochow, Eric Sigmon, Johnny Raines, William Barham, Brian Williamson, Jason Lowe, Lindsay Albert, James Hinson, Don Wayne Scott, and Jim Westmoreland, all in their individual and official capacities ("Greensboro Defendants");

- City of Burlington and employees Cody Westmoreland and Eric Watkins, in their individual and official capacities ("Burlington Defendants"); and

- City of Reidsville and employees Lynwood Hampshire, Shannon Coates, and Robert Hassell, in their individual and official capacities ("Reidsville Defendants").[2]

---

[1] Therefore, to the extent Sheriff Barnes is dismissed from any causes of action, so will Travelers.

[2] The claims of the second amended complaint are designated as follows. First Cause of Action: Violation of 1983–City of Burlington, C. Westmoreland, and Watkins, Official Capacity; Second Cause of Action: Violation of 1983–City of Reidsville, Hampshire, Hassell, and Coates, Official Capacity; Third Cause of Action: Violation of 1983–City of Greensboro, Schwochow, Hinson, Sigmon, Raines, Barham, Williamson, Albert, and Lowe, Official Capacity; Fourth Cause of Action: Violation of 1983–Sheriff Barnes, Stalls, Cook, Wilkins, and Buskirk, Official Capacity; Fifth Cause of Action: Violation of 1983–Stalls Buskirk, Wilkins and Cook, Individually; Sixth Cause of Action: Violation of 1983–Hampshire and Coates, Individually; Seventh Cause of Action: Violation of 1983–C. Westmoreland and Watkins, Individually; Eighth Cause of Action: Violation of 1983–City of Greensboro, Schwochow, Hinson, Sigmon, Raines, Barham, Williamson, Albert, and Lowe, Individually; Ninth Cause of Action: Malicious Prosecution–Watkins, Westmoreland, Hampshire,

Before the court are the motions to dismiss by the GCSO
Defendants, Greensboro Defendants, and Burlington Defendants for
failure to state a claim upon which relief can be granted pursuant
to Federal Rule of Civil Procedure 12(b)(6).[3]  (Docs. 36; 43; 45;
47.)  Plaintiff responded but also moved for leave to file a second
amended complaint (Doc. 54), which the Defendants opposed.  (Docs.
68, 69, 70, 71.)  Following a hearing on these motions on September
10, 2019, the court granted Plaintiff's motion for leave to amend,
with the parties' agreement that the court will treat Defendants'
briefs in opposition to Plaintiff's motion for leave as supplements
to Defendants' pending motions to dismiss.  For the reasons that
follow, Defendants' motions will be granted in part and denied in
part.

## I.  BACKGROUND

The allegations of the second amended complaint, taken in the
light most favorable to White, show the following.

---

Stalls, Cook, Schwochow, Buskirk, Burlington, Reidsville, Sheriff
Barnes, and City of Greensboro; Tenth Cause of Action: Trespass – Sheriff
Barnes, Stalls, and Wilkins; Eleventh Cause of Action: Trespass – City
of Greensboro, Lowe, Sigmon, Raines, Barham, Schwochow, Albert,
Williamson, and City of Burlington; Twelfth Cause of Action: Trespass –
Hampshire and City of Reidsville; Thirteenth Cause of Action: COBRA–City
of Greensboro; Fourteenth Cause of Action: Taking–City of Greensboro;
Fifteenth Cause of Action: Tortious Interference with Contract Hinson,
Westmoreland, and Scott; Sixteenth Cause of Action: In the Alternative,
Violation of the North Carolina Constitution, All Defendants;
Seventeenth Cause of Action: Conspiracy.  (Doc. 81.)

[3] The Reidsville Defendants did not file a dispositive motion but instead
filed an Answer.  (Doc. 39.)

4

White, while employed as a GPD police officer (Doc. 81 ¶ 31), earned additional income by buying and reselling houses and certain equipment in his spare time. (Id. ¶ 32.). In August 2016, a Scott's Tractor store in Reidsville, North Carolina, reported a theft of nine mowers to the Reidsville Police Department ("RPD"). (Id. ¶ 34.) A few days later, on August 24, White unknowingly purchased and took possession of one of these stolen mowers. (Id. ¶ 35.) Before purchasing the mower, he told his brother-in-law, Defendant James Stalls, that he was considering buying the mower. (Id. ¶ 36.) Stalls, an officer in the GCSO (id. ¶ 17), was jealous of White's side business flipping houses and equipment, so much so that Stalls began to spread rumors within the GCSO and among local fire stations that White was either responsible for the mower thefts or was dealing with stolen equipment. (Id. ¶¶ 33, 41.)

White went on vacation with his family over the following Labor Day weekend, and while he was away Stalls entered his house, ostensibly to check on a pet at the request of White's wife, and investigated the mower White had recently purchased. (Id. ¶¶ 41, 43.) Stalls found the mower, removed the cover, and took photographs, including of the mower's vehicle identification number (also known as a VIN). (Id. ¶ 43.) Stalls then told GCSO Deputies Cook and Buskirk what he had done and provided the information he had obtained. (Id.) Stalls asked Cook to search the GCSO database for the mower's VIN, which both men knew was

prohibited by GCSO policy and procedure. (Id.) Because Stalls and Buskirk were engaged in an extramarital affair, Buskirk was motivated to share Stalls' jealousy and animosity toward White. (Id. ¶¶ 43, 41.)

As a result of the Scott's Tractor store theft and other lawn mower thefts in the area, a multi-department law enforcement effort developed. (Id. ¶ 39.) Buskirk, armed with the information Stalls provided from his search of White's home and Cook's VIN check, encouraged Defendant Hampshire, an officer of the RPD, to investigate White. (Id. ¶ 45.)

On September 15, 2016, White offered the mower for sale on Craigslist. (Id. ¶ 47.) David Terry and his wife contacted White four days later about purchasing the mower. (Id. ¶ 48.) Prior to the Terry's contact, however, they had received a text message containing a photo of "an engine number or serial number." (Id. ¶ 47.) White contends that one of the Defendants sent this text message to the Terrys. (Id. ¶ 51.)

The Terrys purchased and took possession of the mower on September 19. (Id. ¶ 48.) The next day, they told White they believed the mower was stolen, and although White disagreed, he advised them to report it to law enforcement if that was their conclusion. (Id. ¶ 50.)

The Terrys in fact contacted the Durham County Sheriff's Office ("DCSO") about the mower and provided a serial number. (Id.

¶ 52.)  That serial number, which ended in "866," was different from the VIN photographed by Stalls while in White's residence. (Id.)  DCSO determined that the "866" serial number was associated with one of the mowers stolen from Scott's Tractor, and informed RPD.  (Id. ¶ 53.)  The same day the Terrys reported the mower stolen, DCSO took possession of it and the RPD reported the mower as "recovered" in its database.  (Id. ¶¶ 53–54.)  On November 10, after law enforcement again met with the Terrys, Hampshire changed the VIN of the "recovered" mower in the law enforcement database to a number ending in "684."  (Id. ¶ 67.)  No law enforcement officer personally viewed the lawn mower to confirm the serial number.  (Id. ¶¶ 68, 73.)

As the investigation into the lawn mower thefts continued, Buskirk continued to push for officials to specifically investigate White, based on the information unlawfully obtained by Defendants Stalls and Cook.  (Id. ¶¶ 57, 60.)

In November 2016, Defendant Hampshire met with other law enforcement officers, including Buskirk, about the lawn mower thefts.  At this meeting, Buskirk identified White in a photograph and revealed that he was a GPD police officer.  (Id. ¶ 61.)  This led Hampshire to seek the involvement of the North Carolina State Bureau of Investigation ("SBI"), which assigned SBI Agent Denny to

assist in the investigation.[4]  (Id. ¶ 62.)

On November 2, 2016, Hampshire and Defendant Wilkins, a deputy with GCSO, went to White's residence where, without a warrant, they entered the garage and looked around, noting the presence of police equipment.  (Id. ¶ 63.)  A week later, Hampshire and SBI Agent Denny interviewed White regarding the sale of the lawn mower to the Terrys.  (Id. ¶ 66.)  During this interview, White stated that he did not believe the mower he purchased and sold to the Terrys was stolen, and he also told law enforcement that Stalls had been spreading unfounded rumors about him.  (Id.)

Between November 2016 and March 2017, the SBI, RPD, and BPD all worked cooperatively to investigate the lawn mower thefts, informally designating the investigation "Breaking Bad."  (Id. ¶¶ 70-71.)

Hampshire presented the evidence against White to district attorneys in Guilford and Rockingham Counties, but both declined to prosecute.  (Id. ¶¶ 75-76.)  On March 5, 2017, Hampshire applied for and obtained a warrant from a magistrate in Alamance County to search White's residence for records relating to the sale of the mower to the Terrys.  (Id. ¶ 74.)  The warrant was executed the next day, and members of various law enforcement agencies, including officers from both the GPD and BPD, participated. (Id.)

---

[4] No first name is alleged, but White has not alleged any cause of action against the SBI or Agent Denny in this suit.

Officers removed White's personal property as well as GPD property loaned to him. (Id. ¶ 81.) Among the seized items were firearms and silencers.

The same day as the search of White's home, White was arrested by Defendant Hinson of the GPD and his employment was terminated. (Id. ¶¶ 82, 97.) Although an arrest warrant had been drafted and prepared for a magistrate to execute, White was actually arrested before the warrant was approved.[5] (Id. ¶ 82.) According to White, although he was fired the same day he was arrested, the arrest was unprecedented as other GPD officers had been charged with serious offenses – including possession of child pornography – but were not terminated. (Doc. 81 ¶ 107.) Defendant Hinson, who effected the arrested, had urged Greensboro Defendants Don Wayne Scott and Jim Westmoreland to immediately fire White. (Id. ¶ 108.) White claims Hinson pressured Don Wayne Scott and Jim Westmoreland to terminate him because he had filed grievances against Hinson for unequal treatment. (Id. ¶¶ 108-09.)

The next day, March 7, Cody Westmoreland and SBI Agent Denny interviewed GPD Officer D.S. Rakes,[6] who falsely told them that White's arrest would make him homicidal (Id. ¶ 84). Without investigating the truthfulness of this claim, Westmoreland told

---

[5] White conceded at the hearing on these motions that Defendant Hinson had received notice of the unexecuted warrant prior to the arrest.

[6] Plaintiff has not sued Officer Rakes in this lawsuit.

Defendant Watkins. (Id.) Watkins, also without investigating the statement, included Rakes' statement in his criminal complaint charging White with federal firearms offenses. (Id. ¶¶ 85, 93.) The federal firearms charge was based on a serial number from one of the firearms seized from White's home that turned out to be incorrectly reported by Defendant Watkins. (Id. ¶ 93.) That same day, Agent Denny charged White with possession of weapons of mass destruction in Guilford County. (Id. ¶ 86.)

On March 8, GPD Defendant Schwochow wrongly determined that White had illegally possessed GPD equipment (id. ¶ 91) even though GPD's inventory system lacked the ability to distinguish between GPD-loaned equipment and equipment personally purchased and owned by White. (Id. ¶ 95). Schwochow reached this conclusion because he begrudged White's wife's refusal to provide after-school care for Schwochow's children. (Id. ¶ 92.) Agent Denny used this incorrect information to file charges against White for theft of GPD equipment. (Id. ¶¶ 94, 96.) Following White's arrest, "various Defendants" appeared on television to speak about the arrest of a police officer to promote themselves and to further their careers. (Id. ¶ 101.)

On June 19, 2017, U.S. District Judge Loretta C. Biggs of this court determined in White's federal criminal case that his motion to suppress should be granted, finding that the firearms seized during the March 6 search of White's residence (for

materials related to the mower theft) could not be justified on the plain view doctrine, as asserted. (Id. ¶ 78.) United States v. White, 1:17-cv-94-1, 2017 WL 2633521 at *7–8 (M.D.N.C. June 19, 2017). Judge Biggs' opinion also noted that in his search warrant application, Defendant Hampshire had attributed misleading statements to White (from their November 9, 2016 interview).[7] White, 2017 WL 2633521, at *6 ("There is little question that the statement made by . . . Hampshire . . . was intended to mislead the judge into believing [Plaintiff] had admitted to stealing [the lawn mower].").  Judge Biggs found a Franks[8] hearing unnecessary, however, because she granted the motion to suppress based on the government's failure to demonstrate that the firearms were seized in plain view.  Id.  Following this decision, the Government dismissed all criminal charges against White.  (Doc. 81 ¶ 98.)

