IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

WILLIAM Z. WHITE,                    )
                                     )
                Plaintiff,           )
                                     )
        v.                           )        1:18CV969
                                     )
THE CITY OF GREENSBORO, et al.,      )
                                     )
                Defendants.          )

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, Chief District Judge.

This lawsuit arises out of the arrest and firing of Plaintiff William White, a former Greensboro Police Department officer, after he was investigated for illegal activity stemming from the theft of several commercial-grade lawn mowers. After the criminal charges against White were eventually dropped, he brought this case alleging numerous violations of both federal and North Carolina law against multiple Defendants across four law enforcement agencies.

Before the court are motions for summary judgment by the following remaining Defendants:

- Officers from the Guilford County Sheriff's Office ("GCSO") -- Sheriff B.J. Barnes, James Stalls, and Homer Wilkins -- and Travelers Casualty & Surety Company of America as surety for Sheriff Barnes ("GCSO Defendants") (Doc. 128);

- Officers from the Greensboro Police Department ("GPD") -- James Schwochow, Eric Sigmon, Johnny Raines, Jr., William Barham, Brian Williamson, Jason Lowe, and Lindsay Albert (Doc. 136) -- as well as a separate motion by GPD Deputy Chief James Hinson, Jr. (Doc. 102) ("Greensboro Defendants");

- City of Reidsville and officers from the Reidsville Police Department ("RPD") -- Chief Robert Hassell, Lynwood Hampshire, and Shannon Coates ("Reidsville Defendants") (Doc. 131);

- City of Burlington (Doc. 126).

White responded to each motion (Docs. 111, 149-152), and Defendants filed reply briefs (Docs. 112, 156, 157, 159). Also before the court are four motions to seal various documents (Docs. 105, 130, 138, 153) and Defendants' joint motion to exclude expert testimony (Doc. 117), which are all fully briefed (Docs. 108, 123, 143). For the reasons set forth below, the motions will be granted in part and denied in part.

**I.   BACKGROUND**

**A.   Facts**

The facts presented, taken in the light most favorable to White as the non-moving party, show the following:

**1.   Theft of Lawn Mowers and Investigation**

White was a police officer for the GPD from April 2009 until

2

March 6, 2017. (Doc. 111-1 ¶ 3.)[1] During this time, he earned additional money by buying and reselling houses and equipment, including lawn equipment, during his off-duty hours. (Id. ¶ 4.)

On August 22, 2016, the RPD received a report that several commercial-grade lawn mowers were stolen from Scott's Tractor, a lawn mower dealer in Reidsville, North Carolina. (Doc. 140-1.) RPD Lieutenant Shannon Coates responded to the report and assigned RPD Sergeant Lynwood Hampshire to investigate. (Id., Doc. 140-2 at 16:16-20.) Hampshire would serve as the lead investigator for the duration of the investigation. (Doc. 140-2 at 17:1-3.)

On August 24, White purchased a John Deere zero-turn lawn mower from an individual in the parking lot of Sedgefield Lawn and Garden in Jamestown, North Carolina. (Doc. 151-1 at 16:10-14, 20:25-21:7.) White viewed the mower on several occasions before he purchased it. (Doc. 128-6 at 27:20-28:17.) He purchased the mower for potential personal use, business use, and resale. (Doc. 151-1 at 16:15-21.) The seller was a white male who had multiple mowers in a trailer that was towed by a pick-up truck. (Doc. 128-6 at 17:3-20:17.) White does not recall the type of truck, where it was licensed, the seller's name, or the time of day in which he purchased the mower. (Id. at 20:12-17.) He did receive a pamphlet

---

[1] All citations to the record are to the ECF docket page except for testimony, which is cited to the deposition transcript page and line number.

with serialized information from the seller at the time of purchase. (Id. at 31:3-7.)

On August 30, Hampshire inputted the serial numbers of the stolen lawn mowers into the National Criminal Information Center ("NCIC"), a national database that police agencies use to search for missing persons or stolen items. (Doc. 140-2 at 21:14-24.) He also sent an email and pictures of the suspect's vehicle that he acquired from Scott's Tractor's video surveillance on the night of the theft to the Property Investigator's Group, a group of detectives from local jurisdictions that meets to share information about criminal activity to assist in investigations. (Id. at 24:2-10; Doc. 140-3 at 1.) But this group could not provide any helpful information about the theft. (Doc. 140-2 at 24:17-22.)

White's stepbrother is James ("Matt") Stalls, a GCSO deputy.[2] (Doc. 128-2 at 14:13.) They grew up together from approximately the age of 5 to 18 years old. (Id. at 14:22-25.) In addition to being stepbrothers, they are also brothers-in-law; their wives are sisters. (Id. at 14:14-15.) The two families spent time together, including for vacations, birthdays, special occasions, and weekly Sunday dinners. (Id. at 17:10-19, 18:17-20:11.) At a Sunday

---

[2] Unless otherwise noted, Defendant Matt Stalls is referred to as "Stalls" and his wife as "Brittany Stalls." Similarly, Plaintiff William White is referred to as "White" and his wife as "Christina White."

4

dinner the week before Labor Day 2016,[3] White's wife, Christina, asked her sister, Brittany Stalls, to take care of her and her husband's dogs over Labor Day weekend while they were on vacation. (Id. at 21:3-7; Doc. 128-4 at 18:18-22.) Brittany Stalls had done so previously (Docs. 128-4 at 15:22-16:2; 128-5 at 78:10-14), and both Stalls contend that on occasion Matt Stalls would go by himself to care for the dogs without any complaint or objection from the Whites (Docs. 128-2 at 22:4-23:4; 128-4 at 17:16-18:22). According to Christina White, however, she had previously told her sister that she did not want Stalls to feed the dogs because he played too roughly with them, and to her knowledge Stalls had never been over to her house to care for them. (Doc. 128-5 at 82:13-83:17.)

On September 3, Matt and Brittany Stalls went to the Whites' house to care for the dogs. (Doc. 128-2 at 23:21-24:18.) As they entered the garage where the dog food was kept, Stalls noticed a John Deere mower in the garage with a sheet over the seat. (Id. at 23:5-11, 25:25-26:5.) He removed the sheet, sat on the seat, and took a photograph of the mower's vehicle identification number ("VIN"), also known as the serial number. (Id. at 26:6-27:8; Doc. 128-3 at 5.) Stalls states he did this because he was interested

_____

[3] The parties do not provide the exact dates. The Sunday before Labor Day 2016 would have been August 28.

5

in purchasing a mower for himself.  (Doc. 128-2 at 26:11-17.)

Later that day, Stalls texted White asking about the mower. (Id. at 28:17-24; Doc. 128-3 at 6-8.)  White told Stalls the mower was not his and he was debating if he wanted to keep it.[4]  Several days later, Stalls checked the mower's model number against a police database.  (Doc. 128-3 ¶ 7.)    Stalls says he did this because he started to suspect the mower might be stolen because White told him he got it from another police officer, the mower looked brand new, and the asking price was half the mower's value. (Doc. 128-2 at 29:4-23.)  The search reflected that the mower had been reported stolen by the RPD.  (Id. at 30:3-6.)  Stalls then

---

[4] Because it is relevant to the remaining claims, the court sets out their text message thread in full (Doc. 128-3 at 6-8) (errors in the original):

    Stalls: Went by your house earlier to let the dogs out…where did u steal that mower from?
    White: haha nice isn't it
    Stalls: Do I need to run the vin number?  And yes…its beautiful
    White: already did but it's being sold
    Stalls: Why are u selling it?
    White: way to big, and it is a commercial, I just need a residential
    Stalls: What's ur asking price
    White: it's not mine it's another officers, it's an $11,000 mower he wants $5900 I think but not sure I will have to ask again, I am just trying to see if I want it
    Stalls: It looks brand new…u sure there ain't an "insurance" claim on it?
    White: it is, but no there is not, I am still debating I may keep but I doubt I can use one that big
    Stalls: It will take longer for u to get it out of the garage than to cut the grass.  I would love to have one that big but I can't afford it.  Will he take payments?  Lol
    White: I doubt, think the neighbors want it though, he was drooling over it

6

called his stepmother, Anita Holder -- who is White's mother and was herself a former GPD police officer, including interim chief of police -- for guidance. (Id. at 30:8-9; Doc. 111-2 ¶¶ 7-10.) Holder told Stalls to confront White about the mower, which Stalls did via text message and a phone conversation on September 19. (Docs. 128-2 at 30:11-31:5; 128-3 ¶¶ 7-9.) Stalls also told at least two other GCSO officers that White was in possession of a stolen mower. (Doc. 128-2 at 31:10-24.)

By this point White had decided to sell the mower. On September 15, he posted an ad on Craigslist. (Doc. 151-1 at 45:20-24.) In part, the ad read: "John Deere 930 commercial zero turn, like new 18 hours . . . garage kept. mowed with 1 season, divorcing and need gone NOW." (Doc. 140-6 at 1.) On September 19 -- the same day Stalls texted him asking to talk about the mower -- White sold the mower to David and Dennie Terry ("the Terrys") who picked up the mower that night at White's house. (Doc. 151-1 at 50:13-25.) White gave the Terrys a bill of sale that he signed "Bill White." (Doc. 140-6 at 2.)

The next day, September 20, the Terrys developed some concerns with the mower. First, the mower's hour reading was in fact 1.8 hours. (Doc. 128-8 ¶ 8.) This was different from White's Craigslist ad that represented the mower had been used for 18 hours or "one season." (Id.) Second, the Terrys were unable to locate the serial number for the mower. (Doc. 140-10 at 4-6.) In the

7

spot where they expected the serial number to be, David Terry observed "sticky residue (as if a sticker had been removed). Etched in the glue residue was the word 'void.'" (Doc. 128-8 ¶ 9.) The Terrys became concerned the mower was stolen. (<u>Id.</u> ¶ 11.) They texted White to express their concerns. (<u>Id.</u>; Doc. 140-10.) In response, White texted: "1TC930MCHGT042903., this is the number I was given on bill of sale, not sure if it helps but I never bought a warranty so not sure." (Doc. 140-10 at 6.) The Terrys requested a picture of the bill of sale that White said he had received from the seller to confirm the serial number, but they never received it. (<u>Id.</u> at 8; Doc. 128-8 ¶ 6.)

Still concerned, the Terrys contacted a John Deere dealer in Roxboro, North Carolina, and provided the serial number White had given them. (Doc. 128-8 ¶ 15.) The dealer told the Terrys that that particular serial number belonged to a mower that was sold in New York the day before. (<u>Id.</u>) The same dealer also told the Terrys that John Deere also attaches the serial number beneath the mower. (<u>Id.</u> ¶ 16.) David Terry took a picture of the serial number for the mower he had purchased from White. The mower's actual VIN was 1TC930MCPGT043684. (<u>Id.</u>; Doc. 140-7.) The Terrys provided this VIN to the John Deere dealer in Roxboro who told them there was no record of a mower with that serial number having been sold. (Doc. 128-8 ¶ 17.)

At this point the Terrys contacted White to request a refund.

(Id. ¶ 18.)  White responded that he had already spent the Terrys'
money to pay other debts.  (Id.; Doc. 140-10 at 9.)  The Terrys
then contacted a friend at the Durham County Sheriff's Office
("DCSO"), Deputy Peter Lilje.  (Doc. 128-8 ¶ 19.)  Lilje ran the
mower's VIN on a police database and it returned a hit linking the
Terrys' mower to one of the mowers stolen from Scott's Tractor.[5]
(Id.; Doc. 140-5 at 2.)  Lilje met with the Terrys that evening
and had the mower towed to a secure location.  (Doc. 128-8 ¶ 19.)
On September 20 and again several days later, the Terrys texted
White to inform him the mower was reported stolen and that they
had contacted the police, and they encouraged White to do the same.
(Id. ¶¶ 20-21.)

On September 26, the Terrys contacted the GCSO by phone
because White's house -- where they bought the mower -- was located
in Guilford County, North Carolina.  (Id. ¶ 22.)  The Terrys spoke
to GCSO Detective Homer Wilkins who recommended they contact the
RPD because Reidsville was where the mowers were stolen.  (Id.;

---

[5] It is not fully clear which VIN Deputy Lilje ran.  His report lists
the VIN as 1TC915BAAET020866.  (Doc. 140-5 at 1.)  This number
corresponds to a VIN for another mower that was reported stolen from
Scott's Tractor, although it is not the VIN on the Terrys' mower.  (See
Docs. 140-1; 140-7.)  White cites this difference as an example of a
discrepancy that "negate[s] probable cause" for the search warrant for
White's house.  (Doc. 151 at 8-9.)  Hampshire says he did not find the
discrepancy curious and that he assumed Lilje copied it in error because
the VINs for all the stolen mowers were listed together on the police
database.  (Doc. 140-2 at 60:3-11, 64:19-22.)  The court need not
determine what happened.  For reasons given infra, even with this
discrepancy there was probable cause for the search warrant.

9

Doc. 128-7 ¶¶ 3, 10.)  The Terrys did so and eventually spoke to Hampshire, who was investigating the Scott's Tractor theft, on October 7.  (Doc. 140-3 at 1.)

On November 2, Hampshire went to the GCSO office to meet Wilkins so the two of them could conduct a "knock and talk" at White's house.  (Id. at 2.)  Wilkins had been directed by his supervisor to accompany Hampshire.  (Doc. 128-7 ¶ 12.)  Upon arriving at White's house, Hampshire and Wilkins knocked on the front door, but no one answered.  (Doc. 140-2 at 79:14-18.) Hampshire noticed cobwebs on the front door and thought the door might not be used, so he walked through an open garage door to another door to the house, knocked on that door, and again no one answered.  (Id. at 79:18-80:14.)  Hampshire left his business card on the door inside the garage and left.  (Id. at 80:14.)  During this time, Wilkins stayed on the driveway and did not enter the garage.  (Id. at 134:18-22.)  According to White and his wife, Christina White, the Whites do not ordinarily use the garage door to enter or exit their home.  (Docs. 151-1 at 110:23-24; 151-2 at 77:3-6.)

Prior to going to White's house for the knock and talk, Hampshire learned that White was a GPD police officer.  (Docs. 140-2 at 18:3-9; 140-9 at 27:16-28:22.)  He later spoke with Coates, his supervisor, who advised him to contact the North Carolina State Bureau of Investigation ("SBI") and GPD's

10

Professional Standards Division. (Doc. 140-2 at 18:3-9.) The SBI was contacted because it is standard practice for the SBI to be involved when a police officer is the suspect in an investigation. (Doc. 140-8 at 170:5-171:3.) Hampshire contacted SBI Agent Destinie Denny, who had worked with the RPD in the past. (Id. at 21:15-22:10.)

On November 3, Hampshire and Wilkins met with the Terrys at GCSO's District 3 office in Jamestown. (Doc. 128-8 ¶ 24.) Wilkins was again present, at Hampshire's request. (Doc. 128-7 ¶ 21.) During this meeting the Terrys provided Hampshire with a copy of their text messages with White and the bill of sale White had given them, as well as the picture of the VIN David Terry took from the mower. (Doc. 140-3 at 1-2.) The Terrys also told Hampshire about the difference in hours the mower had actually been used versus what was listed on White's Craigslist ad (1.8 hours versus 18 hours). (Docs. 140-2 at 28:10-16; 140-6 at 1.)

On November 9, Hampshire and Denny interviewed White at the RPD offices. (Doc. 140-2 at 36:14-21.) According to Hampshire, White told them that he purchased the mower in the parking lot of Sedgefield Lawn and Garden from a man with a black pick-up truck and a black trailer that had three or four John Deere mowers inside. (Id. at 38:1-10.) White said the seller was from a John Deere "up North" that was closing, and they arranged for the mower to be delivered to White's house. (Id. at 38:14-23.) According

11

to Hampshire, White offered to look through his phone records to help identify the seller but never did. (Id. at 39:11-17, 139:7-14.)

The next day, November 10, Hampshire spoke to the manager of Sedgefield Lawn and Garden. (Doc. 140-3 at 2.) The manager told Hampshire that no one had been in their lot selling John Deere mowers. Hampshire concluded that the parking lot would not be a suitable place to sell mowers because it would have impeded traffic and been noticed by store staff. (Id. at 3.)

At some point the mower was returned to Scott's Tractor. In February 2017, Hampshire learned that Scott's Tractor had taken possession of the mower, and he went to take a picture of the underside of the mower. (Docs. 140-2 at 51:24-53:1; 140-3 at 3-4.) The mower was then re-sold, although the owners of Scott's Tractor admitted to having already collected the insurance proceeds based on the original theft. (Doc. 140-3 at 4.) Hampshire reported this development and discussed his concerns about possible insurance fraud with Coates, Denny, a local district attorney, and an investigator with the North Carolina Department of Insurance. (Docs. 140-2 at 46:1-47:16; 140-3 at 4.)

### 2. Theft in Burlington

On January 16, 2017, Detective Cody Westmoreland of the Burlington Police Department ("BPD") was assigned to investigate the theft of three John Deere Gators from Quality Equipment in

12

Burlington, North Carolina. (Docs. 127-1; 127-2 at 22:11-23:17.) That investigation led to a suspect, Jeffrey Strickland, Jr. (Docs. 127-2 at 24:23-25:5; 127-13 ¶¶ 9-11.) Westmoreland learned that Strickland was a sworn officer with High Point Parks and Recreation and was previously a GPD police officer. (Doc. 127-13 ¶ 12.) Accordingly, because the investigation centered on another law enforcement officer and because Westmoreland would have to travel outside his jurisdiction to investigate the thefts, he requested the assistance of the SBI. (Id. ¶ 13.) The SBI agent assigned to Westmoreland's case informed Westmoreland that SBI Agent Denny was working on a similar case -- the RPD's investigation into the theft of mowers from Scott's Tractor. (Id. ¶¶ 14-15.) Westmoreland met with Denny and informed him that White was a suspect in the RPD case. (Id. ¶ 15.) Denny believed that the Quality Equipment and Scott's Tractor thefts may have been related because they occurred during a similar time frame, had similar methods of operation, and both involved police officers. (Docs. 127-2 at 30:25-31:4; 127-3 at 25:3-26:7.)

The SBI eventually obtained Strickland and White's phone records, which showed numerous calls with each other during the relevant time period.[6] (Docs. 127-5 ¶ 3; 127-6 at 41:19-23.)

_____

[6] In addition, Strickland delivered the John Deere mower that White sold to the Terrys to White's house in August 2016. (Docs. 140-2 at 139:25-140:14; 140-8 at 174:3-175:15; 128-5 at 88:25-89:5.) Christina White was at home and observed Strickland deliver the mower. (Doc. 128-5 at

Ultimately, the SBI decided to execute search and arrest warrants for Strickland and White at the same time.[7]  (Doc. 127-5 ¶ 3.)

