IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

WILLIAM Z. WHITE,             )
                              )
            Plaintiff,        )
                              )
      v.                      )      1:18-cv-00969
                              )
THE CITY OF GREENSBORO, et al., )
                              )
            Defendants.       )

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, Chief District Judge.

This lawsuit arises out of the arrest and firing of Plaintiff William White, a former Greensboro Police Department officer, after he was investigated for illegal activity stemming from the theft of several commercial-grade lawn mowers. After the criminal charges against White were eventually dismissed, he brought this case alleging numerous violations of both federal and North Carolina law against multiple Defendants across four law enforcement agencies.

The court has already ruled on motions to dismiss and for summary judgment, dismissing all claims except those relating to trespass. Before the court are two motions by the remaining Defendants: a motion to exclude expert testimony or evidence from Anita Holder, White's proffered expert witness, filed by officers of the Greensboro Police Department ("GPD") -- James Schwochow, Eric Sigmon, Johnny Raines, Jr., William Barham, Brian Williamson,

Jason Lowe, and Lindsay Albert ("Greensboro Defendants"), Defendant Matthew Stalls ("Stalls"), and Defendant the City of Reidsville ("Reidsville") (Doc. 166); and a motion for reconsideration of the court's previous order denying summary judgment (Doc. 173) filed by the Greensboro Defendants on the basis of public official immunity. White has responded, opposing both motions. (Docs. 169, 175.) Defendants have filed replies. (Docs. 171, 176.) The court heard argument on the motions on January 25, 2022. For the reasons set forth below, the motion to exclude White's expert witness will be granted in part and denied in part, and the motion to reconsider will be granted in part and denied in part. Moreover, the present analysis has required the court to revisit its analysis of the dismissal of the Ninth Cause of Action against the Greensboro Defendants in their personal capacity pursuant to 42 U.S.C. § 1983, and that claim will be reinstated.

I.  **BACKGROUND**

A.  **Facts**

The background of this case is extensively set out most recently in this court's prior amended memorandum opinion and order. White v. City of Greensboro, 532 F. Supp. 3d 277 (M.D.N.C. Apr. 5, 2021). Relevant facts will be discussed as pertinent to each pending motion.

In short, White was a police officer for the GPD from April

2

2009 until March 6, 2017. (Doc. 111-1 ¶ 3.)[1] On August 22, 2016, the Reidsville Police Department ("RPD") received a report that several commercial-grade lawn mowers were stolen from Scott's Tractor, a lawn mower dealer in Reidsville, North Carolina. (Doc. 140-1.) RPD Lieutenant Shannon Coates responded to the report and assigned RPD Sergeant Lynwood Hampshire to investigate. (Id., Doc. 140-2 at 16:16-20.) Hampshire would serve as the lead investigator for the duration of the investigation. (Doc. 140-2 at 17:1-3.)

On September 3, Stalls -- who is Plaintiff's step-brother as well as brother-in-law, and a deputy with the Guilford County Sheriff's Office ("GCSO") -- and his wife, Brittany, went to the Whites' house to care for the White's dogs while the Whites were away. (Doc. 128-2 at 23:21-24:18.) Upon entering the garage where the dog food was kept, Stalls noticed a John Deere mower with a sheet over the seat. (Id. at 23:5-11, 25:25-26:5.) He removed the sheet, sat on the seat, and photographed the mower's vehicle identification number ("VIN"), also known as the serial number. (Id. at 26:6-27:8; Doc. 128-3 at 5.)

Several days later, and suspecting the mower might be stolen, Stalls checked the mower's model number against a police database.

---

[1] All citations to the record are to ECF docket page or paragraph number except for testimony, which is cited to the deposition transcript page and line.

(Doc. 128-3 ¶ 7.) Stalls says he did this because White told him he got it from another police officer, the mower looked brand new, and the asking price was half the mower's value. (Doc. 128-2 at 29:4-23.) Stalls's research reflected that the mower had been reported stolen by the RPD. (Id. at 30:3-6.) Stalls then called his stepmother, Anita Holder -- who is White's mother and a former GPD police officer, including interim chief of police (and incidentally White's proposed expert witness) -- for guidance. (Id. at 30:8-9; Doc. 111-2 ¶¶ 7-10.) Holder told Stalls to confront White about the mower, which Stalls did via text message and a phone conversation on September 19. (Docs. 128-2 at 30:11-31:5; 128-3 ¶¶ 7-9.)

On October 7, Hampshire received a call from a couple, the Terrys, who reported they had recently bought a mower from White and who expressed concern about the possibility it had been stolen earlier from Scott's Tractor. (Doc. 140-3 at 1.) On November 2, Hampshire went to the GCSO to meet Wilkins, who had been directed by his supervisor to assist, so the two of them could investigate by conducting a "knock and talk" at White's house. (Id. at 2; Doc. 128-7 ¶ 12.) Upon arriving at White's house, Hampshire and Wilkins knocked on the front door, but no one answered. (Doc. 140-2 at 79:14-18.) Hampshire testified that he noticed cobwebs on the front door and believed it "[did] not look like the primary way they go in and out of the house," so he saw the open garage

4

door and what he viewed as a "clear path" to another door to the house that was "well used," knocked on that door, and again no one answered. (Id. at 79:18-80:14.) He pushed what he thought was a doorbell, only to learn it was a garage door button, so he pushed it again to maintain the open garage door, left his business card on the door inside the garage, and left. (Id.) During this time, Wilkins stayed on the driveway and did not enter the garage. (Id. at 134:18-22.) According to White and his wife, Christina, the Whites do not ordinarily use the garage door to enter or exit their home. (Docs. 151-1 at 110:23-24; 151-2 at 77:3-6.)

Prior to going to White's house for the knock and talk, Hampshire learned that White was a GPD police officer. (Docs. 140-2 at 18:3-9; 140-9 at 27:16-28:22.) Hampshire later spoke with Coates, his supervisor, who advised him to contact the North Carolina State Bureau of Investigation ("SBI") and GPD's Professional Standards Division. (Doc. 140-2 at 18:3-9.) The SBI was contacted because it is standard practice for the SBI to be involved when a police officer is the suspect in an investigation. (Doc. 140-8 at 170:5-171:3.) Hampshire contacted SBI Agent Destinie Denny, who had worked with the RPD in the past. (Id. at 21:15-22:10.)

Following an investigation, Hampshire several months later applied for and obtained a warrant from a magistrate to search two of White's residences on March 5, 2017. (Doc. 140-12.) Also on

5

March 5, the investigating agencies[2] informed GPD Chief Wayne Scott that they had probable cause to arrest White for felony possession of stolen property and felony obtaining property by false pretenses, that the agencies were in the process of obtaining search warrants for White's residences, and that they planned to arrest White on March 6. (Doc. 103-1 ¶ 9.) The investigating agencies had updated Scott during their investigation, and GPD's Professional Standards Division was also investigating White's possible involvement in the mower thefts. (Id. ¶ 6.) Scott agreed that the agencies had probable cause to arrest White and decided to terminate White's employment with GPD. (Id. ¶¶ 10-11.)

On the morning of March 6, Hampshire conducted a briefing at SBI's Greensboro office prior to executing the search warrants. Present were members from the SBI, Burlington Police Department ("BPD"), GCSO, and the Randolph County Sheriff's Office. (Doc. 140-13 at 1.) Hampshire had prepared an operations plan, which was reviewed by his supervisor Coates, outlining the execution of the search warrants. (Docs. 140-2 at 89:19-23; 139.) Also that morning, White was arrested at work, charged with various crimes, and his employment with GPD was terminated as a result. (Doc. 103-1 ¶¶ 18-19.)

At about 8:00 a.m., the RPD and SBI executed the search

---

[2] Chief Scott's declaration did not identify which agencies informed him that probable cause existed to arrest White.

warrant at White's primary residence. Present at the start of the search were two agents from the RPD, including Hampshire as the officer in charge, and two agents from the SBI. (Doc. 139 at 7.) Detective Victoria Underwood of the BPD was present as a BPD liaison officer because the BPD was conducting a simultaneous arrest of Strickland as a result of its investigation into the theft at another seller, Quality Equipment. (Docs. 127-14 ¶¶ 5-6; 140-2 at 140:11-14.) GCSO Deputy Amanda Fleming was present as a GCSO liaison officer because White's house was in Guilford County. (Docs. 139 at 7; 140-2 at 136:12-137:21.) Other officers arrived during the search, including RPD Chief Robert Hassell. (Doc. 140-2 at 91:25-92:4.)

