IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

WILLIAM Z. WHITE,            )
                             )
          Plaintiff,         )
                             )
     v.                      )        1:18-cv-00969
                             )
THE CITY OF GREENSBORO, et al., )
                             )
          Defendants.        )

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, Chief District Judge.

This lawsuit arises out of the arrest and firing of Plaintiff William White, a former Greensboro Police Department officer, after he was investigated for illegal activity stemming from the theft of several commercial-grade lawn mowers. After the criminal charges against White were eventually dismissed, he brought this case alleging numerous violations of both federal and North Carolina law against multiple Defendants across four law enforcement agencies.

The court previously ruled on motions to dismiss and for summary judgment, dismissing all claims except those relating to trespass. A motion for reconsideration of the court's previous order denying summary judgment (Doc. 173) was subsequently filed by officers of the Greensboro Police Department ("GPD") -- James Schwochow, Eric Sigmon, Johnny Raines, Jr., William Barham, Brian Williamson, Jason Lowe, and Lindsay Albert ("Greensboro

Defendants"), on the basis of public official immunity, which the court granted in part and denied in part (Doc. 228). This led the court to vacate its prior order (Doc. 82) dismissing the Eighth Cause of Action against the Greensboro Defendants in their individual capacities alleging a violation of 42 U.S.C. § 1983 for a warrantless search of White's home (Doc. 228), and the court reopened discovery for this claim only.

The Greensboro Defendants now move for summary judgment as to the Eighth Cause of Action on the grounds of qualified immunity and damages. (Doc. 233 (Raines), Doc. 235 (Barham), Doc. 237 (Williamson), Doc. 239 (Lowe), Doc. 241 (Sigmon), Doc. 243 (Schwochow), Doc. 245 (Albert).) White opposes all motions. (Doc. 247.) For the reasons set forth below, the motions for summary judgment will be granted on the basis of qualified immunity for Lowe, Sigmon, Schwochow, and Albert, and granted in part on the issues of damages for Raines, Barham, and Williamson.

## I. BACKGROUND

The background of this case is extensively set out most recently in this court's prior amended memorandum opinion and order. White v. City of Greensboro, 532 F. Supp. 3d 277 (M.D.N.C. Apr. 5, 2021). Relevant facts will be discussed as pertinent to these motions.

In short, White was a police officer for the GPD from April

2

2009 until March 6, 2017. (Doc. 111-1 ¶ 3.)[1] On August 22, 2016, the Reidsville Police Department ("RPD") received a report that several commercial-grade lawn mowers were stolen from Scott's Tractor, a lawn mower dealer in Reidsville, North Carolina. (Doc. 140-1.) RPD Lieutenant Shannon Coates responded to the report and assigned RPD Sergeant Lynwood Hampshire to investigate. (Id., Doc. 140-2 at 16:16-20.) Hampshire would serve as the lead investigator for the duration of the investigation. (Doc. 140-2 at 17:1-3.)

On October 7, Hampshire received a call from a couple, the Terrys, who reported they had recently bought a mower from White and who expressed concern about the possibility it had been stolen earlier from Scott's Tractor. (Doc. 140-3 at 1.) Prior to conducting a knock and talk at White's residence, Hampshire learned that White was a GPD police officer. (Docs. 140-2 at 18:3-9; 140-9 at 27:16-28:22.) Hampshire later spoke with Coates, his supervisor, who advised him to contact the North Carolina State Bureau of Investigation ("SBI") and GPD's Professional Standards Division. (Doc. 140-2 at 18:3-9.) The SBI was contacted because it is standard practice for the SBI to be involved when a police officer is the suspect in an investigation. (Doc. 140-8 at 170:5-

---

[1] All citations to the record are to ECF docket page or paragraph number except for testimony, which is cited to the deposition transcript page and line.

3

171:3.) Hampshire contacted SBI Agent Destinie Denny, who had worked with the RPD in the past. (Id. at 21:15-22:10.)

Following an investigation, Hampshire several months later applied for and obtained a warrant from a state magistrate to search two of White's residences on March 5, 2017. (Doc. 140-12.) Also on March 5, the investigating agencies[2] informed GPD Chief Wayne Scott that they had probable cause to arrest White for felony possession of stolen property and felony obtaining property by false pretenses, that the agencies were in the process of obtaining search warrants for White's residences, and that they planned to arrest White on March 6. (Doc. 103-1 ¶ 9.) The investigating agencies had updated Scott during their investigation, and GPD's Professional Standards Division was also investigating White's possible involvement in the mower thefts. (Id. ¶ 6.) Scott agreed that the agencies had probable cause to arrest White and decided to terminate White's employment with GPD. (Id. ¶¶ 10-11.)

On the morning of March 6, Hampshire conducted a briefing at SBI's Greensboro office prior to executing the search warrants. Present were members from the SBI, Burlington Police Department ("BPD"), Guilford County Sheriff's Office ("GCSO"), and the Randolph County Sheriff's Office. (Doc. 140-13 at 1.) Hampshire had prepared an operations plan, which was reviewed by his

---

[2] Chief Scott's declaration did not identify which agencies informed him that probable cause existed to arrest White.

4

supervisor, Coates, outlining the execution of the search warrants. (Docs. 140-2 at 89:19-23; 139.) Also that morning, White was arrested at work, charged with various crimes, and terminated from his employment with GPD as a result. (Doc. 103-1 ¶¶ 18-19.)

At about 8:00 a.m., the RPD and SBI executed the search warrant at White's primary residence. Present at the start of the search were two agents from the RPD, including Hampshire as the officer in charge, and two agents from the SBI. (Doc. 139 at 7.) Detective Victoria Underwood of the BPD was present as a BPD liaison officer because the BPD was conducting a simultaneous arrest of Strickland as a result of its investigation into the theft at another seller, Quality Equipment. (Docs. 127-14 ¶¶ 5-6; 140-2 at 140:11-14.) GCSO Deputy Amanda Fleming was present as a GCSO liaison officer because White's house was in Guilford County. (Docs. 139 at 7; 140-2 at 136:12-137:21.) Other officers arrived during the search, including RPD Chief Robert Hassell. (Doc. 140-2 at 91:25-92:4.)

