IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

WILLIAM Z. WHITE,            )
                             )
            Plaintiff,       )
                             )
      v.                     )      1:18-cv-00969
                             )
THE CITY OF GREENSBORO, et   )
al.,                         )
                             )
            Defendants.      )

## <u>MEMORANDUM OPINION AND ORDER</u>

THOMAS D. SCHROEDER, Chief District Judge.

This lawsuit arises out of the arrest and firing of Plaintiff William White, a former Greensboro Police Department officer, after he was investigated for illegal activity stemming from the theft of several commercial-grade lawn mowers. After the criminal charges against White were dismissed, he brought this case alleging numerous violations of both federal and North Carolina law against multiple Defendants across four law enforcement agencies. The court has resolved several dispositive motions (Docs. 82, 161, 228, and 251) and as a result the claims have been substantially narrowed. What remain are White's claims alleging violation of 42 U.S.C. § 1983 and North Carolina trespass law against officers of the Greensboro Police Department ("GPD") -- Johnny Raines, Jr., William Barham, and Brian Williamson ("Greensboro Defendants") -- for a warrantless search of his home on March 6, 2017; trespass

against Defendant James Stalls for his entry into White's garage and view of a mower covered with a tarp on September 3, 2016; and trespass against Defendant City of Reidsville ("Reidsville") for Reidsville Police Department Sergeant Lynwood Hampshire's "knock and talk" at White's house door inside his garage on November 2, 2016. (Doc. 81.) Before the court are multiple pre-trial motions in limine filed by the parties in anticipation of trial. For the reasons set forth below, the motions will be granted in part and denied in part.

## I. BACKGROUND

### A. Facts

The background of this case is extensively set out most recently in this court's prior amended memorandum opinion and order. White v. City of Greensboro, 532 F. Supp. 3d 277 (M.D.N.C. Apr. 5, 2021). Relevant facts will be discussed as pertinent to these motions.

In short, White was a police officer for the GPD from April 2009 until March 6, 2017. (Doc. 111-1 ¶ 3.)[1] On August 22, 2016, the Reidsville Police Department ("RPD") received a report that several commercial-grade lawn mowers were stolen from Scott's Tractor, an equipment dealer in Reidsville, North

---

[1] All citations to the record are to ECF docket page or paragraph number except for testimony, which is cited to the deposition transcript page and line.

2

Carolina. (Doc. 140-1.) RPD Lieutenant Shannon Coates responded to the report and assigned RPD Sergeant Lynwood Hampshire to investigate. (Id.; Doc. 140-2 at 16:16-20.) Hampshire would serve as the lead investigator for the duration of the investigation. (Doc. 140-2 at 17:1-3.)

### 1. September 3, 2016 alleged trespass by Stalls

On September 3, 2016, Defendant James Stalls -- who is Plaintiff's step-brother as well as brother-in-law, and a deputy with the Guilford County Sheriff's Office ("GCSO") -- and his wife, Brittany, went to the Whites' house to care for the Whites' dogs while the Whites were away. (Doc. 128-2 at 23:21-24:18.) Upon entering the garage where the dog food was kept, Stalls noticed a John Deere mower with a sheet over the seat. (Id. at 23:5-11, 25:25-26:5.) He removed the sheet, sat on the seat, and photographed the mower's vehicle identification number, also known as the serial number. (Id. at 26:6-27:8; Doc. 128-3 at 5.)

Several days later, and suspecting the mower might be stolen, Stalls checked the mower's model number against a police database. (Doc. 128-3 ¶ 7.) Stalls says he did this because White told him he got it from another police officer, the mower looked brand new, and the asking price was half the mower's value. (Doc. 128-2 at 29:4-23.) Stalls's research reflected that the mower had been reported stolen by the RPD. (Id. at

3

30:3-6.) Stalls then called his stepmother, Anita Holder -- who is White's mother and a former GPD police officer, including interim chief of police -- for guidance. (Id. at 30:8-9; Doc. 111-2 ¶¶ 7-10.) Holder told Stalls to confront White about the mower, which Stalls did via text message and a phone conversation on September 19. (Docs. 128-2 at 30:11-31:5; 128-3 ¶¶ 7-9.)

### 2. October 7, 2016 alleged trespass by Hampshire

On October 7, Hampshire received a call from a couple, the Terrys, who reported they had recently bought a mower from White and who expressed concern about the possibility it had been stolen. (Doc. 140-3 at 1.) On November 2, Hampshire went to the GCSO headquarters to meet GCSO Deputy Homer Wilkins, who had been directed by his supervisor to assist, so the two of them could investigate by conducting a "knock and talk" at White's house to speak with him informally. (Id. at 2; Doc. 128-7 ¶ 12.) Upon arriving at White's house, Hampshire and Wilkins knocked on the front door, but no one answered. (Doc. 140-2 at 79:14-18.) Hampshire testified that he noticed cobwebs on the front door and believed it "[did] not look like the primary way they go in and out of the house," so he saw the open garage door and what he viewed as a "clear path" to another door to the house that was "well used," knocked on that door, and again no one answered. (Id. at 79:18-80:14.) He pushed what he thought

4

was a doorbell, only to learn it was a garage door button, so he pushed it again to maintain the open garage door, left his business card on the door inside the garage, and left. (Id.) During this time, Wilkins stayed on the driveway and did not enter the garage. (Id. at 134:18-22.) According to White and his wife, Christina, the Whites do not ordinarily use the garage door to enter or exit their home. (Docs. 151-1 at 110:23-24; 151-2 at 77:3-6.)

Prior to conducting a knock and talk at White's residence, Hampshire learned that White was a GPD police officer. (Docs. 140-2 at 18:3-9; 140-9 at 27:16-28:22.) Hampshire later spoke with Lieutenant Coates, his supervisor, who advised him to contact the North Carolina State Bureau of Investigation ("SBI") and GPD's Professional Standards Division. (Doc. 140-2 at 18:3-9.) The SBI was contacted because it is standard practice for the SBI to be involved when a police officer is a suspect in an investigation. (Doc. 140-8 at 170:5-171:3.)