## II.  ANALYSIS

### A.  Standard of Review

Federal Rule of Civil Procedure 8(a)(2) provides that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P.

---

[7] Specifically, the court found that Hampshire had reported in the warrant affidavit: "During the interview William White made the comment 'he was here to talk about the mower he stole[.]'  He immediately recanted the stole to say sold."  Judge Biggs found that such representation failed to acknowledge that White was responding to a question posed to him. White, 2017 WL 2633521, at *6.

[8] Franks v. Delaware, 438 U.S. 154 (1978).

8(a)(2).   Under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).[9]  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.  In considering a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint," Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam), and all reasonable inferences must be drawn in the plaintiff's favor.  Ibarra v. United States, 120 F.3d 472, 474 (4th Cir. 1997).  "Rule 12(b)(6) protects against meritless litigation by requiring sufficient factual allegations 'to raise a right to relief above the speculative level' so as to 'nudge[] the[] claims across the line from conceivable to plausible.'"  Sauers v. Winston-Salem/Forsyth Cty. Bd. of Educ., 179 F. Supp. 3d 544, 550 (M.D.N.C. 2016) (alterations in original) (quoting Twombly, 550 U.S. at 555).  "[T]he complaint must 'state[] a plausible claim for relief' that permit[s] the court to infer more

---

[9] To the extent Defendants move to dismiss based on sovereign immunity, that raises an issue of personal jurisdiction such that Federal Rule of Civil Procedure 12(b)(2) is the proper vehicle.  Simmons v. Corizon Health, Inc., 122 F. Supp. 3d 255, 268 (M.D.N.C. 2015).  Thus, any motion to dismiss based on sovereign immunity will be considered under Rule 12(b)(2).

than the mere possibility of misconduct' based upon 'its judicial experience and common sense.'" <u>Coleman v. Md. Ct. App.</u>, 626 F.3d 187, 190 (4th Cir. 2010) (alterations in original) (quoting <u>Iqbal</u>, 556 U.S. at 679). Thus, mere legal conclusions are not accepted as true, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." <u>Iqbal</u>, 556 U.S. at 678.

**B. GCSO Defendants**

White alleges that the GCSO Defendants violated his Fourth and Fifth Amendment rights in both their official and individual capacities, maliciously prosecuted him, and trespassed on his property. Alternatively, he alleges that the GCSO Defendants violated his rights under the North Carolina Constitution. Each claim will be considered in turn.

**1. Section 1983 Official Capacity Claims**

White alleges that all GCSO Defendants, acting in their official capacity, deprived him of his Fourth and Fifth Amendment rights in violation 42 U.S.C. § 1983. (Doc. 81 ¶¶ 133-39.) GCSO Defendants argue that White has failed to sufficiently allege the existence of an official policy, practice, or custom to establish liability under an official capacity theory. (Doc. 37 at 11-12.) Furthermore, GCSO Defendants argue that the official capacity claims alleged against the individual officers must be dismissed because they are duplicative, as official capacity claims against

agents are understood to be claims against the entity for which the agents act. (Id. at 11.)

White's Fourth Amendment claim refers to Defendants Stall's and Wilkins' separate warrantless searches of White's residence, as well as Defendants Buskirk and Cook's use of the information gained from Stall's warrantless search even though both were aware the information had been gathered unlawfully. Apart from a general reference to a due process violation, White does not further articulate his Fifth Amendment claim. (Doc. 81 ¶¶ 134, 136.) Due process claims under the Fifth Amendment apply to federal actors, whereas due process claims under the Fourteenth Amendment apply to state actors. See United States v. Al-Hamdi, 356 F.3d 564, 573 n.11 (4th Cir. 2004). The standard of review for the two types of due process challenges does not differ. Id. The court therefore construes White's Fifth Amendment due process challenges as being brought under the Fourteenth Amendment's due process clause.

To succeed on a § 1983 claim against a municipality or municipal agency, a plaintiff must demonstrate a constitutional violation as a result of official policy, practice, or custom. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978). A policy, practice, or custom for which a municipality may be held liable can arise in four ways: "(1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3)

14

through an omission, such as a failure to properly train officers, that 'manifest[s] deliberate indifference to the rights of citizens'; or (4) through a practice that is so 'persistent and widespread' as to constitute a 'custom or usage with the force of law.'" Lytle v. Doyle, 326 F.3d 463, 471 (4th Cir. 2003) (alteration in original) (quoting Carter v. Morris, 164 F.3d 215, 218 (4th Cir. 1999)).

White has not plausibly stated a claim meeting this standard. His claims arise out of actions taken against him specifically; he has not alleged that any of the GCSO Defendants regularly engaged in similarly unlawful conduct as to other citizens. The factual allegations do not show that the existence of an express policy instituted by the GCSO, nor do they show Sheriff Barnes, as a final policymaking authority, made decisions that violated White's rights. Furthermore, there is no allegation regarding Barnes' failure to train officers, nor does White sufficiently plead facts indicating the existence of a persistent and widespread practice by the GCSO. White's incantation of the legal standard for a Monell claim is insufficient, as a mere conclusion of law. See Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc, 591 F.3d 250, 255 (4th Cir. 2009) (interpreting Iqbal v. Ashcroft, 556 U.S. 662 (2009) to mean that conclusory restatements of the elements of a claim are not considered in ruling on a 12(b)(6) motion to dismiss). Because White has not alleged facts sufficient to render

such a claim under Monell plausible, his official capacity claims against Sheriff Barnes will be dismissed.

The claims against the other GCSO officers in their official capacity must also be dismissed because suits against governmental officers in their official capacity are treated as suits against the government. Hafer v. Melo, 502 U.S. 21, 25 (1991). "Because the real party in interest in an official-capacity suit is the governmental entity and not the named official, 'the entity's "policy or custom" must have played a part in the violation of federal law.'" Id. (quoting Kentucky v. Graham, 473 U.S. 159, 167 (1985)). Therefore, the "immunities available to the defendant in an official-capacity action are those that the governmental entity possesses." Id. at 26. White has not alleged additional facts that would show these individual Defendants followed an official policy or custom in committing constitutional violations. White acknowledges that his official capacity § 1983 claims against the individual GCSO Defendants are duplicative. (Doc. 55 at 17.) Moreover, his claims suffer from an additional problem. "[S]tate officials, sued for monetary relief in their official capacities" are not "persons subject to suit under § 1983." Id. (citing Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989)). White seeks only monetary damages for his official capacity claims, not

injunctive or equitable relief.[10]  For all these reasons, the § 1983 official capacity claims against the individual GCSO officers will be dismissed as well.

### 2.    Section 1983 Individual Capacity Claims

White alleges Defendants Stalls, Buskirk, Cook, and Wilkins, in their individual capacity, violated his constitutional rights under § 1983.  Specifically, White points to Stalls's and Wilkins's warrantless searches of his residence.  As to Buskirk and Cook, he cites their use of information from Stalls's warrantless search -- knowing that it had been obtained illegally -- to target him in the lawn mower theft investigation.  GCSO Defendants argue generally that their actions did not proximately cause White any injury.  They also assert that Cook and Buskirk are entitled to qualified immunity.

### a.    Stalls

White alleges that Stalls violated his Fourth Amendment rights by performing a warrantless search of his residence while he and his family were away on vacation.

The Fourth Amendment protects against "unreasonable searches and seizures."  U.S Const. amend. IV.  Although GCSO Defendants do not contest that Stalls' search of White's home violated his Fourth Amendment rights, they seek dismissal on the contention that the

---

[10] White seeks monetary damages for all of his official capacity claims. (Doc. 81 ¶¶ 118, 125, 132, 139.)

search did not proximately cause White any harm.  They argue that none of the warrants executed against White in the investigation used any of the information Stalls found in the garage.  Rather, the warrants came from an independent source – namely, the Terrys – and as a result, White cannot recover compensatory damages from Stalls.

Section 1983 creates tort liability "in favor of persons who are deprived of 'rights, privileges, or immunities secured' to them by the Constitution."  Memphis Cmty. Sch. Dist. v. Stachura, 477 U.S. 299, 305–06 (1986) (quoting Carey v. Piphus, 435 U.S. 247, 253 (1978)).  Section 1983 damages are intended to compensate an individual for the injuries they suffer as a result of a constitutional violation.  Id. at 306.  "Where no injury [is] present, no 'compensatory' damages could be awarded."  Id. at 308.  White's theory, however, asserts that the actions of the GCSO Defendants preceded any information the Terrys provided and that the GCSO Defendants' actions prompted law enforcement to investigate White.  Even if Defendants are correct that White cannot show any compensatory damage -- a fact-bound determination not normally suitable for resolution at this early stage -- Defendants acknowledge that he would nevertheless be entitled to nominal damages.  See Carey, 435 U.S. at 266-67.  Therefore, GCSO Defendants' motion as to White's § 1983 claim against Stalls in his individual capacity will be denied.

### b.  Cook and Buskirk

Because the GCSO Defendants' factual allegations against Defendants Cook and Buskirk are similar, the court will consider the motion to dismiss Plaintiff's § 1983 individual capacity claims as to those Defendants together.

According to the second amended complaint, Stalls told Cook about his warrantless search of White's residence and gave Cook the serial number from the mower stored in the garage. (Doc. 81 ¶ 43.) Cook then allegedly proceeded to search that serial number in the GCSO database and provided the results –- indicating that the mower was stolen from Scott's Tractor –- to Buskirk. Buskirk, knowing that Stalls obtained the mower's serial number during a warrantless search, passed the information garnered from Cook's investigation to other law enforcement officials in hopes that White would be further targeted by the investigation. (Id. ¶¶ 60, 141.) Thus, Cook and Buskirk allegedly violated White's constitutional rights by furthering the investigation against him, even though both knew the information had been discovered through unconstitutional means. (Id. ¶ 141.) The GCSO Defendants argue that the deputies' actions were not the proximate cause of White's alleged harms and, in the alternative, that both officers are entitled to qualified immunity.

Qualified immunity shields government officials performing discretionary functions from personal liability for civil damages

under § 1983, so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Ridpath v. Bd. of Governors Marshall Univ., 447 F.3d 292, 306 (4th Cir. 2006) (quoting Wilson v. Layne, 526 U.S. 603, 609 (1999)). Officials are entitled to immunity unless the § 1983 claim satisfies a two-prong test: (1) the allegations, if true, substantiate a violation of a federal statutory or constitutional right, and (2) the right was "clearly established" such that a reasonable officer would have known his acts or omissions violated that right. Id. Under the first prong, a plaintiff must sufficiently allege that an officer's actions amount to a violation of a federal statutory or constitutional right. Id. at 307. Under the second prong, an alleged constitutional right is clearly established if, according to pre-existing law, "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). The phrase "clearly established" depends on the "level of generality at which the relevant 'legal rule' is to be identified." Id. at 639. Therefore, unlawfulness must be apparent, but the test does not require that "the very action in question has previously been held unlawful." Wilson v. Layne, 526 U.S. 603, 615 (1999) (quoting Anderson, 483 U.S. at 640). This determination is to be assessed at the time an action occurred under an objective

reasonableness standard. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The court may consider the prongs in either order, as a plaintiff's failure to satisfy either requires that the officer receive immunity. Pearson v. Callahan, 555 U.S. 223, 236 (2009).

White's Fourth Amendment claim is predicated on these Defendants' use of information gained from Stalls' presumptively unconstitutional search. White cites United States v. Calandra, 414 U.S. 338, 347 (1974), in support of his contention that evidence traced to an unlawful search is excludable as fruit of the poisonous tree. (Doc. 55 at 17.) But Calandra cabined, not expanded, the application of the rule, refusing to extend the exclusionary rule to a grand jury witness and noting that the remedy was not "a personal constitutional right of the party aggrieved." Calandra, 414 U.S. at 348. The parties have not cited any case that utilizes Calandra to show the existence of a Fourth Amendment violation as a basis for denying qualified immunity in a § 1983 claim, nor is the court aware of any.