### 3.  Search of White's Residence

On March 5, 2017, Hampshire applied for and obtained a warrant from a magistrate to search two of White's residences.  (Doc. 140-12.)  The warrant application listed the following facts establishing probable cause:

- Nine riding lawn mowers were stolen from Scott's Tractor on August 21, 2016.

- On September 19, White sold one of the mowers that had been reported stolen from Scott's Tractor to the Terrys, who picked up the mower from White's house.

- When the Terrys inspected the lawn mower the next day, they noted the VIN was missing and the mower displayed 2.0 hours, which was fewer than the 18 hours White advertised.

---

87:16-89:5.)  She knew it was Strickland because he had worked with White and they were friends.  (Id. at 89:6-8.)  However, it does not appear that any law enforcement officer was aware of this fact during the investigation and prior to executing the search warrant on White's house. As Hampshire and Denny both testify, White did not tell them during their November 9, 2016 interview that Strickland delivered the mower, even though it would have been relevant for their investigation.  (Docs. 140-2 at 139:15-140:14; 140-8 at 173:25-174:7.)  Accordingly, the court does not consider this fact in its analysis.

[7] Strickland ultimately pleaded guilty in July 2020 to felony obstruction of justice, two counts of felony possession of stolen goods, and two counts of felony obtaining property by false pretenses stemming from the theft of the John Deere Gators from Quality Equipment.  (Doc. 127-15.)

14

- The VIN White provided the Terrys was connected to a mower sold in New York "just days before" this sale.

- The Terrys discovered the actual VIN for the mower which was connected to one stolen from Scott's Tractor.

- White did not provide the Terrys a bill of sale from when he originally purchased the mower.

- White did not report the mower as stolen even after the Terrys reported it to him as stolen.

- Hampshire went to Sedgefield Lawn and Garden and verified that the parking lot would not have fit a truck as described by White, and that the manager would not have allowed any such sales.

(Id. at 7-9.) Hampshire also stated in the application that during his interview with Denny, White said he "was here to talk about the mower he stole" which he recanted "to say sold." (Id.)

Also on March 5, the investigating agencies informed GPD Chief Wayne Scott that they had probable cause to arrest White for felony possession of stolen property and felony obtaining property by false pretenses, that the agencies were in the process of obtaining search warrants for White's residences, and that they planned to arrest White on March 6.[8] (Doc. 103-1 ¶ 9.) The investigating agencies had updated Scott during their investigation, and GPD's

---

[8] Chief Scott's declaration does not identify which agencies informed him that probable cause existed to arrest White.

15

Professional Standards Division was also investigating White's possible involvement in the mower thefts. (Id. ¶ 6.) Scott agreed that the agencies had probable cause to arrest White and decided to terminate White's employment with GPD. (Id. ¶¶ 10-11.)

On the morning of March 6, Hampshire conducted a briefing at SBI's Greensboro office prior to executing the search warrants. Present were members from the SBI, BPD, GCSO, and the Randolph County Sheriff's Office. (Doc. 140-13 at 1.) Hampshire had prepared an operations plan, which was reviewed by his supervisor Coates, outlining the execution of the search warrants. (Docs. 140-2 at 89:19-23; 139.)

Later that morning, White arrived for work at GPD headquarters. Scott met with White and fired him effective immediately. (Doc. 103-1 ¶ 18.) White was then arrested by Agent Denny from the SBI and Lieutenant Coates from the RPD, and Coates handcuffed him. (Id. ¶ 19; Doc. 103-4 ¶¶ 4-5.) During the arrest, two GPD officers, including Deputy Chief James Hinson, placed their hands on White's arms to assist in the arrest. (Doc. 103-1 ¶ 20.)

At about 8:00 a.m., after White was arrested, the RPD and SBI executed the search warrant at White's primary residence.[9] Present at the start of the search were two agents from the RPD, including

---

[9] A second warrant was executed simultaneously at another house owned by White. However, this house was for sale and was essentially vacant. (Doc. 140-13 at 5.) No claims have been brought by White as to the search of this house.

16

Hampshire as the officer in charge, and two agents from the SBI. (Doc. 139 at 7.) Detective Victoria Underwood of the BPD was present as a BPD liaison officer because the BPD was conducting a simultaneous arrest of Strickland as a result of its investigation into the theft at Quality Equipment. (Doc. 127-14 ¶¶ 5-6.) Deputy Amanda Fleming of the GCSO was present as a GCSO liaison officer since White's house was in Guilford County. (Docs. 139 at 7; 140-2 at 136:12-137:21.) Other officers arrived during the search, including RPD Chief Robert Hassell. (Doc. 140-2 at 91:25-92:4.)

When the officers arrived at White's house, the only people present were Christina White, the Whites' daughter, and Anita Holder. (Doc. 137-7 at 7:23-8:10.) Hampshire allowed Holder to leave with the Whites' daughter. (Id.; Doc. 140-2 at 95:22-96:9.) The search officers proceeded to search the residence. They discovered a John Deere Gator and trailer in White's garage. The Gator was reported as stolen from Wake County, North Carolina, in November 2016. (Doc. 140-13 at 2, 11.) The officers were unable to find a VIN for the trailer, which appeared to have been scratched off. (Id.) Both the Gator and trailer were seized and towed to the RPD impound lot.[10] (Id.)

Hampshire's operations plan directed that, upon discovery of

---

[10] Additional items seized include four cell phones, $60,000 in cash wrapped in foil under the sink in the master bathroom, a hard drive and two thumb drives, and several firearms. (Doc. 140-15.) This is in addition to property identified as belonging to the GPD, discussed infra.

17

any GPD equipment or property, Hampshire was to notify RPD Lieutenant Coates who would in turn notify the GPD to come to White's house to retrieve the property. (Docs. 139 at 11; 140-2 at 87:13-23.) This is what happened. The investigating officers discovered GPD equipment at White's house, Hampshire notified Coates, and Coates notified the GPD to collect the property. (Docs. 139-1 at 3; 140-2 at 87:13-18.) At some point, two GPD officers reviewed Hampshire's search warrant and concluded it would cover their equipment, although it is unclear when this occurred. (Doc. 140-2 at 124:2-14.)

At about 10:00 a.m., GPD Lieutenant Johnny Raines was directed to go to White's house to pick up GPD-issued equipment. (Doc. 137-10 at 15.) Raines was a member of Resource Management, the GPD division that keeps track of GPD equipment. (Doc. 137-11 at 79:3-9.) According to several GPD Defendants, it is standard practice for GPD to attempt to collect issued equipment as soon as possible after an officer leaves the department. (Docs. 137-10 at 15; 137-12 at 3.) Raines directed Sergeant William Barham to accompany him to White's house. (Id.) When they arrived, Raines looked into an open garage and noticed what appeared to be GPD equipment in the garage. (Doc. 137-10 at 15.) Officers from the SBI and RPD escorted Raines and Barham to the master bedroom where they both observed additional GPD equipment. (Id.; Doc. 137-12 at 4.) At this point, Raines went to the living room where Christina

White was sitting and asked her if they could collect GPD property. (Doc. 137-10 at 16.)  While Raines says Christina White "stated that we could collect and remove the property," (id.), Christina White says she never gave Raines permission to look for GPD equipment and that he was already searching for the equipment before he spoke to her (Doc. 152-2 at 17:21-18:3).

Shortly thereafter, GPD Sergeant Brian Williamson arrived at White's house.  (Docs. 137-10 at 16; 137-14 at 4.)  Williamson was the team leader for GPD's Special Response Team ("SRT"), of which White was a member prior to his termination.  (Doc. 137-14 at 3.) Because it was unlikely a non-SRT member could identify SRT equipment, Williamson reported to White's house to identify GPD's SRT equipment.  (Id. at 4.)  Williamson subsequently ordered GPD Detective Jason Lowe, who was the sniper team lead on GPD's SRT, to come to White's house to identify any SRT sniper equipment White may have had.  (Doc. 137-15 at 4.)

During the search for GPD equipment, Williamson observed two Rubbermaid bins in the master bedroom that were "full to the rim" with ammunition that was the same type GPD SRT uses.  (Doc. 137-14 at 4.)  He reported this to Raines.  (Id.)  Raines observed that White appeared to have more GPD equipment than an officer would typically be issued, including about a dozen ballistic vests in the master bedroom when an officer is usually only issued one or two such vests.  (Doc. 137-10 at 16.)  Williamson and Barham

19

also noticed that one of these vests had the name of Raines's wife
-- who was a former GPD officer -- inscribed on the inside of the
vest. (Docs. 137-12 at 4; 137-14 at 4.) According to Barham, "At
that point, the situation changed. There was credible evidence
that [White] had GPD property that he should not possess." (Doc.
137-12 at 4.)

Raines informed the SBI and RPD and contacted his command
staff to notify them that he believed White may have stolen GPD
property. (Doc. 137-10 at 17.) In response, GPD's Property Crimes
division ordered Sergeant Eric Sigmon to find the next available
GPD detective and report to White's house. (Doc. 137-18 at 3.)
Sigmon ordered Detective James Schwochow to accompany him. (Id.;
Doc. 137-20 ¶ 5.) Sigmon was Schwochow's direct supervisor. (Doc.
137-20 ¶ 5.) Upon their arrival, there were several piles of
equipment in White's driveway. (Id. ¶ 6.) Sigmon ordered
Schwochow to make an inventory of the property. (Id. ¶ 7.) At
some point GPD Detective Lindsay Albert was also ordered to go to
White's house, where she helped organize and sort GPD property.
(Doc. 137-21 at 3.) During this time, she observed a bicycle in
White's garage that looked like a customized model the GPD used.
(Id. at 4.)

White states he was in lawful possession of all property found
at his house, either because he purchased it for personal use or
because he had permission to store it at his house. (Doc. 152-1

20

at 166:17-22; see generally id. at 166:23-189:25.)

All told, there were at least seven GPD officers present at White's house on March 6: Raines, Barham, Williamson, Lowe, Sigmon, Schwochow, and Albert (collectively "the Greensboro Search Officers").

Barham transported the seized property that the Greensboro Search Officers had identified as GPD property from White's residence to two GPD locations: the SRT gear and ammunition went to an SRT ammunition cage, and the remainder of the equipment went to the GPD logistics armory. (Docs. 137-10 at 4-5.; 137-20 ¶ 10.)

The search concluded in the evening of March 6. (Doc. 140-2 at 95:16-18.)

### 4. After the Search

After the March 6 search, the SBI began investigating White for possession of excessive GPD property. (Doc. 137-4 at 162:21-163:12.) SBI Agent Denny was the charging officer for this aspect of the investigation. (Id. at 163:10-12.) GPD Chief Scott decided that GPD would not pursue any criminal charges against White for possible theft of GPD property, but that GPD would cooperate in any investigation the SBI decided to pursue. (Doc. 137-11 at 83:7-84:25.) To that end, GPD Sergeant Sigmon directed Schwochow to compile a list of items GPD collected from White's residence, including what had been issued to White and what had not been issued as well as the value of that property. (Docs. 137-19 at

21

43:3-14; 137-20 ¶ 12.) On March 8, Schwochow began compiling this information. (Doc. 137-20 ¶ 13.) To do this, he spoke to multiple individuals at GPD who had knowledge of or documentation about what equipment had and had not been issued to White and the value of the GPD property. (Id. ¶ 14.) In so doing, Schwochow did not speak to White. (Doc. 152-3 at 58:18-20.)

At the end of his investigation, Schwochow gave his report -- which included spreadsheets documenting the GPD property and a written summary -- to SBI Agent Denny. (Docs. 137-20 ¶ 16; 137-24.) Schwochow did not make an express determination as to the existence of probable cause for the crimes the SBI was investigating, although he believed probable cause did exist. (Doc. 137-20 ¶¶ 18-19.) However, in his report Schwochow wrote, "I determined that the ammunition, SRT gear and bicycle fell under the category of larceny by employee . . . [and] the other equipment and items . . . fell under the category of embezzlement." (Doc. 137-24 at 59-60.)

Based on Schwochow's report, Denny decided to pursue a felony larceny charge against White for theft of GPD property. (Doc. 137-4 at 163:24-164:1.) She did not speak to other GPD officers as part of her investigation. (Doc. 154-1 at 103:14-104:23.) Rather, she spoke to the Guilford County district attorney, who decided to bring the felony larceny charge against White. (Doc. 137-4 at 166:12-19.) On March 23, Denny discussed possible charges

22

with a Guilford County magistrate, who found probable cause to arrest White for felony larceny. (Id. at 169:2-7; Doc. 137-27.) An arrest warrant was issued, and White was arrested that day. (Doc. 137-27.) Denny did not speak to Schwochow about which charges, if any, to bring. (Doc. 137-4 at 169:7-9.) Schwochow did not have any further involvement in the investigation after he gave his report to Denny. (Doc. 137-20 ¶ 20.) Ultimately, the charges were resolved in White's favor. (Doc. 81 ¶ 98.)

In addition to the state larceny charge, White was charged in a two-count indictment with federal firearms violations based on firearms and silencers seized during the search of his house. See United States v. White, No. 1:17-CR-94-1, 2017 WL 2633521 (M.D.N.C. June 19, 2017). On June 19, 2017, U.S. District Judge Loretta C. Biggs of this court granted White's motion to suppress evidence obtained from the search of his house on March 6. See id. In part, Judge Biggs's opinion noted that in his search warrant application, Hampshire had attributed misleading statements to White from their November 9, 2016 interview.[11] See id. at *6

---

[11] Specifically, Judge Biggs found that Hampshire had reported in the warrant application: "During the interview William White made the comment 'he was here to talk about the mower he stole[.]' He immediately recanted the stole to say sold." Judge Biggs found that such representation failed to acknowledge that White was responding to a question posed to him. White, 2017 WL 2633521, at *6. However, White's reliance on Judge Biggs's opinion is misplaced for at least two reasons. First, her finding that the statement was "material" does not address the legal requirement of whether it was "necessary" to the finding of probable cause (which it was not, as there was sufficient other evidence to

("There is little question that the statement made by Sgt. Hampshire characterizing his interview with White was intended to mislead the judge into believing White had admitted to stealing a tractor and further had recanted that admission."). Following this decision, the Government dismissed the federal charges against White. (Doc. 81 ¶ 98.)

B. **Procedural History**

White initiated this action in November 2018 (Doc. 1) and filed a first amended complaint in December 2018 (Doc. 21). In January 2019, Defendants GCSO, Greensboro, and Burlington moved to dismiss for failure to state a claim upon which relief could be granted.[12] (Docs. 36; 43; 45; 47.) White responded but also moved for leave to file a second amended complaint (Doc. 54), which the Defendants opposed (Docs. 68-71). Following a hearing on these motions in September 2019, the court granted White's motion for leave to amend. (Doc. 80.) Subsequently, the court granted in part and denied in part Defendants' motions to dismiss. See White

---

support probable cause for the charges related to the mowers). See, e.g., United States v. Akinkoye, 185 F.3d 192, 199 (4th Cir. 1999) (finding that a Franks hearing was not required because probable cause existed apart from the alleged inconsistencies in the warrant affidavit). Second, Judge Biggs declined to hold a hearing under Franks v. Delaware, 438 U.S. 154 (1978), because, even assuming the warrant was valid, she still granted the motion to suppress after rejecting the Government's contention that the firearms, which were not listed in the warrant application, were found in plain view. White, 2017 WL 2633521, at *6-8.

[12] Defendant Reidsville did not file a dispositive motion but instead filed an Answer. (Doc. 39.)

v. City of Greensboro, 408 F. Supp. 3d 677 (M.D.N.C. 2019).
Discovery proceeded. The current motions followed and are now
fully briefed and ready for decision.

## II. ANALYSIS

### A. Motion to Exclude Expert Testimony

All remaining Defendants have jointly moved to exclude expert
testimony or evidence from Anita Holder, White's sole proffered
expert witness, on the grounds that White failed to serve an expert
report for Holder and she is an advocate for her son. (Doc. 117.)
White opposes this motion. (Doc. 123.)

Federal Rule of Civil Procedure 26(a)(2) governs pretrial
disclosure of expert testimony. Rule 26(a)(2) requires a party to
disclose the identity of any expert witnesses and, if the expert
is retained, specially employed to provide expert testimony, or an
employee who regularly gives expert testimony, to provide a written
report identifying the expert's opinions and the basis for them.
See Fed. R. Civ. Pro. 26(a)(2)(A) and (B).[13] All other expert
witnesses are subject to a limited disclosure and need not file a
written report. See id. 26(a)(2)(C).

Here, the parties filed a joint Rule 26(f) report in December

---

[13] In relevant part, subsection (a)(2)(B) provides: "Unless otherwise
stipulated or ordered by the court, this disclosure [of expert witnesses]
must be accompanied by a written report--prepared and signed by the
witness--if the witness is one retained or specially employed to provide
expert testimony in the case or one whose duties as the party's employee
regularly involve giving expert testimony."

25

2019, which provided that all expert witness disclosures and reports were due by July 31, 2020, and that discovery would close on September 30, 2020. (Doc. 94.) On July 30, 2020, White filed "Plaintiff's Expert Disclosure," which identified Holder as an expert witness. (Doc. 118-1.) The disclosure stated that Holder "will offer testimony about Defendants [sic] actions and the actions of their employers regarding their failure to properly follow the usual and customary practices of the industry and to follow their own policies and procedures" and would be "based upon her education and experience in the industry, her interactions with the Defendants and their relevant employers, as well as her review of documents produced in discovery and produce[d] pursuant to public records requests." (Id.) Holder states she did not receive compensation from White for her services as an expert witness. (Doc. 123-1 ¶ 14.) Discovery closed September 30, 2020, and Defendants' motion to exclude followed on October 2.

There is no dispute that White did not file an expert report for Holder. The issue is whether he was required to and, if so, what should be done about it.

Rule 26(a)(2) requires a report when, as relevant here, the expert is "retained or specially employed" to provide expert testimony.[14] In construing this provision, courts distinguish

---

[14] The report requirement also applies if the expert witness is "one

between expert witnesses who were directly involved in the underlying facts and expert witnesses who were retained specifically for the litigation, with only the latter having to provide a written report. See, e.g., Downey v. Bob's Disc. Furniture Holdings, Inc., 633 F.3d 1, 6 (1st Cir. 2011) ("[A] court must acknowledge the difference between a percipient witness who happens to be an expert and an expert who without prior knowledge of the facts giving rise to litigation is recruited to provide expert opinion testimony."); Stuart v. Loomis, No. 1:11-CV-804, 2014 WL 204214, at *2 (M.D.N.C. Jan. 17, 2014) (the expert report requirement "distinguishes between retained and specially employed experts and those experts who were directly involved in the underlying facts of a case"); Indem. Ins. Co. of N. Am. v. Am. Eurocopter LLC, 227 F.R.D. 421, 424 (M.D.N.C. 2005) ("If the witness has not provided a Rule 26(a)(2)(B) report, the Court will only allow an individual to give an expert opinion . . . if that individual has a connection with the case by being a participant in the events.").