When the officers arrived at White's house, the only persons present in the home were Christina White, the Whites' daughter, and Anita Holder, White's mother. (Doc. 137-7 at 7:23-8:10.) Hampshire allowed Holder to leave with the Whites' daughter. (Id.; Doc. 140-2 at 95:22-96:9.) The search officers proceeded to search the residence. They discovered a John Deere Gator and trailer in White's garage. The Gator was reported as stolen from Wake County, North Carolina, in November 2016. (Doc. 140-13 at 2, 11.) The officers were unable to find a VIN for the trailer, which appeared to have been scratched off. (Id.) Both the Gator and trailer were seized and towed to the RPD impound lot. (Id.)

Hampshire's operations plan directed that, upon discovery of

7

any GPD equipment or property, Hampshire was to notify RPD Lieutenant Coates, who would in turn notify the GPD to come to White's house to retrieve the property. (Docs. 139 at 11; 140-2 at 87:13-23.) And that is what happened. The investigating officers discovered GPD equipment at White's house, Hampshire notified Coates, and Coates notified the GPD to come to collect the property. (Docs. 139-1 at 3; 140-2 at 87:13-18.)

At about 10:00 a.m., GPD Lieutenant Johnny Raines was directed by a superior to go to White's house to pick up GPD-issued equipment. (Doc. 137-10 at 15.) Raines was a member of Resource Management, the GPD division that keeps track of GPD equipment. (Doc. 137-11 at 79:3-9.) According to several GPD Defendants, it is standard practice for GPD to attempt to collect issued equipment as soon as possible after an officer leaves the department. (Docs. 137-10 at 15; 137-12 at 3.) Raines directed Sergeant William Barham to accompany him. (Doc. 137-12 at 3.) When both officers arrived, Raines looked into an open garage and noticed what appeared to be GPD equipment in the garage. (Doc. 137-10 at 15.) Officers from the SBI and RPD escorted Raines and Barham to the master bedroom where they both observed additional GPD equipment. (Id.; Doc. 137-12 at 4.) Sometime thereafter, Raines went to the living room where Christina White was sitting and asked her if they could collect GPD property. (Doc. 137-10 at 16.) While Raines says Christina White "stated that we could collect and

8

remove the property," (id.), Christina White testified that she never gave Raines permission to look for GPD equipment and that he was already searching for the equipment before he spoke to her (Doc. 152-2 at 17:21-18:3).

Shortly thereafter, GPD Sergeant Brian Williamson arrived at White's house. (Docs. 137-10 at 16; 137-14 at 4.) Williamson was the team leader for GPD's Special Response Team ("SRT"), of which White was a member prior to his termination. (Doc. 137-14 at 3.) Because it was unlikely a non-SRT member could identify SRT equipment, Williamson reported to White's house to identify GPD's SRT equipment. (Id. at 4.) Williamson subsequently ordered GPD Detective Jason Lowe, who was the sniper team lead on GPD's SRT, to come to White's house to identify any SRT sniper equipment White may have had. (Doc. 137-15 at 4.)

During the search, apparently after Raines found a GPD vest with his wife's name on it and knowing that his wife had left the GPD, Raines believed "[t]here was credible evidence that [White] had GPD property that he should not possess." (Doc. 137-12 at 4.) Unnamed GPD officers reviewed Hampshire's search warrant and concluded it would cover their equipment to permit them to proceed. (Doc. 140-2 at 124:2-14.) Raines informed the SBI and RPD and contacted his command staff to notify them that he believed White may have stolen GPD property. (Doc. 137-10 at 17.) In response, GPD's Property Crimes division ordered more GPD officers to arrive

9

throughout the morning. (Docs. 137-18 ¶ 9; 137-20 ¶ 5; 137-21 ¶ 9.) All told, there were at least seven GPD officers present at White's house on March 6: Raines, Barham, Williamson, Lowe, Sigmon, Schwochow, and Albert, and each entered the house at some point.[3]

Eventually, all criminal charges against White were dismissed.

### B. Procedural History

Plaintiff brought this action pursuant to a second amended complaint (Doc. 81) alleging various constitutional and other claims against multiple law enforcement agencies and individuals. As a result of this court's previous rulings, White's only remaining claims are as follows: (1) trespass against Stalls (based on his view of the mower in White's garage on September 3, 2016); (2) trespass against Reidsville (based on Hampshire's "knock and talk" at White's house door inside the garage on November 2, 2016); and (3) trespass against the Greensboro Defendants (based on their collection of GPD equipment in connection with the search of White's home on March 6, 2017). (Doc. 161.)

White first engaged Holder as an expert witness in September or October 2017. (Doc. 167-1 at 19:18-20:04.) On July 30, 2020,

---

[3] (Docs. 137-10 at 15 (Raines and Barham); 137-14 ¶ 9 (Williamson); 137-15 ¶ 9 (Lowe); 137-18 ¶ 9 (Sigmon); 137-19 at 34:15-16 (Schwochow); 137-21 ¶ 9 (Albert).)

Plaintiff formally disclosed Holder as an expert witness with a two-sentence general description of her proposed areas of testimony. (Doc. 118-1.) When Holder filed an affidavit at the summary judgment stage seeking to opine on the absence of probable cause, Defendants moved to preclude her testimony, and the court refused to consider it on the ground that whether probable cause existed was a legal question for the court and not the basis for expert opinion. See White, 532 F. Supp. 3d at 297-301. The court also concluded that Holder was a retained expert witness subject to Rule 26(a)'s written report requirement, which was not met. Id. at 298-99. Finding that White's failure to provide a report was based on a mistaken belief that Holder qualified as an uncompensated percipient expert (for whom no report is required), the court declined to strike her at that point but permitted White to serve an expert report for her in the event he claimed she had any expert opinions pertaining to the remaining claims for trespass in the case, subject to her being deposed by Defendants. Id. at 300-301. The court specifically granted Defendants the "right to challenge any proposed testimony at a later date." Id.

White served Holder's 24-page single-spaced expert report (Doc. 167-2) on Defendants on April 30, 2021. Holder was deposed on June 2, 2021. On July 6, Defendants moved to exclude her expert testimony. (Doc. 166.) Then, on September 27, the Greensboro Defendants moved to reconsider the court's prior order denying

11

their motion for summary judgment based on the trespass claim. (Doc. 173.)

## II. ANALYSIS

### A. Motion to Exclude Expert Witness

Federal Rule of Evidence 702 permits an expert witness to offer opinion testimony if she "is qualified as an expert by knowledge, skill, experience, training, or education." Rule 702 provides four requirements that a witness qualified as an expert must meet in order to testify: (1) the expert's specialized knowledge will "help the trier of fact to understand the evidence;" (2) the testimony has a sufficient factual basis; (3) the testimony is the result of reliable methodologies; and (4) the expert reliably applied the methodologies to the facts. Fed. R. Evid. 702(a)-(d). The "proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence" pursuant to Federal Rule of Civil Procedure 104(a). See Fed. R. Evid. 702 Advisory Committee notes to 2000 amendment; Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993); Sardis v. Overhead Door Corp., 10 F.4th 268, 283 (4th Cir. 2021) (noting that the Federal Rule of Evidence Advisory Committee has recently stated that judges must "apply the preponderance standard of admissibility to Rule 702's requirements.") (quoting Advisory Comm. on Evidence Rules, Agenda for Committee Meeting 17 (Apr. 30, 2021)). This rule "imposes a

12

special obligation upon a trial judge to 'ensure that any and all [expert] testimony . . . is not only relevant, but reliable.'" Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 147 (1999) (quoting Daubert, 509 U.S. at 589). Daubert set out additional factors for consideration, which "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony. . . . Too much depends upon the particular circumstances of the particular case at issue." Id. at 150 (citation and internal quotation marks omitted).

Thus, Holder's testimony must be both relevant to the disputed matter and reliable. Daubert, 509 U.S. at 597 ("[T]he trial judge [has] the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."). The court has "broad latitude" to consider any "factors bearing on validity that the court finds to be useful." EEOC v. Freeman, 778 F.3d 463, 466 (4th Cir. 2015) (quoting Westberry v. Gislaved Gummi AB, 178 F.3d 257, 261 (4th Cir. 1999)). However, "[e]xpert testimony rooted in 'subjective belief or unsupported speculation' does not suffice." Zuckerman v. Wal-Mart Stores E., L.P., 611 Fed. Appx. 138, 138 (4th Cir. 2015) (per curiam) (unpublished) (quoting Daubert, 509 U.S. at 590).