When the officers arrived at White's house, the only persons present in the home were White's wife Christina, the Whites' daughter, and Anita Holder, White's mother. (Doc. 137-7 at 7:23-8:10.) Hampshire allowed Holder to leave with the Whites' daughter. (Id.; Doc. 140-2 at 95:22-96:9.) The search officers proceeded to search the residence. They discovered a John Deere

5

Gator and trailer in White's garage. The Gator was reported as stolen from Wake County, North Carolina, in November 2016. (Doc. 140-13 at 2, 11.) The officers were unable to find a vehicle identification number for the trailer, which appeared to have been scratched off. (Id.) Both the Gator and trailer were seized and towed to the RPD impound lot. (Id.)

Hampshire's operations plan directed that, upon discovery of any GPD equipment or property, Hampshire was to notify RPD Lieutenant Coates, who would in turn notify the GPD to come to White's house to retrieve the property. (Docs. 139 at 11; 140-2 at 87:13-23.) And that is what happened. The investigating officers discovered GPD equipment at White's house, Hampshire notified Coates, and Coates notified the GPD to come to collect the property. (Docs. 139-1 at 3; 140-2 at 87:13-18.)

At about 10:00 a.m., GPD Lieutenant Johnny Raines was directed by a superior to go to White's house to pick up GPD-issued equipment. (Doc. 137-10 at 15.) Raines was a member of Resource Management, the GPD division that keeps track of GPD equipment. (Doc. 137-11 at 79:3-9.) According to several GPD Defendants, it is standard practice for GPD to attempt to collect issued equipment as soon as possible after an officer leaves the department. (Docs. 137-10 at 15; 137-12 at 3.) Raines directed Sergeant William Barham to accompany him. (Doc. 137-12 at 3.) When both officers arrived, Raines looked into an open garage and noticed what

6

appeared to be GPD equipment. (Doc. 137-10 at 15.) Officers from the SBI and RPD escorted Raines and Barham to the master bedroom where they both observed additional GPD equipment. (Id.; Doc. 137-12 at 4.) Sometime thereafter, Raines went to the living room where Christina White was sitting and asked her if they could collect GPD property.[3] (Doc. 137-10 at 16.) While Raines says Christina White "stated that we could collect and remove the property," (id.), Christina White testified that she never gave Raines permission to look for GPD equipment and that he was already searching for the equipment before he spoke to her (Doc. 152-2 at 17:21-18:3).

Shortly thereafter, GPD Sergeant Brian Williamson arrived at White's house. (Docs. 137-10 at 16; 137-14 at 4.) Williamson was the team leader for GPD's Special Response Team ("SRT"), of which White was a member prior to his termination. (Doc. 137-14 at 3.) Because it was unlikely that a non-SRT member could identify SRT equipment, Williamson reported to White's house to identify GPD's SRT equipment. (Id. at 4.) Williamson subsequently ordered GPD Detective Jason Lowe, who was the sniper team lead on GPD's SRT, to come to White's house to identify any SRT sniper equipment White may have had. (Doc. 137-15 at 4.) While looking for White's

---

[3] Barham believes the conversation between Raines and Christina White may have occurred prior to Raines and Barham entering the master bedroom. (Doc. 236-2 at 22:13-18, 24:3-6.) However, that would contradict Raines's account. (See Doc. 234-2 at 22:15-21, 23:5-9; Doc. 157-1 ¶ 9.)

uniform, Williamson overheard that RPD could not open a floor safe in the master bedroom. (Id. at 19:5-17; Doc. 137-14 ¶ 9.) Williamson asked Christina White for the combination, but she said she did not know it. (Doc. 238-2 at 20:9-25.) Williamson then called a former instructor who was a master locksmith who provided Williamson with the factory combination to open the safe. (Id.)

During the search, apparently after Raines found a GPD vest with his wife's name on it and knowing that his wife had left the GPD, Raines believed "[t]here was credible evidence that [White] had GPD property that he should not possess." (Doc. 137-12 at 4.) Unnamed GPD officers reviewed Hampshire's search warrant and concluded it would cover their equipment to permit them to proceed. (Doc. 140-2 at 124:2-14.)[4] Raines informed the SBI and RPD and contacted his command staff to notify them that he believed White may have stolen GPD property. (Doc. 137-10 at 17.) In response, GPD's Property Crimes division ordered more GPD officers to arrive throughout the morning. (Docs. 137-18 ¶ 9; 137-20 ¶ 5; 137-21 ¶ 9.) All told, seven GPD officers responded to the Whites' house on March 6: Raines, Barham, Williamson, Lowe, Sigmon, Schwochow, and Albert, and each entered the house at some point.[5]

---

[4] This argument is not advanced in the present motions.

[5] (Docs. 137-10 at 15 (Raines and Barham); 137-14 ¶ 9 (Williamson); 137-15 ¶ 9 (Lowe); 137-18 ¶ 9 (Sigmon); 137-19 at 34:15-16 (Schwochow); 137-21 ¶ 9 (Albert).)

Eventually, all criminal charges against White were dismissed.

Plaintiff brought this action pursuant to a second amended complaint (Doc. 81) alleging various constitutional and other claims against multiple law enforcement agencies and individuals. As a result of this court's previous rulings, White's only remaining claims against the Greensboro Defendants are for trespass (under state law) and a violation of 42 U.S.C. § 1983 for their warrantless entry into and search of his home on March 6, 2017.[6] (Doc. 228.)

## II. ANALYSIS

### A. Standard of Review

A court must grant a motion for summary judgment if the pleadings, depositions, and affidavits submitted show that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is considered "material" if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Under this standard, a genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

---

[6] White also has remaining claims for trespass against Defendant James Stalls (based on his view of a mower in White's garage on September 3, 2016) and against Defendant City of Reidsville (based on Hampshire's "knock and talk" at White's house door inside the garage on November 2, 2016).

Id. As a result, the court will only enter summary judgment in favor of the moving party when the record "shows a right to judgment with such clarity as to leave no room for controversy" and clearly demonstrates that the non-moving party "cannot prevail under any circumstances." Campbell v. Hewitt, Coleman & Associates, Inc., 21 F.3d 52, 55 (4th Cir. 1994) (citation omitted). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are [fact-finder] functions . . ." Anderson, 477 U.S. at 255. On summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Id. However, "only reasonable inferences from the evidence . . . in light of the competing inferences to the contrary" should be considered by the court. Sylvia Development Corp. v. Calvert County, Maryland, 48 F.3d 810, 818 (4th Cir. 1995) (citations omitted). In evaluating material submitted in support of or in opposition to a motion for summary judgment, the court may reject inadmissible evidence. See Fed. R. Civ. P. 56(c)(4); Evans v. Technologies Applications & Service Co., 80 F.3d 954, 962 (4th Cir. 1996).