### 3. March 6, 2017 GPD search Greensboro Defendants

Several months later on March 5, 2017, following an investigation, Hampshire applied for and obtained a warrant from a state magistrate to search two of White's residences. (Doc. 140-12.) Also on March 5, the investigating agencies[2] informed

---

[2] Chief Scott's declaration did not identify which agencies informed

5

GPD Chief Wayne Scott that they had probable cause to arrest White for felony possession of stolen property and felony obtaining property by false pretenses, that the agencies were in the process of obtaining search warrants for White's residences, and that they planned to arrest White on March 6. (Doc. 103-1 ¶ 9.) The investigating agencies had updated Scott during their investigation, and GPD's Professional Standards Division was also investigating White's possible involvement in the mower thefts. (Id. ¶ 6.) Scott agreed that the agencies had probable cause to arrest White and decided to terminate White's employment with GPD. (Id. ¶¶ 10-11.)

On the morning of March 6, Hampshire conducted a briefing at SBI's Greensboro office prior to executing the search warrants. Present were members from the SBI, Burlington Police Department ("BPD"), GCSO, and the Randolph County Sheriff's Office. (Doc. 140-13 at 1.) Hampshire had prepared an operations plan, which was reviewed by his supervisor, Lieutenant Coates, outlining the execution of the search warrants. (Docs. 140-2 at 89:19-23; 139.) Also that morning, White was arrested at work, charged with various crimes, and terminated from his employment with GPD as a result. (Doc. 103-1 ¶¶ 18-19.)

---

him that probable cause existed to arrest White.

At about 8:00 a.m., the RPD and SBI executed the search warrant at White's primary residence. Present at the start of the search were two agents from the RPD, including Hampshire as the officer in charge, and two agents from the SBI. (Doc. 139 at 7.) When the officers arrived at White's house, the only persons present in the home were White's wife Christina, the Whites' daughter, and Holder. (Doc. 137-7 at 7:23-8:10.) Hampshire allowed Holder to leave with the Whites' daughter. (Id.; Doc. 140-2 at 95:22-96:9.) The search officers proceeded to search the residence. They discovered a John Deere Gator and trailer in White's garage. The Gator was reported as stolen from Wake County, North Carolina, in November 2016. (Doc. 140-13 at 2, 11.) The officers were unable to find a vehicle identification number for the trailer, which appeared to have been scratched off. (Id.) Both the Gator and trailer were seized and towed to the RPD impound lot. (Id.)

Hampshire's operations plan directed that, upon discovery of any GPD equipment or property, Hampshire was to notify RPD Lieutenant Coates, who would in turn notify the GPD to come to White's house to retrieve the property. (Docs. 139 at 11; 140-2 at 87:13-23.) And that is what happened. The investigating officers discovered GPD equipment at White's house, Hampshire notified Lieutenant Coates, and Coates notified the GPD to come to collect the property. (Docs. 139-1 at 3; 140-2 at 87:13-18.)

At about 10:00 a.m., Defendant Johnny Raines, GPD Lieutenant, was directed by a superior to go to White's house to pick up GPD-issued equipment. (Doc. 137-10 at 15.) Raines was a member of Resource Management, the GPD division that keeps track of GPD equipment. (Doc. 137-11 at 79:3-9.) According to several GPD Defendants, it is standard practice for GPD to attempt to collect issued equipment as soon as possible after an officer leaves the department. (Docs. 137-10 at 15; 137-12 at 3.) Raines directed Defendant William Barham, GPD Sergeant, to accompany him. (Doc. 137-12 at 3.) When both officers arrived, Raines looked into an open garage and noticed what appeared to be GPD equipment. (Doc. 137-10 at 15.) Officers from the SBI and RPD escorted Raines and Barham to the master bedroom where they both observed additional GPD equipment. (Id.; Doc. 137-12 at 4.) Sometime thereafter, Raines went to the living room where Christina White was sitting and asked her if they could collect GPD property.[3] (Doc. 137-10 at 16.) While Raines says Christina White "stated that we could collect and remove the property," (id.), Christina White testified that she never gave Raines permission to look for GPD equipment and that he was

---

[3] Barham believes the conversation between Raines and Christina White may have occurred prior to Raines and Barham entering the master bedroom. (Doc. 236-2 at 22:13-18, 24:3-6.) That contradicts Raines's account. (See Doc. 234-2 at 22:15-21, 23:5-9; Doc. 157-1 ¶ 9.)

already searching for the equipment before he spoke to her (Doc. 152-2 at 17:21-18:3).

Shortly thereafter, Defendant Brian Williamson, GPD Sergeant, arrived at White's house. (Docs. 137-10 at 16; 137-14 at 4.) Williamson was the team leader for GPD's Special Response Team ("SRT"), of which White was a member prior to his termination. (Doc. 137-14 at 3.) Because it was unlikely that a non-SRT member could identify SRT equipment, Williamson reported to White's house to identify GPD's SRT equipment.[4] (Id. at 4.) While looking for White's uniform, Williamson overheard that RPD could not open a floor safe in the master bedroom. (Doc. 238-2 at 19:5-17; Doc. 137-14 ¶ 9.) Williamson asked Christina White for the combination, but she said she did not know it. (Doc. 238-2 at 20:9-25.) Williamson then called a former instructor who was a master locksmith who provided Williamson with the factory combination to open the safe. (Id.)

During the search, apparently after Raines found a GPD vest with his wife's name on it and knowing that his wife had left the GPD, Raines believed "[t]here was credible evidence that [White] had GPD property that he should not possess." (Doc. 137-12 at 4.) Unnamed GPD officers reviewed Hampshire's search

---

[4] Williamson subsequently ordered GPD Detective Jason Lowe, who was the sniper team lead on GPD's SRT, to come to White's house to identify any SRT sniper equipment White may have had. (Doc. 137-15 at 4.)

9

warrant and concluded it would cover their equipment to permit them to proceed. (Doc. 140-2 at 124:2-14.) Raines informed the SBI and RPD and contacted his command staff to notify them that he believed White may have stolen GPD property. (Doc. 137-10 at 17.) In response, GPD's Property Crimes division ordered more GPD officers to arrive throughout the morning. (Docs. 137-18 ¶ 9; 137-20 ¶ 5; 137-21 ¶ 9.)

Eventually, all criminal charges against White, pending in Alamance and Guilford Counties as well as in this federal court, were dismissed. (See Doc. 81 ¶ 98.)