To the contrary, while White's understanding of the exclusionary rule is correct in so far as it applies to criminal cases, it is clear that the exclusionary rule and the fruit of the poisonous tree doctrine simply do not apply in civil cases. Ware v. James City Cty., 652 F. Supp. 2d 693, 705-06 (E.D. Va. 2009) ("In other words, for this court to exclude the evidence of Plaintiff's criminal activity found by [the police officer] during

the (albeit unreasonable) search would be to apply to exclusionary rule to this civil case," which the Supreme Court has never done.") (quoting Nixon v. Applegate, No. 2:06-2560-CMC-RSC, 2008 WL 471677, at *4 (D.S.C. Feb. 19, 2008)), aff'd, 380 F. App'x 274 (4th Cir. 2010); Townes v. City of New York, 176 F.3d 138, 149 (2d Cir. 1999) (noting that "the fruit of the poisonous tree doctrine is not available to assist a § 1983 claimant"). Thus, the "use of fruits of a past unlawful search or seizure 'work[s] no new Fourth Amendment wrong.'" United States v. Leon, 468 U.S. 897, 906 (1984) (alteration in original) (quoting Calandra, 414 U.S. at 354).

In light of the applicable law, it is apparent that White has failed to satisfy the first prong of the qualified immunity analysis. Therefore, Buskirk and Cook are entitled to qualified immunity as to these § 1983 individual capacity claims, which will be dismissed.

### c. **Wilkins**

Wilkins accompanied Defendant Hampshire of the RPD to White's residence, where they performed a cursory search of the garage without a warrant, observing various property, including what appeared to be police equipment. (Doc. 81 ¶ 63.) GCSO Defendants make the same arguments for Wilkins as they do for Stalls. For the same reasons described in Stalls' analysis above —- namely that proximate cause is a fact-bound inquiry and GCSO Defendants acknowledge that at least a nominal damage claim exists —- GCSO

Defendants' motion to dismiss White's § 1983 claim as to Wilkins will be denied.

### d.  Due Process Claims

White also generally alleges that the GCSO Defendants, in their individual capacities, violated his due process rights. Courts have consistently held, however, that the Due Process Clause "is not the proper lens through which to evaluate law enforcement's pretrial missteps" when the Fourth Amendment provides a textual source of constitutional protection.  Safar v. Tingle, 859 F.3d 241, 245 (4th Cir. 2017); see also Graham v. Connor, 490 U.S. 386, 395 (1989); Evans v. Chalmers, 703 F.3d 636, 646 n.2 (4th Cir. 2012).  White's § 1983 claims against Stalls and Wilkins clearly fall under the Fourth Amendment, as their actions were searches as understood by the Fourth Amendment.  Any due process claims against them will therefore be dismissed.

While the claims against Cook and Buskirk do not fall under the Fourth Amendment, they may fall under the Fourteenth Amendment's guarantee of due process, although White does not clarify whether the alleged violation is one of procedural or substantive due process.  Procedural due process appears inapplicable given the circumstances of Cook and Buskirk's actions.  See Snider Int'l Corp. v. Town of Forest Heights, Md., 739 F.3d 140, 145-46 (4th Cir. 2014) (describing the distinction between substantive and procedural due process).  One's

substantive due process rights are not violated "whenever someone cloaked with state authority causes harm." Cty. of Sacramento v. Lewis, 523 U.S. 833, 848 (1998). Rather, the executive action in question must be "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." Hawkins v. Freeman, 195 F.3d 732, 738 (4th Cir. 1999) (quoting Lewis, 523 U.S. at 847 n.8). The test remains "an admittedly imprecise one in formulation." Id. at 741. "Of primary importance" is the fact that the standard derives ultimately from the "'touchstone of due process [which] is protection of the individual against arbitrary action of government.'" Id. at 742 (quoting Lewis, 523 U.S. at 847). "As applied to claims of executive-act violations, it therefore seeks to determine as a threshold matter whether the executive conduct challenged was 'fatally arbitrary' in this constitutional sense." Id. Intentional conduct alone will not meet this test; rather, the conduct must be "intended to injure in some way *unjustifiable by any government interest*." Id.

White's allegations against Buskirk and Cook fail to meet this stringent standard. Cook allegedly investigated whether the serial number discovered during an allegedly unlawful search related to a stolen mower, and Buskirk allegedly passed to other law enforcement the fact that the number matched one of the stolen mowers. Their conduct was not unjustifiable by a government interest. Indeed, they were attempting to investigate a theft.

Therefore, it cannot be said to be so outrageous as to shock the conscience and therefore violate substantive due process. Having failed to satisfy the first prong of a qualified immunity analysis that Buskirk's or Cook's actions violated his constitutional rights, White's due process claims against them will therefore be dismissed.

### 3. Malicious Prosecution

White alleges generally that GCSO Defendants maliciously prosecuted him in connection with the mower investigation.

White has indicated in the case caption that the Defendants are sued in both their individual and official capacities, and he seeks compensatory and punitive damages. So, the court construes White to have sued all officers in both their official and individual capacity. Doe v. Durham Pub. Schs. Bd. of Edu., 1:17cv773, 2019 WL 331143, at *7 (M.D.N.C. Jan. 25, 2019) (quoting White v. Trew, 736 S.E.2d 166, 167 (N.C. 2013)).

An official-capacity state law claim against individual officers, however, is construed as a claim against the municipality or, in the GCSO's case, the Sheriff's office. See Meyer v. Walls, 489 S.E.2d 880, 888 (N.C. 1997) (municipality); Simmons, 122 F. Supp. 3d at 267 (sheriff's office). These official capacity claims are "subject to the same jurisdictional" rules as the suits against the governmental entities. Meyer, 489 S.E.2d at 888. Thus, if the governmental entity enjoys sovereign immunity and cannot be

sued, the state tort claims against the officers named in their official capacities must likewise be dismissed.

Generally, a municipality "is immune from torts committed by an employee carrying out a governmental function" unless the municipality waives its immunity by purchasing liability insurance. Turner v. City of Greenville, 677 S.E.2d 480, 483 (N.C. Ct. App. 2009) (quoting Schmidt v. Breeden, 517 S.E.2d 171, 174 (N.C. Ct. App. 1999)); see also N.C. Gen. Stat. § 153A-435(a). White has alleged that the GCSO, City of Greensboro, and City of Burlington have all purchased liability insurance such that they have waived sovereign immunity. (Doc. 81 ¶ 29.) Only Greensboro has contested this assertion, presenting the entirety of its insurance policy. (Doc. 66 at 4-5, Ex. A.) So, as to GCSO, the court must proceed to determine whether White has stated a claim.

As he does against many Defendants, White alleges a state law malicious prosecution claim against GCSO Defendants Stalls, Cook, and Buskirk in their individual and official capacities.[11] To make out a malicious prosecution claim under state law, White must show that a defendant "(1) instituted, procured or participated in the criminal proceeding against [the] plaintiff; (2) without probable cause; (3) with malice; and (4) the prior proceeding terminated in favor of [the] plaintiff." Moore v. Evans, 476 S.E.2d 415, 421

---

[11] Plaintiff also names Sheriff Barnes as vicariously liable in his official capacity for the malicious prosecution claim.

(N.C. Ct. App. 1996) (alterations in original) (quoting Williams v. Kuppenheimer Mfg. Co., Inc., 412 S.E.2d 897, 899 (N.C. Ct. App. 1992)).

Under North Carolina law, the first element of a malicious prosecution claim requires that a "criminal proceeding" be brought against a plaintiff.  Id.  White claims that five of the criminal proceedings instituted against him form the grounds for the malicious prosecution claims against the GCSO Defendants named in this cause of action.  These five proceedings are: (1) the search of his residence pursuant to the search warrant dated March 6, 2017, whose application was authored by Defendant Hampshire (Doc. 37 Ex. 7); (2) his arrest by Defendant Hinson based on the later-issued arrest warrant whose application was authored by Defendant Westmoreland for the felony charges of possession of stolen goods and obtaining property under false pretenses; (Id. Ex. 1); (3) the arrest warrant whose application was authored by SBI Agent Denny for two felony charges of possession of weapons of mass destruction dated March 7, 2017 (Id. Ex. 2); (4) the federal criminal complaint sought by Defendant Watkins dated March 10, 2017, charging White with possession of an unregistered firearm (Doc. 37, Ex. 3; Doc. 44, Ex. E); and (5) the arrest warrant for felony larceny of GPD equipment dated March 23, 2017, whose application was authored by SBI Agent Denny (Id. Ex. 5).

White argued at hearing on these motions that the GCSO's

contribution of ill-gotten information to law enforcement officers provided enough evidence for law enforcement to receive a search warrant for his residence on March 6, 2017 -- the first criminal proceeding described above.  The GCSO Defendants did not provide any information to law enforcement after the search of White's residence and his arrest on March 6.  According to White however, because the other criminal proceedings arose from the results of the March 6 search, the GCSO Defendants remain liable under a malicious prosecution theory for those proceedings.  This means, however, that the inverse of White's theory is also true: if White fails on his malicious prosecution claim as to the first criminal proceeding, the GCSO Defendants cannot also be liable for the remaining proceedings brought against him because they provided no additional information that contributed to those proceedings.

The first element of a malicious prosecution claim requires a showing that a defendant instituted, procured, or participated in a criminal proceeding against White.  Although none of the GCSO Defendants directly instituted these proceedings by either arresting White or authoring the warrant application, it is unnecessary for an individual to be directly involved for a malicious prosecution claim to satisfy the first requirement.  Lopp v. Anderson, 795 S.E.2d 770, 780 (N.C. Ct. App. 2016).  Rather, "where 'it is unlikely there would have been a criminal prosecution of [a] plaintiff' except for the efforts of a defendant," a genuine

issue of material fact exists regarding the first requirement of a malicious prosecution claim.  Becker v. Pierce, 608 S.E.2d 825, 829 (N.C. Ct. App. 2005) (alteration in original) (quoting Williams, 412 S.E.2d at 900).  White's theory is that the investigation into his actions was initiated and exacerbated by the GCSO Defendants such that without their unconstitutional actions, he would not have been subjected to any criminal proceedings.

The court can assume, without deciding, that this is sufficient at this early stage to meet the first prong of a malicious prosecution claim, because White has failed to satisfy the second element -- that without the unlawfully obtained information, probable cause did not exist for Hampshire's warrant application that culminated in the March 6 search of White's residence.  A successful malicious prosecution claim requires a proper allegation that the criminal proceeding at issue lacked probable cause.  See Moore, 476 S.E.2d at 421-22.  Determining the existence of probable cause is an objective test that considers "whether the facts and circumstances, known at the time, were such as to induce a *reasonable* police officer to arrest, imprison, and or/prosecute another."  Id. at 422.  There are two elements to White's argument.  First, he argues that the unconstitutionally-obtained information gathered by the GCSO Defendants motivated the investigation into him such that, had the GCSO Defendants not

provided that information, he would not have been investigated. This theory fails, however, because the Terrys independently provided information to law enforcement based on their belief that the lawn mower they had purchased from White was stolen.[12]  Even if the GCSO Defendants convinced other law enforcement officers to target White, the Terrys provided more than ample reason to provide the investigation with enough evidence to reasonably believe that White may have possessed a stolen mower or knowingly sold one under false pretenses.[13]

Second, White argues that Judge Biggs' suppression order (Doc. 55 Ex. A) (<u>United States v. White</u>, 1:17-cv-94-1, 2017 WL 2633521 (M.D.N.C. June 19, 2017)), clearly indicates that Hampshire's search warrant for his residence contained false representations that materially affected the existence of probable cause.  (Doc. 55 at 12.)  Although Judge Biggs determined that Hampshire's false or misleading statement "was material to the

---

[12] White claims that the Terrys received a photo of an "engine number or serial number" before contacting him about purchasing the mower. (Doc. 81 ¶ 47.)  Additionally, he claims that "one or more Defendants provided a list of all serial numbers" of the stolen mowers to the Terrys.  (<u>Id.</u> ¶ 51.)  White named over twenty Defendants in this action, but there is no indication which provided the serial numbers, and there is certainly not enough in the second amended complaint to suggest that one of the GCSO Defendants did so.