The proverbial example of this distinction is the treating physician, who is often testifying based on both 1) her role as a first-hand participant in the diagnosis and treatment of the

---

whose duties as the party's employee regularly involve giving expert testimony." Fed. R. Civ. Pro. 26(a)(2)(B). There is no question that Holder is not White's employee, so this provision does not apply.

patient <u>and</u> 2) her specialized knowledge and training. Courts generally hold that treating physicians must be disclosed as expert witnesses, but they are not required to submit a Rule 26(a)(2)(B) report if their opinions are formed as a part of the patient's treatment; however, they are required to file a report if their opinions are formed outside the scope of the patient's treatment. <u>See, e.g.,</u> <u>Drennen v. United States</u>, 375 F. App'x 299, 306 (4th Cir. 2010) (per curiam);[15] <u>Fielden v. CSX Transp., Inc.</u>, 482 F.3d 866, 871 (6th Cir. 2007); <u>Goodman v. Staples</u>, 644 F.3d 817, 819 (9th Cir. 2011) (noting that while "generally speaking" treating physicians are excused from the report requirement, they are required to provide a report when they are "asked to opine on matters outside the scope of the treatment they rendered").[16]

Here, Holder is plainly a retained expert witness subject to Rule 26(a)'s written report requirement. The basis for Holder's opinion is "her education and experience in the industry, her interactions with the Defendants and their relevant employers, as well as her review of documents produced in discovery and

---

[15] Unpublished opinions of the Fourth Circuit are not precedential but can be cited for their persuasive, but not controlling, authority. <u>See</u> <u>Collins v. Pond Creek Mining Co.</u>, 468 F.3d 213, 219 (4th Cir. 2006).

[16] This specific example finds support in the Advisory Committee Notes to the Federal Rules of Civil Procedure. <u>See</u> Fed. R. Civ. P. 26 advisory committee's note to 1993 Amendment ("A treating physician, for example, can be deposed or called to testify at trial without any requirement for a written report."); Fed. R. Civ. P. 26 advisory committee's note to 2010 Amendment (listing "physicians or other health care professionals" as expert witnesses who generally are not required to provide a report).

28

produce[d] pursuant to public records requests." (Doc. 118-1.) In other words, her expert opinion is based on her experience as a police officer with GPD and her knowledge of police policies and procedures, not from her being "directly involved in the underlying facts" of the case. Cf. Stuart, 2014 WL 204214, at *2. This distinguishes Holder from both the quintessential treating physician and the examples White cites in his opposition brief, who in each instance had personal involvement in the underlying facts of each case. See Goodman, 644 F.3d at 819 (noting that treating physicians are "not specially hired to provide expert testimony; rather, they are hired to treat the patient" and so testimony stemming from their direct, personal involvement in the patient's treatment is not subject to the written report requirement); Downey, 633 F.3d at 6 (exterminator who personally inspected plaintiff's home was a non-retained expert because his testimony "arises not from his enlistment as an expert but, rather, from his ground-level involvement in the events giving rise to the litigation").

White responds that Holder "contemporaneously observ[ed] and assist[ed] in the defense of Plaintiff's 2017 criminal prosecution." (Doc. 123 at 5.) This may be so, but the "events giving rise to the ligation" are the actual investigation, firing, and arrest of White and the search of his house, not his subsequent criminal prosecution. There is no evidence that Holder had

29

"ground-level involvement" in <u>these</u> events. Indeed, by her own admission she came in afterwards, starting in 2017 by "actively assisting [White's] attorneys by reviewing discovery documents."[17] (Doc. 123-1 ¶ 11.) Again, her opinions are based on her prior experience and reviewing documents <u>after</u> the operative events. As such, even though she is not being compensated by White, she is still "retained" by him for Rule 26(a) purposes and was required to file a written report. This she did not do. <u>Cf. Sauers v. Winston-Salem/Forsyth Cnty. Bd. of Educ.</u>, No. 1:15CV427, 2018 WL 1627160, at *4 (M.D.N.C. Mar. 30, 2018) ("Even if [the treating doctor] was not compensated . . . because she considered material obtained outside of her treatment of [the patient] in offering her opinion, she was subject to Rule 26(a)(2)'s written report requirement.").

Having determined that Holder is a retained expert witness for whom a report should have been provided, the court now must determine an appropriate remedy. Defendants request that Holder's testimony be excluded, while White argues for the less severe

---

[17] White does not address it, but the discovery provided with the pending summary judgment motions suggests that Holder's involvement in the case from August 22, 2016, when the mowers were stolen from Scott's Tractor, until White's arrest on March 6, 2017, was limited to speaking to Matt Stalls about his suspicions that White had a stolen mower and being present at the Whites' house when the investigating officers arrived to execute the search warrant, although she left before the search started. (Docs. 128-2 at 30:8-13; 140-2 at 95:22-96:9.) This is far from the kind of direct, active involvement in the underlying facts that, e.g., a treating physician has.

remedy of reopening discovery for issuance of a report and a deposition.

If a party does not comply with Rule 26(a), that party "is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). "[T]he basic purpose of Rule 37(c)(1) [is] preventing surprise and prejudice to the opposing party." S. States Rack & Fixture, Inc. v. Sherwin-Williams Co., 318 F.3d 592, 596 (4th Cir. 2003). The district court has broad discretion to determine whether to exclude undisclosed expert evidence and should consider: "(1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence." Stuart, 2014 WL 204214, at *1 (quoting S. States, 318 F.3d at 597).

Here, the court will exercise its discretion and deny the motion to exclude Holder's testimony at this time, finding that the failure to provide a written report, while unjustified, may be harmless and subject to cure. See Haynes v. City of Durham, N.C., No. 1:12CV1090, 2016 WL 469608, at *9 (M.D.N.C. Feb. 5, 2016) ("[E]ven when a party fails to 'provide information or identify a witness as required by Rule 26(a),' the exclusion that ordinarily

31

prevails is subject to an exception where 'the failure was substantially justified or is harmless.'" (quoting Fed. R. Civ. P. 37(c)(1))).

White argues that he "reasonably and in good faith believed" that no report was required for Holder. (Doc. 123 at 7.) However, "Rule 37(c)(1) does not require a finding of bad faith or callous disregard of the discovery rules." S. States, 318 F.3d at 596. Nevertheless, while the court need not find bad faith, the "party's explanation for its failure to disclose the evidence" is a relevant consideration, and courts look far more critically when it appears the non-disclosing party is engaging in discovery gamesmanship. See Tokai Corp. v. Easton Enters., Inc., 632 F.3d 1358, 1365-66 (Fed. Cir. 2011) (affirming district court's exclusion of expert when plaintiff made a "tactical decision not to submit written reports from its experts" and admonishing, "Conclusory expert reports, eleventh hour disclosures, and attempts to proffer expert testimony without compliance with Rule 26 violate both the rules and principles of discovery, and the obligations lawyers have to the court. Exclusion and forfeiture are appropriate consequences to avoid repeated occurrences of such manipulation of the litigation process" (citation omitted)). There are no such allegations here.

In addition, the balance of relevant factors weighs in White's favor. Holder is White's sole expert witness, and he argues that

"his case will inevitably be weakened" if he cannot offer her testimony. (Doc. 123 at 8.) Defendants can hardly say they were surprised, given that White timely disclosed Holder as an expert and the general parameters and basis for her testimony. Indeed, a plain reading of Holder's proposed testimony would have made clear to Defendants, as they apparently concluded, that she should be treated as a retained expert witness. After the deadline for expert disclosures on July 31, 2020 -- when it became clear that White had identified Holder as an expert but was not providing a written report -- Defendants did not inquire of White's counsel as to the report, nor did they indicate their intention to move to exclude the witness on this ground. They also declined to depose her but waited two months until the close of discovery to seek her exclusion. While Defendants had no duty to inform their opposing counsel of their position and intentions as to Holder, these facts are relevant to the court's exercise of its discretion to fashion a remedy that is fair under the circumstances. It is also important that a trial date has not yet been set so there is no trial to "disrupt."

The cases Defendants cite favoring exclusion are distinguishable, involving, for example, an expert attempting to offer a new opinion during trial, see S. States, 318 F.3d at 593, or one month before, see Campbell v. United States, 470 F. App'x 153, 157 (4th Cir. 2012); a party filing its expert disclosures

33

late, see Wilkins v. Montgomery, 751 F.3d 214, 219 (4th Cir. 2014); or a party failing to adhere to the court's prior orders regarding expert disclosure, see Saudi v. Northrop Grumman Corp., 427 F.3d 271, 278 (4th Cir. 2005). Because "the central purpose of Rule 37(c)(1) is to prevent last minute surprise to an opposing party," courts in the Fourth Circuit "generally deny motions to strike in cases where the surprise is curable." SAS Inst. Inc. v. Akin Gump Strauss Hauer & Feld, LLP, No. 5:10-CV-101-H, 2012 WL 12914641, at *4 (E.D.N.C. Dec. 11, 2012) (citations omitted). The court will do likewise here.

It is difficult to determine, based on White's limited expert disclosure for Holder, whether she seeks to offer an opinion that survives this court's rulings dismissing several claims and finding that probable cause is a legal question for the court, not Holder, to decide.[18] Given this uncertainty, the court will permit White to file an expert report for Holder within 30 days, should he still desire to present her as an expert witness on a topic within Holder's Rule 26(e) disclosure which White contends is not precluded by this court's decision. Defendants will be permitted to either depose Holder within 45 days of the service of the report, or challenge the scope of the report, should they so elect. See GAVCO, Inc. v. Chem-Trend Inc., 81 F. Supp. 2d 633, 639

---

[18] See Part II.C.3.

34

(W.D.N.C. 1999) (at the summary judgment stage, noting that while defendant's "complete failure" to provide an expert report was "not justified," plaintiff could have mitigated any alleged harm by deposing the witness or moving to compel an expert report; accordingly, court permitted plaintiff to depose the witness prior to trial).

Defendants argue they may suffer prejudice from reopening discovery, given the pending summary judgment motions. (Doc. 143 at 7.)  However, White has only offered evidence from Holder for a single pending motion -- the summary judgment motion of GPD Deputy Chief James Hinson -- and as explained infra, the court need not consider Holder's declaration to decide this motion.  As Hinson points out, Holder's opinion about the existence of probable cause for that motion "is irrelevant to the sole question that remained . . .  whether Deputy Chief Hinson had information supporting probable cause for Plaintiff's arrest."  (Doc. 112 at 9 n.1.)  The court will therefore not consider Holder's declaration in resolving Hinson's motion for summary judgment.[19]

---

[19] Defendants also argue that Holder is an improper witness because "she is [White's] mother, and has been advocating for him every step of the way."  (Doc. 118 at 14.)  This argument is premature.  When the nature of Holder's proposed testimony is more fully defined -- if and when White files an expert report for Holder and if and when she is deposed -- the court can consider this argument at a later time in accordance with its gatekeeping role over expert testimony, which generally precludes the court from making the kind of credibility assessments that are proper for the factfinder.  See Fed. R. Evid. 702; Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993); United States v. Lespier, 725 F.3d

35

Accordingly, Defendants' joint motion to exclude expert testimony or evidence from Anita Holder is granted in part and denied in part at this time, subject to Defendants' right to challenge any proposed testimony at a later date. (Doc. 117.)

**B.  Motions to Seal**

Also before the court are four separate motions to seal documents filed by Defendants Hinson (Doc. 105), GCSO (Doc. 130), and GPD (Doc. 138) and by Plaintiff White (Doc. 153). White also filed a response to Hinson's motion. (Doc. 108.)

When a party makes a request to seal judicial records, a district court "must comply with certain substantive and procedural requirements." Va. Dep't of State Police v. Wash. Post, 386 F.3d 567, 576 (4th Cir. 2004). Procedurally, the court must (1) give the public notice and a reasonable opportunity to challenge the request to seal; (2) "consider less drastic alternatives to sealing"; and (3) if it decides to seal, make specific findings and state the reasons for its decision to seal over the alternatives. Id. "As to the substance, the district court first must determine the source of the right of access with respect to each document, because only then can it accurately weigh

_____

437, 449 (4th Cir. 2013) ("The assessment of a witness's credibility . . . is usually within the jury's exclusive purview." (quoting United States v. Dorsey, 45 F.3d 809, 815 (4th Cir. 1995))).

36

the competing interests at stake." Id. (quotations and alteration omitted). "While the common law presumption in favor of access attaches to all 'judicial records and documents,' the First Amendment guarantee of access has been extended only to particular judicial records and documents." Stone v. Univ. of Md. Med. Sys. Corp., 855 F.2d 178, 180 (4th Cir. 1988) (citation omitted). Relevant here, it is unquestioned that the public has a First Amendment right to access documents filed in connection with a motion for summary judgment in a civil case. Wash. Post, 386 F.3d at 578.

"Where the First Amendment guarantees access . . . access may be denied only on the basis of a compelling governmental interest, and only if the denial is narrowly tailored to serve that interest." Stone, 855 F.2d at 180. "The burden to overcome a First Amendment right of access rests on the party seeking to restrict access, and that party must present specific reasons in support of its position." Wash. Post, 386 F.3d at 575; see Press-Enterprise Co. v. Superior Court, 478 U.S. 1, 15 (1986) ("The First Amendment right of access cannot be overcome by [a] conclusory assertion."). The public's right of access "may be abrogated only in unusual circumstances." Stone, 855 F.2d at 182. Evaluating whether these "unusual circumstances" exist in a particular case is a fact-based inquiry conducted in light of the "specific facts

37

and circumstances" of the case at issue.  See Washington Post, 386 F.3d at 579.

     With these standards in mind, the court turns to each motion.

     First, Hinson moves to seal Docket Entries 103-5 and 103-6, which are the RPD's operations plan for the execution of the search warrant and arrest of White and an audio recording of White's arrest and termination.  (Doc. 105.)  However, these documents are not necessary to the court's disposition of Hinson's motion for summary judgment.  Further, the parties have now consented to the audio recording being filed for public view (Docs. 105 ¶ 4; 108 at 2) and the court agrees that White has waived any confidentiality he might have had in this record by virtue of bringing this lawsuit.  See Robinson v. Bowser, No. 1:12CV301, 2013 WL 3791770, at *7 (M.D.N.C. July 19, 2013).  Accordingly, the court will unseal Docket Entry 103-6.  The court will also give Hinson 20 days to withdraw Docket Entry 103-5, the operations plan, and his pending motion to seal.  See United States v. Dunlap, 458 F. Supp. 3d 368, 372 (M.D.N.C. 2020) (permitting party to withdraw sealed documents and refile with redactions).  Otherwise, the court will unseal that document.

     Next, the GPD moves to seal Docket Entries 137-5 and 137-8, which is another copy of the RPD's operations plan and a case report from SBI Agent K.F. Cummings.  (Doc. 138.)  In Docket Entry 137-5, the RPD operations plan, GPD has redacted any identifying

38

information not relevant to the matter.

The court finds that these documents should be sealed. GPD cites to N.C. Gen. Stat. § 132-1.4, which provides that "[r]ecords of criminal investigations conducted by public law enforcement agencies . . . are not public records." As this court has noted, § 132-1.4 is "evidence of a strong public policy in North Carolina in favor of privacy with respect to . . . criminal investigation records." Alexander v. City of Greensboro, No. 1:09-CV-00293, 2013 WL 6687248, at *5 (M.D.N.C. Dec. 18, 2013). This protection extends to completed investigations involving past matters. See McCormick v. Hanson Aggregates Se., Inc., 596 S.E.2d 431, 436 (N.C. Ct. App. 2004) ("As is clear from the plain words of the statute, the criminal investigation exception does not apply solely to ongoing violations of the law . . . [and] does not distinguish between active and inactive or closed investigations.") (quotations and citation omitted); Gannett Pac. Corp. v. N.C. State Bureau of Investigation, 595 S.E.2d 162, 166 (N.C. Ct. App. 2004) (noting that the justifications for excluding criminal investigation records from public disclosure -- including protecting confidential informants and investigative techniques -- "do not dissipate upon conclusion of an investigation") (citing News & Observer Pub. Co. v. State, 322 S.E.2d 133, 137-38 (N.C. 1984)).

Here, both documents are records from a criminal

39

investigation conducted by the RPD and SBI, and both contain the names of several non-party employees and others. A compelling governmental interest exists to keep these documents confidential, as evidenced by North Carolina's strong policy promoting the privacy of documents such as these. See Alexander, 2013 WL 6687248, at *5; Stone, 855 F.2d at 181 (where state statute prohibits discoverability of certain records, district courts should first determine if the records at issue are covered by the statute, then determine whether the right of access nevertheless outweighs the state's public policy).

Further, the request to seal these documents is narrowly tailored; both documents would be useless if redacted much further to remove confidential information. The motion is unopposed by White or any other interested party. And the motion has been pending for over 90 days, yet no one has objected to the sealing of any document during that time. See Stone, 855 F.2d at 181 (public notice of a request to seal and an opportunity to challenge can be done by docketing the request "reasonably in advance of deciding the issue"). Therefore, the court will grant GPD's motion to seal Docket Entries 137-5 and 137-8. (Doc. 138.)

Finally, GCSO moves to seal Docket Entries 128-10 and 132, which are an excerpt from the deposition of SBI Agent Denny taken for this case and portions of the GCSO brief in support of its motion for summary judgment that cites to Denny's deposition

40

testimony. (Doc. 130.) White has also moved to seal an excerpt from Denny's deposition testimony and portions of his brief in opposition to GPD's motion for summary judgment that cites to that testimony, Docket Entries 152-4 and 152. (Doc. 153.)

The court finds that these documents should not be sealed. Like the GPD, both the GCSO and White cite to N.C. Gen. Stat. § 132-1.4.[20] However, unlike GPD's documents, Denny's deposition testimony is not itself a "record of [a] criminal investigation." North Carolina defines "records of criminal investigations" as "all records or any information . . . that is compiled by public law enforcement agencies for the purpose of attempting to prevent or solve violations of the law." N.C. Gen. Stat. § 132-14(b)(1). A deposition taken over three years after the relevant criminal investigation has concluded cannot be fairly said to be "compiled by public law enforcement agencies for the purpose of attempting to prevent or solve violations of the law." Id. (emphasis added). While Denny's deposition details some steps she and the other agencies took during the criminal investigation into White, it does not disclose SBI investigative techniques, informant identities, or other persons investigated but not charged. See

---

[20] Both parties also cite to N.C. Gen. Stat. § 153A-98 and § 160A-168. (Docs. 130 ¶ 3; 153 ¶ 3.) However, both provisions deal with the privacy of public employee personnel records, e.g., information relating to hiring, firing, promotions, or disciplinary actions. Denny's deposition is not itself a personnel record, and nothing in it appears to implicate these provisions.