Defendants move to exclude Holder's testimony as inadmissible under Rule 702 and Daubert, challenging both its relevance and

reliability.[4]   (Doc. 167.)   Defendants argue that Holder's testimony is not relevant to the three remaining trespass claims and that she cannot opine on legal conclusions or authorization for civil trespass.  (Id. at 6-12.)  Defendants also argue that Holder's opinions are not reliable because she proffers no methodology or evidence as to how she reached her opinions, which they contend are circular.  (Id. at 14-20.)  Finally, Defendants contend that Holder's advocacy role for White through the history of this case renders her opinions unreliable.  (Id. at 20-22.) White responds that Holder's opinions are relevant because the officers were on duty at the time of two of the trespass, and her reasons given "go[] much further than" legal conclusions.  (Doc. 169 at 4-7.)  He also argues that Holder's opinions are reliable, given her expertise and experience in law enforcement, and

---

[4] Defendants do not challenge Holder's general qualifications as a law enforcement officer.  She has training and extensive experience as a law enforcement officer, as well as her experience training other officers as a certified school director for the State of North Carolina.  (Doc. 169-1 at 230:22-230:25.)  She has a degree in criminal justice and joined the GPD in 1987.  (Doc. 167-1 at 41:17-41:25.)  She graduated from the academy, went through field training, and immediately became a patrol officer.  (Doc. 169-1 at 44:22-45:25.)  She was transferred to vice/narcotics in 1991 or 1992, and soon thereafter was promoted to sergeant.  (Id. at 46:15-46:25).  Over the next two decades, Holder rose through the ranks of the GPD, ultimately becoming Deputy Chief of Police in 2008 and acting Chief of Police in 2014, before retiring in August 2015.  (Id. at 47:04-51:25; Doc. 167-1 at 52:01-52:21).  In addition to her experience and educational background, she has spent many hours investigating this matter (Doc. 167-1 at 185:09-185:23) and has reviewed voluminous relevant documents, investigatory reports, videos, telephone records, and depositions (Doc. 167-2 at 3-5).  The court therefore need not address her qualifications.

14

objective despite her history of involvement with the case and familial relationship to the Plaintiff. (Id. at 7-10.)

Holder's report goes far beyond the scope of what the court ordered would be permitted. It is largely a rambling discussion criticizing the conduct of the various law enforcement agencies and explaining why, in Holder's view, they lacked probable cause to pursue her son for criminal conduct, all premised on her conclusion from the outset that the various law enforcement officers trespassed on her son's property. As noted, the probable cause opinions are impermissible, as they are the subject of a legal determination. In addition, her opinion that the Greensboro Defendants' entry into the White's house was "negligent or malicious" is an improper ultimate determination that fails to meet the standard required to demonstrate an exception to public official immunity because, as discussed in detail to follow, more than mere negligence must be shown. (Doc. 169-1 at 137 (emphasis added).) To permit White to inject the broad scope of her proposed testimony into the case at this late stage, given her woefully inadequate initial disclosure (Doc. 118-1), would be grossly prejudicial to the Defendants. To the extent the report fails to follow the court's prior order, the report should and will be disregarded. Put another way, Ms. Holder's report is largely not relevant to the jury decisions for the limited claims remaining in the case related to trespass. As to her specific proposed

15

testimony for these claims, it will be addressed on a claim-by-claim basis.[5]

As for White's trespass claim against Defendant Stalls, this court previously concluded that Stalls was acting as a private citizen when he entered White's garage with his wife off-duty to feed the Whites' dog. White, 532 F. Supp. 3d at 309 ("[T]he evidence is insufficient for a finding that Stalls was acting under color of state law when he entered White's garage and photographed the mower."). White contends that while he authorized Stalls's wife (his sister-in-law) to enter their residence to feed their dog, neither he nor his wife authorized Stalls to accompany her such that Stalls trespassed on that occasion. Holder testified she was retained as an expert "to review [the] information obtained through discovery and determine if it was the work of reasonable police officers or if they made mistakes in following their process." (Doc. 167-1 at 113:8-113:11.) But Holder's opinions and expertise in proper law enforcement conduct will not be relevant to any Defendant not acting in his law enforcement

---

[5] As a threshold matter, Defendants argue that Holder cannot be permitted to opine on the elements of civil trespass and that she is fatally biased because the case involves her son. (Doc. 167 at 12-14.) No doubt, she cannot instruct the jury on the law. United States v. McIver, 470 F.3d 550, 562 (4th Cir. 2006) (noting that "opinion testimony that states a legal standard or draws a legal conclusion by applying law to the facts is generally inadmissible"). And while her familial relationship to the Plaintiff and the fact that Defendant Stalls is also her stepson could certainly be the basis for a jury to find significant bias and thus to discount her testimony, they do not disqualify her as a potential witness.

16

capacity. Her proposed testimony will thus not assist the trier of fact in determining a fact in issue. White conceded this fact at the hearing on this motion and represented that Holder would not intend to offer any opinion as to Stalls. (Doc. 213 at 6:9-15.)

With respect to the trespass claim against Reidsville when Hampshire sought to conduct a knock and talk at White's home on November 2, 2016, the court found insufficient evidence that Hampshire was not acting within the scope of his official duties, or was acting with malice or corruption, and thus enjoyed public official immunity for any personal liability. White, 532 F. Supp. 3d at 328-29. The only issue was whether Hampshire, after no one answered his knocks on front door to White's house and which Hampshire testified had evidence of not being used, trespassed by entering White's open garage to knock on the house door inside the garage. The elements of a trespass claim are: (1) possession of the property; (2) an unauthorized entry; and (3) damage. Id. at 305 (citing Singleton v. Haywood Elec. Membership Corp., 588 S.E.2d 871, 874 (N.C. 2003)). The second and third elements are at issue. An officer "is permitted to approach any door that a 'reasonably respectful citizen unfamiliar with the home' would believe appropriate." State v. Welch, 803 S.E.2d 871, 871 (N.C. Ct. App. 2017) (unpublished) (quoting State v. Huddy, 799 S.E.2d 650, 654 (N.C. Ct. App. 2017)). There is a genuine factual dispute as to

17

whether the house door in the garage was one that a reasonably respectful citizen would believe appropriate to use and, if not, what damages are suffered. Holder has conceded that she cannot offer any expert testimony as to whether a "reasonably respectful citizen unfamiliar with the home" would believe Hampshire's entry into White's garage to use the house door was appropriate. (Doc. 167-1 at 239:02-19 (stating she has a mere "personal opinion" whether a reasonably respectful citizen would believe that the garage was regularly used as an entrance)). White has not identified, nor has the court found, anything in her report that would be relevant to this issue. Therefore, Holder's expert testimony would not assist the trier of fact to determine a fact in issue relevant to the claim against Reidsville as to Hampshire's knock and talk.

Finally, with respect to the trespass claim against the Greensboro Defendants, Holder intends to testify that the Greensboro Defendants were out of their statutory jurisdiction and that the GPD items they searched for and seized exceeded the scope of the search warrant. These are relevant to White's claim against the Greensboro Defendants, but they are not in dispute. As the court has previously held as a matter of law, the Greensboro Defendants were not legally entitled to rely on the authority of the RPD or SBI to invite them into White's home to collect GPD equipment, nor did the search warrant extend to GPD equipment.

18

White, 532 F. Supp. 2d at 312-14; White v. City of Greensboro, 408 F. Supp. 3d 677, 705-08 (M.D.N.C. 2019).[6]  Therefore, Holder's opinions as to these legal issues is not the proper basis for expert opinion and would not assist the jury.  McIver, 470 F.3d at 562 (stating that opinion testimony on a legal standard or drawing a legal conclusion is generally inadmissible).

There remains the question whether Holder's opinions would assist the trier of fact in determining a factual predicate to a finding of public official immunity for the Greensboro Defendants: whether the Greensboro Defendants were acting within the scope of their official duties, and maliciously, when they entered White's home and collected what they claim was GPD equipment.  Because the court finds as a matter of law (for the reasons that follow) that White has not presented sufficient facts for a jury to determine that Greensboro Defendants Lowe, Sigmon, Schwochow, and Albert were acting outside the scope of their official duties, or with malice or corruption, this issue is moot as to them.  However, Holder does opine that because each of the Greensboro Defendants was trained annually "that they cannot enter a person's home without consent, or a valid search warrant, or an exigency which they did not cause," their trespass was "malicious" (Doc. 167-2 at

---

[6] In any event, as noted elsewhere in this opinion, whether the GPD equipment was within the scope of the RPD and SBI search warrant is a question of law, not fact, for the court to determine.