While the movant bears the initial burden of demonstrating that there are no genuine disputes of material fact, once that burden has been met, the non-moving party must demonstrate the existence of a genuine dispute of material fact. Bouchat v.

10

Baltimore Ravens Football Club, Inc., 346 F.3d 514, 521 (4th Cir. 2003); Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). A mere scintilla of evidence is insufficient to circumvent summary judgment. Anderson, 477 U.S. at 252; Dash v. Mayweather, 731 F.3d 303, 311 (4th Cir. 2013) ("[T]he nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence."); see also Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987) (noting that there is an affirmative duty for "the trial judge to prevent factually unsupported claims and defenses from proceeding to trial" (citation omitted)). Instead, the nonmoving party must convince the court that, upon the record taken as a whole, a rational trier of fact could find for the nonmoving party. Anderson, 477 U.S. at 248–49. Trial is unnecessary if "the facts are undisputed, or if disputed, the dispute is of no consequence to the dispositive question." Mitchell v. Data General Corp., 12 F.3d 1310, 1315–16 (4th Cir. 1993).

    **B.  Fourth Amendment Qualified Immunity**

    The Greensboro Defendants move for summary judgment on Plaintiff's § 1983 claim in their personal capacity for a warrantless search of White's home.[7] (Docs. 233, 235, 237, 239,

---

[7] White's second amended complaint alleges that the GPD's search itself

241, 243, 245.) As discussed in this court's prior order, there is evidence that on March 6, 2017, the Greensboro Defendants wrongfully entered White's house at the invitation of the RPD and SBI (who lacked authority to invite third parties inside for purposes unrelated to the search warrant), without a warrant or consent (at least not at the outset) from White, in order to search and seize GPD equipment. (See Doc. 228 at 48-49.) The Greensboro Defendants contend they are entitled to qualified immunity because it was not clearly established that "an officer must make an independent determination that his entry into a house and participation in an ongoing search by other law enforcement agencies are authorized" where (1) "the law enforcement agencies conducting the search have requested the presence of that officer's agency" and (2) "that officer has been directed by superiors to go to that house and collect that agency's gear identified during the search." (See, e.g., Doc. 234 at 7-12.) The Greensboro Defendants rely on White v. Pauly, 137 S. Ct. 548 (2017) (per curiam), for the contention that "no settled Fourth Amendment principle requires [an] officer to second-guess the earlier steps already taken by his or her fellow officers." (Id.) In response, White argues that the Greensboro Defendants cannot justify their warrantless search of his home and instead "acknowledge they were

---

was warrantless and without consent, and thus unconstitutional. (Doc. 81 ¶¶ 175-80; see Doc. 228 at 47.)

merely looking for certain equipment from a separated officer's home and entering the home to obtain GPD equipment when the suspect, Plaintiff White[,] was not on premises." (Doc. 247 at 9.) In reply, the Greensboro Defendants argue that "a reasonable officer in [each Greensboro Defendant's] position would have believed he [or she] was acting within the confines of the Fourth Amendment, be it through the [RPD's search] warrant, the prior consent of Plaintiff, a mutual aid agreement, or otherwise." (Doc. 248 at 4-12.)

Qualified immunity shields government officials performing discretionary functions from personal liability for civil damages under § 1983, so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Ridpath v. Board of Governors Marshall University, 447 F.3d 292, 306 (4th Cir. 2006) (quoting Wilson v. Layne, 526 U.S. 603, 609 (1999)). Officials are entitled to immunity unless the § 1983 claim satisfies a two-prong test: (1) the allegations, if true, substantiate a violation of a federal statutory or constitutional right, and (2) the right was "clearly established" such that a reasonable officer would have known his acts or omissions violated that right. Id. Under the first prong, a plaintiff must sufficiently allege that an officer's actions amount to a violation of a federal statutory or constitutional right. Id. at 307. Under the second prong, an alleged

constitutional right is clearly established if, according to pre-existing law, "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). The phrase "clearly established" depends on the "level of generality at which the relevant 'legal rule' is to be identified." Id. at 639. Unlawfulness must be apparent, but the test does not require that "the very action in question ha[ve] previously been held unlawful." Wilson 526 U.S. at 615 (quoting Creighton, 483 U.S. at 640). This determination is to be assessed at the time an action occurred under an objective reasonableness standard. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In other words, "[a] Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011) (citation omitted). The court may consider the prongs in either order, as a plaintiff's failure to satisfy either entitles the officer to immunity. Pearson v. Callahan, 555 U.S. 223, 236 (2009).

Whether any of the Greensboro Defendants is entitled to public official immunity depends on the facts relating to each officer's role on March 6. Therefore, each officer's actions will be addressed in turn.

14

<u>Raines and Barham</u>

Lieutenant Raines and Sergeant Barham were ordered "to go to Plaintiff's residence to pick up the GPD issued equipment," and they entered the Whites' home on the morning of March 6 to collect GPD property issued to White. (Doc. 137-10 at 15; 137-12 at 3-4; 157-1 at 3-4; Doc. 234-2 at 17:19-23; Doc. 236-2 at 17:25-18:7, 22:3-7.) Both officers were aware that the SBI and RPD were executing their search warrant and that White had been terminated earlier that day. (Doc. 234-2 at 18:15-24; Doc. 236-2 at 17:25-18:7, 24:7-9; Doc. 137-10 at 15.) According to Raines's report, SBI and RPD officers "allowed [Raines and Sergeant Barham] to enter the property to see what items, if any, were present that belonged to the City of Greensboro." (Doc. 137-10 at 15.) According to Raines, they "stood outside until [RPD and SBI] were to the point where they felt comfortable allowing us to walk through the property." (<u>Id.</u>) Then, Raines and Barham were escorted to the Whites' master bedroom where they observed items that "appeared to be City property." (<u>Id.</u>) Determining there was GPD property they "would need to examine and potentially collect," Raines spoke with Christina White in the living room and, he claims, eventually obtained permission to "collect and remove the property." (<u>Id.</u> at 16.) The officers then searched various parts of the house, collecting what they deemed to be GPD property; but Raines eventually "came to believe" that White had more GPD property than

15

had been issued to him, and Raines advised his command staff that he believe White possessed stolen GPD property. (Id. at 17.) GPD Criminal Investigations Division officers were then dispatched to assist with the "investigation." (Id.)