**B. Procedural History**

The case is set for trial in September 2022, and the parties filed several motions in limine. (See Docs. 182, 185, 192, 197, 199, 201, 203.) The court directed the parties to meet and confer to resolve or narrow their evidentiary disputes. (Doc. 252 at 1.) The parties responded, noting resolution of some motions. (See id. at 2-5.) Additionally, on July 26, the Greensboro Defendants withdrew their previous motion in limine (Doc. 197) in order to file a replacement motion in limine (Doc. 255) that advances the same arguments but also includes the § 1983 Fourth Amendment claim the court re-instated in the interim. (Doc. 257.) Because this motion advances the same arguments as the previous motion, response and reply briefs are not necessary for decision. See, e.g., Baucom v. Doall Co., No.

10

317CV00242MOCDSC, 2017 WL 11578197, at *1 n.1 (W.D.N.C. July 5, 2017); Green v. Cafe, No. 4:04CV111H(2), 2008 WL 7871054, at *1 (E.D.N.C. Dec. 1, 2008), aff'd sub nom., Green v. Maroules, 328 F. App'x 868 (4th Cir. 2009) ("The court finds that defendants' response is not necessary to the court's adjudication of these motions and, therefore, issues its ruling prior to expiration of defendants' response time.").

## II. ANALYSIS

### A. Motions to Sever

Defendants Stalls and Reidsville separately move for separate trials pursuant to Federal Rules of Civil Procedure 20, 21, and 42. (Docs. 182, 185.) White has responded to each motion (Docs. 218, 222), and Defendants have replied (Docs. 229, 231).

Federal Rule of Civil Procedure 20(a) governs permissive joinder of parties. Rule 20(a)(1) permits persons to be joined as plaintiffs if "they assert any right to relief jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences;" and "any question of law or fact common to all plaintiffs will arise in the action." Fed. R. Civ. P. 20(a)(1). Similarly, Rule 20(a)(2) provides that persons may be joined as defendants in one action if "(A) any right to relief is asserted against them jointly, severally, or in the alternative with

11

respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or fact common to all defendants will arise in the action." Fed. R. Civ. P. 20(a)(2). "The United States Supreme Court has articulated that 'the impulse is toward the broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties and remedies is strongly encouraged.'" Todd v. Cary's Lake Homeowners Ass'n, 315 F.R.D. 453, 456 (D.S.C. 2016) (quoting United Mine Workers of America v. Gibbs, 383 U.S. 715, 724 (1966)). Further, the Fourth Circuit has explained that "Rule 20 gives courts wide discretion concerning the permissive joinder of parties." Aleman v. Chugach Support Services, Inc., 485 F.3d 206, 218 n.5 (4th Cir. 2007); see Saval v. BL Ltd., 710 F.2d 1027, 1031 (4th Cir. 1983) (explaining that Rule 20 "should be construed in light of its purpose, which is to promote trial convenience and expedite the final determination of disputes, thereby preventing multiple lawsuits" (citation omitted)).

Federal Rule of Civil Procedure 21 addresses misjoinder of parties and provides that the court "may . . . sever any claim against a party." Fed. R. Civ. P. 21. Commonly, Rule 21 is invoked to sever parties improperly joined or where "venue is improper as to some but not all defendants." See C.L. Ritter Lumber Co., Inc. v. Consolidation Coal Co., 283 F.3d 226 (4th

12

Cir. 2002); Sehler v. Prospect Mortgage, LLC, 2013 WL 6145705, at *2 (E.D. Va. Nov. 21, 2013); see also 7 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1689 (3d ed. 2022). "However, even where the parties are appropriately joined and venue is proper, a court may sever any claim and proceed with it separately or transfer it to a more convenient forum." RAI Strategic Holdings, Inc. v. Altria Client Services LLC, No. 1:20-CV-00393-LO, 2020 WL 6882646, at *2 (E.D. Va. Sept. 3, 2020); see Sykes v. Bayer Pharmaceuticals Corp., 548 F. Supp. 2d 208, 218 (E.D. Va. 2008) ("[A] court may 'deny joinder if it determines that the addition of the party under Rule 20 will not foster the objectives of the rule, but will result in prejudice, expense, or delay.'" (quoting Aleman, 485 F.3d at 218 n.5)). Courts in the Fourth Circuit weigh multiple factors to determine whether to sever claims under Rule 21:

> (1) whether the issues sought to be tried separately are significantly different from one another; (2) whether the separable issues require different witnesses and different documentary proof; (3) whether the party opposing severance will be prejudiced if it is granted; and (4) whether the party requesting severance will be prejudiced if the claims are not severed.

Altria Client Services, 2020 WL 6882646, at *2 (citing Equal Rights Center v. Equity Residential, 483 F. Supp. 2d 482, 489 (D. Md. 2007)) (collecting cases). Additionally, courts consider "(5) fundamental fairness, (6) judicial economy, (7)

13

undue delay, and (8) the dual threat of duplicative litigation and inconsistent verdicts." Moulvi v. Safety Holdings, Inc., No. 3:20CV595, 2021 WL 4494191, at *6 (E.D. Va. Sept. 30, 2021) (citation omitted). Because "Supreme Court precedent and pertinent cases within the Fourth Circuit establish that courts should favor joinder of parties within a single case[,] . . . Rule 21 discretion to sever should be exercised sparingly." Id. (citations omitted); Altria Client Services, 2020 WL 6882646, at *2 (collecting cases); see United Mine Workers of America v. Gibbs, 383 U.S. 715, 724 (1966).

Additionally, Federal Rule of Civil Procedure 42(b) permits a court, for convenience, to avoid prejudice, or to expedite and economize, to separate issues to be presented at trial. Fed. R. Civ. P. 42(b). "[T]he granting of separate trials is within the sound discretion of the trial judge." Bowie v. Sorrell, 209 F.2d 49, 51 (4th Cir. 1953); see White v. Bloomberg, 501 F.2d 1379, 1385 (4th Cir. 1974) ("We hold that the district courts are free to tailor an appropriate procedure to fit the facts and the pleadings and to select what seems best for a given case."). Because "a single trial will be more expedient and efficient," F & G Scrolling Mouse, L.L.C. v. IBM Corp., 190 F.R.D. 385, 387 (M.D.N.C. 1999), "[i]n civil cases, bifurcation is the exception, not the rule," Gonzalez v. SeaWorld Parks & Entertainment LLC, No. 4:20CV27 (RCY), 2021 WL 3173574, at *1

14

(E.D. Va. July 27, 2021) (quoting <u>Mt. Hawley Ins. Co. v. Adell</u> <u>Plastics, Inc.</u>, Civ. No. JKB-17-00252, 2019 WL 2360929, at *3 (D. Md. June 4, 2019)); <u>see</u> <u>Response of Carolina, Inc. v. Leasco</u> <u>Response, Inc.</u>, 537 F.2d 1307, 1323-24 (5th Cir. 1976) ("[S]eparation of issues [under Rule 42(b)] is not the usual course that should be followed." (citation omitted)). Ultimately, the moving party bears the burden of convincing the court that bifurcation "will (1) promote greater convenience to the parties, witnesses, jurors, and the court, (2) be conducive to expedition and economy, and (3) not result in undue prejudice to any party." <u>F & G Scrolling Mouse</u>, 190 F.R.D. at 387; <u>accord</u> <u>Toler v. Government Employees Insurance Co.</u>, 309 F.R.D. 223, 225 (S.D. W. Va. 2015).