[13] The criminal law permits knowledge to be shown by "willful blindness," where actual knowledge may be less than apparent.  <u>State v. Boyle</u>, 376 S.E.2d 745, 747-48 (N.C. 1989) (providing the elements of willful blindness and noting that the "circumstances from which knowledge may be inferred is far broader than the limited concept of willful blindness").

state court's finding of probable cause," that does not end the inquiry. See White, 2017 WL 2633521, at *6. Even excising Hampshire's statement in paragraph 14 of the search warrant application (Doc. 37 Ex. 7), probable cause still existed for the warrant. Probable cause refers to the "existence of such facts and circumstances, known to [the defendant] at the *time*, as would induce a reasonable man to *commence* a prosecution." Turner v. Thomas, 794 S.E.2d 439, 444 (N.C. 2016) (alteration in original) (quoting Best v. Duke Univ., 448 S.E.2d 506, 510 (N.C. 1994)). If the problematic facts described in Judge Biggs' suppression order are removed from consideration, the remaining facts as alleged by White show that the Terrys purchased a lawn mower from him, suspected it was stolen, reported that suspicion to law enforcement, and identified White as the seller. (Doc. 37 Ex. 7 ¶¶ 2-9.) The VIN number the Terrys provided (which was not the number Stalls found) indicated that the mower was stolen. The search warrant application also notes that the location where White reported he had purchased the lawn mower – a parking lot of a lawn and garden store - was not large enough for the sale he described, nor did the retailer, who law enforcement interviewed, believe he would have permitted such a sale, had it actually occurred. (Id. Ex. 7 ¶¶ 14-15.) None of this information was supplied by GCSO Defendants. Therefore, even if GCSO Defendants were motivated by ill-will toward White and the information White challenges were

excluded, White has failed to show that the search warrant for his house otherwise lacked probable cause.

As a result, White's malicious prosecution claim fails as to the search warrant for his residence. Because this is the only criminal proceeding for which the GCSO allegedly provided information, the malicious prosecution claims that arose as a result of the March 6 search must also fail. Therefore, the malicious prosecution claims as to the GCSO Defendants in both their individual and official capacities will be dismissed.[14]

### 4. Trespass

White alleges that GCSO Defendants Stalls and Wilkins trespassed on his property. (Doc. 81 ¶¶ 196–97.) He further alleges that Sheriff Barnes is liable for these trespasses on a respondeat superior theory. (Id. ¶ 200.) Because the GCSO Defendants did not seek dismissal of this claim (Doc. 37 at 22–23), it will remain.

### 5. North Carolina Constitutional Violations

White claims in the alternative that all Defendants "violated [his] rights under the North Carolina Constitution." (Doc. 80 ¶ 248.) Specifically, Sheriff Barnes, Stalls, Cook, Wilkins, and Buskirk violated his rights under Article 1 § 19 by depriving him

---

[14] Because Sheriff Barnes was sued in his official capacity on the malicious prosecution claim on a respondeat superior theory, the malicious prosecution claim against him will likewise be dismissed.

of his liberty and property. He also alleges that the GCSO Defendants "entered onto Plaintiff's property on more than one occasion, without permission, making illegal searches thereof," thus violating his state constitutional rights. (Id. ¶ 249.)

"[A] direct cause of action under the State Constitution is permitted only 'in the absence of an adequate state remedy.'" Davis v. Town of S. Pines, 449 S.E.2d 240, 247 (N.C. Ct. App. 1994) (quoting Corum v. Univ. of N.C. ex rel. Bd. of Governors, 413 S.E.2d 276, 289 (N.C. 1992)). Thus, the availability of a direct cause of action under the North Carolina Constitution depends on the injury White seeks to be remedied, and whether a state law claim is available to him. Notably, an adequate state remedy refers to the "possibility of relief," and it is not necessary that a plaintiff prevail on his other state law claims. Craig ex rel. Craig v. New Hanover Cty. Bd. of Educ., 678 S.E.2d 351, 355 (N.C. 2009). Furthermore, "the affirmative defense of public official immunity does not render common law tort claims inadequate," for purposes of this consideration. DeBaun v. Kuszaj, 767 S.E.2d 353, 357 (N.C. Ct. App. 2014).

White has alleged state claims against the GCSO Defendants for his injuries: malicious prosecution and trespass, and conspiracy to commit the same. At the hearing on these motions, he asserted that the malicious prosecution claims against the GCSO Defendants applied to all five criminal proceedings against him.

He reasons that, but for GCSO Defendants' actions, the search of his residence –- where law enforcement found the evidence for the other criminal proceedings against him –- would never have occurred and he would not have been subjected to the other proceedings. Under this theory, White has an adequate state remedy for all injuries he has suffered. Therefore, his claims under the North Carolina Constitution against the GCSO Defendants will be dismissed.

### C. Greensboro Defendants

White brings eight different causes of action against various Defendants grouped together as "Greensboro Defendants," including the City of Greensboro.

### 1. Section 1983 Official Capacity Claims

White alleges numerous constitutional violations against the Greensboro Defendants in their official capacity. (Doc. 81 ¶¶ 126–32.) These claims are analyzed under the legal standard for official capacity claims described in the analysis of the similar claims brought against the GCSO Defendants, and they fail for the same reasons. White's complaint merely reiterates the legal standard under Monell (id. ¶ 127) but does not allege any factual support for an official policy, practice, or custom as to the alleged unconstitutional actions of the Greensboro Defendants. Contrary to White's argument, the fact that "many GPD officers . . . participated in the [alleged] unlawful search," is

legally insufficient to meet the _Monell_ standard. (Doc. 62 at 11.) Therefore, as with the similar official capacity claims against the GCSO Defendants, the motion to dismiss the § 1983 claim against the City of Greensboro and § 1983 official capacity claims against the Greensboro Defendants will be granted.

### 2. Section 1983 Individual Capacity claims

White claims that the Greensboro Defendants, acting in their individual capacity, violated his Fourth Amendment and due process rights.[15] He alleges two distinct constitutional torts committed by two separate groups: first, he alleges that GPD officers Schwochow, Sigmon, Rains, Barham, Williamson, Albert, and Lowe ("Greensboro Search Officers") violated his Fourth Amendment rights by helping to perform the March 6 search of his residence. Second, he claims that Defendant Hinson falsely arrested him, or arrested him without probable cause.

### a. Greensboro Search Officers

White's complaint alleges that the Greensboro Search Officers entered his residence and removed his personal property without permission or warrant in violation of his constitutional rights. The Greensboro Search Officers assert qualified immunity.

As noted above, to overcome the application of immunity, White

---

[15] As with his § 1983 claims against GCSO Defendants, White's Fifth Amendment due process claims will be construed as Fourteenth Amendment due process claims.

must allege the violation of a clearly established constitutional right.  Ridpath, 447 F.3d at 306.  White argues that these Defendants committed a constitutional violation by entering his home without permission or a warrant and seizing his personal possessions.  He claims they violated North Carolina law, specifically, N.C. Gen. Stat. § 15A-247, which states "[a] search warrant may be executed by any law-enforcement officer acting within his territorial jurisdiction, whose investigative authority encompasses the crime . . . involved." (Doc. 61 at 11.)  White's theory is that the GPD's jurisdiction does not include his residence, which is located in Pleasant Grove, North Carolina, and by acting outside their jurisdiction, the Greensboro Search Officers violated his rights.

Even assuming the Greensboro Search Officers did violate White's constitutional rights,[16] those rights were not clearly established at the time of the search, so the officers would still be entitled to qualified immunity.  The lone case cited by White

_____

[16] To be held liable under a § 1983 individual capacity theory, it must be "affirmatively shown that [an] official charged acted personally in the deprivation of the plaintiff's rights" such that the defendant "had personal knowledge of and involvement in the alleged deprivation of [plaintiff's rights]."  Wright v. Collins, 766 F.2d 841, 850 (4th Cir. 1985) (quoting Vinnedge v. Gibbs, 550 F.2d 926, 928 (4th Cir. 1977)).  The Fourth Circuit has held that when an officer acts pursuant to a facially valid warrant, particularly when the officers are unaware of the lack of a factual basis for the warrant, no constitutional violation occurs.  Smith v. Munday, 848 F.3d 248, 257, 257 n.3 (4th Cir. 2017).  White has not alleged that the Greensboro Search Officers had any knowledge of that fact.  He makes no claim regarding their personal awareness or knowledge about the facts supporting the warrant.

for the proposition that an officer's extraterritorial search constitutes a constitutional violation, <u>Neal v. Luedtke</u>, 713 F. App'x 177, 180 (4th Cir. 2017), was decided <u>after</u> the March 6 search. The "clearly established" prong of a qualified immunity analysis considers the "'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." <u>Wilson</u>, 526 U.S. at 614 (quoting <u>Anderson</u>, 483 U.S. at 639). Because <u>Neal</u> was decided in November 2017, months after the March 6 search of White's house, it is inapplicable for considering whether the Greensboro Search Officers violated a clearly established constitutional right. White provides no other case law in support of his contention that his rights were clearly established. Without more, the court cannot say that the Greensboro Search Officers' alleged extra-jurisdictional actions violated White's clearly established constitutional rights. The Greensboro Search Officers are entitled to qualified immunity, and Greensboro Defendants' motion to dismiss as to the individual capacity claims against the Greensboro Search Officers will be granted.

### b. Hinson

White claims that Defendant Hinson falsely arrested him "without investigation" and "based on personal animus." (Doc. 81 ¶ 177.) White alleges that Hinson arrested him before any magistrate executed a warrant for his arrest, but the GPD had

received a copy of the Burlington Defendants' arrest warrant prior to the arrest. (Id. ¶¶ 71-72, 82.) The warrant was in fact signed by a magistrate later that afternoon. (Doc 37. Ex. 1; Doc. 81 ¶ 82.) While the amended complaint references the arrest warrant and a portion has been provided by the parties, no one has provided the full arrest warrant including, most importantly, the affidavit setting forth the factual basis for a determination of probable cause.

To state a § 1983 violation for an unconstitutional seizure, an officer must have "seized [a plaintiff] pursuant to legal process that was not supported by probable cause and . . . the criminal proceeding [must] have terminated in [the plaintiff's] favor." Burrell v. Virginia, 395 F.3d 508, 514 (4th Cir. 2005) (first and third alterations in original).[17] "A decision by . . . a neutral magistrate . . . as to the existence of probable cause" has a significant impact on the issue of whether an acting officer "was objectively reasonable in his belief that probable cause existed." Cruse v. Blackburn, No. 3-17:00485, 2018 WL 793501, at *5 (S.D. W. Va. Jan. 16, 2018) (citing Durham v. Horner, 690 F.3d

---

[17] The Burrell court characterized this claim for an unlawful seizure as a federal malicious prosecution claim under § 1983. Burrell, 395 F.3d at 514. White characterizes his claim against Hinson as based on Hinson's "false[] arrest[]" of him. (Doc. 81 ¶ 127.) A false arrest under § 1983, however, only exists when "no arrest warrant ha[d] been obtained," Burrell, 395 F.3d at 514, and permitted recovery of damages "from the time of detention up until issuance of process or arraignment, but not more." Brooks v. City of Winston-Salem, N.C., 85 F.3d 178, 181–82 (4th Cir. 1996) (quoting Heck v. Humphrey, 512 U.S. 477, 484 (1994)).

38

183, 189 (4th Cir. 2012)).  Of course, if the acting officer provides misleading information that influenced the magistrate's decision, the officer will not be shielded from liability.  Durham, 690 F.3d. at 189.  Defendant Hinson, however, did not apply for the arrest warrant – Burlington Defendant Westmoreland did.  There is no factual allegation that Hinson participated in the investigation into White or knew anything about White's alleged crimes besides what was contained in the "long form" warrant.

It is true that under North Carolina law, Hinson could conduct a felony arrest without a warrant, as long as he had probable cause to do so.  N.C. Gen. Stat. §15A-401(b)(2)(a).  The more problematic issue, however, is that the court does not have the complete arrest warrant to review at this point.  Defendants argue that because the magistrate approved the same warrant that Hinson acted upon to arrest White, Hinson's decision to arrest was based on probable cause.  Although a court must show great deference to a magistrate's determination of probable cause, see Illinois v. Gates, 462 U.S. 213, 236 (1983); United States v. Leon, 468 U.S. 897, 914 (1984), the court must nevertheless "conscientiously review the sufficiency of affidavits on which warrants are issued." Gates, 462 U.S. at 239.  This, of course, presupposes that the court has the complete warrant to consider in the first place.  Although no party is obligated to provide this information on a Rule 12(b)(6) motion to dismiss, the court cannot simply take the

Defendants at their word and conclude that because the magistrate signed the arrest warrant later in the afternoon of March 6, it was based on probable cause. Nor can Hinson argue that he was relying on the probable cause found by the magistrate, because there was no such finding when he arrested White. The court is constrained from making any finding that Hinson had probable cause to arrest White when the only evidence of what he knew is not before the court. The motion to dismiss on this basis will therefore be denied.