41

<u>McCormick</u>, 596 S.E.2d at 436; <u>Alexander</u>, 2013 WL 6687248, at *5 (granting motion to seal at summary judgment stage when documents included, in part, "information regarding police informants"); <u>Johnson v. City of Fayetteville</u>, No. 5:12-CV-456-F, 2014 WL 7151147, at *11 n.6 (E.D.N.C. Dec. 11, 2014) (denying motion to seal police documents when "[t]here is no indication that disclosure of the documents will jeopardize any ongoing criminal investigations or reveal the names of confidential informants").

Both GCSO and White state that they have discussed this matter with counsel for the SBI who does not consent to the production of Denny's deposition. (Docs. 130 ¶ 4; 153 ¶ 4.) However, no specific reasons are given to explain why the public's First Amendment right to access should be overcome in this particular circumstance. <u>See</u> <u>Wash. Post</u>, 386 F.3d at 575 ("The burden to overcome a First Amendment right of access rests on the party seeking to restrict access, and that party must present specific reasons in support of its position."); <u>Press-Enterprise Co.</u>, 478 U.S. at 15 ("The First Amendment right of access cannot be overcome by [a] conclusory assertion."). Accordingly, the court will deny both GCSO's and White's motions to seal. (Docs. 130; 153.)

### C. Motions for Summary Judgment

#### 1. Standard of Review

Summary judgment is appropriate when the pleadings, affidavits, and other discovery materials show that there is no

42

genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine dispute as to any material fact.  Celotex, 477 U.S. at 323.  "Once the moving party meets its initial burden, the non-moving party may not rely upon mere allegations or denials contained in its pleadings, but must come forward with some form of evidentiary material allowed by Rule 56 demonstrating the existence of a genuine issue of material fact requiring a trial."  Ruffin v. Shaw Indus., Inc., 149 F.3d 294, 301 (4th Cir. 1998) (per curiam) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986); Celotex, 477 U.S. at 324).  A mere scintilla of evidence is insufficient to circumvent summary judgment.  Anderson, 477 U.S. at 252.  Instead, the nonmoving party must convince the court that, upon the record taken as a whole, a rational trier of fact could find for the nonmoving party.  Id. at 248-49.

When considering a summary judgment motion, the court views the evidence and draws all reasonable inferences in the light most favorable to the non-moving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986).  The court is not permitted to "weigh the evidence or make credibility determinations."  Jacobs v. N.C. Admin. Off. of the Cts., 780 F.3d

43

562, 568 (4th Cir. 2015).  There is no issue for trial unless
sufficient evidence favoring the non-moving party exists for a
reasonable factfinder to return a verdict in its favor.  Anderson,
477 U.S. at 249-50, 257.  Thus, the issue to be determined on a
summary judgment motion is "not whether . . . the evidence
unmistakably favors one side or the other, but whether a fair-
minded jury could return a verdict for the plaintiff on the
evidence presented."  Id. at 252.  "If the evidence is merely
colorable, or is not significantly probative, summary judgment may
be granted."  Id. at 249-50 (citations omitted).

    Applying this standard, the court turns to the respective
motions of the Defendants.

### 2.  GCSO Defendants

    White has three remaining claims against the GCSO Defendants:
a state-law trespass claim against Stalls, Wilkins, and Barnes (in
his official capacity via respondeat superior);[21] a state-law
conspiracy claim against Stalls and Wilkins; and a claim under 42
U.S.C. § 1983 for an unconstitutional search against Stalls and
Wilkins in their individual capacities.

### a.  Defendant Wilkins

    As an initial matter, White does not contest Wilkins's motion
for summary judgment.  (Doc. 150 at 1.)  Accordingly, the court

---

[21] Travelers Casualty & Surety Company of America is also named as the
surety for Sheriff Barnes.

will grant Wilkins's motion.  See Taylor v. Shreeji Swami, Inc.,
No. 5:17-CV-405-FL, 2019 WL 189815, at *5 (E.D.N.C. Jan. 14, 2019)
("Plaintiff does not contest [defendant's summary judgment] motion
concerning this claim. Consequently, the court grants [the]
motion."); Tyree v. Bos. Sci. Corp., No. 2:12-CV-08633, 2014 WL
5320569, at *6 (S.D.W. Va. Oct. 17, 2014) (same).

### b. Trespass

White's trespass claim is based on Stalls entering his garage
over Labor Day weekend in 2016 and discovering the mower that is
at the heart of this dispute.

A trespass claim under North Carolina law has three elements:
"(1) possession of the property by plaintiff when the alleged
trespass was committed; (2) an unauthorized entry by defendant;
and (3) damage to plaintiff." Singleton v. Haywood Elec.
Membership Corp., 588 S.E.2d 871, 874 (N.C. 2003) (quoting Fordham
v. Eason, 521 S.E.2d 701, 703 (N.C. 1999)).  At issue here is the
second element, an unauthorized entry.

Both sides present conflicting evidence as to whether Stalls
had permission from the Whites to be at their house on the day in
question, September 3, 2016.  According to Stalls, he and his wife
Brittany had taken care of the Whites' dogs in the past, including
times when Stalls went by himself, and the Whites had never
expressly prohibited Stalls from entering their house. (Docs.
128-2 at 22:4-23:4; 128-4 at 17:16-18:22.)  Stalls also points to

45

the text messages he exchanged with White that same day, in which White does not challenge Stalls's presence in his garage. (See Docs. 128-3 at 6-8; 133 at 20.) However, according to Christina White, she had previously told her sister that she did not want Stalls to come feed the dogs because he played too roughly with the dogs, and to her knowledge Stalls had never been over to the Whites' house to care for their dogs. (Doc. 128-5 at 82:13-83:17.) Specifically, Christina White says she told her sister, "I didn't like the way that Matt is around dogs and that when [Brittany Stalls] does come and take care of the dogs I'd like for it to just be her." (Id. at 83:7-9.)

At the summary judgment stage, the court is not permitted to "weigh the evidence or make credibility determinations." Jacobs, 780 F.3d at 568. At this point, there is at least a genuine dispute as to whether Christina White's consent to Brittany Stalls provided consent, express or implied, to Stalls to enter White's garage on this occasion.

Stalls also argues that he is protected by public official immunity as to White's trespass claim. (Doc. 133 at 21.) In North Carolina, the doctrine of public official immunity "protects public officials from individual liability for negligence in the performance of their governmental or discretionary duties." Campbell v. Anderson, 576 S.E.2d 726, 730 (N.C. Ct. App. 2003). Police officers are public officials who "enjoy absolute immunity

46

from personal liability for their discretionary acts done without corruption or malice." Schlossberg v. Goins, 540 S.E.2d 49, 56 (N.C. Ct. App. 2000). However, public official immunity only applies if the officer is acting as a public official executing a governmental function at the time of the incident giving rise to the claim. See id.; Jones v. Kearns, 462 S.E.2d 245, 247-48 (N.C. Ct. App. 1995) (officer "was on duty as a police officer when she responded to a fellow officer's radio call for assistance . . . and therefore was a public official executing a governmental function at the time of the accident"). Here, for reasons discussed at length below in connection with White's § 1983 claim against Stalls, there are no facts showing that Stalls was on duty when he entered White's garage, and Stalls himself disputes that he was acting with any law enforcement purpose. (Doc. 156 at 8.) If that is the case, there is no issue as to whether he was acting in an official capacity and public official immunity does not apply.

Accordingly, the court will deny Stalls's motion for summary judgment as to White's trespass claim.[22]

---

[22] In his reply brief, Stalls argues for the first time that even if there is a genuine dispute as to the trespass claim, it was nothing more than a "technical trespass" and so the court should limit White's recovery to nominal damages. (Doc. 156 at 9.) Because this argument was made for the first time in a reply brief, the court need not consider it. See Triad Int'l Maint. Corp. v. Aim Aviation, Inc., 473 F. Supp. 2d 666, 670 n.1 (M.D.N.C. 2006) ("Reply briefs are limited to discussion of matters newly raised in the response and may not inject new

47

## c.  Conspiracy

White alleges that all Defendants, including Stalls, are liable on a theory of civil conspiracy under North Carolina law. (Doc. 81 ¶¶ 255-58.)  White alleges that all Defendants "entered into an agreement and conspiracy whereby they would prosecute Plaintiff for charges that lacked probable cause" because they either held "personal ill will towards Plaintiff" or "desired to advance their careers at all costs."  (Id. ¶¶ 256-57.)

The elements of civil conspiracy are: "(1) an agreement between two or more individuals; (2) to do an unlawful act or to do a lawful act in an unlawful way; (3) resulting in injury to plaintiff inflicted by one or more of the conspirators; and (4) pursuant to a common scheme."  Strickland v. Hedrick, 669 S.E.2d 61, 72 (N.C. Ct. App. 2008) (citation omitted).  Stalls argues that there is no evidence of any agreement between him and any other Defendant to act in furtherance of the conspiracy.  (Docs. 133 at 18-19; 156 at 1-4.)  The court agrees.

Stalls has come forward with evidence that the other alleged co-conspirators have either denied the existence of an agreement or have denied speaking to (or even knowing) Stalls before White

---

grounds."); Local Rule 7.3(h) ("A reply brief is limited to discussion of matters newly raised in the response.").  Further, issues of proximate cause are generally left to the jury.  See Hampton v. Hearn, 838 S.E.2d 650, 655 (N.C. Ct. App. 2020) (citing Conley v. Pearce-Young-Angel Co., 29 S.E.2d 740, 742 (N.C. 1944)).  It will be for a jury to decide if Stalls trespassed and, if so, if that trespass caused White any injury.

48

was arrested on March 6, 2017. Specifically, the Terrys have stated that they "have never spoken to nor [sic] communicated with Deputy James Stalls of the Guilford County Sheriff's Office. In fact, we had never even heard of Deputy Stalls's name until his attorney . . . contacted us in September 2020."[23] (Doc. 128-8 ¶ 27.) GCSO Deputies Wilkins and Cook both deny the existence of any conspiracy against White, with Wilkins saying he "never discussed with Deputy Stalls the criminal investigation" conducted by the other agencies. (Docs. 128-7 ¶¶ 24, 27; 128-14 ¶¶ 3-5.) GPD Detective Schwochow testified that he does not know Stalls. (Doc. 128-16 at 20:8-10.)

RPD Sergeant Hampshire -- the lead investigator into the theft from Scott's Tractor -- testified that the first time he ever met or spoke to Stalls was in May 2017, after the search warrant was executed at White's house that March, and that the first time he saw the photograph of the mower that Stalls took while in White's garage was when he was deposed for this case in September 2020. (Doc. 140-2 at 52:8-12, 129:18-131:11.) Similarly, SBI Agent Denny said she was not aware that Stalls went into White's garage until after the search warrant was executed, that she did not speak to Stalls until May 2017, and that she never had any direct

---

[23] The Terrys further state, "At no time were we ever asked by anyone to buy the mower from Mr. White. At no time were we asked by anyone to buy the mower from Mr. White as part of a law enforcement 'sting' operation or as part of a plan to help set-up Mr. White." (Doc. 128-8 ¶ 30.)

conversations with anyone from the GCSO regarding the investigation into White. (Doc. 134 at 70:17-71:16, 145:13-21.) Finally, BPD Detective Westmoreland -- the lead investigator into the theft from Quality Equipment -- testified that he never spoke to anyone at GCSO regarding his investigation, and that the first time he heard Stalls's name was during his deposition for this case. (Doc. 128-11 at 49:16-50:4, 86:9-13.)

In response, White argues, "Circumstantial evidence may be used to establish a claim for civil conspiracy." (Doc. 150 at 7 (citing Dickens v. Puryear, 276 S.E.2d 325, 337 (N.C. 1981)).) The standard set out in Dickens, however, is more stringent than White makes it out to be. As the North Carolina Supreme Court put it in that case: "Although civil liability for conspiracy may be established by circumstantial evidence, the evidence of the agreement must be sufficient to create more than a suspicion or conjecture in order to justify submission of the issue to a jury. An adequately supported motion for summary judgment triggers the opposing party's responsibility to come forward with facts, as distinguished from allegations, sufficient to indicate he will be able to sustain his claim at trial." Dickens, 276 S.E.2d at 337 (citations omitted).

Stalls does acknowledge that he spoke to several other current and former law enforcement officers after he determined that the mower he discovered in White's garage had been reported as stolen.

In his deposition, Stalls states he spoke to at least two GCSO deputies -- Phil Lowe and David Cook -- when he discovered that the mower was stolen. (Doc. 128-2 at 31:10-24.) He also spoke to Anita Holder, his stepmother and White's mother, who had retired from the GPD a year prior. (Id. at 30:7-11, 38:24-39:4; Doc. 111-2 ¶ 10.)

After these conversations, Stalls testifies, he did not speak to anyone else and was not aware that White was under investigation until Hampshire came to GCSO on November 2, 2016, for the knock and talk. (Doc. 128-2 at 35:2-14.) He further states that he did not speak to anyone with the RPD, BPD, GPD, or SBI during the course of their investigations (id. at 40:2-11), and White has not offered any evidence to the contrary. Another GSCO deputy, Elizabeth Buskirk, also says that Stalls spoke to her on "a couple" of occasions about White and the lawn mower, although Stalls never told her the mower was stolen and she was not aware of that fact until Hampshire came to GCSO for the knock and talk.[24] (Doc. 128-13 at 19:22-20:2, 30:7-13.)

These conversations, in the face of the other record evidence, are insufficient to create "more than a suspicion or conjecture"

---

[24] Stalls also spoke to members of the Pleasant Garden Fire Department, including Todd Ross, about the case on the day White was arrested. (Doc. 128-2 at 65:12-66:20.) White eventually filed a complaint in August 2017 with the GCSO against Stalls. (Doc. 128-12 at 4-5.) After a GCSO internal affairs investigation, Stalls was disciplined for speaking to Anita Holder and Todd Ross. (Doc. 128-2 at 85:3-15.)

of the existence of an agreement at this summary judgment stage.
See Dickens, 276 S.E.2d at 337.   Meanwhile, the rest of the
evidence generally shows that the investigation into White was
proceeding upon an independent basis separate from any actions
Stalls may have taken.  Because there is no genuine dispute as to
the lack of an agreement between Stalls and any other party, White
cannot sustain his conspiracy claim as to Stalls.  The court will
therefore grant Stalls's motion for summary judgment as to this
claim.[25]

### d.    Section 1983 Individual Capacity Claim

White's federal § 1983 claim against Stalls is based on the
same underlying event as his state-law trespass claim -- Stalls
entering White's garage on September 3, 2016 and taking a picture
of the lawn mower.   Specifically, White alleges that Stalls
"illegally entered [White's] home and searched his garage without
a warrant in violation of his Fourth Amendment rights."  (Doc. 81
¶ 141.)

To state a claim under § 1983, "a plaintiff must allege the
violation of a right secured by the Constitution and laws of the
United States, and must show that the alleged deprivation was

---

[25] Further, White has specifically alleged that the "common scheme" for
the conspiracy was that Defendants "would prosecute Plaintiff for charges
that lacked probable cause."  (Doc. 81 ¶ 256.)  This claim is precluded
by the court's finding in Part II.C.4 infra, that probable cause existed
to believe White possessed stolen property and had obtained property by
false pretenses.

52

committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988). The key issue here is the second prong -- whether Stalls was "acting under color of state law" when he entered White's garage and viewed the mower.[26] While White contends this inquiry involves underlying factual disputes that should be left for the factfinder, this is ultimately a legal question that the court can resolve at the summary judgment stage. See Goldstein v. Chestnut Ridge Volunteer Fire Co., 218 F.3d 337, 344 n.7 (4th Cir. 2000) ("[T]he ultimate resolution of whether an actor was a state actor or functioning under color of law is a question of law for the court.").

The color of law requirement excludes from the reach of § 1983 all "merely private conduct, no matter how discriminatory or wrongful." Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) (quoting Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 50 (1999)). A defendant acts under color of state law for § 1983 purposes when he "exercise[s] power 'possessed by virtue of state

---

[26] The parties do not brief this issue particularly well. Outside of a reference to the "under color of state law" standard in Stalls's reply brief (Doc. 156 at 5), the parties instead focus on whether Stalls's action was "motivated by a law enforcement purpose," and neither side cites to any case law regardless (see Docs. 133 at 22; 150 at 5-6). This is not the operative question for a § 1983 claim. As will be seen, even actions undertaken for private purposes can be "under color of state law" if there is a sufficient nexus between the act and the officer's official status. See Rossignol, 316 F.3d at 524 ("[I]t is clear that if a defendant's purportedly private actions are linked to events which arose out of his official status, the nexus between the two can play a role in establishing that he acted under color of state law.").

53

law and made possible only because the wrongdoer is clothed with the authority of state law.'" West, 487 U.S. at 49 (quoting United States v. Classic, 313 U.S. 299, 326 (1941)). This includes situations in which an officer acts in his official capacity or while exercising responsibilities pursuant to state law. Id. However, § 1983 also "includes within its scope apparently private actions which have a 'sufficiently close nexus' with the State to be 'fairly treated as that of the State itself.'" Rossignol, 316 F.3d at 523 (quoting Jackson v. Metro. Edison Co., 419 U.S. 345, 351 (1974)).

"Acts of police officers in the ambit of their personal, private pursuits fall outside of 42 U.S.C. § 1983." Rogers v. Fuller, 410 F. Supp. 187, 191 (M.D.N.C. 1976). Indicia of state authority -- such as an officer being on duty, wearing a uniform, or driving a patrol car -- are important considerations, although they are not dispositive. Revene v. Charles Cnty. Comm'rs, 882 F.2d 870, 872 (4th Cir. 1989). "Rather, the nature of the act performed is controlling." Id.

Here, the evidence is insufficient for a finding that Stalls was acting under color of state law when he entered White's garage and photographed the mower. There is no evidence that Stalls was on duty on the day in question, nor is there any indication that he was wearing his uniform, driving his patrol car, or exhibiting any other outward manifestation of state authority. Indeed, Stalls

has testified -- and White does not dispute -- that Stalls and his wife stopped by the Whites' house on their way home from a shopping trip on a Saturday, with their kids in tow, because of Christina White's request to care for the Whites' dogs. (Docs. 128-2 at 23:21-24:16; 128-3 ¶ 3.)