15), her testimony is potentially relevant to the issue of public official immunity as to Greensboro Defendants Raines, Barham, and Williamson. However, even Holder's report appears to accept that no Defendant disputes that law enforcement officers cannot enter a home absent one or more of those conditions. So, it is unclear of the necessity of her testimony. And to be sure, Holder never opines that any officer was acting outside the scope of his official duties.

The court will therefore reserve on the issue whether Holder may be permitted to testify to the limited extent that Raines, Barham and Williamson would have known they could not enter White's home without a warrant, consent, or exigency, and that will depend on whether any Defendant disputes knowing these three conditions on which they could lawfully enter White's home.

For these reasons, the motion to exclude expert testimony from Holder will be granted in large part and denied only as noted above.

### B. Motion to Reconsider

Defendants also move for reconsideration of the court's ruling (Doc. 161) denying Defendants' motion for partial summary judgment on Plaintiff's trespass claim against the Greensboro Defendants in their personal capacity. (Doc. 173.) The court had found that there was a jury question whether the Greensboro Defendants were acting within the scope of their official duties

when they entered the Whites' home to collect White's GPD equipment following his dismissal as a GPD officer. (Doc. 161 at 66.)

District courts have discretion to reconsider interlocutory orders until a final judgment is entered. Akeva, L.L.C. v. Adidas Am., Inc., 385 F. Supp. 2d 559, 565 (M.D.N.C. 2005); see also Am. Canoe Ass'n, Inc. v. Murphy Farms, Inc., 326 F.3d 505, 514-15 (4th Cir. 2003) ("[A] district court retains the power to reconsider and modify its interlocutory judgments, including partial summary judgments, at any time prior to final judgment when such is warranted.") (citation omitted). "Most courts have adhered to a fairly narrow set of grounds on which to reconsider their interlocutory orders and opinions." Akeva, 385 F. Supp. 2d at 565. Generally, courts look to Rule 59(e)'s standards for guidance[7] and will only reconsider interlocutory rulings under Rule 54(b) when (1) there has been an intervening change in controlling law, (2) new evidence becomes available, or (3) the earlier decision was based on a clear error of law or would result in a manifest injustice. Id. at 566. Such a motion allows a district

---

[7] Where an order is not final and does not resolve all claims, such as in the case of entry of partial summary judgment, reconsideration of the interlocutory order is subject to the court's discretion under Rule 54(b), and not the heightened standards of Rule 59(e) or 60(b). Am. Canoe, 326 F.3d at 514-15. However, such standards "have evolved as a means of guiding that discretion." Id. at 515; Hatch v. DeMayo, No. 1:16CV925, 2018 WL 6003548, at *1 (M.D.N.C. Nov. 15, 2018) ("[C]ourts in this Circuit have frequently looked to the standards under Rule 59(e) for guidance in considering motions for reconsideration under Rule 54(b).") (collecting cases).

court to correct its own errors, but it does not serve as a vehicle for a party to raise new arguments or legal theories that could have been raised before the judgment. See Hatch v. Demayo, No. 1:16cv925, 2018 WL 6003548, at *1 (M.D.N.C. Nov. 15, 2018) (slip copy) (quoting South Carolina v. United States, 232 F. Supp. 3d 785, 793 (D.S.C. 2017)). While the court's authority to reconsider interlocutory orders "may be tempered at times by concerns of finality and judicial economy," "[t]he ultimate responsibility of the federal courts . . . is to reach the correct judgment under law." Am. Canoe Ass'n, 326 F.3d at 515.

The Greensboro Defendants argue that North Carolina law requires a plaintiff to "allege malice or corruption" to defeat public official immunity and that the facts do not indicate such. (See Doc. 174 at 10 (citing Campbell v. Anderson 576 S.E.2d 726, 730 (N.C. Ct. App. 2003)).) They contend that the "malice" and "scope of duty" exceptions to public official immunity "are not always severable" and "seemingly merge" at times. (See id. at 13-14 (citing Epps v. Duke Univ., Inc., 468 S.E.2d 846, 854-55 (N.C. Ct. App. 1996)).) Thus, they contend, "the Court's holdings granting public official immunity to Hampshire but denying public official immunity to the Greensboro Officers do not appear to be reconcilable." (Doc. 173 ¶ 8.) They reason as follows:

> In both instances there was a question of fact as to authorization, in both instances the alleged trespasses took place while the Officers were outside of their

> territorial jurisdiction and working in their capacity
> as law enforcement officers, and in both instances there
> was no evidence of malice or corruption in the Officers'
> alleged trespasses.

(Id.)  They continue, "[j]ust like with the trespass claim against Hampshire . . . technical authorization . . . is not material to the public official immunity analysis for the Greensboro Officers — the issue is whether there is evidence of malice or corruption." (Doc. 174 at 10.)  The difficulty of the Greensboro Defendants' argument – its statement of law – is that it contradicts North Carolina law as articulated by the North Carolina courts.

Under the most common articulation of North Carolina law, police officers, as government officials, are entitled to public official immunity unless the officer's actions were "malicious, corrupt, or outside the scope of his official authority." Thomas v. Sellers, 542 S.E.2d 283, 286 (N.C. Ct. App. 2001). "A defendant acts with malice when he wantonly does that which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial or injurious to another." Id. (quoting Grad v. Kaasa, 321 S.E.2d 888, 890 (N.C. 1984)). Accordingly, "public officers' immunity, at the least, is unavailable to officers who violate clearly established rights because an officer acts with malice when he 'does that which a man of reasonable intelligence would have known to be contrary to his duty.'"  Bailey v. Kennedy, 349 F.3d 731, 742 (4th Cir. 2003)

(quoting Grad 321 S.E.2d at 890). North Carolina courts have explained that unlike the federal standard, which is an objective test, the North Carolina standard (at least as to malice and corruption) is an inquiry into the subjective state of mind of the government actor. Andrews v. Crump, 547 S.E.2d 117, 123 (N.C. App. 2001); cf. Cooper v. Sheehan, 735 F.3d 153, 160 (4th Cir. 2013) (explaining that the state law "man of reasonable intelligence standard" is "functionally identical" to federal "clearly established" standard).

North Carolina presumes that public officials act fairly, impartially, and in good faith. In re Annexation Ordinance No. 300-X, 284 S.E.2d 470, 472 (N.C. 1981). To overcome public official immunity, a plaintiff must first make an initial showing that the defendant's conduct falls within an immunity exception, i.e., the conduct is malicious, corrupt, or outside the scope of official authority. Epps, 468 S.E.2d at 851-52. Then the burden of production shifts to the defendant to demonstrate that he is "acting within the scope of his authority." Id. If the defendant cannot make this showing, then he does not have the benefit of immunity; it is as if the official never committed the act, but rather the individual did. Id. at 852. However, there is no shifting of the burden of proof, as it always rests with the plaintiff to demonstrate that the defendant acted within an exception to immunity. Id.

24

Many reported cases involving law enforcement officers appear to turn on the presence or lack of malice, as whether the officer was acting in his or her official capacity is rarely contested. See, e.g., Wilcox v. City of Asheville, 730 S.E.2d 226, 230 n.2 (N.C. Ct. App. 2012) (noting that "this Court has previously held that a plaintiff must separately allege the exceptions to public official immunity") (citation omitted); Showalter v. North Carolina Dept. of Crime Control and Public Safety, 643 S.E.2d 649, 652 (N.C. Ct. App. 2007) ("The North Carolina rule is that a public official engaged in the performance of governmental duties involving the exercise of judgment and discretion may not be held liable unless it is alleged and proved that his act, or failure to act, was [1] corrupt or malicious, or [2] that he acted outside of and beyond the scope of his duties."); Schlossberg v. Goins, 540 S.E.2d 49, 56 (N.C. Ct. App. 2000) (noting "police officers enjoy absolute immunity from personal liability for their discretionary acts done without corruption or malice" (citing Collins v. North Carolina Parole Comm'n, 473 S.E.2d 1, 3 (N.C. 1996) (holding that a public officer is immune from personal liability if he "exercises the judgment and discretion with which he is invested by virtue of his office, keeps within the scope of his official authority, and acts without malice or corruption")).