On this record, Raines and Barham's reliance on Pauly is misplaced. In Pauly, two officers responded to Pauly's house late one evening following a report that Pauly's brother had been engaged in a road rage incident and was intoxicated. 137 S. Ct. at 549. The officers demanded that Pauly and his brother exit the house, but only one officer identified himself as "State Police," and the Pauly brothers did not hear any identification. Id. at 550. Instead, the brothers shouted "[w]e have guns." Id. Officer White, who was not aware that the officers failed to identify themselves, arrived at the moment one of the brothers yelled that they had guns, and White took shelter behind a stone wall. Id. A few seconds later, Pauly's brother stepped out of the back door of the house, screamed, and fired two shotgun blasts, followed by Pauly, who opened a front window and pointed a handgun in the direction of Officer White. Id. An officer shot at Pauly but missed, and Officer White shot and killed Pauly. Id. Though the district court denied Officer White qualified immunity, the Court reversed. It held that Officer White did not violate clearly established law, despite his failure to shout a warning before using deadly force, in light of the "unique" circumstances

16

surrounding his late arrival on the scene.  Id. at 552.  The Court
concluded:

> Clearly established federal law does not prohibit a
> reasonable officer who arrives late to an ongoing police
> action in circumstances like this from assuming that
> proper procedures, such as officer identification, have
> already been followed.  No settled Fourth Amendment
> principle requires that officer to second-guess the
> earlier steps already taken by his or her fellow officers
> in instances like the one White confronted here.

Id.

In the present case, a reasonable officer in Raines and
Barham's position would have understood that entering White's home
without a warrant or proper permission violated his Fourth
Amendment right to privacy.  Unlike the officer in Pauly, Raines
and Barham were not actively responding to an ongoing crime.
Rather, they understood that – separate from the search warrant
being executed by other agencies – they "were there to collect Mr.
White's GPD property . . . since he was no longer employed" (Doc.
234-2 at 22:7-9, 18:17-21; see Doc. 236-2 at 18-4:7, 21:25-22:7.)
They do not claim that the warrant granted them authority to enter
the home.  (See Doc. 234-2 at 20:7-11, 20:21-21:1.)  Rather, they
rely on the fact that they were responding to the SBI and RPD's
call to collect White's GPD gear they had observed during the
search.

It was clearly established at the time "that the Fourth
Amendment prohibits government agents from allowing a search

warrant to be used to facilitate a[n] . . . independent search of another's home for items unrelated to those specified in the warrant." Buonocore v. Harris, 65 F.3d 347, 356 (4th Cir. 1995). Indeed, Raines claims he spoke with Christina White in the living room and eventually obtained permission to "collect and remove the property" – authorization which otherwise would have been unnecessary unless he understood their presence and purpose was outside the scope of the search warrant and its investigation. (Doc. 137-10 at 15.) In fact, while Raines and Barham were unfamiliar with the particulars of the warrant being executed, they acknowledge they knew their purpose at the outset was not related to a "criminal matter"; which remained the case at least until they believed "Mr. White had come into possession of that property outside of our normal procedures." (Doc. 234-2 at 30:7-13, 31:3-18; see Doc. 236-2 at 30:20-31:7, 31:22-32:11, 33:10-20.) To put it simply, in the words of Williamson, there is evidence Raines and Barham understood they "[were]n't [t]here to help execute [the] search warrant . . . . [They] [were] there to collect his gear." (Doc. 238-2 at 24:13-19.) It was also clearly established at the time that GPD could not rely on the RPD and SBI to provide consent to enter a home for the purpose of collecting employment-related equipment that was wholly unrelated to the search warrant. Buonocore, 65 F.3d at 356 (holding "that the Fourth Amendment prohibits government agents from allowing a

18

search warrant to be used to facilitate a private individual's independent search of another's home for items unrelated to those specified in the warrant" as it "is not 'reasonable'" and "obviously exceeds the scope of the required specific warrant and furthermore violates the 'sanctity of private dwellings'") (quoting United States v. Martinez-Fuerte, 428 U.S. 543, 561 (1976)); Wilson v. Layne, 141 F.3d 111, 117 n.6 (4th Cir. 1998) (en banc), aff'd, 526 U.S. 603 (1999) ("Buonocore, therefore, addressed the question of whether a third party, who is not authorized by the warrant to conduct a search, may accompany law enforcement officers in executing a warrant and undertake an independent search for items not described in the warrant.")

Because it was clearly established on March 6, 2017 that an officer cannot enter a home without a proper warrant (which Raines and Barham acknowledge they were not acting under) or consent (which the RPD and SBI were not allowed to give to a third person for a purpose unrelated to their warrant), White has stated a claim for personal liability against Raines and Barham to overcome qualified immunity. And because Christina White denies she ever gave GPD officers her consent to search for GPD equipment, there is a genuine dispute whether the officers' actions following the alleged consent were lawful. Therefore, Raines's and Barham's motions for summary judgment on the basis of qualified immunity will be denied.

19

<u>Williamson</u>

Sergeant Williamson received a call from the GPD's SRT team leader informing him of a search at the Whites' home. (Doc. 137-14 ¶ 9.) Williamson called Raines "to understand the situation." (<u>Id.</u>) After learning from Raines that White had been terminated and the SBI and RPD were executing a search warrant, Williamson responded to the scene. (<u>Id.</u>) Williamson, a member of the GPD SRT Team, sought to identify SRT gear issued by GPD. (<u>Id.</u>) Williamson met Raines in the driveway, and Raines "broke away from [his] presence" before returning and telling Williamson they could enter the home. (Doc. 238-2 at 14:8-22.) He did not ask Raines about the basis for his statement. (<u>Id.</u> at 14:23-16:2.) Williamson entered the garage to observe SRT gear that he was told was identified as stolen. (Doc. 137-14 ¶ 9.) Williamson then went into the Whites' master bedroom to observe more GPD gear, after which he says he met with Christina White and asked her to direct him to where more gear might be. (<u>Id.</u>) Williamson engaged in a search of the home, looking for GPD gear. (<u>Id.</u>) He directed Officer Lowe to the scene to assist in the identification of GPD equipment. (<u>Id.</u>) Williamson understood his purpose was unrelated to the search warrant, as the Greensboro Defendants "[were]n't [t]here to help execute [the] search warrant . . . . [They] [were] there to collect [White's] gear." (Doc. 238-2 at 24:13-19.)