"[B]ifurcation may be appropriate where . . . the litigation of the first issue might eliminate the need to litigate the second issue, or where one party will be prejudiced by evidence presented against another party." <u>Amato v. City of</u> <u>Saratoga Springs</u>, 170 F.3d 311, 316 (2d Cir. 1999) (citations omitted); <u>see</u> <u>Saint John's African Methodist Episcopal Church v.</u> <u>GuideOne Specialty Mutual Insurance Co.</u>, 902 F. Supp. 2d 783, 788 (E.D. Va. 2012) (bifurcating insurance coverage and bad faith claims because "[a]ny reference to [insurer's] alleged bad faith in denying [insured's] insurance claim or failing to pay [insured] under the insurance policy, as well as any evidence

15

offered solely to establish such bad faith, would serve only to prejudice the jury"). "Merely presenting some proof which supports bifurcation is not enough" to satisfy this burden. F & G Scrolling Mouse, 190 F.R.D. at 387. "In addition, at least one other Circuit has cautioned that a 'court should not bifurcate claims unless the issue to be tried separately is so distinct and separate from the others that a trial of it alone may be had without injustice.'" Light v. Allstate Insurance Co., 182 F.R.D. 210, 213 (S.D.W. Va. 1998) (quoting McDaniel v. Anheuser-Busch, Inc., 987 F.2d 298, 305 (5th Cir. 1993)).

Both Stalls and Reidsville argue that the court should hold separate trials pursuant to Rules 20, 21, and 42. (See Doc. 183 at 1 (arguing that the court should order separate trials pursuant to Rules 20(b) and 42(b)); Doc. 186 at 9-21 (arguing that the "parties are not properly joined" for trial and the court should sever Reidsville's trespass claim "pursuant to Rules 20, 21, and 42"); see Doc. 231 (Defendant Reidsville: arguing for separate trials without relying on a particular rule).) However, there is a significant distinction between severing claims into separate actions under Rule 21 and ordering separate trials for different claims or issues under Rule 42(b). See Gaffney v. Riverboat Services of Indiana, Inc., 451 F.3d 424, 441-42 (7th Cir. 2006). Severing claims under Rule 21 "creates two discrete, independent actions, which then proceed

16

as separate suits for the purpose of finality and appealability." Id. at 441; Herklotz v. Parkinson, 848 F.3d 894, 898 (9th Cir. 2017) ("When a claim is severed, it becomes an entirely new and independent case."); E.S. v. Independent School District, No. 196 Rosemount-Apple Valley, 135 F.3d 566, 568 (8th Cir. 1998) (same); United States v. O'Neill, 709 F.2d 361, 368 (5th Cir. 1983) (same). In contrast, ordering separate or joint trials under Rule 42 has no bearing on whether claims are severed into separate actions or joined into one action. See McDaniel, 987 F.2d at 304 n.19 (noting that "this distinction, clear enough in theory, is often obscured in practice since at times the courts talk of separate trial and severance interchangeably" (citation omitted)).

Generally, district courts should bifurcate claims under Rule 42(b), rather than sever them under Rule 21, when they "are factually interlinked, such that a separate trial may be appropriate, but final resolution of one claim affects the resolution of the other." Gaffney, 451 F.3d at 442. In contrast, courts sever claims under Rule 21 where the claims are "discrete and separate" and "one claim must be capable of a resolution despite the outcome of the other claim." Id.; see, e.g., Reinholdson v. Minnesota, 346 F.3d 847, 850 (8th Cir. 2003) (holding that, because the "trials of [the] individual claims may expose issues of systemic violation that would cause

17

the district court to reconsider its decision to dismiss plaintiffs' claims against the State defendants in their entirety," severance under Rule 21 was inappropriate; instead construing the district court's order as an order for separate trials under Rule 42(b), such that the individual claims may not be appealed until "a final judgment has been rendered in the entire action").

Stalls and Reidsville each contend that they will suffer from undue prejudice, jury confusion, and delay without severance. (Doc. 183 at 3-8; Doc. 186 at 16-21.) Reidsville further argues that White's trespass claims against it is improperly joined because the claims do not arise out of the same transaction or occurrence as the other claims and the claims do not involve common questions of law or fact. (Doc. 186 at 9-16.) In response, White argues that severance would harm judicial economy and be prejudicial. (Doc. 218 at 6-9; Doc. 222 at 8-11.) Additionally, in response to Reidsville, White contends that the claims constitute the "same transaction or occurrence," and have common questions of law and fact, because they are all trespass claims related to the criminal investigation into him. (Doc. 222 at 6-7.) In reply, Stalls and Reidsville maintain that there is no "evidentiary overlap" or "cohesive story" tying the remaining claims together, as White's conspiracy claims were dismissed and they will be

18

prejudiced by unrelated damages claims and jury confusion. (Doc. 229 at 2-7; Doc. 231 at 2-6.)

The court will first address Reidsville's motion for severance under Rule 21.

### 1. Reidsville's Rule 21 motion for severance

Upon weighing the relevant factors governing severance under Rule 21, the court will deny Reidsville's motion to sever the claims into separate actions.