### c. Due Process Claims

White generally alleges that the Greensboro Defendants violated his due process rights. These claims, however, are inapplicable because all of White's claims derive from the Fourth Amendment's protection against unreasonable searches and seizures. In such circumstances where the alleged right violated by officials falls under an enumerated right, generalized due process claims cannot prevail. See Safar, 859 F.3d at 245; see also Gerstein v. Pugh, 420 U.S. 103, 125 n.27 (1975) (noting that the Fourth Amendment defines the "'process that is due' for seizures of persons . . . in criminal cases"). All of White's § 1983 claims against the Greensboro Search Officers arise out of their search of his residence. White's § 1983 claim against Defendant Hinson stems from Hinson's arrest. These actions plainly fall under the Fourth Amendment, and so the motion to dismiss White's due process

claims against the Greensboro Defendants in their individual capacity will be granted.

### 3. COBRA

White alleges that after GPD terminated his employment on March 6, 2017, the City of Greensboro failed to provide him statutory notice about his right to continued group health coverage to ensure that he and his family would continue to have health insurance. (Doc. 81 ¶ 220.) White claims that as a result of this, his health insurance lapsed, and he was unable to afford alternate health coverage when his wife gave birth later that year. (Id. ¶ 224.) White argues that this failure violated the Consolidated Omnibus Reconciliation Act of 1986 ("COBRA"), 29 U.S.C. § 1166. The City of Greensboro argues that there is no allegation it is the administrator of its employees' health insurance plan, which is the only party statutorily required to give notice.

COBRA requires that when a "qualifying event" occurs — such as an employee's termination — the employer must "notify the administrator" of the qualifying event, and the administrator in turn must notify the employee of his rights under the act. 29 U.S.C. § 1166 (2), (4). White has not identified the health plan administrator for his healthcare plan in his allegations, and he has not alleged that the City of Greensboro is the plan administrator. He argues that because the city eventually gave

the requisite notice and information, it is liable under COBRA. (Doc. 81 ¶ 228.)

To properly allege a COBRA failure-to-provide-notice claim, however, White must bring a cause of action against the plan administrator; an employer is not by default presumed to be the plan administrator.  See <u>Weatherly v. Fall Creek Condo. Owners' Assoc.</u>, No. 16-03356-cv-s-DPR, 2017 WL 11068773, at *3 (W.D. Mo. June 21, 2017); <u>see also</u> <u>Guzman v. Macy's Retail Holdings, Inc.</u>, No. 09-cv-4472, 2010 WL 1222044, at *8 (S.D.N.Y. Mar. 29, 2010); <u>Vorachack v. Alden Estates of Barrington, Inc.</u>, No. 07-c-3045, 2007 WL 3171310, at *2 (N.D. Ill. Oct. 26, 2007).  Because White has not identified any Defendant as the plan administrator, his COBRA claim necessarily fails as a matter of law the motion to dismiss will be granted.

### 4. Takings Clause Claim

White alleges that the City of Greensboro violated the Takings Clause of the U.S. Constitution when Greensboro Defendants seized property that he rightfully owned during the March 6 search of his residence.

The Takings Clause of the Fifth Amendment provides that private property shall not "be taken for public use, without just compensation," U.S. Const. amend. V, and has been incorporated to apply to the states through the Fourteenth Amendment.  <u>Murr v. Wisconsin</u>, 137 S. Ct. 1933, 1942 (2017).  To state a takings claim,

a plaintiff must demonstrate he (1) has a property interest to assert and that (2) "the government physically . . . infringed on that interest for public use." Patty v. United States, 136 Fed. Cl. 211, 214 (Fed Cl. 2018). A takings claim, however, "does not apply when property is retained . . . as the result of the government's exercise of its authority pursuant to some power other than the power of eminent domain." Cybernet, LLC v. David, No. 7:16-cv-16, 2018 WL 5779511, at *16 (E.D.N.C. Nov. 2, 2018) (quoting Denby v. City of Casa Grande, No. cv-17-00119-phx, 2018 WL 1586650, at *3 (D. Ariz. Mar. 31, 2018)).

White has not alleged any public use for his property seized by the Greensboro Defendants, nor has he alleged that those Defendants seized his property through any governmental power of eminent domain. Indeed, when law enforcement officials exercise their authority to "seize [or] impound [property] . . . or otherwise enforce criminal law," law enforcement exercises its police power, not its power of eminent domain. See Patty, 136 Fed. Cl. at 214. Here, the GPD officers seized property pursuant to a search warrant and in their capacity as law enforcement officers. There is no allegation that they seized White's property pursuant to the power of eminent domain, nor any claim of a public use for the seized property. White's taking claim will therefore be dismissed.

### 5.  Malicious Prosecution

The remaining claims against the Greensboro Defendants are state law claims.  As noted above, White has alleged these state law claims against Defendants in both their individual and official capacities.  In North Carolina, municipalities are "immune from liability for the torts of its officers and employees 'if the torts are committed while they are performing a government function.'" Clayton v. Branson, 570 S.E.2d 253, 256-57 (N.C. Ct. App. 2002) (quoting Williams v. Holsclaw, 495 S.E.2d 166, 168 (N.C. Ct. App. 1998)).  This applies to claims that utilize a respondeat superior theory of liability.  Hart v. Brienza, 784 S.E.2d 211, 217 (N.C. Ct. App. 2016).  Although White alleged that the City of Greensboro had waived sovereign immunity through the purchase of liability insurance, the city has provided its complete insurance contract. A careful review of it reveals that the city does not have insurance coverage for the acts alleged here.  (Doc. 66, Ex. A.) Therefore, all claims against the City of Greensboro under state law will be dismissed because the municipality enjoys sovereign immunity.  Likewise, all state tort claims against individual Greensboro Defendants in their official capacities will be dismissed because, as noted previously, an official capacity suit against an individual public official is construed as a suit against the state or municipality.  Where, as here, the municipality enjoys sovereign immunity, the official capacity

claims are likewise barred by immunity.

White names two Greensboro Defendants -- Williamson and Schwochow -- in his malicious prosecution claim along with the numerous other Defendants.[18]  These claims are subject to the same legal analysis as that described previously for the malicious prosecution claims against the GCSO Defendants, which will not be repeated here.

The first element of a malicious prosecution claim requires a plaintiff to show that the defendant either instituted, procured or participated in the criminal proceeding against the plaintiff. Moore, 476 S.E.2d at 421.  This element is satisfied when a plaintiff shows that, but for a defendant's actions, a criminal prosecution likely would not have occurred.  See Becker, 608 S.E.2d at 829.  Greensboro Defendants argue that Williamson is not alleged to have done anything regarding the bringing of these charges. (Doc. 44 at 21.)[19]  The only factual allegation White makes against Williamson is that he, along with the other Greensboro Search Officers, "participated" in the search of White's home.  (Doc. 81 ¶ 80.)  There are no facts alleged that Williamson personally

---

[18] Williamson is not listed in the malicious prosecution cause of action heading but is named in the substantive allegations.  White clarified at the hearing that the omission of Williamson in the heading was merely an oversight.

[19] Williamson also argues that White's claim against him fails because there is no alleged any fact suggesting that Williamson lacked probable cause or acted with malice.  (Id.)

seized any property, much less that related to the bringing of any charge.  Rather, White claims that unidentified "officers on scene" removed his possessions.  (Id. ¶ 80.)  Because White does not attribute any specific action during the search to Williamson that allegedly led to the institution of any criminal proceeding, he has failed to properly allege a sufficient factual basis for plausibly believing that Williamson participated, procured, or instituted a criminal proceeding against him.  Thus, Defendants' motion to dismiss the malicious prosecution claim against Williamson in his individual capacity will be granted.

The claim against Defendant Schwochow stands on a different footing.[20]  White alleges that Schwochow was the officer who determined that he illegally possessed GPD property (id. ¶ 91), but he also alleges that the GPD's inventory system would not allow Schwochow to make this determination (id. ¶ 95).  Schwochow also allegedly had animus against White stemming from a dispute regarding child care.  (Id. ¶ 92.)  White alleges that Schwochow provided SBI Agent Denny with a list of items that Schwochow claimed White illegally possessed even though the GPD's system was

---

[20] To the extent that Defendant Schwochow seeks public official immunity as to the malicious prosecution claim, the court finds he is not entitled to such immunity.  Public official immunity applies to public officials in their individual capacity for negligence in performance of their duties.  See King v. Jefferies, 402 F. Supp. 2d 624, 635 (M.D.N.C. 2005). Public official immunity does not apply to actions taken with malice. Id.  Because a malicious prosecution claim requires a showing of malice, which White has sufficiently pleaded, Schwochow is not entitled to public official immunity.

incapable of providing a reliable inventory.

The first element of a malicious prosecution claim, that the defendant participated in the criminal proceeding against the plaintiff, is satisfied "where 'it is unlikely there would have been a criminal prosecution of [a] plaintiff' except for the efforts of a defendant." Becker, 608 S.E.2d at 829 (alteration in original) (quoting Williams, 412 S.E.2d at 900). Schwochow provided critical information -- the inventory of allegedly stolen/illegally possessed property -- that formed the basis for Agent Denny's grand larceny charges. Without it, it is unlikely grand larceny charges would have been brought. This is enough to satisfy the first element. The second element, a lack of probable cause, is plausibly alleged because White claims there was no way for the GPD's inventory system to properly distinguish between his rightfully owned property and the GPD's loaned property. Taken as true, as the court must on a Rule 12(b)(6) motion, this suffices to meet the second prong.

As for a showing of malice, North Carolina courts have held that, in a malicious prosecution action, "malice can be inferred from the want of probable cause alone." Fowler v. Valencourt, 423 S.E.2d 785, 788 (N.C. Ct. App. 1992), rev'd on other grounds, 435 S.E.2d 530 (N.C. 1993). Even so, malice in a malicious prosecution claim may be further shown by "offering evidence that [the] defendant 'was motivated by personal spite and a desire for

revenge' or that [the] defendant acted with 'reckless and wanton disregard' for plaintiff['s] rights." Becker, 608 S.E.2d at 829 (quoting Moore v. City of Creedmoor, 481 S.E.2d 14, 24 (N.C. 1997)). Although White has plausibly alleged implied malice through a lack of probable cause, he has also sufficiently alleged that Schwochow acted with malice against him stemming from the animosity that developed as a result of the fallout between the two officers and their families. White has also pleaded the final element -- that the cause of action terminated in his favor. (Doc. 81 ¶ 98.) Thus, Greensboro Defendants' motion to dismiss the malicious prosecution claim against Defendant Schwochow in his individual capacity will be denied.[21]

### 6. Trespass

White alleges that the Greensboro Search Officers trespassed when they arrived and helped perform the search of White's home on March 6, 2017. The Greensboro Defendants initially assert public official immunity. (Doc. 44 at 14 n.5.)

Public official immunity, which applies to public officials sued in their individual capacity, is analogous to qualified immunity in the federal context. Under North Carolina law, a public official is entitled to immunity from suit in his individual

---

[21] As noted above, the malicious prosecution claim against Greensboro will be dismissed because the city has sovereign immunity.

capacity unless he "engaged in discretionary actions which were allegedly: (1) corrupt; (2) malicious; (3) outside of and beyond the scope of his duties; (4) in bad faith; or (5) willful and deliberate." Smith v. Jackson Cty. Bd. of Educ., 608 S.E.2d 399, 411 (N.C. Ct. App. 2005) (quoting Reid v. Roberts, 435 S.E.2d 116, 119 (N.C. Ct. App. 1993)). White has not alleged that the Greensboro Search Officers were corrupt, malicious, acting in bad faith, or acting willfully and deliberately in showing up to perform the search on March 6.[22] Rather, he alleges that, although SBI and GCSO officials invited these officers to participate in the search, they knowingly acted outside of their municipal jurisdiction, as defined by state law, to seize property not identified in the search warrant. See N.C. Gen. Stat. §§ 15A-247; 160A-286.

A trespass claim under North Carolina law requires a showing of three elements: "(1) possession of the property by plaintiff when the alleged trespass was committed; (2) an unauthorized entry by defendant; and (3) damage to plaintiff." Singleton v. Haywood Elec. Membership Corp., 588 S.E.2d 871, 874 (N.C. 2003) (quoting Fordham v. Eason, 521 S.E.2d 701, 703 (N.C. 1999)).