The most important consideration is the nature of the act performed. Revene, 882 F.2d at 872. Here, too, Stalls's actions do not suggest he was acting under color of state law. Stalls entered the garage with his wife where the Whites kept their dog food, noticed the mower partly covered by a sheet, removed the sheet and sat on the mower, and then took a picture of the mower's VIN. (Doc. 128-2 at 23:5-11, 25:25-27:8.) Such acts do not have a "sufficiently close nexus" with the state to be "fairly treated as that of the State itself." Rossignol, 316 F.3d at 523. There is no evidence of any sort of "systematic, carefully-organized plan" by state officials. Cf. id. at 523-25 (off-duty sheriff's deputies acted under color of state law when they organized a coordinated effort to buy up newspapers with the sole intention to suppress speech critical of the sheriff). Nor did Stalls summon other officers for assistance in searching White's house.[27] Cf. United States v. Tarpley, 945 F.2d 806, 809 (5th Cir. 1991) (off-

---

[27] In his complaint, White alleges that multiple GSCO officers, including Stalls, entered his house and searched it without a warrant. (Doc. 81 ¶ 141.) He has come forward with no evidence for this allegation and has abandoned it in his briefing.

duty deputy acted under color of state law in assaulting victim when, in significant part, he called another police officer for assistance and identified the officer as an ally because "[t]he presence of police and the air of official authority pervaded the entire incident").

Perhaps most importantly, Stalls was present in White's garage because of his personal status as White's brother-in-law and stepbrother, not because of his status as a police officer. In other words, the entry into the garage and actions therein were not "misuse[s] of power [Stalls] possessed by virtue of state law" but a "purely personal pursuit." Cf. Jones v. Prince George's Cnty., No. CIV.A. AW-04-1735, 2005 WL 1074353, at *3 (D. Md. Apr. 28, 2005) (emphasis added) (noting that it is only "the misuse of power possessed by virtue of state law, as opposed to a 'purely personal pursuit,' [that] falls within the scope of Section 1983") (quoting Revene, 882 F.2d at 872); Nexus Servs., Inc. v. Vance, No. 5:17-CV-00072, 2018 WL 542977, at *4 (W.D. Va. Jan. 24, 2018) (off-duty police officer's trespass onto company property was "purely private" and not because of her capacity as an officer). As the Fourth Circuit has admonished, "where the action arises out of purely personal circumstances, courts have not found state action even where a defendant took advantage of his position as a public officer in other ways." Rossignol, 316 F.3d at 524 (collecting cases); see also Screws v. United States, 325 U.S. 91,

56

111 (1945) ("[A]cts of officers in the ambit of their personal pursuits are plainly excluded" from § 1983 liability); Bonenberger v. Plymouth Twp., 132 F.3d 20, 24 (3d Cir. 1997) ("[A] state employee who pursues purely private motives and whose interaction with the victim is unconnected with his execution of official duties does not act under color of law."). White himself claims that Stalls's actions were motivated out of jealousy toward White. (Doc. 81 ¶¶ 33, 103.) Perhaps. But the fact that Stalls is employed as a sheriff's deputy does not render every action he takes in his personal capacity one conducted under color of state law. Such private, personal disputes, divorced from any nexus to the state, are beyond the scope of § 1983.

Because Stalls was not acting under color of state law when he entered White's garage, White cannot sustain his § 1983 claim against him. Stalls's motion for summary judgment as to this claim will therefore be granted.

### e.    Sheriff Barnes and Travelers

The sole remaining claim seeks to hold Sheriff Barnes liable for Stalls's actions under a theory of respondeat superior. Travelers Casualty & Surety Company of America is also named as a Defendant as the issuer of the Sheriff's surety bond.

The doctrine of respondeat superior imposes liability on an employer for torts committed by its employees who are acting within the scope of their employment. Matthews v. Food Lion, LLC, 695

57

S.E.2d 828, 830 (N.C. Ct. App. 2010). For respondeat superior liability to be imposed, the employee's wrongful act must generally be either (1) expressly authorized by the employer; (2) committed within the scope of the employee's employment and in furtherance of the employer's business; or (3) ratified by the employer. See BDM Invs. v. Lenhil, Inc., 826 S.E.2d 746, 764 (N.C. 2019) (citations omitted). In addition, the employee must have been operating within the scope of his or her employment at the time of the incident. Matthews, 695 S.E.2d at 831; Troxler v. Charter Mandala Ctr., 365 S.E.2d 665, 668 (N.C. Ct. App. 1988) ("To be within the scope of employment, an employee, at the time of the incident, must be acting in furtherance of the principal's business and for the purpose of accomplishing the duties of his employment."). In contrast, liability is not imposed on an employer when an employee is "engaged in some private matter of his own or outside the legitimate scope of his employment." Matthews, 695 S.E.2d at 831 (quoting Van Landingham v. Singer Sewing Machine Co., 177 S.E. 126, 127 (N.C. 1934)).

In his complaint, White alleges that Stalls's trespass was "imputable to Defendant Sheriff Barnes as the trespass was done during the course and scope of agency and done in furtherance of Sheriff Barnes' business." (Doc. 81 ¶ 200.) However, for reasons discussed in addressing White's § 1983 claim against Stalls, there is no evidence to support the contention that Stalls was acting

58

within the scope of his employment at the time he entered White's garage. Nor is there any evidence that Sheriff Barnes expressly authorized or ratified that act -- or, for that matter, that he was even aware of it. And, indeed, White seems to acknowledge as much in his response brief: in addressing whether Stalls is entitled to public official immunity, White states "Defendant Stalls is also not entitled to public officials' immunity as to the trespass claim because his actions were clearly outside the scope of his official duties . . . and there was no investigation into Plaintiff at this point pursuant to which Defendant Stalls could be acting in any official capacity." (Doc. 150 at 4.) In addressing this specific claim, White merely states that "[b]ecause Plaintiff's trespass claim against Defendant Stalls is not subject to summary judgment, the *respondeat superior* claim against Defendant Barnes must also survive."[28] (Id. at 7.) However, there is no evidence that Stalls was acting within the scope of his employment, as must be shown for respondeat superior liability to be imposed on Sheriff Barnes. Stalls's actions therefore cannot be not imputed to Sheriff Barnes, and Barnes's

---

[28] White argues elsewhere that trespass is an intentional tort. (See Doc. 150 at 5.) This undermines his argument here, since an intentional tort is rarely -- although not never -- considered to be within the scope of employment for respondeat superior purposes. See Borneman v. United States, 213 F.3d 819, 828 (4th Cir. 2000) (observing that under North Carolina law "an intentional tort is rarely considered to be within the scope of an employee's employment," although noting further that "'rarely' does not mean 'never'") (citation omitted).

59

motion for summary judgment as to this claim will be granted.

### 3. Greensboro Defendants

White has four remaining claims against the Greensboro Defendants: state-law trespass and conspiracy claims against all Greensboro Search Officers who participated in the March 6 search of White's residence; a state-law malicious prosecution claim against James Schwochow; and a § 1983 claim for unlawful seizure against Deputy Chief James Hinson in his individual capacity.

#### a. Trespass

White argues that the Greensboro Search Officers trespassed when they entered his house to retrieve GPD property on March 6 while the search warrant was being executed by the SBI and RPD.

A North Carolina trespass claim has three elements: "(1) possession of the property by plaintiff when the alleged trespass was committed; (2) an unauthorized entry by defendant; and (3) damage to plaintiff." Singleton, 588 S.E.2d at 874 (citation omitted). At issue here is the second element, an unauthorized entry. The Greensboro Search Officers argue that they were at White's house with consent and legal privilege, and that they are entitled to public official immunity. (Doc. 137 at 27.)

As to consent, the Greensboro Search Officers first argue that they had consent from the other law enforcement agencies to collect GPD property while a search under a lawful warrant was being executed. (Id.) They cite no authority that an agency

60

executing a search warrant can give permission to officers from another agency to enter the property, and the court is not aware of any. In North Carolina, a search warrant "may be executed by any law-enforcement officer acting within his territorial jurisdiction, whose investigative authority encompasses the crime or crimes involved." N.C. Gen. Stat. § 15A-247. This would encompass the GCSO, as White's house was in Guilford County, and the SBI, which enjoys statewide jurisdiction, see N.C. Gen. Stat. § 143B-917. It would also cover the RPD, which applied for and obtained the search warrant to search for items related to the theft of lawn mowers. However, it would not cover a different agency that sought to enter and retrieve different property. Cf. United States v. Sanchez, 509 F.2d 886, 889 (6th Cir. 1975) (search warrant obtained by state officers to search for narcotics "could not be used to validate the entrance of a federal officer having both probable cause and the opportunity to obtain a separate warrant to search for different items of property").

The Greensboro Search Officers also argue that they had consent from Christina White to collect GPD property. (Doc. 137 at 27-28.) "[C]onsent is a defense to a claim of trespass." Food Lion, Inc. v. Cap. Cities/ABC, Inc., 194 F.3d 505, 517 (4th Cir. 1999) (citing Miller v. Brooks, 472 S.E.2d 350, 355 (N.C. Ct. App. 1996)). GPD Lieutenant Raines says he "approached Plaintiff's wife and asked for her consent" and that Christina White "gave her

61

consent . . . for GPD to collect and remove the GPD property."
(Doc. 157-1 at 4.)  However, Christina White testified in her
deposition that she never gave Raines, who was the first GPD
officer to arrive at the White's house and the first to speak to
her, permission to look for GPD equipment. (Doc. 152-2 at 17:21-
24.)  She further states that GPD officers were already looking
for GPD equipment in her house before they spoke to her.  (Id. at
18:2-3.)  This is seemingly confirmed by Raines himself, who
acknowledges that the SBI and RPD first escorted him to the master
bedroom where he saw GPD property, and then he asked Christina
White for consent to collect GPD property.  (Doc. 157-1 at 4.)
At this point there is at least a genuine dispute as to whether
the GPD had consent to enter White's residence to collect GPD
property.

The Greensboro Search Officers next argue that they had a
legal privilege to be at White's house.  (Doc. 137 at 28-30.)
White contends that finding a legal privilege here would require
an extension of North Carolina law, and would not be appropriate
in any event on these facts.

"As an affirmative defense to trespass, a defendant may assert
that its entry onto plaintiff's land 'was lawful or under legal
right.'"  CDC Pineville, LLC v. UDRT of N.C., LLC, 622 S.E.2d 512,
518 (N.C. Ct. App. 2005) (quoting Singleton, 588 S.E.2d at 874).
The Greensboro Search Officers acknowledge that finding a legal

62

privilege under these facts would require an extension of North Carolina law. (See Doc. 137 at 28 ("North Carolina appellate courts do not appear to have addressed a trespass under these specific facts.").) The court declines to do so at this time. As a federal court applying North Carolina law, this court is obliged to apply the jurisprudence of North Carolina's highest court, the Supreme Court of North Carolina. See Private Mortg. Inv. Servs., Inc. v. Hotel & Club Assocs., Inc., 296 F.3d 308, 312 (4th Cir. 2002). When that court has not spoken directly on an issue, this court must "predict how that court would rule if presented with the issue." Id. The decisions of the North Carolina Court of Appeals are the "next best indicia" of what North Carolina's law is, though its decisions "may be disregarded if the federal court is convinced by other persuasive data that the highest court of the state would decide otherwise." Id. (quoting Liberty Mut. Ins. Co. v. Triangle Indus., Inc., 957 F.2d 1153, 1156 (4th Cir. 1992)). In predicting how the highest court of a state would address an issue, this court "should not create or expand a [s]tate's public policy." Time Warner Entm't-Advance/Newhouse P'ship v. Carteret-Craven Elec. Membership Corp., 506 F.3d 304, 314 (4th Cir. 2007) (alteration and quotation omitted). Here, prior North Carolina cases that discuss whether a defendant's trespass was "lawful or under legal right" are generally limited to situations of contractual authorization or express easements. See, e.g.,

63

Singleton, 588 S.E.2d at 874 (utility company lacked contractual authorization to enter plaintiff's land to repair power lines); Dempsey v. Silver Creek Homeowners Ass'n, Inc., 647 S.E.2d 689 (N.C. Ct. App. 2007) (express easement in deed permitted homeowners association to enter plaintiff's land to landscape).

Defendants cite to the Restatement of Torts § 198 as well as cases in other jurisdictions for the proposition that an actor has a legal privilege to enter another's land at a reasonable time and manner to recover personal property. (Doc. 137 at 28-29.) But § 198 by its express terms applies to situations in which the property "has come upon the land otherwise than with the actor's consent." Restatement (Second) of Torts § 198 (1965).[29] Here, the property GPD initially sought to recover -- and which could therefore be the basis of any reason to enter White's home -- was White's GPD-issued equipment, which the officers at the time believed White possessed merely by virtue of his employment as a GPD officer. They had no inkling that he may have possessed more than what had been issued him. The Greensboro Search Officers surely were not authorized to enter White's home without permission to gather his work-related equipment merely because he had been

---

[29] In full, § 198 reads: "One is privileged to enter land in the possession of another, at a reasonable time and in a reasonable manner, for the purpose of removing a chattel to the immediate possession of which the actor is entitled, and which has come upon the land otherwise than with the actor's consent or by his tortious conduct or contributory negligence."

64

told moments before that his employment had been terminated. Contrary to GPD's argument (Doc. 157 at 3), the fact that the Greensboro Search Officers eventually discovered allegedly stolen GPD property, which would be present at White's house without GPD consent, does not change the analysis because that property was discovered after GPD entered White's house. Thus, even were North Carolina courts to adopt § 198, it would not apply to these facts. The cases Defendants cite are similarly distinguishable. Cf. State v. Logsdon, 827 N.E.2d 869, 872 (Ohio App. 2005) (overturning criminal trespass conviction when protestor, after his sign was stolen without his consent and reasonably concerned the sign would be destroyed, entered a clinic and quickly and peaceably retrieved the sign).

Finally, the Greensboro Search Officers argue they enjoy public official immunity against White's trespass claim. (Doc. 137 at 31-34.)

A public official is entitled to immunity from suit in his individual capacity unless he "engaged in discretionary actions which were allegedly: (1) corrupt; (2) malicious; (3) outside of and beyond the scope of his duties; (4) in bad faith; or (5) willful and deliberate." Smith v. Jackson Cnty. Bd. of Educ., 608 S.E.2d 399, 411 (N.C. Ct. App. 2005) (citation omitted).

As this court observed in its prior opinion, White does not allege that the Greensboro Search Officers were corrupt,

65

malicious, acting in bad faith, or acting willfully and deliberately. Rather, he alleges that the officers knowingly acted outside the scope of their duties by operating outside their jurisdiction with no lawful basis to be present at White's house. White, 408 F. Supp. 3d at 705–06. The Greensboro Search Officers now argue that they did not participate in the search or "seize" any property. (Doc. 137 at 32-33.) But that is beside the point. White's claim is for trespass. The issue is whether the Greensboro Search Officers made an "unauthorized entry" into White's house for purposes of common law trespass, not what they did when they were there. See Singleton, 588 S.E.2d at 874. For the reasons discussed, there is at least a genuine dispute as to whether the GPD had any lawful right to be present at White's house. The Greensboro Search Officer's motion for summary judgment as to White's trespass claim will therefore be denied.

### b. Causation

The Greensboro Search Officers also argue that, even if they could be liable for trespass, partial summary judgment is appropriate on White's damages claim because the trespass did not cause White's alleged damages.[30] (Doc. 137 at 44-46.)

"North Carolina courts have concluded that a trespasser 'is

---

[30] The Greensboro Defendants make the same argument about White's malicious prosecution claim against Schwochow. Because the court is granting the motion for summary judgment as to that claim, it need not consider the alternative argument about causation.

66

liable for all damage proximately resulting from his wrongful entry.'" <u>Food Lion, Inc. v. Cap. Cities/ABC, Inc.</u>, 964 F. Supp. 956, 960 (M.D.N.C. 1997) (quoting <u>Smith v. VonCannon</u>, 197 S.E.2d 524, 528 (N.C. 1973)). Nominal damages are available in a trespass action. <u>See</u> <u>VonCannon</u>, 197 S.E.2d at 528. As White points out (Doc. 154 at 13), proximate cause is generally a question of fact for the jury. <u>See</u> <u>Hampton</u>, 838 S.E.2d at 655 ("'[W]hat is the proximate cause of an injury is ordinarily a question for the jury . . . It is to be determined as a fact, in view of the circumstances of fact attending it.'") (quoting <u>Conley</u>, 29 S.E.2d at 742). Given this, the court will deny the motion for summary judgment on this ground. It will be up to the jury to determine whether the Greensboro Search Officers trespassed and, if so, what, if any, injury was caused by it.

### c. Conspiracy

White's other remaining claim against all the Greensboro Search Officers is for civil conspiracy.

For a civil conspiracy under North Carolina law, White must prove "(1) an agreement between two or more individuals; (2) to do an unlawful act or to do a lawful act in an unlawful way; (3) resulting in injury to plaintiff inflicted by one or more of the conspirators; and (4) pursuant to a common scheme." <u>Strickland</u>, 669 S.E.2d at 72. Because a conspiracy claim alone is insufficient to impose civil liability, the Defendants subject to the claim

67

must also have caused an injury pursuant to a wrongful act done in furtherance of the conspiracy. See Krawiec v. Manly, 811 S.E.2d 542, 550-51 (N.C. 2018). In other words, "A claim for conspiracy . . . cannot succeed without a successful underlying claim." Jay Grp., Ltd. v. Glasgow, 534 S.E.2d 233, 236 (N.C. Ct. App. 2000). Here, because the court is denying Defendants' motion for summary judgment as to the trespass claim against all Greensboro Search Officers, that trespass claim is the necessary predicate.

However, a successful conspiracy claim also requires proof of an agreement between two or more persons to do a wrongful act in furtherance of the conspiracy. As discussed in addressing the GCSO Defendants' motion for summary judgment, while "civil liability for conspiracy may be established by circumstantial evidence, the evidence of the agreement must be sufficient to create more than a suspicion or conjecture in order to justify submission of the issue to a jury." Dickens, 276 S.E.2d at 337.

The Greensboro Search Officers have put forward evidence that they were present at White's house almost entirely in response to direct instructions from their superiors.[31]  These officers

---

[31] The one exception is Williamson, who seemingly reported to White's house on his own volition after speaking with Raines who needed assistance identifying SRT gear. (Doc. 137-14 at 4.) The specific facts are laid out in Part I.A, but to recap: Raines reports that he "was made aware that Mr. White was terminated and instructed to respond to his residence . . . to collect his gear." (Doc. 137-10 at 15.) He instructed Barham to come with him. (Id.; Doc. 137-12 at 3.)  Similarly, Williamson instructed Lowe to come to White's house to identify SRT sniper

generally state that they were not aware that White had been fired or that a search warrant was being executed until that day. For example, Schwochow states his supervisor, Sigmon, did not explain to him that White was fired and arrested until they were on their way to White's house. (Doc. 137-20 ¶ 5.) Similarly, Raines states that on March 6 he was "made aware" that White was terminated, "instructed to respond to his residence," and "informed" that officers from other agencies would be present executing a search warrant. (Doc. 137-10 at 15.)