But as a recent federal court decision has demonstrated, this is not always the case. In Alexander Industries, LLC v. Town of

25

Holly Ridge, Case No. 7:20CV136-FL, 2022 WL 288178 (E.D.N.C. Jan. 31, 2022), the court denied a motion to dismiss trespass claims against two police officers who allegedly entered a commercial gym with a key card provided by a prior owner (which the present owner allegedly revoked) to enforce the Governor's Covid-19 mandate. The court found the factual allegations sufficient to allege that the officers' actions in entering the gym were contrary to what an "officer of reasonable intelligence would know" "to be contrary to his or her duty." Id. at *6 (internal quotation marks omitted). The officers' alleged actions were a clear violation of the Fourth Amendment[8] and contrary to their duty to uphold the law, having been committed for the prejudicial purpose of investigating the plaintiff for violations of an executive order. Id. The officers also never attempted to obtain a search warrant, although they had the time. Id. The court concluded that, based on the allegations, the officers "acted maliciously or at least beyond the scope of their duties."[9] Id.

This result is consistent with two cases on which White relies. In Epps, supra, a medical examiner, in conducting an autopsy of an individual who died from cardiac trauma, removed the

---

[8] The protections of the Fourth Amendment are incorporated against the States through the Fourteenth Amendment. Torres v. Madrid, 141 S. Ct. 989, 997 (2021).

[9] The court dismissed the trespass claim against a third officer who never entered the gym. Id. at *7.

eyeballs and spinal cord.  Public official immunity was found to
be unavailable because there was a question of fact, supported by
affidavits of medical experts, whether the "removal of eyeballs
and a spinal cord [were] within the scope of an autopsy into a
death from decedent's cardiac trauma."  Epps, 468 S.E.2d at 855.
No contention of malice or corruption on the part of the medical
examiner was alleged.  Id. at 854.

And in Allmond v. Goodnight, 753 S.E.2d 400 (N.C. App. 2013),
an unpublished (and thus non-precedential) opinion, the North
Carolina Court of Appeals affirmed the denial of dispositive
motions by a highway patrolman who, while travelling at
approximately 120 miles per hour, collided with a vehicle and
killed its occupant.  The court found that the complaint's
allegations that the patrolman was "not acting in response to any
official duty" because he was speeding "for no legitimate reason"
was sufficient to allege that he was acting outside the scope of
his official duties so as preclude public official immunity.  Id.
at 421.  The court similarly affirmed the denial of the patrolman's
motion for summary judgment, finding that testimony by eye
witnesses that they never saw the patrolman in pursuit of any
speeding motorist, contrary to the patrolman's testimony, was
sufficient to create a fact question whether the patrolman was
acting within the scope of his authority or, rather, was speeding
at 120 miles per hour "for no law enforcement-related purpose."

27

Id. at 423. Again, there is no discussion of any further requirement of malice or corruption.

Here, White alleges that on March 6, 2017, the Greensboro Defendants "illegally entered" his property and "without permission or a warrant" seized possessions and removed them. (Doc. 81 ¶ 176.) White further alleges that the Greensboro Defendants' actions were "malicious, corrupt, and outside the scope of their duties, and undertaken in knowing violation of the law."[10] (Id. ¶ 180.) There is no dispute that the Greensboro Defendants were outside their statutory jurisdiction and had no warrant.[11] But this does not preclude them from seeking to consensually and lawfully collect White's GPD gear upon termination, even outside their jurisdiction.

As to the Greensboro Defendants' contention that they were permitted to rely on the RPD search warrant, the Fourth Amendment

---

[10] This court's earlier statement that "White has not alleged that the [Greensboro Defendants] were corrupt, malicious, acting in bad faith, or acting willfully and deliberately in showing up to perform the search on March 6" only described the claim in so far as it related to his contention that the officers' presence outside their jurisdiction was outside the scope of their duties. White, 408 F. Supp. 3d at 705-06 (emphasis added). The court previously rejected the jurisdictional contention as a basis for overcoming qualified immunity because the case proscribing such a search post-dated the conduct in this case. See id. at 700-01 (citing Neal v. Luedtke, 713 F. App'x 177, 180 (4th Cir. 2017)).

[11] In North Carolina, a search warrant "may be executed by any law-enforcement officer acting within his territorial jurisdiction, whose investigative authority encompasses the crime or crimes involved." N.C. Gen. Stat. § 15A-247. As discussed in this court's prior order, this statute would encompass the GCSO, the SBI, and the RPD. (Doc. 161 at 61.)

28

provides that warrants must "particularly describe[e] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "The Supreme Court has identified two important purposes underlying the particularity requirement: (1) preventing general searches, and (2) ensuring that the executing officer is able to distinguish between those items which are to be seized and those that are not. United States v. Dickerson, 166 F.3d 667, 693 (4th Cir. 1999) (quoting Matron v. United States, 275 U.S. 192, 196 (1927)), rev'd on other grounds, 530 U.S. 428 (2000). The "particularity" requirement guarantees citizens are not subject to "a general, exploratory rummaging in [their] belongings," Coolidge v. New Hampshire, 403 U.S. 443, 467 (1971), and that nothing is left "to the discretion of the officer executing the warrant," United States v. Robinson, 275 F.3d 371, 381 (4th Cir. 2001) (citing Marron v. United States, 275 U.S. 192 (1927)). This requirement "allow[s] some discretion" in "executing a search warrant, so long as the warrant at least minimally confines the executing officers' discretion by allowing them to seize only evidence of a particular crime." Dickerson, 166 F.3d at 694 (quotations and citation omitted). A search warrant meets the "particularity" requirement "if the description is such that the officer with a search warrant can, with reasonable effort, ascertain and identify the place intended," United States v. Owens,

848 F.2d 462, 463 (4th Cir. 1988), and the things to be seized, see United States v. Hurwitz, 459 F.3d 463, 470 (4th Cir. 2006).

Courts should avoid hyper-technical interpretations of search warrants that might "impose a 'constitutional strait jacket'" on investigating officers." United States v. Dargan, 738 F.3d 643, 647 (4th Cir. 2013) (citation omitted). Rather, search warrants "should be read with a commonsense and realistic approach." United States v. Williams, 592 F.3d 511, 519 (4th Cir. 2010) (internal quotations omitted). "'The degree of specificity required when describing the goods to be seized may necessarily vary according to the circumstances and type of items involved . . . (T)here is a practical margin of flexibility permitted by the constitutional requirement for particularity in the description of items to be seized.'" United States v. Torch, 609 F.2d 1088, 1090 (4th Cir. 1979) (quoting United States v. Davis, 542 F.2d 743, 745 (8th Cir. 1976)) (alterations in original). The specificity in a warrant should be analyzed "by reading all parts of a warrant together." United States v. Weston, 962 F.2d 8, 1992 WL 90554 at *5 (4th Cir. 1992) (unpublished) (citing Andresen v. Maryland, 427 U.S. 463, 480 (1976)); United States v. Blakeney, 949 F.3d 851, 862 (4th Cir. 2020) ("[A] warrant may satisfy the particularity requirement either by identifying the items to be seized by reference to a suspected criminal offense or by describing them in a manner that allows an executing officer to know precisely what he has been

30

authorized to search for and seize."(emphasis in original)); see United States v. Jones, 31 F.3d 1304, 1313 (4th Cir. 1994) (holding that a warrant which "confine[d] the executing inspectors' discretion by allowing them to seize only evidence of a particular crime" had "sufficient particularity to satisfy the Fourth Amendment"). The Fourth Circuit has recognized "a warrant need not — and in most cases, cannot — scrupulously list and delineate each and every item to be seized" because it is frequently "impossible for law enforcement officers to know in advance exactly what . . . records the defendant maintains or how the case against him will unfold." United States v. Cobb, 970 F.3d 319, 327-28 (4th Cir. 2020), as amended (Aug. 17, 2020), cert. denied, 209 L. Ed. 2d 513 (2021) (citation omitted); Dargan, 738 F.3d at 647 (noting that the particularity requirement "preserv[es] the flexibility of law enforcement to adapt to the unforeseen circumstances that necessarily arise in an investigation predicated on incomplete information").