While looking for White's uniform, Williamson overheard that

20

RPD officers could not open a safe in the master bedroom. (Id. at 19:5-17; Doc. 137-14 ¶ 9.) Williamson became "a little upset" because White "was one of the guys . . . on [his] team," and he believed the other agencies executing the search warrant were "getting ready to tear [White's] safe up." (Doc. 238-2 at 19:5-20:7.) Williamson did not want to see White's "nice stand-up [floor] safe" destroyed and, although it would be unusual, he believed a missing uniform might be in it. (Id.) Williamson asked Christina White for the combination, but she told him she did not know it. (Id. at 20:9-25.) So, on his own initiative and not at the request of RPD or the SBI, Williamson called one of his former instructors, who was a master locksmith, who provided the factory combination to open the safe. (Id.) Williamson opened the safe himself, but he does not claim Christina White gave him permission or consent beforehand to do so. (Id.; see id. at 26:23-25). Rather, he "just didn't want [the other agencies] tearing [White's] stuff up, and [he] was still looking for [the] uniform." (Id. at 20:24-25.)[8]

While Williamson admits he was aware that the search warrant did not authorize him to enter the Whites' house, there is evidence

---

[8] Williamson does not purport to rely on the authority of the warrant or a mutual aid agreement with RPD for authority to open the safe. (See Doc. 238-2 at 18:23-19:4, 20:1-25, 21:7-13). Rather, the record reflects he took it upon himself to open the safe for the purpose of examining it for the missing GPD uniform and perhaps to prevent it from being destroyed by RPD and the SBI.

he reasonably believed there was lawful authority to enter the home to retrieve GPD gear when Raines left his presence and returned telling him they could enter. (See Doc. 238-2 at 14:8-22.); see, e.g., Illinois v. Rodriguez, 497 U.S. 177, 188–89 (1990) (voluntary consent of an occupant who has, or is reasonably believed to have, authority over the property constitutes an exception to the Fourth Amendment's warrant requirement). As Williamson correctly points out (Doc. 238 at 9), "no settled Fourth Amendment principle requires [an] officer to second-guess the earlier steps already taken by his or her fellow officers." Pauly, 137 S. Ct. at 552. Williamson reasonably trusted Raines when he told him they had the authority to enter.

However, there is evidence that Williamson exceeded the scope of this authority when he opened White's safe. While Williamson claims he did so to prevent the destruction of his friend's property (see Doc. 238 at 10 n.1 (characterizing Williamson's actions as "sav[ing] Plaintiff, his team member, from having his safe destroyed by the other law enforcement agencies present")), the evidence, viewed in the light most favorable to White, would permit a jury to reasonably conclude that Williamson exceeded that authority. Williamson understood his task to collect GPD equipment was separate from that of the SBI and RPD executing the search warrant and that, even if he reasonably believed he did not need further permission or consent to search for uniform items, "it

would not make sense" for the missing uniform to be in the safe. (Doc. 238-2 at 21:4-6.) Whether Christina White consented at some point in time, or whether Williamson reasonably believed there was consent, is not apparent on this record. Thus, while Williamson may have reasonably believed he had the constitutional authority to enter White's home to collect his uniform, there is evidence that breaking into White's combination-locked safe violated White's clearly established Fourth Amendment right to privacy. See Florida v. Jardines, 569 U.S. 1, 5 (2013) ("When the Government obtains information by physically intruding on persons, houses, papers, or effects, a search within the original meaning of the Fourth Amendment has undoubtedly occurred." (citation omitted)); Katz v. United States, 389 U.S. 347, 351 (1967) ("What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. But what he seeks to preserve as private . . . may be constitutionally protected.); United States v. Coleman, 588 F.3d 816, 819 (4th Cir. 2009) (explaining that questions regarding the scope of consent are governed by an "objectively reasonable" standard based on the information available to officers at that time (citing Florida v. Jimeno, 500 U.S. 248, 250 (1991)); United States v. Jones, 356 F.3d 529, 534 (4th Cir. 2004) (noting that even "general, blanket consent to search a given area or item, by itself, would not likely permit officers to *break into* a locked container located within

23

the area being searched" (emphasis in original)).  Therefore, Williamson's motion for summary judgment on the basis of qualified immunity is granted in part as to Williamson's entry into the Whites' house and denied as to the search of the safe.

Lowe

Lowe, the GPD sniper team lead, was ordered to the Whites' residence by Williamson, his commanding officer, to identify GPD marksman gear.  (Doc. 137-15 ¶ 9.)  By the time of Lowe's arrival, other GPD officers, as well as the SBI and RPD, were already there. Lowe "knew there was a search warrant going on" and understood he "wasn't there to search" but instead to identify SRT equipment. (Doc. 240-2 at 13:5-19.)  Lowe was directed by Williamson to White's bedroom, where he proceeded to identify GPD sniper gear. (Id. at 13:20-24, 17:5-15; Doc. 137-15 ¶ 9.)  He also identified ammunition in a bedroom closet and brought some of the gear out to the driveway.  (Doc. 137-15 ¶ 9.)

White has adduced no evidence that Lowe, who was acting at his superiors' command, either knew or reasonably should have known of a lack of proper consent.  As Lowe correctly points out (Doc. 240 at 7-8), "no settled Fourth Amendment principle requires [an] officer to second-guess the earlier steps already taken by his or her fellow officers."  Pauly, 137 S. Ct. at 552.  On these facts, Lowe reasonably trusted Williamson when he directed him to enter the home.  Thus, there is an insufficient basis to conclude that

24

he violated a clearly established right to overcome qualified immunity, and Lowe's motion for summary judgment will be granted.