The first factor, "whether the issues sought to be tried separately are significantly different from one another," Altria Client Services, 2020 WL 6882646, at *2 (citation omitted), weighs against severance. The present case involves three sets of Defendants (Stalls, Reidsville, and the Greensboro Defendants). Although the claims against each arise from different conduct on different dates from different individuals, they all relate to alleged trespass on White's property, and thus the issues sought to be tried do not "significantly" differ from one another. For example, Stalls and the Greensboro Defendants both rely on a defense of consent from the Whites to enter their home, and Reidsville and the Greensboro Defendants both present factual questions involving actions by police officers. In addition, two of these events occurred during the pendency of a criminal investigation into White. And while the details of the criminal claims will not be relevant to this

19

case, the <u>fact</u> that there was a criminal investigation during the November 2, 2016 and March 6, 2017 incidents is potentially relevant to the actions of more than one Defendant. For example, the jury will need to understand in a general way why Hampshire was interested in conducting a "knock and talk" on November 2, 2016, and why the SBI and RPD were conducting a search of White's home on March 6, 2017, while the GPD officers were present.[5]

The next factor, "whether the separable issues require different witnesses and different documentary proof," <u>id.</u>, weighs in favor of severance. While some witnesses, such as the Whites, and evidence, such as details about their home, overlap across claims, the claims also involve totally unrelated evidence and witnesses and cover events that took place on separate occasions.

The third factor, "whether the party opposing severance will be prejudiced if it is granted," <u>id.</u>, weighs against severance. Severance would require White to try three separate cases, forcing him to rehash similar evidence and arguments, and would impose unnecessary separate timelines for case deadlines. Relatedly, the fourth factor, "whether the party requesting severance will be prejudiced if the claims are not severed,"

---

[5] Plaintiff will not be permitted to seek to put before the jury the details of his conspiracy and other claims the court has dismissed.

id., also weighs against severance. Reidsville has not
demonstrated that it will suffer significant prejudice by trying
its claims with any other Defendant. Further, Reidsville's
argument regarding the potential for juror confusion is not
persuasive. Courts regularly oversee cases involving far more
numerous parties, more complex facts, and even more dissimilar
issues among the parties. This case involves only one
Plaintiff, five remaining Defendants (including the three
Greensboro Defendants), and four remaining claims (two of which
seek federal and state liability founded on the same conduct)
that present relatively simple questions for the jury.

Finally, the remaining factors do not support severance.
"As a general rule, holding multiple trials when claims could be
consolidated in one trial is not conducive to judicial economy."
Altria Client Services, 2020 WL 6882646, at *6 (citation
omitted). Separate trials would require different jury
selections and multiple trials spread out over multiple days,
burdening the court's docket and forcing White to repeatedly
argue many of the same legal concepts, such as North Carolina
trespass law. Thus, the court finds, in light of "Supreme Court
precedent and pertinent cases within the Fourth Circuit [that]
establish that courts should favor joinder of parties within a
single case," Moulvi, 2021 WL 4494191, at *6, the adjudication
of White's claims in a single case will best conserve scarce

21

judicial resources, promote fundamental fairness, and prevent undue delay.

### 2. Rule 42 motions for separate trials

Defendants' motion for separate trials under Rule 42(b) fail for largely the same reasons. Here, separate trials would be a judicially inefficient use of the court's docket management. As discussed above, separate trials would require different juries and multiple trials spread out over several days. Additionally, Defendants' arguments regarding jury confusion is unpersuasive, as what remains are relatively simple claims, and determining whether each Defendant violated North Carolina trespass law when they entered White's home on separate occasions will not be difficult for a jury to assess. Further, separate trials would cause undue prejudice to White for the reasons discussed above.

In sum, the court finds that the Defendants have failed to carry their burden under either Rule 42 or Rule 21 and have not shown that separate trials or severance of claims is warranted. What remains in this case for trial are straightforward and relatively simple questions of trespass and an associated claimed violation of a constitutional right. This case does not warrant the transactional and administrative burdens of separate trials. Therefore, the court will deny Reidsville's motion to sever and Defendants' motions for separate trials, and this

action will proceed in a single trial.

**B. Motions to Exclude Evidence of Damages**

Stalls, Reidsville, and the Greensboro Defendants each move to exclude evidence of White's alleged compensatory and punitive damages. (<u>See</u> Docs. 192, 203, 255.)

**1. Compensatory damages**

Each Defendant argues that White should be precluded from introducing evidence of damages for trespass relating to civil claims this court has dismissed and criminal charges against him dismissed by other courts. (Doc. 193 at 2-12, 16-20; Doc. 204 ¶¶ 6-10; Doc. 256 at 7-12.) Such evidence includes evidence related to the criminal investigation into White, his arrest, the outcome of his criminal charges, criminal defense costs, child custody litigation expenses, his alleged conspiracy by the Defendants, emotional distress suffered as a result of his arrest and termination of his employment, and his lost wages, backpay, and other benefits from losing his employment. In response, White argues that the trespasses were the genesis of the subsequent criminal investigation, which caused the damages at issue. (Doc. 219 at 7-11; Doc. 220 at 6-8, 10-11; Doc. 221 at 6-8.)

"North Carolina courts have concluded that a trespasser 'is liable for all damage proximately resulting from his wrongful entry and, at least, for nominal damages.'" <u>Food Lion, Inc. v.</u>

_Capital Cities/ABC, Inc._, 964 F. Supp. 956, 960 (M.D.N.C. 1997)
(quoting _Smith v. VonCannon_, 197 S.E.2d 524, 528 (N.C. 1973));
_see Owens v. Blackwood Lumber Co._, 193 S.E. 219, 223 (N.C. 1937)
(measuring the "actual loss" of a trespass claim as "[t]he
decreased value of the property" (citation omitted)); _Bishop v._
_Reinhold_, 311 S.E.2d 298, 302-03 (N.C. App. Ct. 1984) (measuring
trespass damages as the difference in fair market value before
and after the trespass or the rental value of the trespassed
property).  North Carolina courts have defined proximate cause
as

> a cause which in natural and continuous sequence,
> unbroken by any new and independent cause, produced
> the plaintiff's injuries, and without which the
> injuries would not have occurred, and one from which a
> person of ordinary prudence could have reasonably
> foreseen that such a result, or consequences of a
> generally injurious nature, was probable under all the
> facts as they existed.