---

[22] Malice in the context of public official immunity means "wantonly do[ing] that which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial or injurious to another." Grad v. Kaasa, 321 S.E.2d 888, 890 (N.C. 1984). "An act is wanton when it is done of wicked purpose, or when done needlessly, manifesting a reckless indifference to the rights of others." Givens v. Sellars, 159 S.E.2d 530, 535 (N.C. 1968).

Defendants contend that "entry onto plaintiff's land 'was lawful or under legal right.'" CDC Pineville, v. UDRT of N.C., LLC, 622 S.E.2d 512, 518 (N.C. Ct. App. 2005) (quoting Singleton, 588 S.E.2d at 874). They cite to Majebe v. N.C. Bd. of Med. Examiners, 416 S.E.2d 404 (N.C. Ct. App. 1992), in which an acupuncturist claimed that a law enforcement officer had committed a trespass when he conducted a search of her acupuncture clinic pursuant to a search warrant. Id. at 405-06. The court of appeals dismissed the claim because the officer making the search did so "pursuant to a search warrant issued by an impartial magistrate. [The officer]'s failure to execute the warrant would have constituted a dereliction of duty." Id. at 408. Defendants argue the same rationale applies here.

Majebe is not on point. First, even if the warrant was facially valid and these Defendants were invited to participate, they still were acting outside of their jurisdictional limitations. Second, and perhaps more importantly, White alleges that the SBI and GCSO invited the Greensboro Search Officers to collect items belonging to the GPD, not to generally assist with the search. (Doc. 81 ¶ 79.) The search warrant for White's residence does not mention GPD equipment at all – it only authorized a search for evidence stemming from White's alleged

possession of a stolen mower.[23]

Defendants argue that even if the search warrant did not authorize the Greensboro Search Officers' entry, they had received the requisite authority from the law enforcement officers who were lawfully present. (Doc. 66 at 8.) But the cases cited by Defendants for this argument are not on point. For example, Defendants cite United States v. Clouston, 623 F.2d 485 (6th Cir. 1980) (per curiam), in which the court denied a plaintiff's motion to suppress evidence when law enforcement invited employees of a telephone company to assist in executing a search warrant for electronic devices that were not identified in the warrant. Id. at 486. Law enforcement had invited the telephone company employees to identify telephone equipment that belonged to the company, which the court determined was reasonable given that the telephone equipment was closely related to the property described in the warrant and was also likely to have been found in close proximity to the property identified in the warrant. Id. at 487.

Defendants also rely on Bills v. Aseltine, 958 F.2d 697 (6th

---

[23] At the hearing, Defendants disagreed with White's characterization of the GPD's presence during the search warrant, arguing that the SBI and GCSO had invited the Greensboro Search Officers to assist with the search and nothing more. According to Defendants, as the Greensboro Search Officers performed the search, they came across the GPD equipment in plain view and lawfully seized it under North Carolina law. But this is a factual dispute the court cannot resolve at this stage.

Cir. 1992).[24]  They argue that <u>Bills</u> stands for the proposition that when officers arrive to execute a search warrant, they hold the premises "in trust," empowering them to allow others to enter. (Doc. 66 at 8.)  In <u>Bills</u>, law enforcement obtained a warrant to search plaintiff's house for a stolen generator.  <u>Bills</u>, 958 F.2d at 699-700.  The officer who sought the warrant also knew that the plaintiff was suspected of having stolen equipment from her employer, but he did not seek a warrant for that equipment.  <u>Id.</u> The officer invited a security officer from the plaintiff's employer to accompany law enforcement on the execution of the search warrant "in the hope that [the security officer] could identify" the employer's stolen equipment.  <u>Id.</u> at 700.  As law enforcement executed the warrant, the security officer found and identified equipment he suspected had been stolen from the plaintiff's employer.  <u>Id.</u>  The next day, the security officer informed law enforcement of what he had found, and a separate search warrant was authored for the equipment.  <u>Id.</u>  The Sixth Circuit rejected the defendants' argument that <u>Clouston</u> applied

---

[24] Defendants also cite to <u>Berger v. Hanlon</u>, No. cv-95-46, 1996 WL 376364 (D. Mont. Feb. 26, 1996), in which the district court dismissed the plaintiffs' trespass claim against a news crew who were invited by law enforcement to film while the officers executed a search warrant on plaintiffs' residence.  Critically, however, the Ninth Circuit reinstated the trespass claim after the Supreme Court vacated the circuit court's decision, <u>see</u> 188 F.3d 1155, 1157 (9th Cir. 1999) ("We also reverse the district court's judgment in favor of the media defendants on [the plaintiffs] state law claim[] for trespass . . . .").  Thus, Defendants' citation of <u>Berger</u> is unpersuasive on this point.

because the security officer was not acting "in aid of the officers or their mission, but for his own purposes involving the recovery of [the employer's stolen equipment]." Id. at 702.

In further support of its holding in Bills, the Sixth Circuit cited to another case, United States v. Sanchez, 509 F.2d 886 (6th Cir. 1975). In Sanchez, an agent of the Bureau of Alcohol, Tobacco and Firearms accompanied state officers who had a search warrant for narcotics. Id. at 888. The Bureau's agent had been invited to attend by the state officers, who had received information that the residence may contain explosives, but the warrant only contemplated a search for narcotics. Id. at 887-88. In ruling against the government, the Sixth Circuit held that because the warrant only authorized the local officials to search the residence for narcotics, it "could not be used to validate the entrance of a federal officer having both probable cause and the opportunity to obtain a separate warrant to search for different items of property." Id. at 889.

The facts of Bills and Sanchez more closely align with the facts of this case, as White has alleged, than with those of Clouston. White alleges that the Greensboro Search Officers were invited not to assist with the search for property associated with stolen mowers, as authorized by the search warrant, but to recover equipment they suspected belonged to GPD, which was not within the scope of the warrant. Because the plausible allegations of the

amended complaint must be taken as true at this stage, White has sufficiently alleged that the Greensboro Search Officers' presence to search for GPD property was not authorized by law because they operated outside their jurisdiction to specifically seize property without a proper warrant. This is sufficient to make out a claim that the officers were acting outside of their scope and duty as law enforcement officials and meets the elements of a trespass.[25]

Therefore, White's claims that the Greensboro Defendants were present specifically to seize GPD property without a warrant is sufficient to survive a Rule 12(b)(6) motion at this stage. The motion to dismiss the trespass claims as to the Greensboro Search Officers will consequently be denied.[26]

### 7. Tortious Interference with Contract

White alleges that Greensboro Defendants Hinson, Westmoreland, and Scott, intentionally and without justification, induced the City of Greensboro to terminate its employment contract

---

[25] At the hearing on these motions, Greensboro Defendants argued that the statute prohibiting the execution of a warrant outside an officer's jurisdiction did not apply because the Greensboro Search Officers were merely assisting rather than actually executing the warrant. This argument was not raised in the briefs and will not be considered at this time. N.C. All. for Transp. Reform, Inc. v. U.S. Dep't of Transp., 713 F. Supp. 2d 491, 510 (M.D.N.C. 2010) ("Raising such new arguments for the first time at oral argument undermines the purpose of orderly briefing and risks subjecting an opponent to an unfair disadvantage."). Moreover, any factual question about the purpose of the Greensboro Search Officers' presence cannot be resolved at this pleading stage.

[26] The trespass claim against the City of Greensboro, however, is dismissed because the municipality retains sovereign immunity.

with him.  He claims that these Defendants acted in this manner "solely because of [their] animus . . . directed toward Plaintiff and not in the legitimate exercise of the business of Defendant Greensboro." (<u>Id.</u> ¶ 244.)  White has further alleged that Deputy Chief Hinson strongly disliked him because White had filed grievances against him for unequal treatment of officers.  (<u>Id.</u> ¶ 108.)  White identified examples of other GPD employees who had not been terminated despite having been accused of wrongdoing he claims is similar.  (<u>Id.</u> ¶¶ 106-07.)

To make out a tortious interference with contract claim under North Carolina law, a plaintiff must show "(1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to the plaintiff." <u>Embree Constr. Grp., Inc. v. Rafcor, Inc.</u>, 411 S.E.2d 916, 924 (N.C. 1992) (quoting <u>United Labs., Inc. v. Kuykendall</u>, 370 S.E.2d 375, 387 (N.C. 1988)).  Defendants argue they are "insiders" who cannot be liable for this tort.  Insiders (or, as the Fourth Circuit phrases it, "non-outsiders") are parties who have a "legitimate business interest" in the contract.  <u>McMillan v. Cumberland Cty. Bd. Of Educ.</u>, 734 F. App'x 836, 845 (4th Cir. 2018) (quoting <u>Smith v. Ford Motor Co.</u>, 221 S.E.2d 282, 292 (N.C.

1976)).  Insiders have "a qualified privilege and their actions are presumed justified."  Id.  This privilege can be overcome if the plaintiff shows that the defendant acted with malice or for a reason "not reasonably related to the protection of a legitimate business interest."  Id. (quoting Sellers v. Morton, 661 S.E.2d 915, 921 (N.C. Ct. App. 2008)).  But this showing of malice must be so overt that "the complaint must admit of no motive for interference other than malice."  Id. (quoting Pinewood Homes, Inc. v. Harris, 646 S.E.2d 826, 832–33 (N.C. Ct. App. 2007)).

White's allegations fail to meet this bar.  All three of these Defendants had a valid reason for terminating White's employment: he had just been arrested for dealing in stolen equipment. Hinson's alleged dislike of White does not overcome the standard set out by McMillan.  Furthermore, the fact that other GPD officers had been accused of committing other "bad acts" is irrelevant; this is not a discrimination claim.  Therefore, Greensboro Defendants' motion to dismiss White's tortious interference with contract claim will be granted.

### 8.  North Carolina Constitutional Violations

White claims in the alternative that the Greensboro Defendants violated his rights under the North Carolina Constitution.  The Greensboro Search Officers "entered onto Plaintiff's property . . . and seized Plaintiff's property and has failed to return it."  (Doc. 81 ¶ 249.)  Hinson "took Plaintiff

into custody without a valid arrest warrant having been issued,"
in violation of Article 1 § 20.  (Id. ¶¶ 249, 251.)  Hinson,
Westmoreland, and Scott violated Plaintiff's Article 1 § 19 rights
by depriving him of equal protection of the laws by failing "to
follow procedures and allow Plaintiff's employment to continue at
GPD until . . . [the] charges against him were investigated." (Id.
¶ 250.)

As noted above, a direct action under the North Carolina
Constitution exists only if no other adequate state remedy is
available for the plaintiff.  Here, White has alleged state law
claims of malicious prosecution, trespass, tortious interference
with contract, as well as conspiracy to commit these torts.  The
tortious interference with contract claim is an adequate state
remedy for the purposes of remedying Plaintiff's loss of job
injury.  White also alleged that the malicious prosecution claim
was intended to remedy his arrest by Hinson, as well as the seizure
of his property by Williamson and Schwochow.  The trespass claim
was intended to remedy White's claim regarding illegal entry onto
his property.  Therefore, White has adequate state remedies against
the Greensboro Defendants for his injuries, and the claims arising
under the state constitution as to the Greensboro Defendants will
be dismissed.

### D.  Burlington Defendants

White brings § 1983 claims against the Burlington Defendants,

who are Westmoreland, Watkins, and the City of Burlington, malicious prosecution claims, a trespass claim against the City of Burlington, and a direct action against all Burlington Defendants under the North Carolina Constitution. As to the state law claims, White alleges that the City of Burlington has waived sovereign immunity by purchasing liability insurance, which the Burlington Defendants do not contest. As such, the City of Burlington has not waived immunity (to the extent of insurance) in regard to the tort claims White has brought against the municipality.

### 1. Section 1983 Official Capacity Claims

White alleges the Burlington Defendants violated his constitutional rights in their official capacity. He alleges that the Burlington Defendants, acting "under color of law and pursuant to an official policy, practice or custom . . . intentionally, knowingly, and recklessly violated Plaintiff's civil rights." (Doc. 81 ¶ 134.) White claims that these Defendants, with other law enforcement officers, formed a "task force . . . not authorized by law," which evidences an "official policy or custom on the part of Burlington . . . to violate the rights of citizens." (Doc. 63 at 14–15.) Despite this argument, White himself has noted that the task force here was "informal." (Id. at 14.)