In response, White points to two pieces of what he categorizes as "circumstantial evidence" of a conspiracy. (Doc. 154 at 12-13.) The first is the fact that Hampshire's operations plan states, on the penultimate page, "During the search any Greensboro issued equipment located should be reported to Sgt. Hampshire, who will notify Lt. Coates to have GPD personnel respond and collect the equipment." (Doc. 139 at 11.) The second is Hampshire testifying that, at some point, "two GPD officers" looked at his search warrant and concluded that it covered GPD equipment. (Doc. 140-2 at 124:2-14.)

On this record, there is no genuine dispute of material fact

---

equipment. (Docs. 137-14 at 5; 137-15 at 4.) Likewise, GPD's Property Crimes division ordered Sigmon to take the next available GPD detective and report to White's house. (Doc. 137-18 at 3.) Sigmon instructed Schwochow to accompany him. (Id.; Doc. 137-20 ¶ 5.) Finally, Albert was ordered by her supervisor to go to White's house. (Doc. 137-21 at 3.)

as to whether any Greensboro Search Officer entered into an agreement with Hampshire, the RPD, or anyone else to trespass on White's property. Hampshire prepared the operations plans, and it was reviewed by Coates, his supervisor. (Id. at 89:19-23.) There is no evidence that anyone from GPD requested to be included or was even aware that they were so included. Nobody from GPD was present during the March 6 meeting at the SBI office before the search warrant was executed. (Docs. 137-2 at 2; 137-4 at 84:21-22.) Nor was anyone present at the start of the search. Hampshire applied for the search warrant and was responsible for executing it. (Docs. 140-2 at 89:24-90:1; 140-12.) The GPD's role in the investigation of the theft of mowers from Scott's Tractor was, on the basis of the record before the court, seemingly minimal. Hampshire recalls only having conversations with a single GPD officer during the investigation. (Doc. 140-2 at 73:4-13.) SBI Agent Denny recalls only asking GPD for White's work schedule and keeping Chief Scott up to date on the investigation. (Doc. 137-4 at 73:5-23.) GPD Chief Scott testified that it was on the basis of the investigating agencies' determination of probable cause to arrest White that he decided to fire White. (Doc. 137-6 ¶¶ 9-11.)

White's circumstantial evidence does not create "more than a suspicion or conjecture" that an agreement existed between the Greensboro Search Officers and any other Defendant to trespass at

70

White's house.[32]  See Dickens, 276 S.E.2d at 337.  The court will therefore grant the Greensboro Search Officers' motion for summary judgment as to the conspiracy claim against them.

### d.  Malicious Prosecution

White's malicious prosecution claim against GPD Detective James Schwochow centers on the investigation Schwochow performed into White's alleged theft of GPD equipment and the SBI's decision to pursue felony larceny charges against White, charges that were eventually resolved in White's favor.[33]

To bring a claim for malicious prosecution in North Carolina, White must show that Schwochow "(1) instituted, procured or participated in the criminal proceeding against the plaintiff; (2) without probable cause; (3) with malice; and (4) the prior proceeding terminated in favor of the plaintiff." Moore v. Evans, 476 S.E.2d 415, 421 (N.C. Ct. App. 1996) (alterations and citation

---

[32] In his complaint, White alleged that "all" Defendants either held "personal ill will towards Plaintiff," or "desired to advance their careers at all costs . . . regardless of . . . evidence that Plaintiff was not responsible for the crime." (Doc. 81 ¶ 257.)  White has produced no evidence of such conclusory allegations.

[33] The record reflects that the possession of stolen goods and obtaining property by false pretenses charges related to the mower filed in Alamance County were dismissed for improper venue.  (Doc. 44-7.)  The dismissal contains the following note by the prosecutor: "[I]t has recently been determined that this defendant's criminal actions have an insufficient connection to this county.  Although this defendant did commit these crimes, the proper venue for these offenses is not in Alamance County."  (Id.)  There is no indication how the felony larceny charge brought by the SBI in Guilford County was resolved other than the unchallenged allegation in the complaint that it was eventually resolved in White's favor.  (Doc. 81 ¶ 98.)

omitted).

Schwochow argues that White's malicious prosecution claim fails because (1) the SBI made an independent decision to charge White with felony larceny, (2) probable cause existed to charge White with felony larceny, and (3) Schwochow did not have the requisite malice. (Doc. 137 at 34-40.) The court need not address all three elements because, as Schwochow argues, there was probable cause to support the arrest warrant of White for felony larceny.

Probable cause is determined by a totality of the circumstances approach. State v. Benters, 766 S.E.2d 593, 598 (N.C. 2014). "The test for whether probable cause exists is an objective one—whether the facts and circumstances, known at the time, were such as to induce a *reasonable* police officer to arrest, imprison, and/or prosecute another." Moore, 476 S.E.2d at 422. Probable cause requires only a "probability or substantial chance of criminal activity, not an actual showing of such activity." Benters, 766 S.E.2d at 598 (citation omitted). In the malicious prosecution context, probable cause exists when the facts and circumstances known to the officer "would induce a reasonable man to *commence* a prosecution." Turner v. Thomas, 794 S.E.2d 439, 444 (N.C. 2016) (citing Best v. Duke Univ., 448 S.E.2d 506, 510 (N.C. 1994)). The fact that White's criminal charges were eventually dropped does not automatically "negate the existence of probable cause at the time prosecution was commenced." Id. at 445 (citation

72

omitted).

White argues that "[a]lthough Defendant Schwochow may have produced a lengthy investigatory file . . . he in fact performed little to no independent investigation." (Doc. 154 at 9-10.) It is not clear what White means by this. Schwochow was present at the March 6 search of White's house at which multiple GPD officers expressed their belief that White appeared to have more GPD equipment than a typical GPD officer would be assigned. (See, e.g., Docs. 137-10 at 16-21; 137-14 at 4-5.) As part of his subsequent investigation, Schwochow spoke to at least five GPD officers who were knowledgeable or had documentation about what equipment White had and had not been assigned, and the value of that equipment. (Doc. 137-20 ¶ 14.) He concluded that the value of the recovered GPD property was over $26,000. (Docs. 137-10 at 2; 137-27 at 2.) He also received a letter from the owner of the store that sold custom-made bicycles to GPD, which stated, "These bicycles were unique, not supplied to any other customers in their make up." (Doc. 137-23.) The final case file of his investigation totaled over 100 pages of notes, inventory, and supplemental reports from the officers involved. (Doc. 137-24.)

By time he completed his report, Schwochow would have known the following:

- Equipment of the same type as that used by GPD, including ammunition, ballistic vests, a specialized bicycle, and

73

trauma pates, was found at White's house in excess of what White had been issued. (Doc. 137-20 ¶ 19.) Multiple GPD officers present during the search believed this was excessive equipment and not likely to be privately purchased. (See, e.g., Doc. 137-10 at 16-17.)

- The equipment included GPD-branded clothing, as well as ballistic vests with the names of former GPD officers on the inside. (Docs. 137-12 at 4; 137-25.) The total value of the unissued equipment was over $26,000.

- The bicycle found in White's garage was identical to those custom-made for GPD and not supplied to any of the bicycle dealer's other customers. (Doc. 137-23.) White had been assigned a GPD bicycle at one point but had returned it and had not been reissued a new one. (Doc. 137-10 at 11.)

- White had the opportunity to steal the excessive GPD equipment. For example, Williamson told Schwochow that White volunteered to drive the SRT truck to training when he was not required to, which would have given him the opportunity to steal SRT ammunition. (Id. at 5.) White had also been assigned to the GPD Logistics Department from October 31, 2016, until he was fired on March 6, 2017, where he had access to several areas where GPD equipment was stored. (Docs. 137-10 at 6, 22; 137-22 ¶ 9.)

74

- White had been terminated and arrested for selling a stolen commercial lawn mower.

A district attorney and magistrate later reviewed the evidence and concluded that probable cause existed to arrest White for felony larceny. (Docs. 137-4 at 166:12-19; 137-27.)

White does not appear to dispute these aspects of Schwochow's investigation. Rather, he argues about what Schwochow did <u>not</u> do -- specifically, that Schwochow "ignored or failed to investigate numerous areas that could or would have uncovered exculpatory evidence," including failing to interview White. (Doc. 154 at 10.) However, even assuming that Schwochow -- or, for that matter, SBI Agent Denny -- could have conducted a more thorough investigation, that does not negate the probable cause established based on the above facts. While an officer cannot ignore exculpatory evidence known to him, a failure to pursue potentially exculpatory leads does not negate probable cause. <u>See</u> <u>State v. Memije</u>, 737 S.E.2d 191 (N.C. Ct. App. 2013) ("Reasonable law enforcement officers are not required to exhaust every potentially exculpatory lead or resolve every doubt about a suspect's guilt before probable cause is established." (quoting <u>Wadkins v. Arnold</u>, 214 F.3d 535, 541 (4th Cir. 2000)); <u>see also</u> <u>Torchinsky v. Siwinski</u>, 942 F.2d 257, 264 (4th Cir. 1991) ("It will, of course, always be possible to contend in court that an arresting officer might have gathered more evidence, but judges cannot pursue all

75

the steps a police officer *might* have taken that *might* have shaken his belief in the existence of probable cause."); Miller v. Prince George's Cnty., MD, 475 F.3d 621, 630 (4th Cir. 2007) ("It is also plain that an officer is not required to exhaust every potentially exculpatory lead or resolve every doubt about a suspect's guilt before probable cause is established." (quotations and citation omitted)).

Here, there is no evidence that Schwochow was aware of any potentially exculpatory evidence.[34]  It is also not necessary to interview the suspect to establish probable cause.  See McKinney v. Richland Cnty. Sheriff's Dep't, 431 F.3d 415, 418–19 (4th Cir. 2005) (probable cause existed to arrest teacher for assaulting a student based on victim's identification of the suspect, even though officer did not visit crime scene, interview anyone besides victim and her mother, or discuss the incident with the school's representatives).  Finally, while not dispositive, the fact that both a prosecutor and a neutral magistrate found probable cause weighs in Schwochow's favor here.  See Wadkins, 214 F.3d at 541

---

[34] The single example of exculpatory evidence White cites is that GPD Detective Lindsay Albert reviewed a log of White's card swipe activity from November 2016 to March 2017 and did not observe White using his badge to enter a city building outside normal Monday to Friday business hours.  (Doc. 154 at 10.)  It is not immediately clear how this evidence is exculpatory; White could have stolen GPD equipment during these hours, as the facts known to Schwochow suggest was possible given that White was assigned to the GPD Logistics Division.  More importantly, while this finding appears in Albert's personal report and is contained in the case file (see Doc. 137-24 at 73), it is not clear that Schwochow was personally aware of this fact.

(in the context of a qualified immunity analysis, concluding that an officer's conference with a prosecutor and the "subsequent issuance of the warrants by a neutral and detached magistrate weigh heavily *toward* a finding that [the officer] is immune" from suit); Smith v. Tilley, No. 2:17-CV-14-FL, 2019 WL 960602, at *6, report and recommendation adopted, 2019 WL 942964 (E.D.N.C. Feb. 25, 2019) ("[T]he fact that the officer possessed a warrant issued by a magistrate provides additional indicia of the existence of probable cause.").

Because probable cause existed to arrest White for felony larceny for theft of GPD equipment, therefore, his North Carolina malicious prosecution claim against Schwochow fails.[35]

Finally, because there is no longer any underlying claim, White is also unable to maintain his conspiracy claim against Schwochow. See Krawiec, 811 S.E.2d at 550-51 (N.C. 2018); Glasgow,

---

[35] White does not argue that Schwochow's use of evidence obtained from a possible trespass to establish probable cause is impermissible as fruit of the poisonous tree so as to give rise to relief in this civil action. To be sure, the "use of fruits of a past unlawful search or seizure works no new Fourth Amendment wrong." United States v. Leon, 468 U.S. 897, 906 (1984) (quotations and alteration omitted); see Lingo v. City of Salem, 832 F.3d 953, 960 (9th Cir. 2016) ("[N]othing within the fruit-of-the-poisonous-tree doctrine suggests that an officer must ignore facts that would give him probable cause to arrest a person merely because those facts were procured through an unlawful search."); White, 408 F. Supp. 3d at 694 ("[I]t is clear that the exclusionary rule and the fruit of the poisonous tree doctrine simply do not apply in civil cases."). Further, White also does not argue that Judge Biggs's opinion in the federal case, in which she held that the plain view doctrine did not apply to firearms seized from White's house during the March 6 search, has any bearing on the probable cause analysis here. Indeed, that opinion dealt only with the firearms, not the rest of the GPD equipment found at White's residence.

77

534 S.E.2d at 236 ("A claim for conspiracy . . . cannot succeed without a successful underlying claim."). The court will therefore grant Schwochow's motion for summary judgment as to the conspiracy claim as well.

### e. Section 1983 Individual Capacity Claim

GPD Deputy Chief James Hinson moves for summary judgment as to the sole remaining claim against him -- a § 1983 claim for unconstitutional seizure in his individual capacity. (Doc. 102.) Specifically, Hinson argues that he is entitled to summary judgment because the evidence shows he neither arrested nor handcuffed White, that he merely assisted other officers in their lawful arrest of White, and that he had sufficient information to determine there was probable cause to arrest White. Alternatively, Hinson argues that even if he could be found liable for an unconstitutional seizure, he is entitled to at least partial summary judgment on White's damages claim. (Doc. 103 at 8-10.) White contends that even if Hinson did not personally handcuff him, he still "seized" him without probable cause. (Doc. 111 at 4-9.)

To state a § 1983 claim for an unconstitutional seizure, an officer must have "seized a plaintiff pursuant to legal process that was not supported by probable cause and . . . the criminal proceeding must have terminated in the plaintiff's favor." White, 408 F. Supp. 3d at 701 (quoting Burrell v. Virginia, 395 F.3d 508,

78

514 (4th Cir. 2005)) (alterations omitted).

The court can assume, without deciding, that White was seized by Hinson for purposes of this claim, because White has failed to satisfy the second element of an unconstitutional seizure -- lack of probable cause.

In its prior opinion, this court found that the facts supporting the arrest warrant of White gave rise to probable cause, and thus granted a motion to dismiss the malicious prosecution claim against BPD Detective Cody Westmoreland, who authored the arrest warrant. See id. at 713. In other words, sufficient facts existed for a reasonable person in Westmoreland's position to believe White had committed the crimes alleged. Of particular importance were the facts provided by the Terrys, including how the Terrys had purchased a mower from White, suspected it was stolen, reported it to the Durham County Sheriff's Office, and identified White as the seller; how the VIN the Terrys provided indicated that the mower was stolen; and how the location where White reported he had purchased the mower was not large enough for the sale he described and the retailer did not believe he would have permitted such a sale. Id. at 698, 713.

However, the court was unable to conclude at that time that Officer Hinson had probable cause to arrest White. Id. at 702. At that point, the court only had a portion of the arrest warrant; it did not have the full arrest warrant, including any affidavit

79

setting forth the factual basis for a determination of probable cause. Id. at 701. This was not a problem for Westmoreland, who was actively involved in the investigation of White and had personal knowledge of the facts giving rise to probable cause. Id. at 713 n.27. But Hinson was not involved in the investigation, and the record did not reflect at that stage what facts were known to him. Id. Hinson had apparently reviewed the unissued arrest warrant, but he could not rely on it because White was arrested before the magistrate signed the warrant and this court was not in position to have independently reviewed the basis for the arrest warrant. See id. at 702. Accordingly, the court denied Hinson's motion to dismiss White's malicious prosecution claim. Id.

The record is now more developed, albeit with some limitations. Specifically, it appears that there is no "full arrest warrant" that would include an affidavit establishing the factual basis for probable cause. (See Doc. 103 at 20 n.3 ("Discovery has not revealed any affidavit provided to the magistrate for Plaintiff's arrest. Rather, the factual basis for the arrest likely was presented orally to the magistrate. This is the common practice for state crimes.").) As such, Hinson relies on the facts developed in discovery.

The court has already determined that the investigating agencies had probable cause to arrest White. Hinson has now established that the investigating agents from the RPD and SBI

80

informed GPD Chief Scott of the basis for their probable cause, who in turn informed Hinson of the same and directed Hinson to be present at the March 6 termination meeting after which the RPD and SBI would arrest White. (Doc. 103-1 ¶¶ 9, 14-16.) Accordingly, on the date of the arrest, Hinson knew that nine lawn mowers had been stolen from Scott's Tractor in August 2016, that the Terrys had purchased a mower from White in September 2016, that the VIN was missing from the mower the Terrys purchased, that the VIN White provided the Terrys belonged to a different mower, and that the RPD had investigated the location where White said he purchased the mower and concluded it could not accommodate the sale he described. (Id. ¶ 7.) In other words, Hinson was aware of the same facts as the investigating agents that this court found established probable cause to arrest White. An arresting officer is permitted to rely on the valid probable cause determination of an instructing officer or another law enforcement agency in effectuating an arrest. See United States v. Laughman, 618 F.2d 1067, 1072 (4th Cir. 1980) ("[S]o long as the officer who orders an arrest or search has knowledge of facts establishing probable cause, it is not necessary for the officers actually making the arrest or conducting the search to be personally aware of those facts."); United States v. Ittenbach, No. 5:14-CR-268-FL, 2015 WL 6455354, at *1, *7 (E.D.N.C. Oct. 26, 2015) (no unlawful seizure when, after a six-month investigation into the defendant, an FBI

81

agent directs a Highway Patrol trooper to effectuate a traffic stop, because "the officer with probable cause relayed the existence of his probable cause to the agency or officers that effected the seizure").

In response, White points to the declaration of Anita Holder, a former GPD police officer, to argue that there remains an issue of material fact as to the existence of probable cause. (Docs. 111 at 9; 111-2.) In relevant part, she concludes, upon a review of some portion of the investigative materials, that, "In my opinion based upon my extensive experience as a law enforcement officer, a reasonable officer in Defendant Hinson's position . . . knew or should have known that probable cause did not exist to arrest Plaintiff on March 6, 2017." (Doc. 111-2 ¶ 24.) But, while Defendants argue that there are various problems with this contention (Doc. 112 at 9-12), the fundamental problem is that where the material facts are undisputed, whether probable cause exists is ultimately a <u>legal</u> question, not one of expert opinion to which a court would defer. <u>S.P. v. City of Takoma Park, Md.</u>, 134 F.3d 260, 272 (4th Cir. 1998) ("When, as in this case, there is no genuine issue of material fact, the existence of probable cause becomes a purely legal question."); <u>Swick v. Wilde</u>, No. 1:10-CV-303, 2012 WL 3780350, at *7 (M.D.N.C. Aug. 31, 2012) ("In the absence of factual disputes, the determination of probable cause is a question of law."); <u>United States v. Barile</u>, 286 F.3d 749,

82

760 (4th Cir. 2002) ("[T]estimony offering nothing more than a legal conclusion -- i.e., testimony that does little more than tell the jury what result to reach -- is properly excluded."). White does not dispute any of the underlying facts; he (and Holder) simply argue that they do not amount to probable cause. However, this court previously concluded that probable cause existed to support the arrest warrant. The evidence before the court now shows that Hinson was aware of the same facts. He therefore had probable cause to justify White's arrest.