There are a host of cases invalidating searches that exceeded the scope of the warrant. See, e.g., United States v. LeBron, 729 F.2d 533, 536-37 (8th Cir. 1984) (holding that a warrant authorizing the search of a residence for certain specific items as well as "any records which would document illegal transactions involving stolen property" and "other property, description unknown, for which there exists probable cause to believe it to be

31

stolen" was impermissibly broad so as to require suppression of firearms seized after the specific items in the warrant were located should be suppressed); United States v. King, 227 F.3d 732, 750-53 (6th Cir. 2000) (holding that the officer exceeded the scope of the warrant by searching the basement); United States v. Angelos, 433 F.3d 738, 744-46 (10th Cir. 2006) (holding that the search of an entire premises exceeded the scope of a warrant); United States v. Sedaghaty, 728 F.3d 885, 910-15 (9th Cir. 2013) (holding that items seized were not within the scope of the warrant); United States v. Schlingloff, 901 F. Supp. 2d 1101, 1106 (C.D. Ill. 2012); see also Cobb, 970 F.3d at 331 (noting that "[a]ny and all evidence of any other crimes" language in the warrant was unconstitutionally "overbroad," but could be "properly severed from the balance of the warrant which . . . was sufficiently particularized").

Here, the RPD and SBI warrant authorized the search of White's residence for items related to "B&E's to John Deere Dealerships and possession of stolen equipment." (Doc. 127-11 at 5.) The several-page factual portion of the affidavit relates solely to alleged stolen commercial mowers. (Id. at 5-7.) It would unlawfully stretch the particularity requirement to conclude that GPD could rely on the general language of the warrant, such as "[a]ny and all other items not listed above which are evidence or instrumentalities that are used in violation of the North Carolina

32

General Statute regarding Obtaining Property by False Pretense, Possession of Stolen Property," to authorize its independent search and seizure of GPD equipment that was not referenced in the warrant and was not part of the SBI and RPD investigation. See Baker v. City of Durham, No. 1:14CV878, 2018 WL 3421334, at *10 (M.D.N.C. July 13, 2018), report and recommendation adopted, No. 1:14CV878, 2018 WL 4674576 (M.D.N.C. Sept. 28, 2018) (finding that a warrant with "any and all stolen property" language "falls within the 'practical margin of flexibility permitted by the constitutional requirement for particularity'" because it also "refer[ed] to . . . [and] instructed officers to look only for items related to that particular crime" (quoting Torch, 609 F.2d at 1090)); Clark v. Bridges, 211 F. Supp. 3d 731, 749 (D.S.C. 2016) (holding a warrant was invalid because the "description of property [as 'Stolen property'] in the instant search warrant fails to appraise an officer executing the warrant of the items to be seized"); cf. Buonocore v. Harris, 65 F.3d 347, 356 (4th Cir. 1995) (holding "that the Fourth Amendment prohibits government agents from allowing a search warrant to be used to facilitate a private individual's independent search of another's home for items unrelated to those specified in the warrant" as it "is not 'reasonable'" and "obviously exceeds the scope of the required specific warrant and furthermore violates the 'sanctity of private dwellings'") (quoting United States v. Martinez-Fuerte, 428 U.S.

33

543, 561 (1976)); Wilson v. Layne, 141 F.3d 111, 117 n.6 (4th Cir. 1998) (en banc), aff'd, 526 U.S. 603 (1999) ("Buonocore, therefore, addressed the question of whether a third party, who is not authorized by the warrant to conduct a search, may accompany law enforcement officers in executing a warrant and undertake an independent search for items not described in the warrant.")

To state the obvious, a warrantless search would be outside the scope and duties of a law enforcement officer, Coolidge v. New Hampshire, 403 U.S. 443, 474-75 (1971) (finding a search or seizure carried out on a suspect's premises without a warrant is "per se unreasonable" absent exigent circumstances), and malicious, Cooper v. Sheehan, 735 F.3d 153, 160 (4th Cir. 2013) ("An officer acts with malice when he 'does that which a man of reasonable intelligence would know to be contrary to his duty,' i.e., when he violates a clearly established right.") (citation omitted).

The Greensboro Defendants argue that they were invited into White's residence by the RPD and SBI. As this court previously noted, however, the Greensboro Defendants cite no authority for the proposition that an agency executing a search warrant can give permission to officers from another agency to enter the property, White, 532 F. Supp. at 312, and this is especially the case where the purpose of the entry, to obtain GPD equipment issued to White, is unrelated to the scope of the warrant. Therefore, based on the face of the search warrant, White has shown sufficient evidence

34

that a man of "reasonable intelligence" would have known that an entry pursuant to it to collect, much less to later search for, GPD gear, without consent, would be unlawful.

In sum, the Greensboro Defendants were clearly within their authority and official duties to visit White's home to seek return of GPD equipment upon White's termination as a GPD officer, even if White lived outside GPD jurisdiction.[12] While Hampshire's operations plan anticipated notifying the GPD if its issued equipment was found among the items in the house (Docs. 139 at 11; 140-2 at 87:13-23), this did not authorize GPD officers to <u>enter</u> the home. The inquiry does not end there, though. Whether any of the Greensboro Defendants is entitled to public official immunity depends on the facts relating to each officer's role on March 6. So, each officer's actions will be addressed in turn.[13]

<u>Raines and Barham</u>

The record indicates that Lieutenant Raines and Sergeant Barham were ordered "to go to Plaintiff's residence to pick up the GPD issued equipment," and they entered the White's home on the morning of March 6 to collect GPD property issued to White. (Doc. 137-10 at 15; 137-12 at 3-4; 157-1 at 3-4.) Both officers were

---

[12] According to several GPD Defendants, it is standard practice for GPD to attempt to collect issued equipment as soon as possible after an officer leaves the department. (Docs. 137-10 at 15; 137-12 ¶ 9.)

[13] The court's analysis is hampered by the fact that the parties largely treated the Greensboro Defendants as a group without conducting the individualized analysis to which each officer is entitled.

Case 1:18-cv-00969-TDS-LPA   Document 228   Filed 02/21/22   Page 35 of 51

aware that the SBI and RPD were executing their search warrant and that White had been terminated earlier that day. (Id.) According to Raines's report, SBI and RPD officers "allowed [Raines and Sergeant Barham] to enter the property to see what items, if any, were present that belonged to the City of Greensboro." (Id.) According to Raines, they "stood outside until [RPD and SBI] were to the point where they felt comfortable allowing us to walk through the property." (Id.) Then, Raines and Barham were escorted to the White's master bedroom where they observed items that "appeared to be City property." (Id.) Determining there was GPD property they "would need to examine and potentially collect," Raines spoke with Christina White in the living room and, he claims, eventually obtained permission to "collect and remove the property." (Id. at 16.) The officers then rummaged through various parts of the house, collecting what they deemed to be GPD property; but Raines eventually "came to believe" that White had more GPD property than had been issued to him, and Raines advised his command staff that he believe White possessed stolen GPD property. (Id. at 17.) GPD Criminal Investigations Department officers were then dispatched to assist with the "investigation." (Id.)

Because it was clearly established on March 6, 2017 that an officer cannot enter a home without a proper warrant, which the Greensboro Defendants did not have, or consent, which the RPD and

36

SBI were not allowed to give to a third person for a purpose unrelated to their warrant, White has stated a claim for personal liability against Raines and Barham. And because Christina White denies she ever gave GPD consent to search for GPD equipment, there is a fact issue whether actions subsequent to the alleged consent were lawful. The motion to reconsider the denial of public official immunity as to Raines and Barham will therefore be denied. Epps, 468 S.E.2d at 855 (denying summary judgment based on public official immunity where there was evidence that "there was no reason to believe [defendant's actions] would . . . [be] within the scope of [his duty.]").

Williamson

Sergeant Williamson received a call from the GPD's SRT team leader informing him of a search at the White's home. (Doc. 137-14 ¶ 9.) Williamson called Raines "to understand the situation." (Id.) After learning from Raines that White had been terminated and the SBI and RPD were executing a search warrant, Williamson responded to the scene. (Id.) Williamson, a member of the GPD SRT Team, sought to identify SRT gear issued by GPD. (Id.) Meeting Raines in the driveway, he entered the garage to observe SRT gear that Williamson was told was identified as stolen. (Id.) Williamson then went into the Whites' master bedroom to observe more GPD gear, after which he says he met with Christina White and asked her to direct him to where more gear might be. (Id.)

37

Williamson engaged in a search of the home, looking for GPD gear. (Id.)  He directed Officer Lowe to the scene to assist in the identification of GPD equipment.  (Id.)  Sometime thereafter, "GPD determined in consultation with Reidsville Police Department that GPD could re-enter the residence."  (Id.)  When RPD could not open a safe in the White's bedroom and Christina White refused to provide a combination, Williamson assisted the RPD by obtaining the combination from the manufacturer.  (Id.)