<u>Sigmon</u>

Sergeant Sigmon is a property crimes supervisor who was ordered by his supervisor, Lieutenant Schultheis, to find the next available GPD detective and report to the White residence. (Doc. 137-18 ¶ 9.) Sigmon understood that in the course of the RPD and SBI's execution of a search warrant they discovered GPD equipment in excess of what had been properly issued to White. As a result, "the investigation of Plaintiff by SBI and [RPD] expanded," and GPD's role of collecting equipment was "transformed" into "assisting in the SBI and [RPD] investigation of Plaintiff" for possible criminal acts against GPD. (<u>Id.</u>) Once Sigmon arrived, he spoke with Raines, who told him he received consent from Christina White to enter the home and retrieve the GPD property. (Doc. 242-2 at 14:18-23.) Sigmon remained outside the residence for "the majority of the time." (Doc. 137-18 ¶ 9.) There was eventually a discussion about how SBI and RPD could take control of the GPD property and turn it over to GPD. (<u>Id.</u>) At some point, Sigmon was directed to go inside and assist in carrying out ammunition. He entered the house once for that purpose and otherwise remained on the driveway until he left shortly thereafter. (<u>Id.</u>)

Based on the record, White has failed to provide sufficient

facts to indicate that Sigmon either knew or reasonably should have known of a lack of constitutional authority to enter the home. As Sigmon correctly points out (Doc. 242 at 8-9), "no settled Fourth Amendment principle requires [an] officer to second-guess the earlier steps already taken by his or her fellow officers." Pauly, 137 S. Ct. at 552. On this record, Sigmon was permitted to reasonably rely on Raines, who said he had consent to enter. Thus, there is an insufficient basis to conclude that he violated a clearly established right to overcome qualified immunity, and Sigmon's motion for summary judgment will be granted.

Schwochow

Officer Schwochow was ordered by his supervisor, Sergeant Sigmon, to join him to drive to White's residence because White had been terminated and "an excessive amount of GPD equipment" had been discovered at his house. (Doc. 137-20 ¶ 5.) Schwochow understood that the SBI was conducting an investigation of White and that GPD was present to assist in identifying "the excessive amount of GPD property that had been found at White's residence" during the SBI search. (Id. ¶ 6; Doc. 247-3 at 36:21-37:3.) Schwochow remained on the Whites' driveway where the GPD items were collected, and he completed an inventory of all of the items thought to belong to the GPD. (Doc. 137-10 at 17.) Once, he entered the garage, as the door was open, to record items that had been stored there. (Doc. 137-19 at 34:11-19, 137:10 at 15.)

Schwochow testified that he had no input into the operation plan for the search warrant, knew nothing about GPD's presence during the search, and had no knowledge of GPD's role, if any, in the execution of the search warrant. (Id. at 31:4-20.) He observed GPD officials have a discussion with SBI agents from about 75 to 80 feet away but was unaware of the substance of the discussion. (Id. at 33:19-34:5.) Thereafter, he was directed by Sgt. Sigmon to inventory the items found; he made no independent determination of whether it was appropriate to carry out his order. (Id. at 37:2-13.)

Based on this record, White has failed to provide sufficient facts to indicate that Schwochow either knew or reasonably should have known of a lack of unconstitutional authority to conduct his activities. He reasonably trusted Sigmon (who had trusted Raines) that GPD had the proper authority to enter White's residence to collect GPD equipment, and he merely did his duty as ordered. He had no reason on this record to second-guess the earlier steps already taken by his fellow officers. Pauly, 137 S. Ct. at 552. Thus, there is an insufficient basis to conclude that he violated a clearly established right to overcome qualified immunity, and Schwochow's motion for summary judgment will be granted.

Albert

Detective Lindsay Albert was ordered to the Whites' residence by her supervisor, Sergeant Atkins. (Doc. 137-21 ¶ 9.) While

Albert was on her way, Sgt. Atkins told her they were "looking into GPD property at the residence." (Id.; Doc. 246-2 at 13:4-7.) Albert was told RPD had a search warrant and had requested GPD assistance. (Doc. 246-2 at 14:9-13.) By the time the two arrived, the "majority of the equipment was already in the garage and in the concrete area just outside the garage." (Doc. 137-21 ¶ 9.) Albert stayed on the driveway, but she later entered the "back bedroom" and observed "police vests with people's names" on them, and she saw weapons in a separate bedroom. (Id.) At the request of the SBI and RPD, she wrote down the make and model of the weapons. (Id.) In the garage she observed a bicycle that looked like what she and White used on the GPD bicycle squad. She photographed the bicycle, forwarded the image to the officer responsible for tracking such equipment, and inventoried the items. (Id.)

On this record, White has failed to provide sufficient facts to indicate that Albert either knew or reasonably should have known of a constitutional basis to enter the home. By the time Albert arrived, the vast majority of the GPD equipment had already been collected, and Albert was following orders under circumstances where she could reasonably assume her presence was lawful. She reasonably trusted Atkins that the GPD had the proper authority to enter the Whites' residence to collect GPD equipment and had no basis to second-guess her superiors. Pauly, 137 S. Ct. at 552.

28

Thus, there is an insufficient basis to conclude that she violated a clearly established right to overcome qualified immunity, and Albert's motion for summary judgment will be granted.

**C. Fourth Amendment Section 1983 Claim Damages**

The Greensboro Defendants also argue they are entitled to partial summary judgment on Plaintiff's Fourth Amendment damages claims on the ground that White has not alleged recoverable damages. (See, e.g., Doc. 233 ¶ 3.) They rely on <u>Townes v. City of New York</u>, 176 F.3d 138 (2d Cir. 1999), for the contention that "injuries derivative of [an invasion of privacy] — [an] arrest, conviction, and incarceration" -- are "not fairly traceable to the actual violations of plaintiff's civil rights." (See Doc. 234 at 13 (quoting <u>Townes</u>, 176 F.3d at 141).) As such, they argue White's Section 1983 claim should be limited to nominal damages, which they contend are unrecoverable as a matter of law. (Doc. 234 at 12-15, 14 n.4.) In response, White argues that the warrantless search of his residence by the Greensboro Defendants violated his constitutional rights under § 1983 and "led directly to false accusations" that he was "in possession of stolen Greensboro property, which turned into criminal charges against him." (Doc. 247 at 9-10.) He thus contends that "there is a clear, unbroken causal chain" between the actions of the Greensboro Defendants and his damages arising from his criminal charges that presents an issue for the jury. (<u>Id.</u>) He does not dispute that his claims

29

would otherwise be limited to nominal damages. (See id.) In reply, the Greensboro Defendants note that this court has already relied on Townes and contend the court rejected White's damages argument when it held that "the exclusionary rule and the fruit of the poisonous tree doctrine simply do not apply in civil cases." (Doc. 248 at 13 (quoting Doc. 82 at 21-22).) They further contend that, even if the court were to accept White's proximate cause argument for damages related to his subsequent arrest, "at least two intervening and superseding causes break the causal chain between the alleged illegal search and Plaintiff's alleged damages: (1) SBI's independent decision to charge White, and (2) White's inculpatory acts that led to probable cause for those charges." (Id. at 14 n.3 (citing Evans v. Chalmers, 703 F.3d 636, 647 (4th Cir. 2012)).)