_Hampton v. Hearn_, 838 S.E.2d 650, 655 (N.C. Ct. App.), _review_
_denied_, 840 S.E.2d 787 (N.C. 2020) (citation omitted); _see Adams_
_v. Mills_, 322 S.E.2d 164, 173 (N.C. 1984) ("An efficient
intervening cause is a new proximate cause.  It must be an
independent force which entirely supersedes the original action
and renders its effect in the chain of causation remote.").
Proximate cause is generally a question of fact for the jury,
_Hampton_, 838 S.E.2d at 655 ("It is to be determined as a fact,
in view of the circumstances of fact attending it." (quoting

24

Conley v. Pearce-Young-Angel Co., 29 S.E.2d 740, 742 (N.C. 1944))), however "[i]f the evidence be so slight as not reasonably to warrant the inference [of causation], the court will not leave the matter to the speculation of the jury," id. (quoting Conley, 29 S.E.2d at 742); Johnson v. Ruark Obstetrics and Gynecology Associates, P.A., 365 S.E.2d 909, 915 (N.C. Ct. App. 1988), aff'd, 395 S.E.2d 85 (N.C. 1990) (recognizing that "where it is contended that plaintiff's injuries are too remote as a matter of law, the trial court may be required to decide whether the tortfeasor was legally exempt from foreseeing plaintiff's injuries in the first place"); People's Center, Inc. v. Anderson, 233 S.E.2d 694, 696 (N.C. Ct. App. 1977) ("It is an elementary principle that all damages must flow directly and naturally from the wrong, and that they must be certain both in their nature and in respect to the cause from which they proceed." (quoting Johnson v. Railroad, 113 S.E. 606, 608 (N.C. 1922))). In other words, "no recovery is allowed when resort to speculation or conjecture is necessary to determine whether the damage resulted from the unlawful act of which complaint is made or from some other source." Anderson, 233 S.E.2d at 696 (citation omitted).

Similarly, as to the § 1983 claim against the Greensboro Defendants, the court has already addressed the scope of damages available. (Doc. 251 at 29-37.) As the court noted there,

25

§ 1983 creates tort liability "in favor of persons who are deprived of rights, privileges, or immunities secured to them by the Constitution." Memphis Community School District v. Stachura, 477 U.S. 299, 305-06 (1986) (quoting Carey v. Piphus, 435 U.S. 247, 253 (1978)). Section 1983 damages are intended to compensate an individual for the injuries suffered as a result of a constitutional violation. Id. at 306. "Where no injury [is] present, no 'compensatory' damages [can] be awarded." Id. at 308.

"The goal of the Court's § 1983 jurisprudence has been to tailor liability to fit the interests protected by the particular constitutional right in question." Townes v. City of New York, 176 F.3d 138, 148 (2d Cir. 1999) (citing Carey, 435 U.S. at 258-59). There is a "gross disconnect" between a claimed constitutional violation involving an unreasonable search and seizure and alleged damages related to post-indictment proceedings. Id. Indeed, "[t]he evil of an unreasonable search or seizure is that it invades privacy, not that it uncovers crime, which is no evil at all." Id. Where there are intervening and superseding events, such as a prosecutor's decision to charge or inculpatory acts that support a finding of probable cause, they break any alleged causal chain of proximate cause. (Doc. 251 at 30, 35-37.) Further, as this court has already held, "it is clear that the exclusionary rule

26

and the fruit of the poisonous tree doctrine simply do not apply in civil cases." (Doc. 82 at 21-22.) Thus, as a victim of an unreasonable search or seizure, White "may recover damages . . . for physical injury, property damage, injury to reputation, etc." but he "cannot be compensated for injuries that result from the discovery of incriminating evidence and consequent criminal prosecution." Townes, 176 F.3d at 148.

Here, there is no evidence in the record that the alleged trespasses proximately caused the compensatory damages related to White's criminal charges. Rather, the court has held that the alleged trespass by Stalls, who is White's brother-in-law as well as step-brother, occurred in his personal capacity, disconnected from any criminal investigation. While the trespasses by Reidsville and the Greensboro Defendants occurred in relation to the investigation into White, the costs related to White's criminal defense and the termination from his job do not flow "directly and naturally from the wrong" of trespass. See id. Instead, the alleged damages at issue were the result of "[a]n efficient intervening cause," the criminal investigation itself, including the decisions to fire White and charge him with criminal conduct, "which entirely supersedes" each Defendant's trespass and "renders its effect in the chain of causation remote." See Adams, 322 S.E.2d at 173. Even if the Defendants could have reasonably foreseen the ultimate

27

consequences of trespassing in relation to a potential criminal matter, "the rest of the evidence generally shows that the investigation into White was proceeding upon an independent basis separate from any [trespassory] actions Stalls [and the other Defendants] may have taken." (Cf. Doc. 161 at 52.) The court will therefore grant Defendants' motions to exclude evidence as to previously dismissed claims, and all counsel and witnesses are precluded from referring to these alleged damages.

### 2. Punitive damages

Defendants also move to preclude White from introducing evidence or arguments relating to an award of punitive damages. (See Doc. 193 at 12-16; Doc. 204 ¶ 8 (motion to exclude evidence of Judge Biggs's written opinion in White's criminal matter); Doc. 256 at 12-15.) In response, White argues that the jury could find that the Defendants "acted willfully and wantonly when they intentionally trespassed on Plaintiff's property." (Doc. 220 at 9-11; Doc. 219 at 8-9; Doc. 221 at 8-9.)

To recover punitive damages under North Carolina law, the claimant bears the burden of showing by clear and convincing evidence that the defendant is liable for compensatory damages and that "one of the following aggravating factors was present and was related to the injury for which compensatory damages were awarded: (1) Fraud. (2) Malice. (3) Willful or wanton conduct." N.C. Gen. Stat. § 1D-15(a). Willful or wanton

28

conduct "means more than gross negligence" and entails "the conscious and intentional disregard of and indifference to the rights and safety of others, which the defendant knows or should know is reasonably likely to result in injury, damage, or other harm." N.C. Gen. Stat. § 1D-5(7). The North Carolina Court of Appeals has further defined conduct as "willful" where there exists a "deliberate purpose not to discharge a duty . . . necessary for the safety of the person or property of another" and conduct as "wanton" when "done needlessly, manifesting a reckless indifference to the rights of others." Cockerham-Ellerbee v. Town of Jonesville, 660 S.E.2d 178, 180 (N.C. Ct. App. 2008) (citations omitted).

As to the federal claim, punitive damages may be awarded in a § 1983 action against an official in his individual capacity. However, there must be sufficient evidence that the defendant's conduct was "motivated by evil motive or intent, or . . . involve[d] reckless or callous indifference to the federally protected rights of others." Smith v. Wade, 461 U.S. 30, 56 (1983); Cooper v. Dyke, 814 F.2d 941, 948 (4th Cir. 1987). "The callous indifference required for punitive damages is essentially the same as the deliberate indifference required for a finding of liability on [a] § 1983 claim." Cooper, 814 F.2d at 948.