To show an express policy, a written ordinance or regulation must indicate that the person with "ultimate authority" in the department either wrote or approved of the policy. Lytle, 326

F.3d at 471. White has not met his burden in that regard to the establishment of the informal task force. <u>Lytle</u> also requires that to have a "persistent and widespread" practice, a plaintiff must point to a "practice . . . so persistent and widespread and so permanent and well settled as to constitute a custom or usage with the force of law." <u>Id.</u> at 473. (quoting <u>Carter</u>, 164 F.3d at 218). Isolated incidents of unconstitutional conduct by subordinate officers are insufficient to establish a custom or practice. <u>See</u> <u>id.</u>

White does not identify any other instance in which Burlington police officers acted in a similar manner as to other citizens. Allegations about the Burlington Defendants' actions against White are insufficient to make out an official capacity claim. For those reasons, as with the § 1983 official capacity claims against GCSO and Greensboro Defendants detailed above, the § 1983 claims against Burlington Defendants, including the claims against Defendants Cody Westmoreland and Eric Watkins in their official capacities, will be dismissed.

### 2. Section 1983 Individual Capacity claims

White alleges that Watkins and Westmoreland "acted outside their territorial jurisdiction, informally deciding to form a task force and/or engaging in mutual aid, without following the proper policies and statutory requirements." (Doc. 81 ¶ 162.) Westmoreland typed up the arrest warrant (for possession of stolen

59

goods and obtaining property by false pretense) that Defendant Hinson read before arresting White (Doc. 37 Ex. 1), and Watkins typed up the arrest warrant for federal firearms charges (id. Ex. 3). White argues that the Burlington Defendants did not follow proper statutes, policies, and procedures in investigating him. (Doc 81. ¶ 165.) Thus, White alleges, they had no authority to investigate crimes or make criminal charges against White because all alleged crimes occurred outside BPD's jurisdiction. (Id. ¶ 162.) Westmoreland also allegedly learned from Officer Rakes, who personally knew White, that he may become homicidal upon being arrested. White alleges this statement was false and that Westmoreland passed it along to Watkins, who included it in his arrest warrant even though both officers never investigated further. (Id. ¶¶ 82, 84, 155.) Finally, in investigating the firearms charges, Watkins incorrectly recorded a firearm serial number that was not on one of White's firearms which led to the charge. (Id. ¶ 93.) All of this, according to White, amounts to constitutional violations for which the Burlington Defendants are liable in their individual capacities. Accordingly, the court must make a qualified immunity analysis raised by these Defendants based on these three claims.

The court may consider the two prongs of the qualified immunity in either order since the failure of a plaintiff to satisfy either one leads to qualified immunity. Pearson, 555 U.S.

at 236. Thus, the court considers whether the Burlington Defendants, as alleged by White, violated clearly established law. Id. at 243–44. For the following reasons, the court concludes that White has failed to make this showing.

Even if all of White's allegations are true, Burlington Defendants did not violate a right "clearly established" by law at the time. White again relies on Neal v. Luedtke, 713 F. App'x 177 (4th Cir. 2017), for the proposition that officers acting outside their jurisdiction in violation of state law act could be acting unconstitutionally. As discussed above in the analysis for the Greensboro Defendants, Neal was decided after the actions committed by Defendants here. White has provided no other authority for his contention that the extra-jurisdictional actions of the Burlington Defendants amounts to a constitutional violation of his clearly established rights, so his argument carries little force here.

White also argues that the Burlington Defendants failed to properly investigate all leads before seeking warrants for his arrest. However, the only case White cites for this argument, Clipper v. Takoma Park, Md., 876 F.2d 17 (4th Cir. 1989), is readily distinguishable from the facts of this case. In Clipper, law enforcement mis-identified plaintiff as a bank robber based on a witness description and the fact that an accomplice was the plaintiff's son-in-law who used a car registered to plaintiff.

However, the only officer who observed the robbery failed to make a positive identification to the arresting officer, and police failed to pursue and follow up on multiple leads, including reviewing the bank video of the robbery, that, taken together, provided ample evidence that plaintiff was not the robber. The Fourth Circuit upheld the jury's verdict, on a deferential sufficiency of evidence standard, finding the police had violated plaintiff's due process rights. Id. at 19 n.*. In so doing, however, the court was careful to say that it "would not suggest that [officer] Starkey's failure to investigate the leads that Clipper provided was, in itself, sufficient to negate probable cause." Id. at 20.

Here, by contrast, there was ample probable cause to support the arrest warrant that White knowingly possessed a stolen mower and sold it under the false pretense that it was his. The search warrant affidavit, including the information provided by the Terrys, provided probable cause. The law does not require law enforcement officers to exhaust every possible lead during an investigation. Smith, 848 F.3d at 254 (quoting Wadkins v. Arnold, 214 F.3d 535, 543 (4th Cir. 2000)). They need only investigate and establish facts that link a suspect to a crime. See id. Here, Westmoreland was involved in the investigation into the stolen mowers since September 2016. (Doc. 81 ¶ 57.) He was told by GCSO Defendant Buskirk that White was a police officer, at which point

the investigation "intensified." (Id. ¶ 57.)  From the face of the second amended complaint, it is apparent that Westmoreland had sufficient probable cause for the arrest, even if White denied culpability.

White's claim that he has suffered constitutional harms because the Burlington Defendants did not independently verify whether he truly was homicidal likewise lacks merit.  This is true for two reasons.  First, the Burlington Defendants had no obligation to perform further investigation into the "homicidal" comment, because it came from another officer who is not alleged to be untrustworthy.  The Fourth Circuit has held that when "an officer applies for a search warrant based on information supplied by [a] fellow officer[], it is unnecessary for him to [present] the reasons he has for believing" the officer or the officer's sources.  United States v. Harrick, 582 F.2d 329, 332 (4th Cir. 1978); see also United States v. Ramos-Cruz, 667 F.3d 487, 502 (4th Cir. 2012) (quoting United States v. Ventresca, 380 U.S. 102, 111 (1965)) (recognizing that observations "of fellow officers . . . engaged in a common investigation are plainly a reliable basis for a warrant").  Even though White claims that the Burlington Defendants had received information from White's mother, a GPD officer, that the GPD did not believe White was "homicidal" (Doc. 81 ¶ 167), that fact alone did not require the officers to forego including the comment in the warrant application

if they believed Rakes to be truthful and trustworthy. In any event, as White alleges, Watkins included the statement from White's mother in the warrant application. (Id.)

More importantly, however, the "homicidal" comment was not material to the firearms charges brought against White. A statement is material if it is necessary to a finding of probable cause. Franks v. Delaware, 438 U.S. 154, 171-72 (1978). The federal crime Watkins charged White with criminalizes possession of "a firearm which is not registered to [the possessor] in the National Firearms Registration and Transfer Record." 26 U.S.C. § 5861(d). Since the statute criminalizes possession, whether or not White was homicidal would not affect the existence of probable cause for the charged offense. See United States v. Freed, 401 U.S. 601, 607-09 (1971) (holding that § 5861(d) has no specific intent requirement). Given the other facts that formed the basis for the warrants, these Defendants' failure to further investigate Rakes' comment did not affect the existence of probable cause. See Miller v. Prince George's Cty., 475 F.3d 621, 628 (4th Cir. 2007). Therefore, the inclusion of the "homicidal" comment does not bear on whether White's constitutional rights were violated.

White also claims that Watkins performed an incorrect search on the serial number of a gun and in doing so, violated his constitutional rights. Because the search contained the wrong serial number, it returned a result indicating that the firearm

was not registered to White.  This in turn formed the basis for the federal firearms charge Watkins prepared.  (Doc. 63 at 16.)

Reckless disregard can expose officials to constitutional liability.  Reckless disregard can be established by alleging that an officer "acted 'with a high degree of awareness of [a statement's] probable falsity,' that is, 'when viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reason to doubt the accuracy of the information he reported." Miller, 475 F.3d at 627 (alteration in original) (quoting Wilson v. Russo, 212 F.3d 781, 788 (3d Cir. 2000)).  Negligence or innocent mistakes, however, cannot form the basis of constitutional violations. United States v. Lull, 824 F.3d 109, 115–16 (4th Cir. 2016).  Besides White's conclusory statements that the Burlington Defendants acted improperly and recklessly, there are no facts alleged that would plausibly indicate that Watkins ran the incorrect firearm serial number purposefully or with knowing disregard.  The fact that these Defendants allegedly desired notoriety and television appearances is insufficient to raise the mistake in a warrant application alleged here to the level of reckless disregard.  White's allegations are therefore insufficient to state a claim that the Burlington Defendants violated his constitutional rights pursuant to § 1983.

White generally alleges that the Burlington Defendants

violated his due process rights.  These due process claims fare no better than those against the GCSO and Greensboro Defendants because, like them, White's claims derive from the Fourth Amendment's protection against unreasonable searches and seizures. Where the alleged right violated by officials falls under an enumerated right, generalized due process claims cannot prevail. See Safar, 859 F.3d at 245.  All of White's § 1983 claims against the Burlington Defendants arise out of their investigation and the arrest warrants they applied for.  These actions plainly fall under the "pretrial missteps" that are governed by the Fourth Amendment. Id.  The Burlington Defendants' motion to dismiss White's due process claims against them in their individual capacity will therefore be granted.

### 3. Malicious Prosecution

White brings malicious prosecution claims against the individual Burlington Defendants in both their individual and official capacities and against the City of Burlington under a theory of respondeat superior.  The amended complaint bases these claims generally on the criminal charges brought against White. At the hearing on these motions, White clarified that as to the Burlington Defendants he seeks to proceed as to all five criminal proceedings to which he was subjected.  Yet, the only proceedings in which Westmoreland and Watkins plausibly participated are the warrants that each authored.  Westmoreland authored the arrest

warrant application that Defendant Hinson read before arresting White on March 6, and Defendant Watkins authored the application for the federal criminal complaint charging White with violating 26 U.S.C. § 5861(d). Consequently, these are the only proceedings that will be considered in the malicious prosecution claims against the Burlington Defendants. See Lopp, 795 S.E.2d at 780 (citing the standard for the first element of a malicious prosecution claim).

The court has previously addressed the legal framework for a malicious prosecution claim. Here, White fails to satisfy the second element - want of probable cause. Probable cause exists when the facts and circumstances known to the defendant "would induce a reasonable man to commence a prosecution." Turner, 794 S.E.2d at 444 (quoting Best, 448 S.E.2d at 510). In a malicious prosecution claim, "[t]he critical time for determining whether or not probable cause existed is when the [criminal proceedings] begin[]." Strickland v. Hedrick, 669 S.E.2d 61, 71 (N.C. Ct. App. 2008) (quoting Hill v Winn-Dixie Charlotte, Inc., 397 S.E.2d 347, 349 (N.C. Ct. App. 1990)). The fact that White's criminal charges were eventually dropped does not automatically "negate the existence of probable cause at the time prosecution was commenced." Turner, 794 S.E. 2d at 445 (citing Bell v. Pearcy, 33 N.C. (11 Ired.) 233, 234 (N.C. 1850)). In considering the claim against Westmoreland, the same facts that supported the March 6 search

warrant of White's residence -- which this court has found was supported by probable cause -- were also available to Westmoreland, who authored the application for the arrest warrant for White for crimes arising out of the sale of the stolen lawn mower to the Terrys. Thus, sufficient facts existed for a reasonable person in Westmoreland's position to believe White had committed the crimes alleged.[27]

As to Watkins' federal criminal complaint, even assuming (without deciding) there was a want of probable cause, there are simply no facts plausibly indicating that Watkins acted with malice. There is no allegation that, at any time before authoring the criminal complaint, Watkins knew that the firearms had been seized in violation of the plain view doctrine, as Judge Biggs later concluded. Nor is there any indication that Watkins' error as to the serial number was anything other than a simple mistake.[28]

---

[27] This is distinguishable from Defendant Hinson's malicious prosecution claim, which this court has not found was supported by probable cause. Defendant Westmoreland, who had been involved in the investigation for months, according to the second amended complaint, was privy to facts that supported his decision to author an arrest warrant. The amended complaint does not allege that Hinson was likewise privy to these details but rather merely received an unissued arrest warrant (the one authored by Westmoreland). Because Hinson is not alleged to have personal knowledge of the facts like Westmoreland did, and because the full arrest warrant has not been submitted for this court's consideration, the court cannot say whether or not Hinson had probable cause to support White's arrest.