Because the court has found that the arresting officers had probable cause irrespective of their alleged failure to consider the facts relied upon by Holder, Hinson is entitled to summary judgment on this claim.

### 4. Reidsville Defendants

White has six claims against the Reidsville Defendants: Hampshire, Coates, Chief Hassell, and the City of Reidsville. White alleges that the Reidsville Defendants violated his Fourth and Fifth Amendment rights in both their official and individual capacities, maliciously prosecuted him, trespassed on his property, and conspired against him. Alternatively, he alleges that the Reidsville Defendants violated his rights under the North Carolina Constitution. The claims will be considered in turn.

83

### a. Section 1983 Official Capacity Claims

White alleges that all Reidsville Defendants, acting in their official capacities, deprived him of his Fourth and Fifth Amendment rights pursuant to § 1983. (Doc. 81 ¶¶ 119-125.) The Reidsville Defendants respond that White cannot establish an unlawful custom, policy, or practice to establish municipal liability; that White cannot establish an underlying deprivation of his constitutional rights; and that the claims against the individual Reidsville Defendants in their official capacities are duplicative of those alleged against the City of Reidsville. (Doc. 140 at 16-26, 40-41.)

White's Fourth Amendment claim alleges that the Reidsville Defendants "falsely arrested Plaintiff and provided false information that resulted in unreasonable, illegal searches and seizures of his person and his property." (Doc. 81 ¶ 120.) Apart from a general reference to a due process violation, White does not further articulate his Fifth Amendment claim. (Id.) As this court observed in its prior opinion, "Due process claims under the Fifth Amendment apply to federal actors, whereas due process claims under the Fourteenth Amendment apply to state actors. The standard of review for the two types of due process challenges does not differ. The court therefore construes White's Fifth Amendment due process challenges as being brought under the Fourteenth Amendment's due process clause." White, 408 F. Supp. 3d at 691

84

(citing <u>United States v. Al-Hamdi</u>, 356 F.3d 564, 573 n.11 (4th Cir. 2004)).

As a threshold matter, the claims against Hampshire, Coates, and Hassell in their official capacities must be dismissed because suits against governmental officers in their official capacity are treated as suits against the government. <u>See</u> <u>Hafer v. Melo</u>, 502 U.S. 21, 25 (1991) ("Because the real party in interest in an official-capacity suit is the governmental entity and not the named official, the entity's 'policy or custom' must have played a part in the violation of federal law.") (quotation omitted). White acknowledges that his official capacity § 1983 claims are duplicative of his claim against the City of Reidsville. (Doc. 151 at 5.) It is to that claim the court now turns.

In enacting § 1983, Congress did not intend to impose liability on a municipality for a violation of a plaintiff's constitutional rights unless deliberate action attributable to the municipality itself was the "moving force" behind the plaintiff's deprivation. <u>Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown</u>*, 520 U.S. 397 (1997) (citing <u>Monell v. Dep't of Soc. Servs. of City of N.Y.</u>*, 436 U.S. 658, 694 (1978)). To succeed on a § 1983 claim against a municipality or municipal agency, a plaintiff must demonstrate a constitutional violation as a result of an official policy, practice, or custom. <u>Monell</u>, 436 U.S. at 694. A policy, practice, or custom for which a municipality may be held liable

85

can arise in four ways: "(1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that manifests deliberate indifference to the rights of citizens; or (4) through a practice that is so persistent and widespread as to constitute a custom or usage with the force of law." <u>Lytle v. Doyle</u>, 326 F.3d 463, 471 (4th Cir. 2003) (alterations and quotations omitted).

There is no evidence of an express policy, omission, or widespread practice amounting to a custom or usage with the force of law on the part of the City of Reidsville to commit constitutional violations. Indeed, White's claims arise out of actions taken against him specifically; he has not alleged or produced any evidence that any of the Reidsville Defendants regularly engaged in similarly unlawful conduct as to other citizens.

In his response in opposition to the Reidsville Defendants' motion for summary judgment, White argues that Reidsville is liable through the decisions of Hassell who, as chief of police of RPD, is a person with "final policymaking authority." (Doc. 151 at 6-7.) Specifically, White argues, "The presence of Defendant Hassell, a person with final policymaking authority on behalf of Defendant Reidsville, during the unlawful search should be directly attributable to Defendant Reidsville." (<u>Id.</u> at 7.)

86

The court need not determine whether Hassell qualifies as a person with "final policymaking authority" under relevant state law or if his mere presence at the search of White's house -- absent any other evidence that he participated in the investigation, search, or arrest of White -- is sufficient for municipal liability, because White cannot establish a violation of his constitutional rights. See Lytle, 326 F.3d at 471 ("To prevail on a § 1983 claim, [plaintiffs] must show that (1) they were deprived of a federal statutory or constitutional right; and (2) the deprivation was committed under color of state law.").

The core issue -- for this, and, as will be seen, for several other claims -- is whether probable cause existed to support White's arrest and the search of his house in connection with the crimes of obtaining property by false pretenses and possession of stolen goods.[36] See Evans v. Chalmers, 703 F.3d 636, 654 (4th Cir. 2012) (existence of probable cause forecloses unlawful search and seizure claims).

Probable cause to search exists when there is "a fair

_____

[36] The elements of obtaining property by false pretenses are: "(1) a false representation of a subsisting fact or a future fulfillment or event, (2) which is calculated and intended to deceive, (3) which does in fact deceive, and (4) by which one person obtains or attempts to obtain value from another." State v. Ricks, 781 S.E.2d 637, 643 (N.C. Ct. App. 2016); N.C. Gen. Stat. § 14-100(a). The elements of possession of stolen goods are: "(1) possession of personal property; (2) which has been stolen; (3) the possessor knowing or having reasonable grounds to believe the property to have been stolen; and (4) the possessor acting with a dishonest purpose." State v. Tanner, 695 S.E.2d 97, 100 (N.C. 2010); N.C. Gen. Stat. § 14-71.1.

87

probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). Probable cause to arrest exists "when the facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed . . . an offense." Wilson v. Kittoe, 337 F.3d 392, 398 (4th Cir. 2003) (citation omitted).

"Probable cause is determined by a 'totality-of-the circumstances' approach." Smith v. Munday, 848 F.3d 248, 253 (4th Cir. 2017) (quoting Gates, 462 U.S. at 230). It is an objective standard. United States v. Gray, 137 F.3d 765, 769 (4th Cir. 1998) (en banc). A court must consider "the facts within the knowledge of the arresting officers to determine whether they provide a probability on which reasonable and prudent persons would act." Id. "Probable cause is not a high bar." D.C. v. Wesby, 138 S. Ct. 577, 586 (2018) (citation omitted). It requires "more than bare suspicion" but "less than that evidence necessary to convict." Gray, 137 F.3d at 769 (internal quotations omitted).

Hampshire listed the following "facts establishing probable cause" in his search warrant application (Doc. 140-12 at 7-9):

- Nine riding lawn mowers were reported stolen from Scott's Tractor on August 21, 2016.

88

- On September 19, White sold one of the mowers that had been reported stolen from Scott's Tractor to the Terrys, who picked up the mower from White's house.

- When the Terrys inspected the lawn mower the next day, they noted the VIN was missing and the mower displayed 2.0 hours, which was fewer than the 18 hours White advertised.

- The VIN White provided to the Terrys was connected to a mower sold in New York "just days before" this sale.

- The Terrys discovered the actual VIN for the mower which matched the VIN for one stolen from Scott's Tractor.

- White did not provide the Terrys a bill of sale from when he purchased the mower.

- White did not report the mower as stolen even after the Terrys reported it to him as stolen.

- Hampshire visited Sedgefield Lawn and Garden and verified that the parking lot would not have fit a truck as described by White, and that the manager would not have allowed any such sales, thus negating the explanation offered by White.

- During his interview with Hampshire and Denny and in response to a question, White said he "was here to talk about the mower he stole" which he recanted "to say sold."

The Reidsville Defendants cite to several other facts that would have been known to Hampshire and the other investigating

89

officers prior to seeking the search warrant. These include the inconsistent explanations White provided to both the Terrys and Hampshire as to how he acquired the mower and why he was selling it. For example, White told the Terrys he purchased the mower from a police officer (Docs. 140-10 at 5; 128-8 ¶ 5) but he told Hampshire and Denny that he purchased the mower from a man "from a John Deere that was closing up North" (Docs. 140-2 at 38:1-23; 140-8 at 32:9-21). White posted on a Craigslist ad that he was selling the mower because he was going through a divorce (Doc. 140-6 at 1), he told the Terrys that he had used the proceeds from the sale to pay off debts (Docs. 140-10 at 9; 128-8 ¶ 18), and he told Hampshire and Denny he was selling because the mower was too big for his needs (Doc. 140-2 at 44:23-45:1). White texted the Terrys a VIN that he said was from the bill of sale, but he did not respond to their repeated requests for a copy. (Docs. 140-10 at 6-8; 128-8 ¶ 6.) In addition to these inconsistencies, Hampshire felt that White was "excruciatingly vague" during their November 2016 interview about how he purchased the mower. (Doc. 140-2 at 43:10-24.) Although the Reidsville Defendants do not discuss it, Hampshire knew from SBI Agent Denny that White had frequent communications with Jeffrey Strickland in the days surrounding the theft of the mowers from Scott's Tractor and that Strickland was under investigation by the SBI and BPD for a similar

90

theft in Burlington. (Id. at 41:16-42:9; Doc. 127-5 ¶ 3.)[37]

In response, White makes a similar argument as he does with GPD Detective Schwochow -- that the Reidsville Defendants "fail to acknowledge the multiple exculpatory facts known by the Reidsville Defendants pursuant to which no reasonable officer could have believed probable cause existed." (Doc. 151 at 7.) Specifically, White argues that many of the facts that purport to establish probable cause are either not suspicious or are inconsistent with the crimes with which White was charged, that there was a discrepancy with the VIN listed on DCSO Deputy Lilje's report and the actual VIN on the mower White sold the Terrys, and that there was evidence that Scott's Tractor may have been engaged in insurance fraud. (Id. at 8-10.) White also repeats his argument that in his search warrant application Hampshire attributed misleading statements to White from their November 9, 2016 interview, which caused Judge Biggs to grant White's motion to suppress evidence in his federal case. (Id. at 10-11.)

As to the first point, "probable cause does not require officers to rule out a suspect's innocent explanation for suspicious facts." See Wesby, 138 S. Ct. at 588 (rejecting such a "divide-and-conquer approach" to probable cause). "[T]he fact

---

[37] Because Hampshire would not have been aware that it was Strickland who delivered the mower to White's house, as discussed in Part I.A., the court will not consider Strickland's delivery role for the probable cause analysis.

that any one fact . . . would not alone support a finding of probable cause does not mean that probable cause was absent, since an assessment of the presence of probable cause must be based on the totality of the relevant circumstances." Sennett v. United States, 667 F.3d 531, 536–37 (4th Cir. 2012) (alterations and citation omitted). Here, even if White may have had an innocent explanation for providing different reasons for selling the mower or even if he "may" have misread the number of hours on the mower, (see Doc. 151 at 8), these inconsistencies, combined with the other facts known to the officers, more than suffice under the totality of the circumstances approach the Supreme Court mandates for probable cause. See Wesby, 138 S. Ct. at 588-89.

As to the discrepancy between the VIN on Deputy Lilje's report and the actual VIN on the Terrys' mower, it is not clear how that discrepancy negates probable cause. Hampshire believed that Deputy Lilje simply copied the wrong VIN from the NCIC system onto his report because the VINs for all eight lawn mowers reported stolen from Scott's Tractor were recorded together. (Docs. 140-2 at 60:3-11, 64:19-22; 140-3 at 2.) Regardless, Hampshire received evidence of the mower's actual VIN from the Terrys, that VIN was connected to a stolen mower from Scott's Tractor, and it was that number that he listed in his search warrant application. (Doc. 140-12 at 8.)

As to White's suggestion about insurance fraud, as the court

92

observed in discussing his malicious prosecution claim against Schwochow, the law does not require investigating officers to exhaust every possible lead during an investigation. See Munday, 848 F.3d at 254. It is sufficient if the officers investigate and establish facts that link a suspect to a crime. See id. In fact, Hampshire did investigate the possibility that Scott's Tractor was engaged in insurance fraud. (Doc. 140-2 at 45:17-47:16.) He discussed the possibility with Coates and Denny, contacted the North Carolina Department of Insurance, which opened an investigation, and contacted the Rockingham County district attorney who declined to prosecute. (Id.) This is far from ignoring exculpatory evidence that can negate probable cause. Cf. Clipper v. Takoma Park, Md., 876 F.2d 17, 19-20 (4th Cir. 1989) (affirming a jury award on a § 1983 unlawful arrest claim after plaintiff was misidentified as a bank robber when police failed to pursue multiple leads, including reviewing photographs of the robbery, while also noting, "We would not suggest that [the officer's] failure to investigate the leads that Clipper provided was, in itself, sufficient to negate probable cause").[38]

---

[38] Clipper is the lone case White cites for the proposition that a failure to investigate, when combined with other factors, can negate probable cause. (Doc. 151 at 7.) This is true so far as it goes. However, this court distinguished that case more fully in its prior opinion:

> In Clipper, law enforcement mis-identified plaintiff as a bank robber based on a witness description and the fact that an accomplice was the plaintiff's son-in-law who used a car

93

As to White's final point, as the court previously stated, "[e]ven excising [this] statement . . . probable cause still existed for the warrant" for the reasons discussed at length already. White, 408 F. Supp. 3d at 698.

In sum: It is undisputed that White sold the Terrys a lawn mower that had been reported stolen. The theft occurred on the night of August 21 from Scott's Tractor in Reidsville, and White purchased the mower three days later and sold it on September 19. When requested by the Terrys, White falsely provided a VIN that did not match the mower he sold to them but in fact matched a mower that had been sold in New York several days prior. There were also substantial inconsistencies in White's stories about the sale with the Terrys, including who White purchased the mower from, and

_____

registered to plaintiff. However, the only officer who observed the robbery failed to make a positive identification to the arresting officer, and police failed to pursue and follow up on multiple leads, including reviewing the bank video of the robbery, that, taken together, provided ample evidence that plaintiff was not the robber. The Fourth Circuit upheld the jury's verdict, on a deferential sufficiency of evidence standard, finding the police had violated plaintiff's due process rights. Id. at 19 n.*. In so doing, however, the court was careful to say that it "would not suggest that [officer] Starkey's failure to investigate the leads that Clipper provided was, in itself, sufficient to negate probable cause." Id. at 20.

White, 408 F. Supp. 3d at 710–11. The court repeats its conclusion on the facts as they related to the Reidsville Defendants at this juncture: "Here, by contrast, there was ample probable cause to support the arrest warrant that White knowingly possessed a stolen mower and sold it under the false pretense that it was his. The search warrant affidavit, including the information provided by the Terrys, provided probable cause." Id. at 711.

demonstrably false statements about why he was selling and how long the mower had been used. White further never provided a bill of sale despite the Terrys' several requests and despite claiming to provide a VIN from a bill of sale. White, a police officer, did not report the mower as stolen when the Terrys alerted him to this fact. The location where White claimed he purchased the mower, in a retailer's parking lot, was not large enough for the sale he described, and the retailer, who Hampshire interviewed, stated he would never have permitted such a sale. During the relevant period, White had also communicated frequently with Strickland, who was under investigation by the SBI and BPD for a similar theft of John Deere equipment in Burlington. These highly incriminating facts provide more than ample probable cause to support White's arrest and the search of his residence for evidence that he knowingly possessed a stolen mower and sold it under false pretenses.

Because there was probable cause to support the Reidsville Defendants' investigation, White cannot establish a violation of his constitutional rights to sustain a claim for municipal liability under § 1983. The Reidsville Defendants' motion for summary judgment as to this claim will therefore be granted.

### b.  Section 1983 Individual Capacity Claims

White next alleges that Hampshire and Coates, acting in their individual capacities, deprived him of his Fourth and Fifth

95

Amendment rights.[39]  (Doc. 81 ¶¶ 146-158.)

White does not make clear the nature of the constitutional violations he alleges occurred.  He captions this cause of action "violation of 1983" but, as Defendants correctly point out (Doc. 140 at 17), "Section 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." Albright v. Oliver, 510 U.S. 266, 271 (1994) (quotations and citation omitted).  White also makes numerous references to "RPD policies and [North Carolina] statutes," (e.g., Doc. 81 ¶ 149), but § 1983 is generally limited to vindicating federal rights, not state and local policies.  See Lugar v. Edmondson Oil Co., 457 U.S. 922, 924 (1982) (Section 1983 "provides a remedy for deprivations of rights secured by the Constitution and laws of the United States") (emphasis added); Collins v. City of Harker Heights, Tex., 503 U.S. 115, 119 (1992) (Section 1983 "does not provide a remedy for abuses that do not violate federal law").

The parties appear to interpret this claim as a violation of White's Fourth and Fourteenth Amendment rights stemming from an allegedly unlawful search without probable cause, in part based on the allegation that Hampshire, as approved by Coates, improperly

---

[39] As with his official capacity § 1983 claims, White's Fifth Amendment due process claims will be construed as Fourteenth Amendment due process claims.

included in his search warrant application the misrepresentation that White admitted to stealing the mower.  (Docs. 81 ¶ 154; 140 at 27; 151 at 12.)

However, even viewing the facts in the light most favorable to White and assuming Hampshire intentionally or recklessly misled the magistrate about what White said at their November 2016 meeting,[40] that fact would not establish a constitutional violation so long as probable cause otherwise existed for the search of White's house.  See Miller, 475 F.3d at 630–31 (construing Franks v. Delaware, 438 U.S. 154 (1978), and concluding: "An investigation need not be perfect, but an officer who intentionally or recklessly puts lies before a magistrate, or hides facts from him, violates the Constitution unless the untainted facts themselves provide probable cause.").  For reasons discussed at length in addressing the official capacity § 1983 claims, the court finds that probable cause existed for the search warrant even without the misleading statement.  Seeing no other apparent basis for a § 1983 claim, the court will grant the Reidsville Defendants' motion for summary judgment.

### c.  Malicious Prosecution

White names Hampshire and the City of Reidsville in his

---

[40] Both Hampshire and Denny continue to contend that they both construed White's statement as admitting he knew the mower was stolen.  (Docs. 140-2 at 38:1-3, 42:16-43:7; 140-8 at 171:12-172:22.)

malicious prosecution claim.  (Doc. 81 ¶¶ 183-93.)