On these facts, there is evidence that Williamson, having talked with Raines "to understand the situation," would have been aware there was no warrant or proper consent for him to enter the White's house in violation of White's clearly established rights. There is certainly no record that Williamson reasonably believed there was consent or that GPD's activity was covered by the search warrant, i.e., that by entering the home to retrieve GPD gear he was lawfully acting within the scope of his employment.  It is also unclear what evidence was being sought in White's safe that occasioned Williamson's later re-entry into the home (whether it related to assisting RPD and SBI execute the warrant, or whether it was to search for GPD items).  Whether Christina White consented at some point in time, or whether Williamson may have reasonably believed there was consent based on his conversation with Raines, is not apparent on this record.  Therefore, the motion to

reconsider the denial of the motion to dismiss based on public official immunity as to Williamson is denied.

Lowe

Lowe, the GPD sniper team lead, was ordered to the White residence by Williamson, his commanding officer, to identify GPD marksman gear. (Doc. 137-15 ¶ 9.) By the time of Lowe's arrival, other GPD officers, as well as the SBI and RPD, would have already been there. Lowe was directed to the White's bedroom, where he proceeded to identify GPD sniper gear. (Id.) He also identified ammunition in a bedroom closet and brought some of the gear out to the driveway. (Id.)

White has adduced no evidence that Lowe, who was acting at his superiors' command, either knew or reasonably would have known of a lack of a proper warrant or lack of consent. Thus, there is an insufficient basis to conclude that he was acting outside the proper scope of his official duties, maliciously, or corruptly so as to overcome the presumption of immunity. In re Annexation Ordinance No. 300-X, 284 S.E.2d 470, 472 (N.C. 1981) ("As a general rule it is presumed that a public official in the performance of his official duties acts fairly, impartially, and in good faith and in the exercise of sound judgment or discretion, for the purpose of promoting the public good and protecting the public interest.") (internal quotations omitted); White v. Pauly, 137 S. Ct. 548, 552 (2017) ("No settled Fourth Amendment principle

requires that officer to second-guess the earlier steps already taken by his or her fellow officers."). Therefore, the motion for reconsideration will be granted, and the motion to dismiss the trespass claim against Lowe in his personal capacity based on public official immunity will be granted.

Sigmon

Sergeant Sigmon is a property crimes supervisor who was ordered by his supervisor, Lieutenant Schultheis, to find the next available GPD detective and report to the White residence. (Doc. 137-18 ¶ 9.) Sigmon understood that in the course of the RPD and SBI's execution of a search warrant they discovered GPD equipment in excess of what had been properly issued to White. As a result, "the investigation of Plaintiff by SBI and [RPD] expanded" and GPD's role of collecting equipment was "transformed" to "assisting in the SBI and [RPD] investigation of Plaintiff" for possible criminal acts against GPD. (Id.) Sigmon remained outside the residence for "the majority of the time" there. (Id.) There was eventually a discussion about how SBI and RPD could take control of the GPD property and turn it over to GPD. (Id.) At some point, Sigmon was directed to go inside and assist in carrying out ammunition. He entered the house once for that purpose and otherwise remained on the driveway until he left shortly thereafter. (Id.)

Based on the facts adduced, White has failed to provide

40

sufficient facts to indicate that Sigmon was acting outside his discretionary discharge of his official duties, or maliciously or corruptly. There is no evidence that he was aware there was a lack of proper authority to enter the home for the limited purpose he was directed -- carrying out ammunition that had been collected by others, including the SBI and RPD. Therefore, the motion to reconsider as to Sigmon will be granted and the motion to dismiss based on public official immunity will be granted.

Schwochow

Officer Schwochow was ordered by his supervisor, Sergeant Sigmon, to join him to drive to White's residence because White had been terminated and "an excessive amount of GPD equipment" had been discovered at his house. (Doc. 137-20 ¶ 5.) Schwochow understood that the SBI was conducting an investigation of White and that GPD was present to assist in identifying "the excessive amount of GPD property that had been found at White's residence" during the SBI search. (Id. ¶ 6.) Schwochow remained on the White's driveway where the GPD items were collected and completed an inventory of all of the items thought to belong to the GPD. (Doc. 137-10 at 17.) Once, he entered the garage, as the door was open, to record items that had been stored there. (Doc. 137-19 at 34:11-19; 137:10 at 15.) Schwochow testified he had no input into the operation plan for the search warrant, knew nothing about GPD's presence during the search, and had no knowledge of GPD's role, if

41

any, in the execution of the search warrant. (Id. at 31:4-20.) He observed GPD officials have a discussion with SBI agents from about 75 to 80 feet away but was unaware of the substance of the discussion. (Id. at 33:19-34:5.) Thereafter, he was directed by Sgt. Sigmon to inventory the items found; he made no independent determination of whether it was appropriate to carry out his order. (Id. at 37:2-13.)

Based on this record, White has failed to adduce sufficient facts to overcome the presumption that Schwochow was acting within the discretionary scope of his official duties, or maliciously or corruptly. There is no evidence that he was or should have been aware of any lack of a proper legal basis for discharging his official duties, as directed by his superiors, at the time. Therefore, the motion to reconsider as to Schwochow will be granted and the motion to dismiss the trespass claim based on public official immunity will be granted.

### Albert

Detective Albert was ordered to go the White's residence by her supervisor, Sergeant Atkins. (Doc. 137-21 ¶ 9.) On the way, Sgt. Atkins said they were "looking into GPD property at the residence." (Id.) By the time they arrived, the "majority of the equipment was already in the garage and in the concrete area just outside the garage." (Id.) Albert stayed on the driveway, but later entered the "back bedroom" and observed "police vests with

42

people's names" on them, and she saw weapons in a separate bedroom. (Id.)  At the request of the SBI and RPD, she wrote down the make and model of the weapons.  (Id.)  In the garage she observed a bicycle that looked like that she and White used on the GPD bicycle squad.  She photographed the bicycle, forwarded the image to the officer responsible for tracking such equipment, and inventoried the items.  (Id.)

Based on this record, White has failed to adduce sufficient facts to overcome the presumption that Albert was acting within the discretionary scope of her official duties, or maliciously or corruptly.  There is no evidence that she was or should have been aware of any lack of a proper legal basis for discharging her official duties at the time.  By the time she arrived, the vast majority of the GPD equipment had already been collected, and Det. Albert was following orders under circumstances where she could reasonably assume her presence was lawful.  Therefore, the motion to reconsider as to Albert will be granted and the motion to dismiss the trespass claim based on public official immunity will be granted.

Contrary to the Greensboro Defendants' contention, this result is consistent with the court's ruling as to Hampshire's November 2, 2016 knock and talk.  As this court previously stated, "'As long as a public officer lawfully exercises the judgment and discretion with which he is invested by virtue of his office, keeps

43

within the scope of his official authority, and acts without malice or corruption, he is protected from liability.'" White, 532 F. Supp. 3d. at 329 (citing Smith v. State, 222 S.E.2d 412, 430 (N.C. 1976)). Hampshire is not liable for trespass in his personal capacity because, even if he trespassed, there is insufficient evidence that he failed to exercise the judgment and discretion of his position to knock on the house door in the open garage after the front door appeared derelict. That is, he was not acting "outside of and beyond the scope of his duties" when conducting "an otherwise lawful knock and talk." See id. ("There is no factual basis to conclude that Hampshire acted maliciously in entering White's open garage door and knocking on the house door while attempting to conduct an otherwise lawful knock and talk. . . . North Carolina courts have upheld the use of knock and talks as an appropriate investigative tool."). In contrast, White has proffered sufficient evidence that the Greensboro Defendants sought to collect the GPD gear (a lawful activity) in an unlawful manner, by unlawfully entering the home and further conducting a warrantless search without White's consent.

C. **Fourth Amendment Qualified Immunity**

The reconsideration motion as to qualified immunity for the Greensboro Defendants has made plain that the court's prior decision at the motion to dismiss stage, White, 408 F. Supp. 3d at 700-01, granting qualified immunity to the same Defendants on

44

White's analogous federal claim based on a Fourth Amendment violation, <u>see</u> Doc. 81, Eighth Cause of Action, is clearly erroneous and should be corrected in so far as it is based on a claim of a warrantless search without consent.