Section 1983 creates tort liability "in favor of persons who are deprived of 'rights, privileges, or immunities secured' to them by the Constitution." Memphis Community School District v. Stachura, 477 U.S. 299, 305-06 (1986) (quoting Carey v. Piphus, 435 U.S. 247, 253 (1978)). Section 1983 damages are intended to compensate an individual for the injuries suffered as a result of a constitutional violation. Id. at 306. "Where no injury [is] present, no 'compensatory' damages [can] be awarded." Id. at 308.

White's present Fourth Amendment damage claim is predicated on the use of incriminating evidence gained from an allegedly

unconstitutional search.  To be sure, the "use of fruits of a past unlawful search or seizure works no new Fourth Amendment wrong." United States v. Leon, 468 U.S. 897, 906 (1984) (quotations and alteration omitted); see Lingo v. City of Salem, 832 F.3d 953, 960 (9th Cir. 2016) ("[N]othing within the fruit-of-the-poisonous-tree doctrine suggests that an officer must ignore facts that would give him probable cause to arrest a person merely because those facts were procured through an unlawful search.").  White fails to identify, and the court is unaware of, any Fourth Circuit decision that has held that the fruit of the poisonous tree doctrine applies in a § 1983 claim.  On the contrary, the Fourth Circuit has affirmed district court opinions that have held otherwise.  See, e.g., Ware v. James City County, Virginia, 652 F. Supp. 2d 693, 705 (E.D. Va. 2009), aff'd sub. nom., Ware v. James City County, Virginia, 380 F. App'x 274 (4th Cir. 2010) (unpublished); White v. Smereka, No. 3:09-CV-00257-W, 2010 WL 2465552, at *4 (W.D.N.C. June 14, 2010), aff'd, 410 F. App'x 714 (4th Cir. 2011) (unpublished) (same, citing Hector v. Watt, 235 F.3d 154 (3d Cir. 2000)).[9]  Thus, as this court has already held, "it is clear that the exclusionary rule and the fruit of the poisonous tree doctrine simply do not apply in civil cases."  (Doc. 82 at 21-22.)  See

---

[9] While the Fourth Circuit does not accord precedential value to its unpublished opinions, it has noted that "they are entitled only to the weight they generate by the persuasiveness of their reasoning."  See Collins v. Pond Creek Mining Co., 468 F.3d 213, 219 (4th Cir. 2006) (citation omitted).

also Martin v. Marinez, 934 F.3d 594, 599 (7th Cir. 2019) ("[T]he fact that the evidence was the fruit of an illegal detention does not make it any less relevant to establishing probable cause for the arrest because the exclusionary rule does not apply in a civil suit under § 1983 against police officer."); Lingo v. City of Salem, 832 F.3d 953, 960 (9th Cir. 2016) (joining other circuits in "rejecting [§ 1983 plaintiff]'s suggestion that probable cause to arrest may be supported only by information that was obtained in accordance with the Fourth Amendment"); Machado v. Weare Police Department, 494 Fed. App'x 102, 106 (1st Cir. 2012) (unpublished) (per curiam) (noting that evidence arguably seized in violation of the Fourth Amendment "is not subject to the exclusionary rule" in civil proceedings "and amply provides probable cause to justify [plaintiff's] arrest" (citing United States v. Calandra, 414 U.S. 338, 348 (1974) ("[S]tanding to invoke the exclusionary rule has been confined to situations where the Government seeks to use such evidence to incriminate the victim of the unlawful search.")); Ali v. Gonzales, 440 F.3d 678, 681 (5th Cir. 2006) ("The Supreme Court has never applied the exclusionary rule to civil cases, state or federal." (citation omitted)).

White also relies on Train v. City of Albuquerque, 629 F. Supp. 2d 1243 (D.N.M. 2009), to argue that he can recover damages resulting from his later criminal charges arising from the evidence seized during the March 6 search. (Doc. 247 at 10-11.) In Train,

32

the district court granted the plaintiff's motion in limine, holding that a plaintiff raising a constitutional claim based on an illegal search may be permitted to introduce evidence and recover damages for post-indictment proceedings if the constitutional deprivation proximately caused the damages. Judge Browning concluded that, in addition to protecting privacy, the Fourth Amendment had been described in the Tenth Circuit as protecting "'liberty, property, and privacy interests — a person's sense of security and individual dignity.'" Id. at 1252 (quoting Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1196 (10th Cir. 2001)). Judge Browning opined that the Tenth Circuit did not "take such a narrow view of the Fourth Amendment" as the Second Circuit in Townes and concluded that "criminal charges, federal detention, and all of the negative consequences of those charges and attendant to federal custody" implicated those broader interests of the Fourth Amendment. Id. As "[federal] imprisonment occasioned economic losses," the court reasoned, "[s]uch losses should be compensable, given that they implicate the interests that the Tenth Circuit has explained the Fourth Amendment protects." Id.

The Fourth Circuit has not directly addressed whether wrongful arrest damages can be recovered for a Fourth Amendment violation predicated on a trespass violation, applying a proximate cause analysis. However, Townes is persuasive, as "[t]he goal of

the Court's § 1983 jurisprudence has been to tailor liability to fit the interests protected by the particular constitutional right in question." 176 F.3d at 148 (citing Carey, 435 U.S. at 258). Here, like the plaintiff in Townes, there is a "gross disconnect" between White's claimed constitutional violation (to be free from unreasonable searches and seizures) and his alleged damages (the cost of post-indictment proceedings). Id. Indeed, "[t]he evil of an unreasonable search or seizure is that it invades privacy, not that it uncovers crime, which is no evil at all." Id.