Whether White can establish that Defendants "acted

29

willfully and wantonly when they intentionally trespassed on Plaintiff's property" or, in the case of the federal claim - with reckless or callous disregard, is generally a question of fact for the jury. As discussed in this court's prior order, there is evidence that Stalls was aware he was not welcome in the Whites' home or garage to take care of their dogs but nevertheless entered. (See Doc. 161 at 45-46.) Moreover, even if he were permitted access, a jury could find that Stalls exceeded that scope by purposefully peering under a sheet covering a commercial mower to gain access to the serial number. Additionally, as to Reidsville, the court previously held that "there is at least a genuine dispute, on the facts of this case, as to whether a reasonable officer would believe it appropriate to knock on the door inside White's garage." (Id. at 105; see id. at 103-105.) Further, the court has previously denied the Greensboro Defendants' summary judgment motions on the basis of qualified immunity and public official immunity, as there is evidence that their conduct "violated White's clearly established Fourth Amendment right to privacy." (See Doc. 253 at 19, 23; Doc. 228 at 36-39.) Given this, the court will defer ruling on the motion in limine to exclude evidence of punitive damages as premature pending the presentation of evidence. It will be up to White to produce sufficient evidence to meet the standard for seeking punitive damages. Until then, the parties

shall not mention punitive damages to the jury in argument or otherwise.

In his response, White argues that Judge Biggs's judicial opinion (granting a motion to suppress in White's prior federal criminal case) is relevant to whether the jury should award punitive damages related to Hampshire's conduct during the criminal investigation. (Doc. 219 at 8-9.) White does not argue that this opinion is evidence of malice or willful or wanton conduct in relation to <u>his</u> trespass claim against Reidsville. Moreover, a judicial opinion is generally inadmissible. <u>See, e.g.</u>, <u>Carter v. Burch</u>, 34 F.3d 257, 265 (4th Cir. 1994) (affirming the exclusion of a judicial opinion pursuant to Federal Rule of Evidence 403 because it "decided the precise issue before the jury" and its probative value was substantially outweighed by its prejudicial effect, noting "[j]udicial findings of fact 'present a rare case where, by virtue of their having been made by a judge, they would likely be given undue weight by the jury.'" (quoting <u>Nipper v. Snipes</u>, 7 F.3d 415, 418 (4th Cir. 1993))); <u>Herrick v. Garvey</u>, 298 F.3d 1184, 1192 (10th Cir. 2002) (noting the admission of prior judgments or findings of fact under Federal Rule of Evidence 803(8) is questionable because "[j]uries are likely to give disproportionate weight to such findings of fact because of the imprimatur that has been stamped on them by the judicial

31

system"); <u>Mendenhall v. Cedarapids, Inc.</u>, 5 F.3d 1557, 1566–70 (Fed. Cir. 1993) (affirming exclusion of evidence of prior decision in subsequent related litigation pursuant to Rule 403). Therefore, Reidsville's motion to exclude evidence of Judge Biggs's written judicial decision on White's criminal charges will be granted.

### C. Motion to Exclude Evidence of Text Messages

Stalls challenges the admissibility of evidence of "emails and text messages allegedly exchanged between Brittany Stalls and Christina White or their mother Mrs. Ross." (Doc. 193 at 21-22.) Stalls argues that the "messages are hearsay and that some lack authentication." (<u>Id.</u>) He also argues that the messages are not relevant to the trespass claim, or whether Stalls had authorization to enter White's home, and would cause prejudice and confuse the jury as they post-date the date of the alleged trespass. (<u>Id.</u>) In a short response, White contends the messages demonstrate malice and "a lack of permission for Defendant Stalls" to be on his property. (Doc. 220 at 11.) He also argues that the messages "can be authenticated" and may be used for purposes such as impeachment. (<u>Id.</u>)

The text and email messages are hearsay that fail to meet a readily apparent exception. "Out-of-court statements constitute hearsay only when offered in evidence to prove the truth of the matter asserted. A statement that would otherwise be hearsay

may nevertheless be admissible if it is offered to prove something other than its truth, and this includes statements used to charge a party with knowledge of certain information." In re C.R. Bard, Inc., MDL. No. 2187, Pelvic Repair System Products Liability Litigation, 810 F.3d 913, 925-26 (4th Cir. 2016) (citation omitted). White does not dispute that the messages are hearsay or explain how the messages "show malice." While such evidence could be admissible for proof of a declarant's state of mind under Federal Rule of Evidence 803(3), Stalls correctly points out that the messages on their face post-date the alleged trespass on September 3, 2016, and are thus are not evidence of state of mind at the time of the trespass. See Fed. R. Evid. 803(3) (granting a hearsay exception for "then-existing state of mind . . . but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will"); United States v. Lentz, 282 F. Supp. 2d 399, 411 (E.D. Va. 2002), aff'd, 58 F. App'x 961 (4th Cir. 2003) ("The statement should not look backward or describe a declarant's past memory or belief about another's conduct." (citing United States v. Carmichael, 232 F.3d 510, 521 (6th Cir. 2000))).

    As a result, it is not entirely clear how White intends to use this evidence for impeachment. Thus, the court will reserve

ruling on the question whether White may be permitted to use the messages for that purpose. See Fed. R. Evid. 613(b). "For a statement to qualify as a witness'[s] prior inconsistent statement under Rule 613(b), the statement must be one that the witness has made or adopted, or to which the witness otherwise has subscribed." Carnell Construction Corp. v. Danville Redevelopment & Housing Authority, 745 F.3d 703, 718-19 (4th Cir. 2014). Whether the evidence is admissible at trial will also depend on if it satisfies Rule 403. See id. at 719-21.

For these reasons, the motion to exclude evidence of text messages between Brittany Stalls and Christina White or their mother, Mrs. Ross, will be granted to the extent they were offered as direct evidence, and the court reserves as to whether they may be admitted for impeachment purposes.

D.    **Motion to Exclude Testimony of Anita Holder**

Defendant Reidsville moves to exclude expert testimony of Anita Holder.[6]   (Doc. 203 at 2.)  Reidsville argues her testimony should be excluded for the reasons stated in Defendants' joint motion to exclude her testimony (Doc. 166).   (Doc. 204 ¶ 12.) The court previously ruled on Defendants' motion to exclude expert testimony or evidence from Holder.   (Doc. 161 at 25-36;

---

[6] Defendant Stalls also moved to exclude expert testimony from Anita Holder (Doc. 192 at 2), but the parties have agreed that motion should be granted (Doc. 252 at 3).