[28] Although the North Carolina Court of Appeals has held that an officer's motivation to advance his political career could contribute to a showing of malice, the court made that determination when the political motivations were not the only basis for malice. Turner v. Thomas, 762 S.E.2d 252, (N.C. Ct.

The motion to dismiss the malicious prosecution claims against the Burlington Defendants, including the City of Burlington, will therefore be granted.

### 4. Trespass

White alleges that an unidentified BPD officer participated in the March 6 search of his residence, thereby committing a trespass for which the City of Burlington is liable. The City of Burlington does not raise any argument that it is entitled to public official immunity (Doc. 49), so the court turns to the merits of the claim.

A trespass claim under North Carolina law requires a showing of three elements: "(1) possession of the property by plaintiff when the alleged trespass was committed; (2) an unauthorized entry by defendant; and (3) damage to plaintiff." Singleton, 588 S.E.2d at 874 (quoting Fordham, 521 S.E.2d at 703). Defendants first argue that White has not alleged any damages and has therefore failed to properly plead a trespass claim. (Doc. 49 at 21.) A trespass claim, however, states a cause of action for nominal damages even if the complaint "contains no allegations setting forth the character and amount of damages" because "an unauthorized entry upon to possession of another" entitles a plaintiff to

_____

App. 204), rev'd on other grounds, 794 S.E.2d 439 (N.C. 2016). See also Turner, 794 S.E.2d at 458 n.18 (Ervin J., concurring, in part, and concurring in the result, in part) (casting doubt on the plaintiff's argument that a political motivation to win a "very public case" is sufficient to allege malice).

"nominal damages at least."  Matthews v. Forrest, 69 S.E.2d 553, 555 (N.C. 1952).  Thus, insofar as Defendants do not challenge the first two trespass elements, White has a cause of action at least for nominal damages and has not failed to allege the final element of a trespass claim.

Defendants also raise the affirmative defense that their "entry onto plaintiff's land 'was lawful or under legal right.'"  CDC Pineville, 622 S.E.2d at 518 (quoting Singleton, 588 S.E.2d at 874).  Just like the Greensboro Search Officers, Burlington Defendants rely on Majebe v. N.C. Bd. of Med. Examiners, 416 S.E.2d 404 (N.C. Ct. App. 1992), in support of this argument.  There, the North Carolina Court of Appeals dismissed Majebe's trespass claim because the officer conducting the search did so "pursuant to a search warrant issued by an impartial magistrate.  [The officer]'s failure to execute the warrant would have constituted a dereliction of duty."  Majebe, 416 S.E.2d at 408.  Defendants argue the same rationale applies here.  White responds that even if the warrant was facially valid, the unidentified BPD officer was operating far outside of his or her jurisdictional limitations, and the existence of a search warrant does not authorize a municipal law enforcement officer to execute it outside of his or her jurisdiction.  (Doc. 63 at 18.)  White also notes that the officer in Majebe was a state officer, as opposed to a municipal officer who is statutorily limited to work within her jurisdiction.  (Id.)

For reasons to similar to those considered with the Greensboro Search Officers, <u>Majebe</u> is distinguishable from the present case. Because the amended complaint does not allege that any of the Burlington Defendants was invited to participate in the March 6 warrant, the BPD officer would have been acting outside of his or her jurisdiction in participating in the warrant. Thus, the court cannot say that White has failed to state a claim for a trespass, and Defendants' motion to dismiss the trespass claim against the City of Burlington will be denied.

### 5. North Carolina Constitutional Violations

White claims in the alternative that all named Defendants "violated [his] rights under the North Carolina Constitution." (Doc. 81 ¶ 248.) Specifically, the Burlington Defendants deprived him of his liberty and property under in violation of Article 1 § 19. (<u>Id.</u> ¶ 249.) Furthermore, Burlington Defendants "arrested Plaintiff without cause and supported by false statements and information they made." (<u>Id.</u>) They also "caused search warrants to be issued based on false statements and false information that resulted in property being seized" from White's home. (<u>Id.</u>) Defendant Westmoreland furthermore violated his rights under Article 1 § 27 by requiring excessive bail. (<u>Id.</u> ¶ 252.)

The Burlington Defendants contend that White has adequate state remedies as to the injuries resulting from any claim he seeks under the North Carolina Constitution. The court agrees. White's

arrest came as a result of the warrant application authored by Burlington Defendants. All his injuries stem from the criminal proceedings brought against him, and they are addressed in his malicious prosecution claims against the Burlington Defendants. The alternative state constitutional claims against the Burlington Defendants will therefore be dismissed.

### E. Conspiracy Claim as to All Defendants

Before considering White's state conspiracy claim against all 24 Defendants, it is necessary to summarize which of his claims survive the present motions to dismiss: (1) White's § 1983 claims against GCSO Defendants Stalls and Wilkins in their individual capacities for violating his Fourth Amendment rights; (2) State trespass claims against GCSO Defendants Stalls and Wilkins, as well as against Sheriff Barnes on a respondeat superior theory; (3) Section 1983 claim against Defendant Hinson in his individual capacity for violating White's Fourth Amendment rights in connection with his arrest; (4) State malicious prosecution claim against Defendant Schwochow in his individual capacity; (5) State trespass claims against all Greensboro Search Officers in their individual capacity; (6) State trespass claim against the City of Burlington on a respondeat superior theory; and (7) all claims against the Reidsville Defendants, as they did not file a motion to dismiss.

White further alleges, upon information and belief, that all

Defendants are liable on a theory of civil conspiracy under North Carolina law. According to his allegations, "all Defendants entered into an agreement and conspiracy whereby they would prosecute Plaintiff for charges that lacked probable cause." (Doc. 81 ¶ 256.) "All" Defendants either held "personal ill will towards Plaintiff," or "desired to advance their careers at all costs . . . regardless of . . . evidence that Plaintiff was not responsible for the crime." (Id. ¶ 257.)

To state a civil conspiracy under North Carolina law, a complaint must state (1) a conspiracy; (2) wrongful acts by the alleged conspirators in furtherance of the conspiracy, and (3) injury. Krawiec v. Manly, 811 S.E.2d 542, 550-51 (N.C. 2018) (quoting State ex rel. Cooper v. Ridgeway Brands Mfg., LLC, 666 S.E.2d 107, 115 (N.C. 2008)). A conspiracy refers to an agreement between two or more people to do a wrongful act. See Tate v. Sallie Mae, Inc., No. 3:10-cv-00386, 2011 WL 3651813, at *2 (W.D.N.C. Aug. 19, 2011). At the motion to dismiss stage, White is not required to allege "specific facts to support the existence of an agreement" between the Defendants. Id. (citing Godfredson v. JBC Legal Grp., P.C., 387 F. Supp. 2d 543, 549 (E.D.N.C. 2005)). This liberal pleading standard derives from the fact that a conspiracy is not a standalone cause of action but rather associates defendants together and "perhaps liberalize[s] the rules of evidence to the extent that under proper circumstances

the . . . conduct of one might be admissible against all." <u>Shope</u>
<u>v. Boyer</u>, 150 S.E.2d 771, 774 (N.C. 1966).

Municipalities, however, cannot ordinarily be a party to a
conspiracy. <u>Houpe v. City of Statesville</u>, 497 S.E.2d 82, 93-94
(N.C. Ct. App. 1998).[29]  For that reason, the conspiracy claim
alleged against the City of Burlington will be dismissed.[30]

Because a conspiracy claim alone is insufficient to impose
civil liability, the Defendants subject to the claim must also
have caused an injury pursuant to a wrongful act in furtherance of
the conspiracy. <u>See</u> <u>Krawiec</u>, 811 S.E.2d at 550-51.  Thus, the
claims the court considers when analyzing White's conspiracy
claims are the state claims that survive Defendants' motions to
dismiss. <u>See</u> <u>id.</u> at 551 (dismissing conspiracy claims that stem
from torts that were not sufficiently pleaded on a motion to
dismiss).  For this reason, the motion to dismiss the conspiracy
claim will be denied as to those Defendants who remain subject to
state law claims following this court's ruling, and otherwise will

---

[29] Although White points out that <u>Houpe</u> left open the possibility that a
municipality <u>might</u> be able to be a party to conspiracy in some
circumstances, he does not identify any case that presents an application
of this exception.  (Doc. 76 at 7.)  Thus, there is no basis to find
that an exception to the general rule espoused in <u>Houpe</u> should apply
here.

[30] This result would also apply to the City of Greensboro as well, but
all state law claims against it are being dismissed because the
municipality enjoys sovereign immunity.  The City of Reidsville
ostensibly will benefit from the same analysis, but it has not filed any
motion to dismiss.

be granted as to those Defendants for whom no state law claim remains.

## III. CONCLUSION

For the reasons stated,

IT IS THEREFORE ORDERED that the pending motions to dismiss are GRANTED IN PART and DENIED IN PART as follows:

1. The GCSO Defendants' motion to dismiss (Doc. 36) is GRANTED as to (1) all § 1983 official capacity claims against Sheriff Barnes, Stalls, Cook, Wilkins, and Buskirk (Fourth Cause of Action); (2) all § 1983 individual capacity claims against Buskirk and Cook in their individual capacities and all due process claims against Stalls and Wilkins (Fifth Cause of Action); (3) all malicious prosecution claims against Sheriff Barnes, Stalls, Cook, and Buskirk in both their individual and official capacities (Ninth Cause of Action); (4) all North Carolina constitutional claims against Sheriff Barnes, Stalls, Cook, Wilkins, and Buskirk in both their official and individual capacities (Sixteenth Cause of Action); and (5) all conspiracy claims against Buskirk and Cook in both their official and individual capacities (Seventeenth Cause of Action), which are DISMISSED, and the motion is otherwise DENIED.

2. The Greensboro Defendants' motions to dismiss (Docs. 43, 45) are GRANTED as to (1) all § 1983 official capacity claims against the City of Greensboro, Schwochow, Hinson, Sigmon, Raines,

Barham, Williamson, Albert, and Lowe (Third Cause of Action); (2) all § 1983 individual capacity claims against the City of Greensboro, Schwochow, Sigmon, Raines, Barham, Williamson, Albert, and Lowe, as well as all due process claims against Hinson (Eighth Cause of Action); (3) the COBRA claim against the City of Greensboro (Thirteenth Cause of Action); (4) the Takings claim against the City of Greensboro (Fourteenth Cause of Action); (4) all malicious prosecution claims against the City of Greensboro, Williamson in both his official and individual capacities, and Schwochow in his official capacity (Ninth Cause of Action); (5) all trespass claims brought against Lowe, Sigmon, Raines, Barham, Schwochow, Albert, and Williamson in their official capacity and against the City of Greensboro (Eleventh Cause of Action); (6) all tortious interference of contract claims brought against Hinson, J. Westmoreland, and Scott in both their official and individual capacities (Fifteenth Cause of Action); (7) all North Carolina constitutional claims brought against the City of Greensboro, Schwochow, Sigmon, Raines, Barham, Williamson, Lowe, Albert, Hinson, Scott, and J. Westmoreland in both their official and individual capacities (Sixteenth Cause of Action); and (8) all conspiracy claims brought against the City of Greensboro, Hinson, Scott, and J. Westmoreland in both their official and individual capacities, as well as the conspiracy claims against Lowe, Sigmon, Raines, Barham, Schwochow, Albert, and Williamson in their

official capacities (Seventeenth Cause of Action), which are DISMISSED, and the motion is otherwise DENIED.

      3.    The Burlington Defendants' motion to dismiss (Doc. 47) is GRANTED as to (1) all § 1983 official capacity claims brought against the City of Burlington, C. Westmoreland, and Watkins (First Cause of Action); (2) all § 1983 individual capacity claims against C. Westmoreland and Watkins (Seventh Cause of Action); (3) all malicious prosecution claims against the City of Burlington, C. Westmoreland, and Watkins in both their official and individual capacities (Ninth Cause of Action); (4) all North Carolina constitutional claims against the City of Burlington, C. Westmoreland, and Watkins in both their official and individual capacities (Sixteenth Cause of Action); and (5) all conspiracy claims against the City of Burlington, C. Westmoreland, and Watkins in both their official and individual capacities (Seventeenth Cause of Action), which are DISMISSED, and the motion is otherwise DENIED.

                                              /s/    Thomas D. Schroeder
                                      United States District Judge

September 30, 2019