White has indicated in the case caption that the Defendants are sued in both their individual and official capacities, and he seeks compensatory and punitive damages.  So, as it did in its prior opinion regarding other Defendants, the court construes White to have sued Hampshire in both his official and individual capacities.  See White, 408 F. Supp. 3d at 695-96.

An official-capacity state-law claim against an individual officer, however, is construed as a claim against the municipality and is subject to the same jurisdictional rules as the suit against the governmental entity.  See Meyer v. Walls, 489 S.E.2d 880, 888 (N.C. 1997); Mullis v. Sechrest, 495 S.E.2d 721, 725 (N.C. 1998) ("[O]fficial-capacity suits are merely another way of pleading an action against the governmental entity.").  Thus, if the governmental entity enjoys sovereign immunity and cannot be sued, the state tort claims against the officers named in their official capacities must likewise be dismissed.  Generally, a municipality "is immune from torts committed by an employee carrying out a governmental function" unless the municipality waives its immunity by purchasing liability insurance.  Turner v. City of Greenville, 677 S.E.2d 480, 483 (N.C. Ct. App. 2009) (quotations omitted); see also N.C. Gen. Stat. § 153A-435(a).  White has alleged that the City of Reidsville has purchased liability insurance such that it has waived sovereign immunity.  (Doc. 81 ¶ 29.)  The City of

98

Reidsville has not contested this assertion, for example, by providing its insurance policy. So the court will proceed to the merits of White's claim.

White's malicious prosecution claim against the Reidsville Defendants is subject to the same legal analysis as that described previously for the same claim against the Greensboro Defendants, and will not be repeated here. An essential element of a malicious prosecution claim is a want of probable cause, i.e., White must show that Hampshire and the City of Reidsville instituted a criminal proceeding against White that lacked probable cause. See Moore, 476 S.E.2d at 421. For reasons given above in addressing White's § 1983 claims, the court finds that probable cause existed to support these Defendants' search of White's residence during the investigation for felony charges of possession of stolen goods and obtaining property under false pretenses. Therefore, the court will grant the Reidsville Defendants' motion for summary judgment as to White's malicious prosecution claim.

### d.    Trespass

White's trespass claim against Hampshire and the City of Reidsville is based on Hampshire's entry into White's garage while attempting to conduct the knock and talk with GCSO Detective Wilkins on November 2, 2016. (Doc. 81 ¶¶ 210-217.)

The Reidsville Defendants state, "Plaintiff does not specify whether his trespass claim is brought against Sgt. Hampshire in

99

his official or individual capacity" and address only the individual capacity claim. (Doc. 140 at 34.) However, as noted previously, the court construes White to have sued Hampshire in both his official and individual capacities. Further, in his response White reaffirms that he is suing each Reidsville Defendant in their individual and official capacities. (Doc. 151 at 1.) Because a suit against an official in his official capacity is considered a suit against the municipality, see Meyer, 489 S.E.2d at 888, White in effect has alleged trespass claims against the City of Reidsville and Hampshire in his individual capacity.

As to the individual capacity claim against Hampshire, the Reidsville Defendants argue that Hampshire is entitled to public official immunity. (Doc. 140 at 34-35.) As discussed, public official immunity applies unless the official "engaged in discretionary actions which were allegedly: (1) corrupt; (2) malicious; (3) outside of and beyond the scope of his duties; (4) in bad faith; or (5) willful and deliberate." Smith, 608 S.E.2d at 411. "The public immunity doctrine protects public officials from individual liability for negligence in the performance of their governmental or discretionary duties." Campbell, 576 S.E.2d at 730. Police officers are public officials who "enjoy absolute immunity from personal liability for their discretionary acts done without corruption or malice." Schlossberg, 540 S.E.2d at 56.

White argues that public official immunity is "generally"

100

only available to torts alleging mere negligence, and because trespass is an intentional tort Hampshire is not entitled to public official immunity. (Doc. 151 at 16.) However, North Carolina courts have applied public official immunity to trespass claims. See, e.g., Campbell, 576 S.E.2d at 730; Hope v. Hope, 595 S.E.2d 238 (N.C. Ct. App. 2004) (trespass to the person); Lineberger v. Yang, No. 514CV137, 2016 WL 5928816, at *8 (W.D.N.C. Oct. 11, 2016) (interpreting North Carolina law and concluding, "The doctrine of public official specifically applies to torts sounding in trespass, malicious prosecution, and false arrest"). North Carolina courts are split on whether public official immunity applies to intentional torts and generally hold that the immunity does not apply only in those intentional torts where "malice encompasses intent." Maney v. Fealy, 69 F. Supp. 3d 553, 564-65 (M.D.N.C. 2014). This reading of the case law in North Carolina reconciles the fact that North Carolina courts at times do apply public official immunity to intentional torts and squares that fact with the underlying justification for the doctrine: "As long as a public officer lawfully exercises the judgment and discretion with which he is invested by virtue of his office, keeps within the scope of his official authority, and acts without malice or corruption, he is protected from liability." Smith v. State, 222 S.E.2d 412, 430 (N.C. 1976).

Here, the record is "devoid of any evidence showing

101

maliciousness or corruption" by Hampshire. See Campbell, 576 S.E.2d at 730. The complaint does not allege any corrupt or malicious acts. And the most that White argues is that this trespass is "part and parcel" of White's malicious prosecution claim. (Doc. 151 at 16.) However, for the reasons given, the court is dismissing that claim because Hampshire had probable cause to obtain a warrant to search White's house as part of his investigation into the theft of the lawn mowers. "Mere allegations of malice without more are insufficient to overcome a motion for summary judgment." Hope, 595 S.E.2d at 238 (citation omitted). There is no factual basis to conclude that Hampshire acted maliciously in entering White's open garage door and knocking on the house door while attempting to conduct an otherwise lawful knock and talk. Accordingly, the court finds that Hampshire is entitled to public official immunity, and Defendants' motion will be granted as to White's trespass claim again Hampshire in his individual capacity.

As to the trespass claim against the City of Reidsville, because White contends that the City of Reidsville has waived sovereign immunity, and Reidsville has not contested this assertion, the court will proceed to its merits.

North Carolina courts have upheld the use of knock and talks as an appropriate investigative tool. "Law enforcement officers are permitted to travel wherever the occupants of the home

102

implicitly permit public access in order to conduct 'knock and talk' investigations." State v. Welch, 803 S.E.2d 871 (N.C. Ct. App. 2017) (citing State v. Grice, 767 S.E.2d 312, 317 (N.C. 2015)). During a knock and talk, the officer "is permitted to approach any door that a 'reasonably respectful citizen unfamiliar with the home' would believe appropriate." Id. (quoting State v. Huddy, 799 S.E.2d 650, 654 (N.C. Ct. App. 2017) (citing Florida v. Jardines, 569 U.S. 1, 8 n.2 (2013)).

Here, White raises no issue with Hampshire's approach to the front door of his house to conduct the knock and talk. See Huddy, 799 S.E.2d at 654 ("[O]fficers are permitted to approach the front door of a home, knock, and engage in consensual conversation with the occupants. Put another way, law enforcement may do what occupants of a home implicitly permit anyone to do, which is 'approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave.'") (quoting Jardines, 569 U.S. at 8) (citation omitted).

White does contend that Hampshire trespassed in entering his garage. On this record, there is at least a disputed question of fact as to whether a "reasonably respectful citizen unfamiliar with the home" would believe it appropriate, upon no answer at the front door, to walk through White's open garage door and knock on an interior door. Cf. Grice, 767 S.E.2d at 314-15 (officers could lawfully approach and knock on side door when front door was

103

inaccessible, covered with plastic, and obscured by furniture). The closest example Defendants cite is Welch, an unpublished opinion by the North Carolina Court of Appeals that upheld an officer's knocking on a door inside an open garage bay. Welch, 803 S.E.2d at 871. But in that case, the officer had reason to believe the occupant of the home had just arrived and had himself accessed the home through that same door. Id. Further, as an unpublished state appeals court case, Welch is not controlling authority, see State v. Mabry, 720 S.E.2d 697, 702 (N.C. Ct. App. 2011), and this court "should not create or expand a state's public policy" in predicting how North Carolina courts would ultimately decide this issue, see Time Warner, 506 F.3d at 314 (alterations omitted).

Hampshire says he entered the garage to knock on the door to the house because he noticed cobwebs on the front door, in his experience many people use a side door as their normal means of entry, and he observed a "clear path to the door" inside the garage. (Doc. 140-2 at 79:18-80:5.) According to the Whites, they not ordinarily use the garage door to enter or exit their home. (Docs. 151-1 at 110:23-24; 151-2 at 77:3-6.) The garage door that Hampshire entered did not face the street; it faced to the side, away from the front door. (Doc. 140-2 at 78:5-11; see Doc. 140-12 at 3.) While it is unclear how far back into the garage the door to the house was, it was at least several feet

104

back and Hampshire had to pass "a lot of things" laying on the garage floor to access the door. (Doc. 140-2 at 82:23-83:13.)

Again, there is at least a genuine dispute, on the facts of this case, as to whether a reasonable officer would believe it appropriate to knock on the door inside White's garage. Accordingly, the court will deny the motion for summary judgment as to White's trespass claim against the City of Reidsville. See Campbell, 576 S.E.2d at 729 ("If there are genuine issues of historical fact respecting the officer's conduct or its reasonableness under the circumstances, summary judgment is not appropriate, and the issue must be reserved for trial.") (citation omitted).[41]

### e. North Carolina Constitutional Violations

White alleges in the alternative that all Defendants "violated [his] rights under the North Carolina Constitution." (Doc. 81 ¶ 248.) Specifically, he alleges that the City of Reidsville, Hampshire, and Coates violated his rights under Article 1 § 19 by depriving him of his liberty and property, arresting him without cause and with the support of false statements, and causing search warrants to be issued based on false

---

[41] The criminal cases the Reidsville Defendants rely on are distinguishable, as the trial court is obliged to find certain facts by a preponderance of evidence before making the legal determination whether an officer's conduct was reasonable under the Fourth Amendment. See Huddy, 799 S.E.2d at 654; United States v. Adkinson, 191 F. Supp. 3d 565, 568 (E.D. Va. 2016) ("In deciding a motion to suppress, the district court is empowered to make findings of fact, and conclusions of law.")

105

statements.  (Id. ¶ 249.)  He also alleges that Reidsville and Hampshire violated his rights under Article I, § 27 by requiring excessive bail.  (Id. ¶ 252.)

"[A] direct cause of action under the State Constitution is permitted only 'in the absence of an adequate state remedy.'" Davis v. Town of S. Pines, 449 S.E.2d 240, 247 (N.C. Ct. App. 1994) (quoting Corum v. Univ. of N.C. ex rel. Bd. of Governors, 413 S.E.2d 276, 289 (N.C. 1992)).  Thus, the availability of a direct cause of action under the North Carolina Constitution depends on the injury White seeks to be remedied, and whether a state-law claim is available to him.  Notably, an adequate state remedy refers to the "possibility of relief," and it is not necessary that a plaintiff prevail on his other state-law claims.  Craig ex rel. Craig v. New Hanover Cnty. Bd. of Educ., 678 S.E.2d 351, 355 (N.C. 2009).  Furthermore, "the affirmative defense of public official immunity does not render common law tort claims inadequate" for purposes of this consideration.  DeBaun v. Kuszaj, 767 S.E.2d 353, 357 (N.C. Ct. App. 2014).

White has alleged state claims against the Reidsville Defendants for his injuries: malicious prosecution and trespass, and conspiracy to commit the same.  Accordingly, White has an adequate state remedy for the injuries he has suffered.  Therefore, his claims under the North Carolina Constitution against the Reidsville Defendants will be dismissed.  See White, 408 F. Supp.

106

3d at 715 (dismissing the same North Carolina Constitution claims against the Burlington Defendants because White had had an adequate state remedy); Jones v. Harrison, No. 4:12-CV-90-D, 2014 WL 3644706, at *6 (E.D.N.C. July 22, 2014) (dismissing claims brought under Article I, §§ 19 and 27 of the North Carolina Constitution where plaintiff had adequate state remedies even though the state-law claims were also dismissed).

### f. Conspiracy

Finally, White brings the same civil conspiracy claim against the Reidsville Defendants as he does against the other Defendants. Specifically, he alleges that all Defendants, including all Reidsville Defendants, "entered into an agreement and conspiracy whereby they would prosecute Plaintiff for charges that lacked probable cause" because they either held "personal ill will towards Plaintiff" or "desired to advance their careers at all costs." (Doc. 81 ¶¶ 256-57.)

As discussed in addressing this same claim against the other remaining Defendants, because a conspiracy claim alone is insufficient to impose civil liability, the Defendants subject to a conspiracy claim must also have caused an injury pursuant to a wrongful act in furtherance of the conspiracy. See Krawiec, 811 S.E.2d at 550-51. Thus, the claims the court considers when analyzing White's conspiracy claims are the state claims that survive Defendants' motion for summary judgment. Here, the only

107

remaining claim is a trespass claim against the City of Reidsville.
But under North Carolina law, municipalities cannot ordinarily be
a party to a conspiracy.  See White, 408 F. Supp. 3d at 715-16
(citing Houpe v. City of Statesville, 497 S.E.2d 82, 93-94 (N.C.
Ct. App. 1998)).  For that reason, White's conspiracy claim against
the City of Reidsville will be dismissed.  See id. at 716 & n.30
(dismissing conspiracy claim against City of Burlington and noting
that the City of Reidsville would likely benefit from the same
analysis).  Because there are no remaining state-law claims against
an individual Reidsville Defendant, White's conspiracy claims
against Hampshire and Coates will also be dismissed.[42]

### 5.  City of Burlington

Defendant City of Burlington moves for summary judgment as to
the sole remaining claim against it -- a North Carolina state-law
claim for civil trespass on a respondeat superior theory of
liability.  (Doc. 126.)  The gist of this claim is that BPD Officer
Victoria Underwood was unlawfully present during the March 6 search
of White's home.  (Doc. 127-14 ¶¶ 5-6.)  Burlington argues that
this remaining claim is barred by the doctrine of governmental
immunity.  (Doc. 127 at 9-12.)  White responds that "he does not
intend to file a response to the motion for summary judgment filed

---

[42] As with the other Defendants, White has also not come forward with any
evidence for his allegations that the Reidsville Defendants pursued
charges against him due to "personal ill will" or out of a "desire[] to
advance their careers at all costs."  (Doc. 81 ¶ 256.)

by Defendant City of Burlington based on its defense [of] sovereign/governmental immunity." (Doc. 149.) While the court can regard White to have conceded the issue, a review of the record confirms the appropriateness of judgment for the City of Burlington.

"In North Carolina, governmental immunity serves to protect a municipality . . . from suits arising from torts committed while the officers or employees are performing a governmental function." Schlossberg, 540 S.E.2d at 52. Law enforcement is a governmental function. Id. This immunity is absolute unless a municipality has consented to being sued or has otherwise waived its immunity. Id. A city may waive its governmental immunity by purchasing liability insurance, but waiver is only to the extent that the city is indemnified by its purchase of insurance. Id. at 53; N.C. Gen. Stat. § 160A-485(a).

Here, the undisputed facts show that Underwood was acting in her official capacity as a law enforcement officer when she was present during the search of White's house, and her actions thereby constitute a governmental function. Further, Burlington's insurance policy during the relevant time states that it "applies to the tort liability . . . only to the extent that such tort liability is not subject to any defense of governmental immunity under North Carolina law" and the purchase of the policy "is not a waiver, under North Carolina General Statutes Section 160A-485

109

or North Carolina General Statute Section 153A-435 or any amendments to those sections, of any governmental immunity that would be available to any insured had you not purchased this policy." (Docs. 127-16 ¶¶ 9-10; 127-17 at 16.)

Accordingly, because the City of Burlington has not waived its governmental immunity, that immunity serves to bar White's trespass claim against it. The court will therefore grant the City of Burlington's unopposed motion for summary judgment. (Doc. 127.)

## III. CONCLUSION

For the reasons stated, White's federal complaint -- which alleged 17 causes of action against 24 defendants across four law enforcement agencies - now proceeds as to only three state-law trespass claims: against Stalls, the City of Reidsville, and the Greensboro Search Officers.

IT IS THEREFORE ORDERED that the pending motions are GRANTED IN PART and DENIED IN PART as follows:

1. Defendants' joint motion to exclude expert testimony or evidence (Doc. 117) is GRANTED IN PART AND DENIED IN PART, subject to Defendants' right to challenge any proposed testimony at a later date. White will be permitted the opportunity to file an expert report for Anita Holder within 30 days in compliance with the limitations set forth herein, after which

110

Defendants will have 45 days from the service of the report to depose and/or challenge her proposed testimony.

2.    Defendant James Hinson, Jr.'s motion to seal (Doc. 105) is DENIED.  Docket Entry 103-6 is unsealed.  Hinson has 20 days to withdraw Docket Entry 103-5 and his pending motion to seal, otherwise, Docket Entry 103-5 will also be unsealed.

3.    Defendant Guilford County Sheriff's Office's motion to seal (Doc. 130) is DENIED.

4.    Defendant Greensboro Police Department's motion to seal (Doc. 138) is GRANTED.

5.    Plaintiff William Z. White's motion to seal (Doc. 153) is DENIED.

6.    Defendant Guilford County Sheriff's Office's motion for summary judgment (Doc. 128) is DENIED as to the state-law trespass claim against Defendant James Stalls (Tenth Cause of Action), but is otherwise GRANTED as to all other remaining claims, which are DISMISSED WITH PREJUDICT.

7.    Defendant Greensboro Police Department's motion for summary judgment (Doc. 136) is DENIED as to the state-law trespass claim against Defendants Raines, Barham, Williamson, Lowe, Sigmon, Schwochow, and Albert (Eleventh Cause of Action), but is otherwise GRANTED as to all other remaining claims, which are DISMISSED WITH PREJUDICE.

8.    Defendant James Hinson, Jr.'s motion for summary

111

judgment (Doc. 102) is GRANTED, and White's § 1983 unconstitutional seizure claim against him is DISMISSED WITH PREJUDICE.

9.   Defendant Reidsville Police Department's motion for summary judgment (Doc. 131) is DENIED as to the state-law trespass claim against the City of Reidsville (Twelfth Cause of Action), but is otherwise GRANTED as to all other remaining claims, which are DISMISSED WITH PREJUDICE.

10.  Defendant City of Burlington's motion for summary judgment (Doc. 126) is GRANTED, and White's state-law trespass claim against it is DISMISSED WITH PREJUDICE.


                                    /s/   Thomas D. Schroeder
                                    United States District Judge

March 31, 2021