As previously noted, Rule 54(b) provides the court "the power to reconsider and modify its interlocutory judgments, including partial summary judgments, at any time prior to final judgment when such is warranted." <u>American Canoe Assoc. v. Murphy Farms, Inc.</u>, 326 F.3d 505, 514-15 (4th Cir. 2003). This power is committed to the discretion of the district court, which is not cabined by the "heightened standards for reconsideration" governing final orders. <u>Id.</u> To be sure, this discretion "is not limitless," and "courts have cabined revision pursuant to Rule 54(b) by treating interlocutory rulings as law of the case." <u>Carlson v. Bos. Sci. Corp.</u>, 856 F.3d 320, 325 (4th Cir. 2017). While that doctrine posits that a court's decision on a rule of law should govern the same issues in subsequent stages in the same case, <u>TFWS, Inc. v. Franchot</u>, 572 F.3d 186, 191 (4th Cir. 2009), it would work an injustice for an erroneous decision to continue to perpetuate an error. Thus, courts may, indeed should, revisit decisions that are clearly erroneous. <u>See</u> <u>Christianson v. Colt Indus. Operating Corp.</u>, 486 U.S. 800, 817 (1988) ("[T]he law-of-the-case doctrine 'merely expresses the practice of courts generally to refuse to reopen what has been decided, not a limit

45

to their power.'") (quoting <u>Messinger v. Anderson</u>, 225 U.S. 436, 444 (1912))); <u>Arizona v. California</u>, 460 U.S. 605, 618 n.8 (1983), <u>decision supplemented</u>, 466 U.S. 144 (1984) ("Under law of the case doctrine, as now most commonly understood, it is not improper for a court to depart from a prior holding if convinced that it is clearly erroneous and would work a manifest injustice." (citing <u>White v. Murtha</u>, 377 F.2d 428, 431–32 (5th Cir. 1967))).

This court's orders on summary judgment and motion to dismiss, neither of which resolved all claims against all parties, are interlocutory and thus subject to revision, by motion or *sua sponte*, at any time. <u>See</u> <u>Sewell Plastics Inc. v. Coca-Cola Co.</u>, 912 F.2d 463, n.1 (4th Cir. 1990) (finding no error in district court's *sua sponte* reconsideration of its previous summary judgment ruling); <u>June v. Thomasson</u>, No. CV GLR-14-2450, 2017 WL 3642944, at *1, *6 (D. Md. Aug. 24, 2017) (unpublished) (conducting *sua sponte* reconsideration of prior interlocutory order to "conduct[] a full qualified immunity analysis" and "correct the manifest injustice that the Court's [prior] Order created.")

On the Greensboro Defendants' motion to dismiss, the briefing focused extensively on the legality of those Defendants acting outside their territorial jurisdiction. The court properly concluded that it was not clearly established at the time of the March 6, 2017 search that it would be unconstitutional for the Greensboro Defendants to participate in a search outside their

46

jurisdiction. White, 408 F. Supp. 3d at 700-01. Thus, the court found that the officers were entitled to qualified immunity as to that basis of the claim. Id. However, White's second amended complaint also alleged that the search itself was warrantless and without consent, and thus unconstitutional. (Doc. 81 ¶ 175-80.) This contention was limited in discussion in White's brief, unsupported by any authority (Doc. 61 at 10), and was not addressed thereafter (see Docs. 46 at 5-19, 67 at 2-8). The court's dismissal of that claim did not consider, but should have addressed, this basis of alleged liability. White, 408 F. Supp. 3d at 716. This was error.

Qualified immunity shields government officials performing discretionary functions from personal liability for civil damages under § 1983, so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Ridpath v. Bd. of Governors Marshall Univ., 447 F.3d 292, 306 (4th Cir. 2006) (quoting Wilson v. Layne, 526 U.S. 603, 609 (1999)). Officials are entitled to immunity unless the § 1983 claim satisfies a two-prong test: (1) the allegations, if true, substantiate a violation of a federal statutory or constitutional right, and (2) the right was "clearly established" such that a reasonable officer would have known his acts or omissions violated that right. Id. Under the first prong, a plaintiff must sufficiently allege that an officer's actions

47

amount to a violation of a federal statutory or constitutional right. Id. at 307. Under the second prong, an alleged constitutional right is clearly established if, according to pre-existing law, "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). The phrase "clearly established" depends on the "level of generality at which the relevant 'legal rule' is to be identified." Id. at 639. Therefore, unlawfulness must be apparent, but the test does not require that "the very action in question has previously been held unlawful." Wilson 526 U.S. at 615 (quoting Anderson, 483 U.S. at 640). This determination is to be assessed at the time an action occurred under an objective reasonableness standard. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The court may consider the prongs in either order, as a plaintiff's failure to satisfy either entitles the officer to immunity. Pearson v. Callahan, 555 U.S. 223, 236 (2009).

Here, White's second amended complaint alleges, and now it is apparent there is evidence,[14] that on March 6, 2017, the Greensboro Defendants wrongfully entered White's house at the invitation of the RPD and SBI (who lacked authority to invite third parties

---

[14] The court considers portions of the factual record solely to explain why not correcting the erroneous grant of the motion to dismiss would work a manifest injustice. The court is not converting the motion into one for summary judgment, even though it might appear that the parties' discovery on the state immunity claim would have adduced the same facts.

inside for purposes unrelated to the search warrant), without a warrant or consent (at least not at the outset) from White, in order to search and seize GPD equipment. To state a § 1983 claim for a Fourth Amendment violation, plaintiff must (1) allege facts sufficient to demonstrate "a legitimate expectation of privacy in the place searched or the item seized," United States v. Simons, 206 F.3d 392, 398 (4th Cir. 2000), and (2) that the officers' "conduct amounted to a violation of the Fourth Amendment," i.e., that the search/seizure was not "reasonable," Doe v. Broderick, 225 F.3d 440, 451 (4th Cir. 2000). The second amended complaint's allegations of unwarranted entry without consent meet this standard. (See Doc. 81 ¶¶ 80, 176, 178.) See Alexander Indus., 2022 WL 288178, at *2-*6 (denying officers' motion to dismiss § 1983 claim for illegal entry and search of gym).

Given the allegations of the current amended complaint (and in light of the facts adduced on the state public official immunity question), it is apparent that White has stated a claim that it was clearly established by March 6, 2017, that the Greensboro Defendants could not enter a private home without a proper search warrant or consent. It is also further alleged that the RPD/SBI search warrant did not cover GPD equipment and that Christina White did not consent to enter the residence or to conduct a search for GPD equipment. (Doc. 81 ¶ 80.) Because these allegations state a claim, and because the evidence White has presented as to the

49

state public official immunity question could be relevant to defeat the application of qualified immunity to certain of the Greensboro Defendants at this stage, it would work a manifest injustice not to correct this court's earlier ruling dismissing the § 1983 claim against the Greensboro Defendants.[15]

Because discovery has closed, the parties will be given the opportunity at the hearing on February 22, 2022, to consider whether additional discovery is requested or necessary to address the federal claim against the Greensboro Defendants (Eighth Cause of Action) and to request any additional changes to the schedule, including reopening the summary judgment briefing for this limited claim. Going forward, the court reminds the parties that the claim against each officer must be assessed separately.

Therefore, the court vacates its dismissal of the § 1983 claims against the Greensboro Defendants in their individual capacities.

III. CONCLUSION

For the reasons stated,

IT IS THEREFORE ORDERED that Defendants' motion to exclude expert testimony (Doc. 166) is GRANTED IN PART and DENIED IN PART, and the motion for reconsideration (Doc. 173) is GRANTED IN PART

---

[15] While it would appear that, for the reasons noted on the state immunity question, the evidence may be insufficient to avoid qualified immunity for Greensboro Defendants Lowe, Sigmon, Schwochow, and Albert, because the dismissal was granted at the motion to dismiss stage, the court declines to consider those facts at this time.

and DENIED IN PART. The Greensboro Defendants' motion for summary judgment on the trespass claim based on public official immunity will be granted as to Defendants Lowe, Sigmon, Schwochow, and Albert and otherwise DENIED.

IT IS FURTHER ORDERED that the court VACATES its prior order (Doc. 82) dismissing the Eighth Cause of Action against the Greensboro Defendants in their individual capacities alleging a violation of 42 U.S.C. § 1983. The parties shall be prepared to address at the February 22, 2022 hearing what relief, if any, from the pretrial schedule is necessary on the § 1983 claim against the Greensboro Defendants.

  /s/   Thomas D. Schroeder
United States District Judge

February 21, 2022