The Fourth Circuit's favorable citation to Townes, moreover, certainly suggests that the court is not disapproving of the analysis. See Evans v. Chalmers, 703 F.3d 636, 647 (4th Cir. 2012) (citing Townes and noting that "constitutional torts, like their common law brethren, require a demonstration of both but-for and proximate causation"). In addition, the rationale in Townes has been adopted by at least two other circuits. See Martin, 934 F.3d at 605-06; Hector v. Watt, 235 F.3d 154 (3d Cir. 2000), as amended (Jan. 26, 2001) (holding that victims of unreasonable searches or seizures may not seek recovery from injuries that result from the discovery of incriminating evidence and consequent criminal prosecution). Townes has also been cited repeatedly by district courts within the circuit when assessing civil damages for Fourth Amendment violations. See, e.g., Vaughn v. Whitfield, No. 8:12-CV-2405-RMG, 2013 WL 5144751, at *20 (D.S.C. Sept. 12, 2013)

(dismissing plaintiff's claim of unreasonable search and seizure under § 1983 on summary judgment "as Plaintiff has not pled or proven any actionable injury based on either alleged unlawful search"); Cullins v. Sumter City Police Department, No. CIV.A. 8:10-264, 2011 WL 291252, at *7 (D.S.C. Jan. 4, 2011), report and recommendation adopted sub nom. Cullins v. Sumter Police Department, No. 8:10-CV-264-RMG, 2011 WL 291249 (D.S.C. Jan. 27, 2011) (same); Tinsley v. Singleton, No. CIV.A.8:08CV532SB, 2009 WL 764877, at *12 (D.S.C. Mar. 23, 2009), on reconsideration, No. 8:08-CV-532-SB, 2010 WL 3282973 (D.S.C. Aug. 18, 2010). As discussed above, this court has also relied on Townes in a previous order. (See Doc. 82 at 21-22.) Thus, as a victim of an unreasonable search or seizure, White "may recover damages for physical injury, property damage, injury to reputation, etc." but he "cannot be compensated for injuries that result from the discovery of incriminating evidence and consequent criminal prosecution." Townes, 176 F.3d at 148.

The Greensboro Defendants' motions for summary judgment contend that White has not pleaded any compensable damages. (See, e.g., Doc. 234 at 12-15, 14 n.4.) To the extent that White's second amended complaint alleges damages which "include but are not limited to" deprivation of his belongings and his child, and monies spent to regain custody of his child, to defend false charges, and to compensate for the loss of health insurance -- all

35

arising out of his criminal charges, the Greensboro Defendants are correct. (Doc. 81 ¶ 182.) However, White seeks damages "in excess of $25,000," and his prayer for relief is not limited to the specific damages mentioned. The Greensboro Defendants contend that even nominal damages are unrecoverable as a matter of law. (Doc. 234 at 12-15, 14 n.4.) See Heck v. Humphrey, 512 U.S. 477, 487 n.7 (1994) ("In order to recover compensatory damages, however, the § 1983 plaintiff must prove not only that the search was unlawful, but that it caused him actual, compensable injury."). However, the Supreme Court recently explained that "a request for nominal damages satisfies the redressability element of standing where a plaintiff's claim is based on a completed violation of a legal right" where "nominal damages were available at common law in analogous circumstances." Uzuegbunam v. Preczewski, 141 S. Ct. 792, 801-02 (2021). This is consistent with this court's previous holding as to the § 1983 claim against Defendant James Stalls, that "even if Defendants are correct that White cannot show any compensatory damage . . . Defendants [Guilford County Sheriff's Office] acknowledge that he would nevertheless be entitled to nominal damages." (Doc. 82 at 18 (citing Carey v. Piphus, 435 U.S. 247, 266-67 (1978) (holding that students suing school officials under Section 1983 were, absent proof of actual injury, entitled to recover nominal damages for violations of their procedural due process)).) See Snider v. Skarban, No. 22-C-25,

36

2022 WL 684848, at *4 (E.D. Wis. Mar. 8, 2022) (holding that "plaintiffs may proceed in this lawsuit [for Fourth Amendment violation claims] for nominal and punitive damages only" (citing Uzuegbunam, 141 S. Ct. at 801); Roberts v. Carroll, No. 4:18-CV-04-SKL, 2021 WL 5139505, at *4 (E.D. Tenn. Nov. 3, 2021) ("The Court concludes Plaintiff is entitled to seek and receive nominal damages if he establishes Defendant Liles used excessive force but fails to establish actual damages." (citing Uzuegbunam, 141 S. Ct. at 800, 802)); Nouri v. Manzella, No. 17-12322, 2019 WL 4278168, at *6 (E.D. Mich. Sept. 10, 2019) ("[P]laintiffs may recover nominal damages for claims asserting [Fourth Amendment] constitutional violations pursuant to 42 U.S.C. § 1983, even where they fail to prove actual damages.").

Thus, the court need not now decide the scope of White's recoverable damages, as it is sufficient to conclude that the Greensboro Defendants' argument that White is entitled to no damages is incorrect. Accordingly, the Greensboro Defendants' motions for partial summary judgment on the issue of damages for the § 1983 claim will be granted to the extent White seeks damages flowing from his alleged wrongful arrest and filing of criminal charges for theft of GPD property but will otherwise be denied.[10]

---

[10] To state the obvious, White cannot seek damages against the Greensboro Defendants for criminal charges unrelated to the Greensboro Defendants' March 6 search.

## III. CONCLUSION

For the reasons stated,

IT IS THEREFORE ORDERED that the motions for summary judgment as to White's § 1983 claim (Eighth Cause of Action) by Greensboro Defendants Raines (Doc. 233) and Barham (Doc. 235) on the basis of qualified immunity are DENIED, that the motion for summary judgment as to Greensboro Defendant Williamson (Doc. 237) on the basis of qualified immunity is GRANTED as to his initial entry into White's home but DENIED as to the entry into White's safe, and that the motions for summary judgment as to Greensboro Defendants Lowe (Doc. 239), Sigmon (Doc. 241), Schwochow (Doc. 243), and Albert (Doc. 245) on the basis of qualified immunity are GRANTED.

IT IS FURTHER ORDERED that the Greensboro Defendants' motions for summary judgment as to damages for White's § 1983 claim (Eighth Cause of Action) by Greensboro Defendants Raines (Doc. 233), Barham (Doc. 235), and Williamson (Doc. 237) is GRANTED IN PART and DENIED IN PART as set forth herein.


　　　　　　　　　　　　　　　　　/s/　　Thomas D. Schroeder
　　　　　　　　　　　　　　　　United States District Judge

June 22, 2022