Doc. 228 at 12-20 (finding that "Holder's expert testimony would not assist the trier of fact to determine a fact in issue relevant to the claim against Reidsville as to Hampshire's knock and talk").) Thus, for the reasons discussed at length already, Reidsville's motion to exclude Holder's expert testimony is granted in part and denied to the limited extent noted previously; namely, whether she would be permitted to testify will depend on whether Raines, Barham, and/or Williamson contends they did not know they could not enter White's home without a warrant, consent, or exigency. (See Doc. 228 at 20.) If any of them makes that contention, then the court will consider permitting her to testify as to an officer's expectation, based on training, in that regard.

### E. Undisputed Matters

On July 5, 2022, the parties filed a joint notice of status of the pending motions in limine. (Doc. 252.) Based on the filing, the parties have agreed not to mention or ask about the following:

1) Evidence of the court's denial of Stalls's motion for summary judgment on the trespass claim (Doc. 192 at 2);

2) Evidence of the GCSO's internal investigation into Stalls (id.);

3) Evidence of expert testimony by Anita Holder as to

35

Stalls (id.);

4)   Evidence of an alleged extra-marital affair between Stalls and GCSO Deputy Buskirk (id.);

5)   Evidence of the sheriff's surety bond (id.);

6)   The existence of liability insurance (Doc. 203 at 1);

7)   Reidsville's ability to pay any judgment rendered (id.);

8)   Other claims or lawsuits involving Reidsville and its employees (id.);

9)   Personnel matters involving RPD Sergeant Lynwood Hampshire (id.);

10)  Evidence related to any settlement offers (id.);

11)  Evidence of the court's ruling on Reidsville's motion for summary judgment (id. at 2.);

12)  Evidence that the city of Greensboro is paying defense costs for the Greensboro Officers and has a qualified duty to indemnify them for any judgment against them in this matter (Doc. 201);

Additionally, the court will deny as moot the motion to exclude evidence of malice towards White by Officer Schwochow (Doc. 199) who is no longer a Defendant in the case.

### III. CONCLUSION

For the reasons stated,

IT IS THEREFORE ORDERED that:

36

1. Stalls's motion for a separate trial (Doc. 182) and Reidsville's motion to sever (Doc. 185) are DENIED.

2. Stalls's motion in limine (Doc. 192) is GRANTED in part and DENIED in part as follows:

   a. The motion to exclude evidence of compensatory damages related to White's criminal defense costs, lost income and benefits, Christina White's lost income, child custody litigation expenses, miscellaneous personal property items, tuition expenses, and pain and suffering or emotional distress related to his arrest or termination of his employment is GRANTED.

   b. The motion to exclude evidence of punitive damages is DENIED as premature.

   c. The motion to exclude evidence of the criminal investigation as related to Stalls, Stalls's participation in an alleged conspiracy, and the outcome of White's criminal charges is GRANTED.

   d. The motion to exclude evidence of the court's denial of Stalls's motion for summary judgment on the trespass claim is GRANTED.

   e. The motion to exclude evidence of the GCSO's internal investigation into Stalls is GRANTED.

   f. The motion to exclude evidence of expert

37

testimony by Anita Holder as to Stalls is GRANTED.

g.  The motion to exclude evidence of an alleged extra-marital affair between Stalls and GCSO Deputy Buskirk is GRANTED.

h.  The motion to exclude evidence of the sheriff's surety bond is GRANTED.

i.  The motion to exclude evidence of emails and text messages allegedly exchanged between Brittany Stalls and Christina White or their mother, Mrs. Ross, is GRANTED in part and DENIED in part as noted above.

3.  The motion to exclude evidence of malice toward White by Officer Schwochow (Doc. 199) is DENIED as moot.

4.  The motion to exclude evidence that the city of Greensboro is paying defense costs for the Greensboro Defendants and has a qualified duty to indemnify them for any judgment against them in this matter (Doc. 201) is GRANTED.

5.  Reidsville's motion in limine (Doc. 203) is GRANTED in part and DENIED in part as follows:

a.  The motion to exclude the existence of liability insurance is GRANTED.

b.  The motion to exclude evidence of Reidsville's

38

ability to pay is GRANTED.

c.  The motion to exclude evidence of other claims or
lawsuits involving Reidsville and its employees
is GRANTED.

d.  The motion to exclude evidence of personnel
matters involving RPD Sergeant Lynwood Hampshire
is GRANTED.

e.  The motion to exclude evidence related to any
settlement offers is GRANTED.

f.  The motion to exclude evidence of previously
dismissed claims including the criminal
investigation against White, White's subsequent
arrest and the outcome of his criminal charges,
White's employment termination, White's alleged
conspiracy between the Defendants, emotional
distress related to his arrest or termination of
his employment, lost wages, backpay, or other
damages associated with his employment
termination from the City of Greensboro, and
damages related to the criminal charges brought
against White is GRANTED.

g.  The motion to exclude evidence of Hampshire's
criminal investigation into White is GRANTED;
provided that the jury may be informed of the

39

fact that Hampshire was present for the "knock and talk" for a lawful purpose related to an ongoing investigation.

h. The motion to exclude evidence of Judge Biggs's written judicial opinion on White's motion to suppress related to his federal criminal charges is GRANTED.

i. The motion to exclude evidence of damages arising from White's arrest and criminal charges is GRANTED.

j. The motion to exclude evidence of damages related to the termination of White's employment is GRANTED.

k. The motion to exclude evidence of the court's ruling on Reidsville's motion for summary judgment is GRANTED.

l. The motion to exclude expert testimony of Anita Holder GRANTED in part and DENIED in part as noted herein.

6. The Greensboro Defendants' motion to exclude evidence of compensatory and punitive damages (Doc. 255) is GRANTED in part and DENIED in part, as noted above; provided that the jury may be informed of the fact that the Greensboro Defendants were present during the

40

lawful search of White's home by other agencies related to an ongoing investigation.

IT IS FURTHER ORDERED that counsel shall instruct all witnesses of these rulings, and neither counsel nor witnesses shall mention these subjects to the jury without prior court approval.

August 5, 2022

/s/   Thomas D. Schroeder
United States District Judge

Case 1:18-cv-00969-TDS-LPA   Document 258   Filed 08/05/22   Page 41 of 41